James A. Hunter
    S.D.N.Y. Bar No. JH–1910
LAW OFFICE OF JAMES A. HUNTER
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, Pennsylvania  19428
Phone: +1 (484) 214-4697
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1,
    Inc., f/k/a Bed Bath & Beyond Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC., | ECF CASE |
| Plaintiff, | |
| – v. – | No. 24-cv-3370 (JHR) (SN) |
| HBC INVESTMENTS LLC and HUDSON BAY CAPITAL MANAGEMENT LP, | COMPLAINT FOR RECOVERY OF "SHORT-SWING" PROFIT UNDER 15 U.S.C. § 78p(b) |
| Defendants. | JURY DEMAND |

Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.

("BBBY"), by its undersigned counsel, pleads for its Complaint as follows:

## INTRODUCTION

1.      This is an action to recover more than $300 million in profit

realized in violation of Section 16(b) of the Securities Exchange Act of 1934, as amended

(the "Act"), 15 U.S.C. § 78p(b).

2.      Section 16(b) was enacted "[f]or the purpose of preventing the

unfair use of information which may have been obtained by [an insider] by reason of his

relationship to the issuer."  15 U.S.C. § 78p(b).

3.      The statute applies to every director or officer of an issuer with a class of equity securities registered under Section 12 of the Act.  *Id.* § 78p(a).  It also applies to every "beneficial owner" of more than 10% of any such class.  *Id.*

4.      Under Section 16(b), these statutory insiders must return to the issuer any profit realized on any purchase and sale, or sale and purchase, of the issuer's equity securities within any period of less than six months.  *Id.* § 78p(b).  If an insider fails to return this "short-swing" profit, the issuer may bring suit to recover it.  *Id.*

5.      Liability under Section 16(b) is strict.  The issuer has the right to recover the profit from a short-swing transaction "irrespective of any intention on the part of [the insider] . . . in entering into such transaction."  *Id.*  Recovery never depends on proof of scienter, a breach of duty, or the actual misuse of inside information.  *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

6.      Plaintiff BBBY, the issuer formerly known as Bed Bath & Beyond Inc., brings this action under Section 16(b) against two of its former investors: HBC Investments LLC ("HBCI") and Hudson Bay Capital Management LP ("Hudson Bay Capital" and, collectively with HBCI, the "Hudson Bay Defendants").

7.      While beneficially owning more than 10% of BBBY's common stock, the Hudson Bay Defendants made hundreds of millions of dollars of profit from ████████████████████ transactions in BBBY's equity securities, ████████ ████████████████

8.      The common stock beneficially owned by the Hudson Bay Defendants underlay derivative securities acquired from BBBY in a complex financing launched on February 7, 2023.

9.      These underlying BBBY shares far exceeded 10% of BBBY's outstanding common stock, but the terms of the derivative securities purported to cap the Hudson Bay Defendants' beneficial ownership by limiting their right to acquire the underlying shares through conversion or exercise.

10.     Nominally, the Hudson Bay Defendants were barred from converting or exercising the derivative securities to the extent the resulting acquisition of BBBY shares would make the Hudson Bay Defendants beneficial owners of more than 9.99% of BBBY's outstanding common stock — a cap set just below the 10% threshold for Section 16(b) liability.

11.     This beneficial ownership "blocker" was illusory.  It was drafted by the Hudson Bay Defendants and solely for their benefit.  BBBY had no way to enforce the blockers in the derivative securities, and it had an incentive not to enforce them. Policing the blockers meant self-policing by the Hudson Bay Defendants, who routinely undercounted their beneficial ownership of BBBY's common stock in contravention of SEC rules.

12.     The blockers' deficiencies were laid bare in the first days of the financing, when the Hudson Bay Defendants, relying on flawed and self-serving beneficial ownership calculations, repeatedly tore through the 9.99% cap.

13.     At the close of trading on February 7, 8, and 9, the Hudson Bay Defendants beneficially owned ██████████████████████████████

████████, far in excess of the limit purportedly set by the blockers. The Hudson Bay Defendants served more than a dozen conversion and exercise requests over these three days, repeatedly misrepresenting to BBBY their beneficial ownership of its common stock.

14. The 9.99% beneficial ownership limitation applied only to conversions and exercises of the derivative securities. Nothing stopped the Hudson Bay Defendants from selling or otherwise disposing of the stock underlying the derivative securities in any amount and at any time.

15. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

16. The flaws in the blockers left the Hudson Bay Defendants with an effectively unlimited right to acquire beneficial ownership of the shares underlying the derivative securities and an unchecked power to dispose of the shares underlying the derivative securities.

17. These unconstrained rights and powers over the shares underlying the derivative securities made the Hudson Bay Defendants "beneficial owner[s]" of those shares for purposes of Section 16(b) of the Act. *See* 17 C.F.R. §§ 240.13d-3(a), (d)(1)(i), 240.16a-1(a)(1).

18. These underlying shares, when added to ████████████ ████████████████████████, amounted to more than 10% of BBBY's

common stock — often far more than 10% — at all times between February 7 and April 18, 2023.

19.     While beneficially owning more than 10% of BBBY's outstanding common stock, the Hudson Bay Defendants ███████████████████████ ███████████████████████████████████████████████ ████████████████████████ .

20.     At the deal's launch on February 7, 2023, the derivative securities acquired by the Hudson Bay Defendants gave them approximately 80% of BBBY's total equity on a fully diluted basis, demoting BBBY's large investor base to minority partners in the firm.

21.     Within a matter of weeks, the Hudson Bay Defendants would convert and exercise these derivative securities to buy from BBBY, ████████████ ████████ , 444 million new BBBY shares — more than 3.7 times the total number of shares BBBY had outstanding at the start of the financing.

22.     ██████████████████████████████ ████████████████████████████████ █████████████████████████████ ██████████████████████████████████ ██████████

23.     ███████████████████████████ ████████████████████████████████████ ████████████████████████████████

24.     The collapse of the stock had much less impact on the Hudson Bay Defendants than on retail investors because the Hudson Bay Defendants' derivative securities generally gave them the right to acquire stock from BBBY at a discount to market. ████████████████████████████████████████

████████████████████████████████

25.     When all was said and done in April 2023, BBBY was bankrupt, while the Hudson Bay Defendants had reaped a short-swing profit of over $300 million.

26.     Under Section 16(b), that profit is the lawful property of BBBY, which the Hudson Bay Defendants are strictly liable to account for and repay.

**THE PARTIES**

27.     Plaintiff BBBY is a corporation formed under the law of the State of New York, with a principal place of business formerly located in Union, New Jersey. BBBY was known as "Bed Bath & Beyond Inc." at all relevant times until September 21, 2023, when it changed its name to "20230930-DK-Butterfly-1, Inc." as part of its wind-down following Chapter 11 bankruptcy.

28.     Defendant HBCI is a limited liability company formed under the law of the State of Delaware with a principal place of business located in Greenwich, Connecticut.  At all relevant times, HBCI operated as a private investment fund for the benefit of its members and shared voting and investment control over its portfolio securities with its investment adviser and managing member, Defendant Hudson Bay Capital.

29.     Defendant Hudson Bay Capital is a limited partnership formed under the law of the State of Delaware with a principal place of business located in Greenwich, Connecticut.  Hudson Bay Capital controlled and sponsored Defendant HBCI

and served at all relevant times as HBCI's investment adviser and managing member. Upon information and belief, and as is customary in the alternative asset management industry, Hudson Bay Capital owned equity interests in HBCI and received fees based on the performance of HBCI's portfolio. Through these interests and fees, Hudson Bay Capital enjoyed the opportunity to profit indirectly from HBCI's investments.

## THE FACTS

### I.     BACKGROUND

30.     BBBY was founded in 1971 by two entrepreneurs in the suburbs of New York City. In the 50 years leading up to its bankruptcy on April 23, 2023, BBBY operated as a regionally- and then nationally-known retailer of home goods under the names "Bed 'n Bath" and later "Bed Bath & Beyond."

31.     At all relevant times until September 29, 2023, BBBY's common stock was registered under Section 12(b) of the Act, 15 U.S.C. § 78*l*(b). The common stock was listed for trading on the Nasdaq Global Select Market at all relevant times until the exchange delisted it on May 3, 2023.

32.     After hitting an all-time high of $80 per share in 2014, BBBY's stock price steadily eroded as the company failed to adapt to changing retail trends. In 2019, BBBY reported its first loss and sales decline in nearly three decades as a public company.

33.     The deterioration of the business accelerated in the new decade with pandemic-related store closures, supply disruptions, and management missteps.

34.     By the end of 2022, BBBY was in desperate need of cash.

35.     While weighing its options for survival, BBBY was approached in early 2023 by representatives of the Hudson Bay Defendants. Although the Hudson Bay

Defendants had no prior investment in BBBY, they proposed to BBBY an extraordinary financing that would soon hand them rights over the vast majority of BBBY's fully diluted common stock.

## II.     THE HUDSON BAY FINANCING

### A.     The Financing Terms

36.     The financing arrangement with the Hudson Bay Defendants, signed on February 7, 2023, envisioned a complex transaction involving the issuance of three new classes of derivative securities:

(a)     convertible preferred stock,

(b)     preferred stock warrants, and

(c)     common stock warrants.

37.     BBBY issued these new securities in a registered offering underwritten by B. Riley Securities, Inc. and "anchored" by the Hudson Bay Defendants. The Hudson Bay Defendants purchased the vast majority of the offered securities, led the negotiation of the deal, and drafted the main deal documents, tailoring many of the key legal terms — including the 9.99% blockers at the heart of this case — to suit their needs.

38.     The following paragraphs summarize the most significant terms of the securities the Hudson Bay Defendants acquired from BBBY.

### 1.     The Series A Preferred

39.     On February 7, 2023, the Hudson Bay Defendants purchased 21,317 shares of BBBY's newly issued Series A Convertible Preferred Stock (the "Series A Preferred").  The shares of Series A Preferred acquired by the Hudson Bay Defendants represented 90.00% of the 23,685 shares of Series A Preferred issued and sold by BBBY on February 7.

40.     A copy of the Certificate of Amendment of the Certificate of Incorporation that BBBY filed with the terms of the Series A Preferred is attached as Exhibit A to this Complaint.

41.     The Series A Preferred was convertible into BBBY's common stock at any time at the holder's option at a conversion price equal to the lesser of (a) a fixed price initially set at $6.15 per share; and (b) a floating price equal to the greater of (i) 92% of the lowest volume-weighted average price ("VWAP") over the last ten trading days ending on the date of conversion, and (ii) $0.7160 per share.

42.     The fixed conversion price of $6.15 per share proved wishful thinking, for BBBY's share price never cleared $4.00 after February 6, 2023. The Hudson Bay Defendants ended up making all of their conversions of the Series A Preferred at the market-discounted, floating exercise price, subject to the $0.7160 per share floor.

43.     The floating conversion term gave the Hudson Bay Defendants access to BBBY's common stock at a significant discount to market. Conversions were based on the lowest VWAP over the last ten trading days, and the Hudson Bay Defendants only had to pay 92% of that price, subject to the floor.

44.     A further discount was built into the price of the Series A Preferred itself. Each share of Series A Preferred had a face value of $10,000.00 but was issued with an original issue discount of $500.00.

45.     Thanks to that $500.00 discount, every $9,500.00 invested in the Series A Preferred gave the Hudson Bay Defendants $10,000.00 of purchase power when the Series A Preferred was converted into BBBY common stock.

## 2. The Preferred Warrants

46. In addition to the 23,685 shares of Series A Preferred sold on February 7, 2023, BBBY issued warrants to purchase up to 84,216 more shares of Series A Preferred (the "Preferred Warrants").

47. A copy of the Form of Preferred Warrant is attached as Exhibit B to this Complaint.

48. The Preferred Warrants were issued pro rata at no additional cost to any investor who purchased at least $75,000,000.00 of Series A Preferred in the offering.

49. This minimum purchase condition was written for the Hudson Bay Defendants. They were the only investors expected to buy more than $75 million of the Series A Preferred, and no one else subscribed for anywhere near that much.

50. The Hudson Bay Defendants' "pro rata" interest in the Preferred Warrants thus came to 100%, and the Hudson Bay Defendants ended up acquiring all 84,216 Preferred Warrants issued on February 7.

51. Each Preferred Warrant was exercisable for one year at any time at the holder's option to purchase an additional share of BBBY's Series A Preferred at the same discounted price of $9,500.00.

52. BBBY also had a conditional right to force the Hudson Bay Defendants to exercise the Preferred Warrants. This "forced exercise" right could be invoked no more than once every 20 trading days, and for no more than 10,527 Preferred Warrants at a time.

53. BBBY's right to force exercises of the Preferred Warrants was subject to numerous conditions. Among these were market conditions that denied BBBY

the right to force exercises of the Preferred Warrants unless the price and volume of its publicly traded common stock exceeded minimum thresholds.

54. These conditions ensured that the Hudson Bay Defendants would never be forced to buy additional Series A Preferred unless they had a strong and liquid market where they could sell the underlying common stock.

### 3. The Common Warrants

55. Investors in BBBY's Series A Preferred also received warrants to purchase shares of BBBY's common stock (the "Common Warrants").

56. A copy of the Form of Common Warrant is attached as Exhibit C to this Complaint.

57. The Common Warrants were "deal sweeteners" offered at no additional cost to buyers of the Series A Preferred based on the size of their subscriptions.

58. The Hudson Bay Defendants' subscription entitled them to acquire 89,399,419 of the 95,387,533 Common Warrants issued on February 7.

59. Each Common Warrant was exercisable for five years at any time at the holder's option to purchase one share of BBBY's common stock at an exercise price of $6.15.

60. An "alternate cashless exercise" term also allowed the holder, in lieu of making a cash payment of $6.15 per share, to relinquish 35% of the underlying shares to which the holder was entitled and receive the remaining 65% of the shares at no out-of-pocket cost.

61. Because BBBY's stock price never traded above $6.15 per share after February 6, the Common Warrants were always "out of the money," and the Hudson

Bay Defendants ended up making all of their exercises of the Common Warrants as alternate cashless exercises.

62.     Any investors who held Preferred Warrants — i.e., the Hudson Bay Defendants — were also entitled to receive additional Common Warrants upon any exercise of the Preferred Warrants.  Each exercise of Preferred Warrants increased the Hudson Bay Defendants' balance of Common Warrants by 50% of the number of shares of BBBY common stock into which the newly issued Series A Preferred were then convertible.

**4.      Summary of the Terms of the Derivative Securities**

63.     This Complaint sometimes refers to the Series A Preferred, the Preferred Warrants, and the Common Warrants collectively as the "Derivative Securities".

64.     Table 1 below summarizes the principal terms of the Derivative Securities.

Table 1.  Summary of the Principal Terms of the Derivative Securities.

| | Series A Preferred | Preferred Warrants | Common Warrants |
|---|---|---|---|
| **Initial Number Issued** | 23,685 | 84,216 | 95,387,533 |
| **Initial Number Acquired by the Hudson Bay Defendants** | 21,317 (90.00% of Issuance) | 84,216 (100.00% of Issuance) | 89,399,419 (93.72% of Issuance) |
| **Nominal Purchase Price** | $9,500.00 per $10,000.00 face value | $0.00 | $0.00 |
| **Convertible/Exercisable to Acquire…** | Common Stock | Series A Preferred and Common Warrants | Common Stock |
| **Conversion/Exercise Price for Underlying Security** | Holder choice of: (a) $6.15 per share, or (b) 92% of lowest 10-day VWAP, subject to floor price | $9,500.00 per share | Holder choice of: (a) $6.15 per share, or (b) surrender of 35% of issuable shares |
| **Term** | Perpetual unless converted or redeemed | 1 year | 5 years |

| | Series A Preferred | Preferred Warrants | Common Warrants |
|---|---|---|---|
| **Future Purchase Commitment?** | Yes, upon forced exercise of Preferred Warrants, subject to conditions | No | No |
| **Blockers Included (Discussed Below)?** | Yes | No | Yes |

## B.    The Economics of the Hudson Bay Financing

65.    While the terms of the financing were complex, the economics were simple.  BBBY initially raised gross proceeds of around $225 million from the sale of the Series A Preferred on February 7.  Provided that the market price and volume conditions could be satisfied for forced exercises of the Preferred Warrants, BBBY stood to raise up to $800 million more over the next eight months from additional sales of Series A Preferred to the Hudson Bay Defendants.

66.    In return for their initial investment in the Series A Preferred and their further purchase commitment under the Preferred Warrants, the Hudson Bay Defendants got the right to buy heavily discounted, freely tradable BBBY common stock ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

67.    To see what a bargain the Hudson Bay Defendants were getting, consider that the 21,317 shares of Series A Preferred they bought on February 7 were initially convertible into 89,842,796 shares of BBBY common stock.  Based on the closing price of $3.01 per share that day, those 89,842,796 underlying shares had a market value of $270,426,815.96 — a 33% premium to the $202,511,500.00 the Hudson Bay Defendants had invested just that morning.

68.    The 89,399,419 Common Warrants issued to the Hudson Bay Defendants lowered the effective purchase price even further.  The alternate cashless exercise term gave the Hudson Bay Defendants an immediate interest, at no additional

cost, in $0.65 \times 89,399,419 = 58,109,623$ shares of BBBY common stock. Those

58,109,623 shares had a market value of $174,909,965.23 at the close of February 7.

69.     So for their $202,511,500.00 initial investment on February 7,

2023, the Hudson Bay Defendants received rights to acquire, at no further cost, BBBY

common stock worth a total of $270,426,815.96 + $174,909,965.23 = $445,336,781.19.

70.     The Hudson Bay Defendants thus enjoyed an average cost of less

than $202,511,500.00 ÷ (89,842,796 + 58,109,623) = $1.37 per share for 147,952,419

underlying shares that had an initial market value of $3.01 per share.

**C.      The Hudson Bay Defendants' Trading Program**

71.     BBBY's financing arrangement with the Hudson Bay Defendants

lasted from February 7 to March 30, 2023.

72.     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

73.     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

traders in the United States are not required to make immediate delivery of the stock they

sell.

74.     At the time of the Hudson Bay financing, SEC rules generally

allowed open-market stock trades to settle on a T+2 cycle, meaning that the seller could

take up to two trading days to make delivery on her sale.

75.     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓

76. ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

77.     The Hudson Bay Defendants' conversions and exercises of the Derivative Securities also rapidly expanded BBBY's shares outstanding.

78. ███████████████████████████████████████████████

████████████████████████████████████████, all of which were acquired from BBBY's treasury through conversions of the Series A Preferred and cashless exercises of the Common Warrants.

79.     To put that number in perspective, BBBY had fewer than 117 million shares outstanding before the deal began.

80.     So in 50 years of business, BBBY issued a net of about 117 million shares, and then the Hudson Bay financing nearly doubled that number in two weeks.

81.     By June 14, 2023, ███████████████████████████████ ████████████████████████ shares outstanding had exploded to more than 782 million.

82.     Of the 665 million or so new shares issued between February and June 2023, ███████████████████████████████████████████████

83. ██████████████████████████████████████████████

████████████████████████████████████████████████

84.     A "meme stock" may be loosely defined as a publicly traded stock with high retail speculative interest driven by viral promotion on social media.  Trading in meme stocks often sees heavy volume, high volatility, and a wide disconnect between market price and fundamental value.

85.     The financial press and social media had dubbed BBBY a meme stock by 2022, ██████████████████████████████████████████████████ ██████████████████████████████████████.

86.     ██████████████████████████████████████████ ██████ by February 14 — only a week into the deal — they had already exercised all but 19 of the 89,399,419 Common Warrants in their original allotment.

87.     To replenish their inventory, the Hudson Bay Defendants made a voluntary exercise of Preferred Warrants on February 15, 2023.  They paid BBBY $23.75 million that day to acquire another 2,500 shares of Series A Preferred Stock and 7,282,261 more Common Warrants.

88.     The Hudson Bay Defendants would voluntarily exercise the Preferred Warrants two more times, once on February 23 and then again on March 7. BBBY raised a total of $58,757,500 from these two exercises of a total of 6,185 Preferred Warrants.

89.     Including an additional forced exercise of 5,527 Preferred Warrants on March 7, 2023, BBBY ended up raising a total of $135,014,000 from sales of new shares of Series A Preferred to the Hudson Bay Defendants after February 7.

D.     **The Preferred Warrant Amendments**

90.     ██████████████████████████████████████████ ██████████████████████████████████████████

91.    The floating conversion price of the Series A Preferred entitled the

Hudson Bay Defendants to make conversions into larger and larger quantities of common

stock as the stock price declined. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

92.    Figure 1 plots the closing price and daily volume of BBBY's

common stock between January 1, 2023 and its delisting on May 2, 2023.  Noted on the

chart are significant events in BBBY's final weeks.

Figure 1.  Price and Volume of BBBY Common Stock, January 1, 2023 – May 2, 2023.



93.    As Figure 1 shows, ████████████████████████

████████████████████████████.

94.    In just the week from February 6 to February 13, the stock lost

65% of its value, plummeting from $5.86 per share to $2.04 per share.

95.     By March 9, the stock was down to $1.23 per share.

96.     Trading below $1.25 per share jeopardized BBBY's right to force exercises of the Preferred Warrants.  The market conditions in the Preferred Warrants required BBBY to maintain a daily VWAP of at least $1.25 per share initially for each of the 20 trading days prior to exercise.

97.     To salvage the Preferred Warrants as a financing vehicle for its urgent cash needs, BBBY began negotiations to lower the minimum price threshold, and on March 13 the parties agreed to amend the Preferred Warrants.

98.     A copy of the March 13 amendment to the Preferred Warrants is attached as Exhibit D to this Complaint.

99.     Under the terms of the amendment, the Hudson Bay Defendants acquired the power, at any time and for any period of time, to unilaterally lower the minimum price and volume conditions to forced exercise of the Preferred Warrants. Ex. D at 1.

100.    The amendment also served as notice of the Hudson Bay Defendants' election to lower the minimum price threshold.  From the effective time of the amendment through 9:00 a.m. on April 3, 2023, the market price threshold was reduced from $1.25 per share to $1.00 per share.

**E.     The Exchange Agreement and Termination of the Financing**

101.    The decline in BBBY's stock price outpaced the amendment. Before BBBY was able to force another exercise of the Preferred Warrants, the stock crashed below a dollar.

102.    The stock spent all of March 20, 2023 below a buck, closing at $0.8125 per share that day.

103.    On March 30, 2023, after it became clear that BBBY would not likely be able to force any further exercises of the Preferred Warrants, BBBY and the Hudson Bay Defendants agreed to terminate the financing.

104.    The termination was effected through an Exchange Agreement dated March 30, 2023 between BBBY and HBCI, a copy of which is attached as Exhibit E to this Complaint.

105.    Pursuant to the Exchange Agreement, the Hudson Bay Defendants agreed to cancel the Preferred Warrants in exchange for (a) 10,000,000 new shares of BBBY common stock and (b) the right to acquire up to 5,000,000 additional shares of BBBY common stock at no cost upon BBBY's completion of a reverse stock split or an increase in its authorized shares.

106.    While the Exchange Agreement cancelled the Preferred Warrants, it had no effect on the Hudson Bay Defendants' other BBBY holdings.  The Hudson Bay Defendants still held 10,019 shares of Series A Preferred, which were convertible as of March 30 into more than 89 million shares of BBBY common stock.  ██████

████████████████████████████████████████

███████████████████████████████

██████████

107.    The Hudson Bay Defendants continued to convert ████████

███████████████████████.

108.    ████████████████████████████████

████████████████████████████████

████

### F.    BBBY's Bankruptcy

109.    BBBY tried to replace the Hudson Bay deal with new financing sources negotiated through B. Riley Securities, Inc.  The new financings included an "at-the-market" agreement pursuant to which B. Riley Securities, Inc. would try to sell up to $300 million shares of BBBY common stock from time to time through the open market.

110.    The ongoing slide in the stock price and the dimming prospects for BBBY's business made it impossible for BBBY to raise sufficient funds through the new financing arrangements with B. Riley Securities, Inc.

111.    On April 23, 2023, BBBY filed a Chapter 11 bankruptcy petition, and its business was liquidated.

## III.    THE HUDSON BAY DEFENDANTS' BENEFICIAL OWNERSHIP OF BBBY'S COMMON STOCK

112.    When the Hudson Bay financing was launched on February 7, 2023, a total of 711,648,336 shares of BBBY common stock underlay the Hudson Bay Defendants' Derivative Securities as set forth in Table 2 below.

Table 2.  Shares of BBBY Common Stock Underlying the Hudson Bay Defendants' Derivative Securities at the Close of the February 7 Offering.

| Derivative Security | Underlying Common Stock |
|---|---|
| Series A Preferred | 89,842,796 Shares |
| Preferred Warrants | 532,406,121 Shares |
| Common Warrants | 89,399,419 Shares |
| **Total:** | **711,648,336 Shares** |

113.    The figures in Table 2 are based on an initial conversion price for the Series A Preferred of $2.3727 per share and assume no cashless exercises of the Common Warrants.

114. Since BBBY only had about 116,837,942 shares of common stock outstanding on February 7, the 711,648,336 shares underlying the Derivative Securities that day represented approximately 85% of BBBY's outstanding common stock on an as-converted, as-exercised basis.

115. The equity stake held by the Hudson Bay Defendants through the Derivative Securities was so enormous that it exceeded 10% of BBBY's outstanding common stock for months after February 7.

116. The percentage remained above 10% even as BBBY's share count ballooned and the Hudson Bay Defendants ███████████████████████████.

117. Attached to this Complaint as Exhibit F are tables setting forth the number of BBBY shares underlying the Hudson Bay Defendants' Derivative Securities for each trading day between February 7 and BBBY's April 23 petition date.

118. As Exhibit F shows, the shares underlying the Derivative Securities, together with ████████████████████████████████████████████, exceeded 10% of BBBY's shares outstanding at all times from February 7 through April 17, 2023.

119. Not until the morning of April 18, 2023 would the Hudson Bay Defendants' ████████████████████████████ back under 10%.

120. If the Hudson Bay Defendants were deemed beneficial owners of all BBBY shares underlying the Derivative Securities, then the Hudson Bay Defendants would have been Section 16(b) insiders at all times from February 7 until April 18, 2023.

A. **The SEC's Beneficial Ownership Rules**

121. Under Rule 16a-1(a)(1), an issuer's 10% beneficial owners are generally determined for Section 16(b) purposes using the same beneficial ownership

rules applicable under Section 13(d) of the Act. Rule 16a-1(a)(1) reads in pertinent part

as follows:

> [F]or purposes of determining whether a person is a beneficial
> owner of more than ten percent of any class of equity securities
> registered pursuant to section 12 of the Act, the term "beneficial
> owner" shall mean any person who is deemed a beneficial owner
> pursuant to section 13(d) of the Act and the rules thereunder . . . .

17 C.F.R. § 240.16a-1(a)(1).

122.    Of the SEC's rules under Section 13(d) of the Act, two are directly

relevant to calculating the extent of the Hudson Bay Defendants' beneficial ownership of

BBBY's common stock.

123.    First, Rule 13d-3(a)(1) provides that a person beneficially owns a

security over which he has or shares, directly or indirectly, voting or investment power.

The rule reads:

> (a) For the purposes of sections 13(d) and 13(g) of the Act a
> beneficial owner of a security includes any person who, directly or
> indirectly, through any contract, arrangement, understanding,
> relationship, or otherwise has or shares:
>
>> (1) Voting power which includes the power to vote, or to
>> direct the voting of, such security; and/or,
>>
>> (2) Investment power which includes the power to
>> dispose, or to direct the disposition of, such security.

*Id.* § 240.13d-3(a).

124.    Second, Rule 13d-3(d)(1)(i) provides that, even if a person does

not presently have or share voting or investment power over a security, he will be deemed

to beneficially own the security if he has the right to acquire one or more of those powers

— through, for example, the exercise or conversion of a derivative security — within

60 days. The rule reads:

> A person shall be deemed to be the beneficial owner of a
> security . . . if that person has the right to acquire beneficial
> ownership of such security, as defined in Rule 13d–3(a) within
> sixty days, including but not limited to any right to acquire: (A)
> Through the exercise of any option, warrant or right; [or] (B)
> through the conversion of a security . . . .

*Id.* § 240.13d-3(d)(1)(i).

125.    Under Rule 13d-3(d)(1)(i), therefore, holders of immediately convertible or exercisable derivative securities would ordinarily be deemed to beneficially own the underlying shares for purposes of Section 13(d) of the Act, and therefore for purposes of the 10% beneficial ownership standard of Section 16(b).

126.    But the Hudson Bay Defendants' investment in BBBY was not their first brush with Section 16(b), *see Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14-cv-5226 (DLC), 2015 U.S. Dist. LEXIS 62236 (S.D.N.Y. May 12, 2015), and they had a plan for avoiding any disclosure and disgorgement obligations arising from their ownership of the Derivative Securities.

## B.    The Blockers

127.    In an attempt to suppress their beneficial ownership of BBBY's common stock, the Hudson Bay Defendants drafted exercise and conversion caps, or "blockers," into the terms of the Series A Preferred and Common Warrants.

128.    These blockers purported to limit the Hudson Bay Defendants' ability to convert the Series A Preferred or exercise the Common Warrants to the extent that conversion or exercise would make the Hudson Bay Defendants beneficial owners of more than 9.99% of BBBY's outstanding common stock.

129.    The blocker for the Series A Preferred is found in Section 4(d) of the Certificate of Amendment of the Certificate of Incorporation of BBBY filed with the

New York Secretary of State on February 6, 2023.  Section 4(d) reads in pertinent part as

follows:

> The Company shall not effect the conversion of any of the Preferred Shares held by a Holder, and such Holder shall not have the right to convert any of the Preferred Shares held by such Holder pursuant to the terms and conditions of this Certificate of Amendment and any such conversion shall be null and void and treated as if never made, to the extent that after giving effect to such conversion, such Holder together with the other Attribution Parties collectively would beneficially own in excess of 9.99% (the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such conversion. . . . For purposes of clarity, the shares of Common Stock issuable to a Holder pursuant to the terms of this Certificate of Amendment in excess of the Maximum Percentage shall not be deemed to be beneficially owned by such Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act.

Ex. A § 4(d).

130.    The blocker for the Common Warrants is found in Section 1(f) of

the form of warrant and reads in pertinent part as follows:

> The Company shall not effect the exercise of any portion of this Warrant, and the Holder shall not have the right to exercise any portion of this Warrant, pursuant to the terms and conditions of this Warrant and any such exercise shall be null and void and treated as if never made, to the extent that after giving effect to such exercise, the Holder together with the other Attribution Parties collectively would beneficially own in excess of 9.99% (the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such exercise. . . .  For purposes of clarity, the shares of Common Stock issuable pursuant to the terms of this Warrant in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act.

Ex. C § 1(f).

131.    Each of the blockers gave the Hudson Bay Defendants the

unilateral right to lift the 9.99% beneficial owner cap at any time by notice to BBBY.  No

such notice would be effective, however, until the 61st day after delivery — just outside the 60-day window within which an acquisition right would entail beneficial ownership under Rule 13d-3(d)(1)(i).

### C. Disclosure Avoidance

132. Relying on the legal engineering of the blockers, the Hudson Bay Defendants took the position that none of the Derivative Securities conferred on them beneficial ownership of more than 9.99% of BBBY's common stock.

133. Based on that position, the Hudson Bay Defendants never filed with the SEC any statements of beneficial ownership under Sections 13(d) or 13(g) of the Act, or any reports of beneficial ownership or changes in beneficial ownership under Section 16(a) of the Act, relating to their investment in BBBY.

134. The Hudson Bay Defendants' interest in avoiding public disclosure of their involvement in the financing was one of the motivating factors behind the inclusion of the blockers in the Derivative Securities.

135. Structuring the deal as an underwritten public offering rather than a private placement furthered the Hudson Bay Defendants' goal of disclosure avoidance.

136. The Hudson Bay Defendants were the whale in the offering. The Derivative Securities they purchased were convertible or exercisable to acquire more than 97.8% of all of the common stock underlying the Derivative Securities sold by BBBY on February 7. The remaining 2.2% of the underlying equity was divided among 28 other investors.

137. Even though the Hudson Bay Defendants had spearheaded the deal and purchased the lion's share of the offered securities, the financing documents did not

have to disclose the Hudson Bay Defendants' involvement if the offering was publicly registered and intermediated by an underwriter.

138.    Instead of identifying the Hudson Bay Defendants, the prospectus for the offering referred to them with cryptic sobriquets like "the holder that purchased at least 20,000 shares of Series A Convertible Preferred Stock."

139.    This opaque disclosure was required by the Hudson Bay Defendants.  On February 6, 2023, the eve of the financing, BBBY signed a side letter with the Hudson Bay Defendants (the "Side Letter") that limited BBBY's right to disclose the Hudson Bay Defendants' participation in the deal.

140.    A copy of the Side Letter is attached as Exhibit G to this Complaint.

141.    In Section 2(f)(ii) of the Side Letter (entitled "Limitations on Disclosure"), BBBY expressly covenanted that "[w]ithout the prior written consent of the Investor (which may be granted or withheld in the Investor's sole discretion), the Company shall not (and shall cause each of its Subsidiaries and affiliates to not) disclose the name of the Investor in any filing, announcement, release or otherwise."  Ex. G § 2(f)(ii).

142.    The Hudson Bay Defendants' participation in the deal would not be officially confirmed until March 14, when BBBY disclosed the amendment of the Preferred Warrants.

143.    Until that time, the Hudson Bay Defendants' involvement was publicly known thanks only to reporting by Bloomberg.  An article published by

Bloomberg on February 7 outed the Hudson Bay Defendants as the lead investor based on sources "with knowledge of the matter" who "asked not to be named."

144.     The Hudson Bay Defendants wanted to downplay their role in the financing to avoid the notoriety that followed previous hedge fund investments in meme stocks, like GameStop Corp.

145.     When a short squeeze sent GameStop's stock soaring in early 2021, triumphant retail investors took to social media to celebrate the losses dealt to hedge funds short the stock.

146.     The head of one of those hedge funds, Melvin Capital, was so aggressively hounded by GameStop investors that he reportedly hired extra security for his family. *See* Anders Melin & Hema Parmar, "Death Threats and Hate Force Hedge Funds to Step Up Security," Bloomberg (Feb. 5, 2021), *at* https://www.bloomberg.com/news/articles/2021-02-05/death-threats-and-hate-force-hedge-funds-to-step-up-security.

147.     Another hedge fund investor who was accused of shorting the stock, Steve Cohen of Point72 Asset Management, said his family faced personal threats from GameStop investors.

148.     A third hedge fund investor, Ken Griffin of Citadel Securities, was so irate at the media's portrayal of his role in the fiasco that he reportedly threatened Sony Pictures with legal action when the affair was dramatized in the movie "Dumb Money."

149.     The Hudson Bay Defendants wanted to avoid this kind of fallout in their own meme investment.  They knew ██████████████████████████████████

████████, and they knew BBBY's investors would point fingers at them just as GameStop investors had fingered the hedge funds that allegedly tried to sink its stock.

150.    The blockers thus served the dual purposes of liability avoidance and disclosure avoidance.  The Hudson Bay Defendants relied on the blockers not only to structure around Section 16(b)'s disgorgement obligations but also to structure around the disclosure obligations of Sections 13(d), 13(g), and 16(a) of the Act.

**D.    The Deficiencies of the Blockers**

151.    Structuring devices like the blockers in the Derivative Securities are not doomed to failure.

152.    On the contrary, binding blockers that effectively deny an investor the right to acquire beneficial ownership of equity securities have been respected as a means of avoiding Section 13 and 16 obligations.  *See, e.g.*, *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 13-17 (2d Cir. 2001).

153.    To be respected as a legitimate structuring method, however, the blockers must actually be binding and effective: "When the limitations provided by [the blockers] are discovered to be illusory or a sham, *they should be disregarded and the courts should analyze the case as though no such limitations existed.*"  *Id.* at 17 n.5 (quoting Br. of the SEC as Amicus Curiae at 25, *Southbrook Int'l*, 263 F.3d 10 (2d Cir. 2001) (No. 00-7630)) (BBBY's emphasis).

154.    The Hudson Bay Defendants' blockers failed this test.  For two reasons, the blockers never placed a genuinely binding and effective constraint on the Hudson Bay Defendants' beneficial ownership of BBBY common stock.

155.    First, the 9.99% cap on conversions and exercises of the Derivative Securities was an illusory contrivance that did not bind the Hudson Bay Defendants in

practice.  The enforcement of the cap depended always on BBBY, which had neither the means nor the inclination to police compliance, reducing the blockers to an honor system. The Hudson Bay Defendants repeatedly dishonored that system, calculating their beneficial ownership in violation of SEC rules and ███████████████████████ ████████████████████████.

156.     Second, the 9.99% cap applied only to conversions and exercises of the Derivative Securities.  It placed no limit, effective or otherwise, on the Hudson Bay Defendants' power to sell the underlying shares.  The Hudson Bay Defendants enjoyed significant dispositive power over those shares, ███████████████████.

1.     **The Blockers Placed No Effective Limit on Conversions and Exercises**

157.     In an amicus brief filed at the Second Circuit's invitation in *Southbrook*, the SEC identified the following factors as relevant to determining whether a blocker (or "conversion cap") is *illusory* or *binding*:

Factors that may indicate that a conversion cap is *illusory* include whether the cap:

- is easily waivable by the parties (particularly the holder of the convertible securities);

- lacks an enforcement mechanism;

- has not been adhered to in practice; or

- can be avoided by transferring the securities to an affiliate of the holder.

Factors that may indicate that a cap is *binding* include whether it:

- is provided in the certificate of designation or the issuer's governing instruments;

- reflects limitations established by another regulatory scheme applicable to the issuer; or

- is the product of bona fide negotiations between the parties.

   Limitations on the number of conversions that may take place over a period of time may add integrity to such provisions, although they are not essential.

Br. of the SEC as Amicus Curiae at 25, *Southbrook*, 263 F.3d 10 (No. 00-7630).

158. A copy of the SEC's amicus brief is attached as Exhibit H to this Complaint.

159. The blockers in the Hudson Bay Defendants' Derivative Securities satisfied almost none of the SEC's criteria for effectiveness, as the following paragraphs demonstrate.

### a.   The Blockers Did Not Reflect Any Independent Regulatory Scheme Applicable to BBBY

160. The blockers served no independent compliance function. BBBY was not a highly regulated business subject to investment controls, and no law, regulation, or exchange rule required BBBY to place any cap on investors' beneficial ownership of its securities.

161. The sole purpose of the blockers was to help the Hudson Bay Defendants sidestep the disclosure and disgorgement obligations of Sections 13 and 16 of the Act.

### b.   The Blockers in the Common Warrants Were Not Mandated by BBBY's Certificate of Incorporation

162. The blockers in the Common Warrants could be freely waived or amended. Unlike the terms of the Series A Preferred, which were enshrined in BBBY's certificate of incorporation, the terms of the Common Warrants were purely contractual.

163. Although Section 11 of the Common Warrants purported to deny the parties the power to amend the blockers, that language was no genuine impediment. The Common Warrants held by the Hudson Bay Defendants were a bilateral agreement between BBBY and HBCI with no third-party beneficiaries. The parties to such an agreement always have the power to amend it.

164. However firmly Section 11 might purport to limit the parties' ability to amend the blocker in Section 1(f), the parties always had the power to amend Section 11 to remove that limitation and then amend the blocker.

165. The clause in Section 1(f) that purported to limit waivers of the blockers was infirm for the same reason: the parties could always amend Section 11 to remove the limitation on blocker amendments, then amend the blockers to remove the limitation on waivers, and then waive the blockers.

166. The vulnerability of the Common Warrant blockers to amendment and waiver matters because of the number of Common Warrants underlying the Preferred Warrants. The common stock underlying just the Common Warrants issuable upon exercise of the Preferred Warrants exceeded 10% of BBBY's outstanding shares at all times from February 7 until March 30, 2023. *See* Ex. F tbls. 1-2.

167. The shares supposedly blocked by Section 1(f) of the Common Warrants could be unblocked at any time simply by amending or waiving that section.

### c. The Blockers Were Not the Product of Bona Fide Negotiations and Could Be Easily Amended

168. Getting BBBY's consent to amend the blockers in the Common Warrants posed no genuine obstacle. The blockers were drafted by and for the benefit of the Hudson Bay Defendants. Beyond keeping the Hudson Bay Defendants happy, the

blockers served no purpose for BBBY, which did not care whether they were enforced, modified, or terminated.

169.    This is not the common case where the issuer's management is scrutinizing every stock accumulation to stymie activists and preempt a change in control.

170.    BBBY had already shopped itself in late 2022 with no success, and by February 2023 it was issuing hundreds of millions of shares to whoever would buy them in a desperate bid to keep the company afloat.

171.    If someone wanted to acquire more than 9.99% of BBBY's common stock, management would have been thrilled.

172.    In fact, BBBY would have much preferred a white knight prepared to buy and hold a controlling stake in the company ██████████████████ ████████████████████████████████████████.

173.    But BBBY's paramount concern in early 2023 was saving its business, which meant raising cash and raising it fast, in any way possible.

174.    BBBY would have gladly amended the Common Warrants if that's what it took to keep the Hudson Bay Defendants buying BBBY stock.

175.    That's exactly what BBBY did with the Preferred Warrants.  When BBBY's stock price fell below the minimum price for forced exercises, BBBY rushed to amend the Preferred Warrants so it could sell the Hudson Bay Defendants more stock.

176.    Had the Hudson Bay Defendants asked BBBY to remove the blockers in the Common Warrants to let them buy more stock, BBBY would have amended the Common Warrants just as quickly.

177.     The blockers were only there to keep the Hudson Bay Defendants happy; if the Hudson Bay Defendants decided they'd be happier without them, the blockers in the Common Warrants would be gone.

        **d.**      **BBBY Had No Way to Enforce the Blockers and No Effective Remedy for Breach**

178.     Even if BBBY had the will to enforce the blockers, it lacked the means.

179.     The Certificate of Incorporation gave BBBY no way to sanction, and thus no way to deter, a conversion of the Series A Preferred in excess of the 9.99% cap.

180.     As for the Common Warrants, a breach of the blockers gave rise at most to a contract claim.  That was an ineffective sanction because BBBY would have no damages.  Only the Hudson Bay Defendants benefitted from the blockers, so it was no loss to BBBY if the blockers were disregarded.

181.     BBBY also had no way to monitor ██████████████ ████████████████████████████████ or know the true extent of the Hudson Bay Defendants' beneficial ownership.

182.     The Hudson Bay Defendants had no duty to quantify their beneficial ownership when they delivered a conversion or exercise request to BBBY. BBBY never received any "end of the trading day" tally ███████████████ ████████████████████████████████████████████████.

183.     The Side Letter expressly barred BBBY from making any inquiry into the legitimacy of the Hudson Bay Defendants' conversion and exercise requests. Section 2(n) of the Side Letter recited that the forms of conversion and exercise notices

"set forth the totality of the procedures required of the Investor in order to exercise the Preferred Warrants or the Common Warrants or convert the Preferred Shares." Ex. G § 2(n). The language went on to forbid BBBY from requesting any "other information" from the Hudson Bay Defendants. *Id.*

184. The Side Letter also obligated BBBY to instruct its transfer agent to issue BBBY common shares to the Hudson Bay Defendants "in such amounts as specified from time to time by the Investor." *Id.* § 3(b). BBBY was forbidden to instruct its transfer agent to issue the shares in any other amount. *Id.*

185. Compliance with the blockers had to be taken on faith, and the conversion and exercise requests taken at face value.

186. Each conversion or exercise request included a perfunctory representation that the acquisition effected thereby would not make the Hudson Bay Defendants beneficial owners of more than 9.99% of BBBY's common stock. For example:

> [T]his Conversion Notice shall constitute a representation by the Holder of the Preferred Shares submitting this Conversion Notice that after giving effect to the conversion provided for in this Conversion Notice, such Holder (together with its affiliates) will not have beneficial ownership (together with the beneficial ownership of such Person's affiliates) of a number of shares of Common Stock which exceeds the Maximum Percentage."

Ex. I at 1; *see also* Ex. J at 1 (similar language for exercises of the Common Warrants).

187. That representation was unreliable on its face. By its terms, the representation only added the holder's beneficial ownership "together with the beneficial ownership of such Person's affiliates." *Id.*

188. This Court has already rejected substantially similar language in another blocker previously employed by affiliates of the Hudson Bay Defendants to avoid

liability under Section 16(b). *See Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14-cv-5226 (DLC), 2015 U.S. Dist. LEXIS 62236, at *6 (S.D.N.Y. May 12, 2025) ("[T]his Note shall not be exercisable by the Holder hereof to the extent (but only to the extent) that giving effect to such conversion or other share issuance hereunder *the Holder (together with its affiliates)* would beneficially own in excess of 9.99% . . . of the Common Stock." (BBBY's emphasis)).

189.    The Court found this language insufficient because it undercounted beneficially owned shares. *See id.* at *18-*20. The count was underinclusive because the language omitted stock beneficially owned by nonaffiliates of the investor who were acting together with the investor as part of a stockholder group. *See id.* SEC rules would require these group shares (not just affiliate shares) to be included in any calculation for an accurate measure of the investor's beneficial ownership. *See* 17 C.F.R. § 240.13d-5(b)(1)(i).

190.    BBBY had no way of knowing over the course of the financing whether the Hudson Bay Defendants were coordinating with other BBBY investors as part of a stockholder group. This uncertainty made the representations in the conversion and exercise requests unreliable because BBBY could not know whether an accurate count of the Hudson Bay Defendants' beneficial ownership "together with [their] affiliates" excluded group shares that would have lifted the Hudson Bay Defendants over the 10% threshold.

191.    Misrepresentation of the count is more than a hypothetical possibility. BBBY's investigation following its bankruptcy has confirmed that the

Hudson Bay Defendants were miscalculating their beneficial ownership over the entire course of their dealings with BBBY.

192.     Voluminous trading records produced to BBBY under Bankruptcy Rule 2004 show  .

193.

194.     Rule 13d-3(d)(1)(i) explains how the numerator and denominator of the percentage beneficial ownership calculation are to be adjusted to account for shares underlying derivative securities.

195.     As previously explained, the rule requires an investor to include in the numerator any securities the investor has "the right to acquire . . . within sixty days," as through conversion or exercise of a derivative security.  17 C.F.R. § 240.13d-3(d)(1)(i).

196.     The rule also requires the investor to include those same acquirable shares in the denominator.  *See id.* ("Any securities not outstanding which are subject to such options, warrants, rights or conversion privileges shall be deemed to be outstanding for the purpose of computing the percentage of outstanding securities of the class owned by such person . . . .").

197.     In computing their percentage beneficial ownership of BBBY's common stock, the Hudson Bay Defendants habitually failed to make these consistent

adjustments to the numerator and denominator ████████████████████████████
████████████████.

198.     The very first transaction the Hudson Bay Defendants made on February 7, at 9:08 a.m., was the submission to BBBY of a request to exercise 5,000,000 Common Warrants.

199.     Because the request elected an "alternate cashless exercise," the submission of the request gave the Hudson Bay Defendants the "right to acquire" 0.65 × 5,000,000 = 3,250,000 shares of BBBY common stock within two trading days.

200.     ████████████████████████████
██████████████████████████
██████████████████████████████

201.     ██████████████████████████████
███████████████████████████
███████████████████████████████████
██████████████

202.     ██████████████████████████████
███████████████████████████████
█████████████████████████████

203.     This treatment violated Rule 13d-3(d)(1)(i).

204.     ██████████████████████████████
████████████████████████ BBBY would not issue those shares until February 8 at the earliest.

205.    BBBY's books and records show unambiguously that BBBY had the same number of shares — namely, 116,837,942 — outstanding at 4 p.m. on both February 6 and February 7, 2023.

206.    ███████████████████████████████████████████ ████████████████████████████████████ the shares were deemed outstanding as "subject to . . . warrants" giving the Hudson Bay Defendants the "right to acquire" the shares "within sixty days."  17 C.F.R. § 240.13d-3(d)(1)(i).

207.    But if the Hudson Bay Defendants still had the "right to acquire" those ████████ shares from BBBY (as they clearly did), then those shares also had to be included in the numerator of the calculation under the plain terms of the rule.

208.    Put simply, the Hudson Bay Defendants either *did* or *did not* have the right to acquire beneficial ownership of those ████████ shares from BBBY within 60 days on the morning of February 7, 2023.  If they *did* have the right to acquire beneficial ownership of those shares from BBBY within 60 days, then the shares should have been included in the numerator of the calculation.  If they *did not* have the right to acquire beneficial ownership of those shares from BBBY within 60 days, then there was no basis for including the shares in the denominator either, since the shares were not actually outstanding.

209.    ███████████████████████████████████████████ ███████████████████████████████████████████████, the Hudson Bay Defendants artificially suppressed their percentage beneficial ownership of BBBY's common stock.

210.     This incorrect accounting was repeated ████████████████████

████████████████████████████.  It served as the basis for the beneficial

ownership representation included in each one of the scores of conversion and exercise

requests submitted to BBBY by the Hudson Bay Defendants during that period.

211.     As a result of this flawed methodology, the beneficial ownership

representations in the Hudson Bay Defendants' conversion and exercise requests, which

served as the sole means of monitoring compliance with the blockers, were necessarily

and universally unreliable.

     **e.**     **The Blockers Placed No Limit on the Number or Frequency of Conversion Requests**

212.     ████████████████████████████████████████████

████████████████ would have hampered enforcement of the blockers even if

(contrary to fact) BBBY were sufficiently motivated and well informed to monitor

compliance.

213.     The Derivative Securities gave the Hudson Bay Defendants the

right to submit any number of conversion and exercise requests at any time.

214.     The Hudson Bay Defendants avidly exercised this right, burying

BBBY's representatives under a pile of stock demands.

215.     In the 52 trading days between February 7 and the April 23

bankruptcy petition date, the Hudson Bay Defendants submitted a total of 90 conversion

or exercise requests to BBBY.

216.     These numbers do not show the full picture, however, because the

Hudson Bay Defendants' requests were frontloaded, with a large quantity submitted in

the first few days of the deal.

217. The Hudson Bay Defendants' own records show that ▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆.

218. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆.

219. When the Hudson Bay Defendants' requests were added to those of the 28 minority investors, BBBY had to process a total of 47 conversion or exercise requests over just the first two days of the deal.

220. Under the circumstances of the financing, when BBBY's personnel were scrambling under white-knuckle stress and round-the-clock work to save the business from ruin amid harrying demands from creditors and vendors, this torrent of conversion and exercise requests was overwhelming.

221. The Hudson Bay Defendants compounded the chaos by exercising their right to revise and resubmit many of their conversion requests.

222. These revised conversion requests reflected lower conversion prices that had been triggered by stock declines following the delivery of the original requests. Because the number of issuable BBBY shares depended on the conversion price, these revised requests also had to update the number of BBBY shares requested.

223. But many of the Hudson Bay Defendants' revisions went beyond updates to the conversion price and number of issuable BBBY shares. Many of them also changed the number of shares of Series A Preferred submitted for conversion, and thus the total dollar value of the transaction.

224.     In two cases, these revisions were material, and it appears the Hudson Bay Defendants simply changed their minds about how much Series A Preferred they wanted to convert.

225.     BBBY's records show that the Hudson Bay Defendants revised and resubmitted 16 conversion requests in February 2023, 11 of which included revisions to the number of shares of Series A Preferred tendered for conversion.

226.     The Hudson Bay Defendants thus submitted a total of 106 original or revised conversion or exercise requests between February 7 and the April 23 Chapter 11 petition date.

227.     BBBY's personnel were faced with processing a breakneck train of conversion and exercise requests that included new demands for stock plus updates to prior demands already in process.

228.     This shambolic crush of paper, coupled with the Hudson Bay Defendants' funny math described above, all but guaranteed that mistakes would be made and that the 9.99% cap would be breached.

229.     And that is exactly what happened.

### f.     The Blockers Were Repeatedly Breached

230.     The Hudson Bay Defendants exceeded the 9.99% threshold on multiple occasions, contravening the blockers and breaching their beneficial ownership representations to BBBY.

231.     Consider the nine conversion and exercise requests the Hudson Bay Defendants submitted to BBBY on February 7, 2023.

232.    As of 4 p.m. that day, the Hudson Bay Defendants had submitted conversion or exercise requests demanding a total of 31,965,740 shares of BBBY common stock, all to be delivered within two trading days.

233.    As of 4 p.m. on February 7, 2023, therefore, the Hudson Bay Defendants had the "right to acquire" beneficial ownership of a total of 31,965,740 shares of common stock from BBBY within 60 days.

234.    BBBY's books and records show that it had outstanding about 116,837,942 shares of common stock at 4 p.m. on February 7, 2023.

235.    It follows from Rule 13d-3(d)(1)(i) that the Hudson Bay Defendants' right to acquire those 31,965,740 shares of BBBY common stock noticed for conversion and exercise on February 7, 2023 gave the Hudson Bay Defendants beneficial ownership of 31,965,740 ÷ (116,837,942 + 31,965,740) = 21.48% of BBBY's shares outstanding.

236.    █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

237.    This treatment was illogical. █████████████

█████████████████████ did not terminate BBBY's obligation to deliver, much less the Hudson Bay Defendants' "right to acquire" from BBBY, the full number of shares noticed for conversion or exercise.

238.     On the contrary, the Hudson Bay Defendants could ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

239.     Without the right to acquire the underlying shares from BBBY, the Hudson Bay Defendants would have needed an alternative source of stock (such as an open-market purchase of BBBY shares) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

240.     The Hudson Bay Defendants beneficially owned the shares subject to pending conversion and exercise requests for the additional reason that the Hudson Bay Defendants continued to hold voting power over the shares until the shares were re-registered in the names of the Hudson Bay Defendants' buyers.

241.     The Hudson Bay Defendants' voting power over the pending shares is clear from the terms of the Series A Preferred and Common Warrants.

242.     The terms of the Series A Preferred unambiguously provide that "[t]he Person or Persons entitled to receive the Conversion Shares issuable upon a conversion of Preferred Shares shall be treated for all purposes as the record holder or holders of such Conversion Shares on the Conversion Date."  Ex. A § 4(c)(i).

243.     The Common Warrants unambiguously provide that, "[u]pon delivery of an Exercise Notice . . . , the Holder shall be deemed for all corporate purposes to have become the holder of record" of the underlying shares.  Ex. C § 1(a).

244.     As the "holder of record" of shares noticed for conversion or exercise, the Hudson Bay Defendants would have the power to vote those shares on any matter submitted to BBBY's stockholders of record.

245. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

246.     In the interim, the Hudson Bay Defendants enjoyed the privileges of record holders of BBBY common stock, including the power to vote and direct the disposition of the shares noticed for conversion or exercise.

247.     The documentation for the settlement of the conversion and exercise requests bears out that the "right to acquire" the shares noticed for conversion or exercise belonged to the Hudson Bay Defendants until the delivery of those shares by BBBY.

248.     Attached as Exhibits I and J to this Complaint are typical examples of conversion and exercise requests submitted to BBBY by the Hudson Bay Defendants.

249.     None of the conversion or exercise requests directed that BBBY issue the shares noticed for conversion or exercise to any of the Hudson Bay Defendants' buyers or, for that matter, to any persons other than the Hudson Bay Defendants.

250.     All of the conversion and exercise requests directed that BBBY issue the shares for the account of the Hudson Bay Defendants at Fidelity Investments, their agent broker.

251.     The Deposit/Withdrawal at Custodian ("DWAC") records for BBBY common stock corroborate that the right to acquire the underlying shares remained with the Hudson Bay Defendants as long as their conversion or exercise notices were pending.

252.    The DWAC records show that BBBY made delivery of all shares in satisfaction of the Hudson Bay Defendants' conversion or exercise requests to accounts or subaccounts in the names of "HBC INVESTMENTS LLC," "HBC INV LLC," "HUDSON BAY INV," or similar names.

253.    These records show unambiguously that it was the Hudson Bay Defendants who enjoyed the "right to acquire" beneficial ownership of the common stock underlying any Derivative Securities the Hudson Bay Defendants noticed for conversion or exercise.

254.    And it was the Hudson Bay Defendants who continued to exercise the right to acquire beneficial ownership of that underlying common stock until BBBY satisfied the conversion and exercise requests by crediting the stock to the Hudson Bay Defendants' account at Fidelity Investments.

255.    BBBY was obligated to satisfy all conversion and exercise requests within two trading days. *See* Ex. A § 4(c)(i), 4(e)(iii); Ex. C § 1(a), (d).

256.    It follows that, for as long as the Hudson Bay Defendants' conversion and exercise requests were pending, the Hudson Bay Defendants had the "right to acquire" beneficial ownership of the shares subject to those requests "within sixty days," and thus beneficially owned those shares within the plain terms of Rule 13d-3(d)(1)(i).

257.    When the beneficial ownership determination correctly accounts for the Hudson Bay Defendants' full acquisitive rights in the shares subject to their pending conversion and exercise requests, it is a mathematical certainty that the Hudson Bay Defendants repeatedly transgressed the 9.99% cap purportedly set by the blockers.

258.    Specifically, the Hudson Bay Defendants beneficially owned more than 9.99% of BBBY's common stock at 4 p.m. New York City time on February 7, 2023:

(a)    At that time, the Hudson Bay Defendants had the right to acquire beneficial ownership of a total of 31,965,740 shares of BBBY common stock within 60 days through pending conversion or exercise requests.

(b)    At the same time, BBBY had outstanding approximately 116,837,942 shares of common stock.

(c)    At that time, therefore, the shares subject to the Hudson Bay Defendants' pending conversion and exercise requests gave them beneficial ownership of 31,965,740 ÷ (116,837,942 + 31,965,740) = 21.48% of BBBY's outstanding common stock.

259.    The Hudson Bay Defendants also beneficially owned more than 9.99% of BBBY's common stock at 4 p.m. New York City time on February 8, 2023:

(a)    At that time, the Hudson Bay Defendants had the right to acquire beneficial ownership of a total of 48,215,740 shares of BBBY common stock within 60 days through pending conversion or exercise requests.

(b)    At the same time, BBBY had outstanding approximately 122,532,421 shares of common stock.

(c)    At that time, therefore, the shares subject to the Hudson Bay Defendants' pending conversion and exercise requests gave them beneficial ownership of 48,215,740 ÷ (122,532,421 + 48,215,740) = 28.24% of BBBY's outstanding common stock.

260.    The Hudson Bay Defendants also beneficially owned more than 9.99% of BBBY's common stock at 4 p.m. New York City time on February 9, 2023:

(a)    At that time, the Hudson Bay Defendants had the right to acquire beneficial ownership of a total of 32,500,000 shares of BBBY common stock within 60 days through pending conversion or exercise requests.

(b)    At the same time, BBBY had outstanding approximately 154,262,331 shares of common stock.

(c)    At that time, therefore, the shares subject to the Hudson Bay Defendants' pending conversion and exercise requests gave them beneficial ownership of 32,500,000 ÷ (154,262,331 + 32,500,000) = 17.40% of BBBY's outstanding common stock.

261.    The Hudson Bay Defendants also beneficially owned more than 9.99% of BBBY's common stock at 4 p.m. New York City time on March 21, 2023:

(a)    At that time, the Hudson Bay Defendants had the right to acquire beneficial ownership of a total of 46,156,987 shares of BBBY common stock within 60 days through pending conversion or exercise requests.

(b)    At the same time, BBBY had outstanding approximately 360,698,965 shares of common stock.

(c)    At that time, therefore, the shares subject to the Hudson Bay Defendants' pending conversion and exercise requests gave them beneficial ownership of 46,156,987 ÷ (360,698,965 + 46,156,987) = 11.34% of BBBY's outstanding common stock.

262. These end-of-day snapshots actually understate the extent of the Hudson Bay Defendants' incursions into the 10% territory the blockers were supposed to defend.

263. A review of all of the conversion and exercise requests received by BBBY, together with DWAC records evidencing the satisfaction of those requests, reveals that the Hudson Bay Defendants' pending conversion and exercise requests gave them the right to acquire beneficial ownership of more than 9.99% of BBBY's common stock from approximately 9:45 a.m. on February 7, 2023 until about 2 p.m. on February 10, 2023, and then again from about 4:25 p.m. on March 20, 2023 until the early afternoon of March 22, 2023.

264. The Hudson Bay Defendants submitted nearly 20 conversion or exercise requests to BBBY during these periods.

265. According to the Hudson Bay Defendants' own records, ███ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████.

266. Each of those conversion and exercise requests was submitted in violation of the 9.99% cap purportedly set by the blockers.

267. And in each of those conversion and exercise requests, the Hudson Bay Defendants materially breached their beneficial ownership representation to BBBY.

268. Yet all of these violative requests were fulfilled, and none was ever withdrawn, nullified, or voided.

269. The paramount proof of the blockers' ineffectiveness is in the pudding: the blockers could not, because they did not, contain the Hudson Bay Defendants' beneficial ownership.

270. While not the only evidence of the blockers' ineffectiveness, the repeated failure to limit conversions and exercises of the Derivative Securities in excess of the 9.99% cap is powerful evidence that the blockers were not an effective and binding limitation on the Hudson Bay Defendants' beneficial ownership of BBBY common stock.

**2.      The Blockers Placed No Limit on the Hudson Bay Defendants' Dispositive Power over the Underlying Shares**

271. By their terms, the blockers purported to limit only conversions or exercises of the Derivative Securities.

272. Nothing in the blockers placed any limit on the Hudson Bay Defendants' power to dispose or direct the disposition of the underlying shares, including through sales made before the shares were issued.

273. That lacuna is critical because dispositive power over a security is sufficient for beneficial ownership under Rule 13d-3(a).  The rule assigns beneficial ownership to anyone who has "investment power" over the security, "which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a)(2).

274. So long as the Derivative Securities were outstanding, the Hudson Bay Defendants had the power to sell the underlying shares at any time and in any amount, and nothing in the terms of the Derivative Securities limited that power.

275. ███████████████████████████████████████████
███████████████████████████.

276. 

277.

278. It was not until approximately 1:45 p.m. on February 8 that BBBY issued and delivered by book-entry transfer the first share of common stock underlying the Hudson Bay Defendants' Derivative Securities.

279.

280.

281.     The extent of the Hudson Bay Defendants' dispositive power over the shares underlying the Derivative Securities is evident not only at the time the shares were sold but also at the time of delivery.

282.

the Hudson Bay Defendants submitted a total of 15 conversion or exercise requests, including six exercise requests on February 8.

283.     The six exercise requests submitted on February 8, which covered a total of 19.5 million BBBY shares, were submitted at staggered times throughout the day, with the first ▮▮▮▮▮▮▮ and the last ▮▮▮▮▮▮

284.     Even though the exercise requests were staggered ▮▮▮▮▮▮▮▮▮ ▮▮▮, all 19.5 million underlying shares covered by those requests were issued and delivered to the Hudson Bay Defendants by book-entry transfer in two lump sums just one second apart ▮▮▮▮▮▮▮▮▮▮▮▮ at 9:27 a.m. on February 10.

285.     At the time of delivery, those 19.5 million shares represented more than 10.1% of BBBY's shares outstanding, even after including in shares outstanding all shares subject to the Hudson Bay Defendants' pending conversion and exercise requests.

286.     At 9:27 a.m. on February 10, therefore, the Hudson Bay Defendants had more than 10% of BBBY's outstanding common stock sitting in their brokerage account.

287.     BBBY delivered those 19.5 million shares to the Hudson Bay Defendants' account at Fidelity Investments because that is where the Hudson Bay Defendants directed BBBY to deliver them.

288.     So those 19.5 million shares represented more than 10% of BBBY shares outstanding, and the Hudson Bay Defendants directed their disposition.

289.     That dispositive power, exercised over more than 10% of BBBY's shares outstanding, made the Hudson Bay Defendants the beneficial owners of more than 10% of BBBY's shares outstanding within the plain terms of Rule 13d-3(a).

290.     Exhibit K to this Complaint sets forth a table calculating the Hudson Bay Defendants' ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████

███ The table quantifies ████████████████████████

████████ and also expresses that quantity as a percentage of shares outstanding.

291. ██████████████████████████████████████

███████████████████████████████████████

████████████████

292.     Even assuming, therefore, that the constraints set by the blockers were genuine, they constrained only the Hudson Bay Defendants' acquisitions of the BBBY common stock underlying the Derivative Securities.  The Hudson Bay Defendants remained free to dispose of the underlying shares in any amount and at any time.

293. ██████████████████████████████████████

███████████████████████████████████████

██████████████

294.     Nothing in the terms of the Derivative Securities or the law, however, required the Hudson Bay Defendants to submit conversion or exercise requests to BBBY before selling the underlying shares to a private purchaser off the market.

295.     In the case of a privately negotiated transaction, the Hudson Bay Defendants were free to enter an agreement to sell the underlying shares in any amount and at any time, regardless of whether conversion or exercise requests had previously been submitted to BBBY.

296.     Suppose for example that the Hudson Bay Defendants found a buyer willing to purchase 200 million BBBY shares — a block that exceeded 10% of shares outstanding at any point in BBBY's corporate history.

297.     The Hudson Bay Defendants had the power to immediately enter into an agreement to sell the entire 200 million-share block and then submit a conversion or exercise request directing BBBY to issue the shares to the buyer.

298.     The blockers would not bar this transaction, notwithstanding that the shares sold amounted to more than 10% of shares outstanding.

299.     The Hudson Bay Defendants always retained the power under the blockers to direct the disposition of a 10%+ block of stock to make delivery on prior sales. ███████████████████ when they directed the disposition of the 19.5 million-share block issued by BBBY on February 10 as alleged above.

300.     BBBY could not stop such a transaction even if it wanted to because it had no way of knowing ████████████████████████████.

301.     A buyer who wished to obscure the size of his purchase could take piecemeal delivery.  If the Hudson Bay Defendants directed BBBY to deliver a control block to separate accounts at different financial institutions, BBBY would never know that a single investor had bought the entire block in a single trade from the Hudson Bay Defendants.

302.     The Derivative Securities thus made possible a rapid and unanticipated change in control of the issuer, which is exactly what the Williams Act was meant to regulate.

303.     The terms of the Derivative Securities gave the Hudson Bay Defendants dispositive power over the underlying securities in another respect: through the "Required Reserve Amount."

304.    The Required Reserve Amount was a portion of BBBY's authorized but unissued common stock (or treasury stock) that BBBY was required to reserve for issuance to holders of the Derivative Securities to satisfy conversion or exercise requests.

305.    Specifically, BBBY had to reserve a number of shares of BBBY common stock equal at any time to (a) 200% (100% after March 30) of the total number of BBBY shares then underlying the Series A Preferred, (b) 100% of the total number of shares then underlying the Common Warrants, and (c) 150% of the total number of shares issuable upon conversion of all of the Series A Preferred then underlying the Preferred Warrants.

306.    The reserve requirement for the Series A Preferred is set forth in Section 11(a) of the Certificate of Amendment of the Certificate of Incorporation that BBBY filed with the New York Secretary of State on February 6, 2023 and reads as follows:

> Reservation.  So long as any Preferred Shares remain outstanding, the Company shall at all times reserve at least 200% of the aggregate number of shares of Common Stock as shall from time to time be necessary to effect the conversion, including without limitation, Alternate Conversions, of all of the Preferred Shares then outstanding from the authorized and unreserved shares of Common Stock or from treasury shares available for reissuance (without regard to any limitations on conversions) (the "**Required Reserve Amount**").  The Required Reserve Amount (including, without limitation, each increase in the number of shares so reserved) shall be allocated pro rata among the Holders based on the number of the Preferred Shares held by each Holder on the Initial Issuance Date or increase in the number of reserved shares, as the case may be (the "**Authorized Share Allocation**").  In the event that a Holder shall sell or otherwise transfer any of such Holder's Preferred Shares, each transferee shall be allocated a pro rata portion of such Holder's Authorized Share Allocation.  Any shares of Common Stock reserved and allocated to any Person

which ceases to hold any Preferred Shares shall be allocated to the
remaining Holders of Preferred Shares, pro rata based on the
number of the Preferred Shares then held by the Holders.
Notwithstanding the foregoing, a Holder may allocate its
Authorized Share Allocation to any other of the Securities held by
such Holder (or any of its designees) by delivery of a written
notice to the Company.

Ex. A § 11(a).

307.     The reserve requirement for the Common Warrants is similarly

worded and found in Section 1(g)(i) of the form of warrant.

308.     Ostensibly, the reserve requirement in the Preferred Warrants

extended only to the underlying Series A Preferred and did not require BBBY to reserve

for issuance to the Hudson Bay Defendants any common stock issuable upon conversion

of that underlying Series A Preferred.

309.     But a separate reserve requirement covering the common stock

issuable upon conversion of the Series A Preferred underlying the Preferred Warrants

was slipped into the Side Letter.  *See* Ex. G § 2(h).

310.     The Required Reserve Amount for all of the Derivative Securities

thus extended to substantially all of BBBY's authorized but unissued stock, as well as

substantially all of its previously issued stock then held in treasury.

311.     The Required Reserve Amount earmarked the vast majority of

BBBY's fully diluted equity for issuance (or reissuance) to the Hudson Bay Defendants

to satisfy conversion or exercise requests under their Derivative Securities.

312.     BBBY was barred from transferring any of these earmarked shares

to persons other than the Hudson Bay Defendants.

313.     The calculation of the Required Reserve Amount disregarded the

blockers.  Even when the Hudson Bay Defendants were supposedly blocked from

acquiring beneficial ownership of the underlying shares in excess of the 9.99% cap, they enjoyed the power to stop BBBY from transferring those excess shares to anyone else.

314.    The Hudson Bay Defendants could freely waive the Required Reserve Amount.

315.    The power to waive the Required Reserve Amount gave the Hudson Bay Defendants an effective veto over BBBY's disposition of the reserved shares.  The Hudson Bay Defendants could enforce the Required Reserve Amount to block a transfer to which they objected or waive the Required Reserve Amount to greenlight a transfer of which they approved.

316.    Waiver of the Required Reserve Amount was possible even under the Series A Preferred.  BBBY's amended certificate of incorporation purported to bar waivers of the blockers, *see* Ex. A § 22, but nothing in the certificate barred waiver of the Required Reserve Amount.

317.    There were no transfer restrictions in the Derivative Securities, and the reserved shares followed any transfers.  If the Hudson Bay Defendants sold a portion of the Derivative Securities to another party, the Required Reserve Amount was proportionally reallocated to the buyer.

318.    The transferability of the Required Reserve Amount allowed the Hudson Bay Defendants to direct dispositions of the underlying shares to whomever they wanted.  Even if the Hudson Bay Defendants already owned 9.99% of BBBY's common stock (and were ostensibly blocked from acquiring more), they could always sell a portion of their Series A Preferred to another buyer, who could immediately convert it.

319.     The Required Reserve Amount thus gave the Hudson Bay Defendants significant dispositive power over the shares underlying their Derivative Securities.  If the Hudson Bay Defendants did *not* want the underlying shares transferred to someone, they could invoke the Required Reserve Amount to stop BBBY from transferring the shares.  If they *did* want the shares transferred to someone, they could sell that person a portion of the Derivative Securities and let the buyer convert or exercise the Derivative Securities to acquire the underlying shares himself.

320.     The value of the Hudson Bay Defendants' dispositive power over the reserved shares is evident from the Exchange Agreement.

321.     Absent the Required Reserve Amount, BBBY might just as well have left the Preferred Warrants outstanding.  There was always some hope, however remote, that a freak surge in the stock price would allow BBBY to force an exercise of the Preferred Warrants and thereby raise more cash.

322.     But BBBY needed to cancel the Preferred Warrants to free the underlying common stock from the clamp of the Required Reserve Amount.

323.     By March 29, 2023, the Required Reserve Amount for the Preferred Warrants consumed all of BBBY's authorized but unissued common stock.

324.     BBBY desperately needed to sell that stock to raise cash, but the Hudson Bay Defendants would not allow it to be sold as long as the stock was included in the Required Reserve Amount for the Preferred Warrants.

325.     The at-the-market financing through B. Riley Securities, Inc., for example, could not move forward while the shares BBBY proposed to sell were earmarked for the Hudson Bay Defendants through the Required Reserve Amount.

326.    The Exchange Agreement released the stock from this encumbrance by cancelling the Preferred Warrants, but at a cost to BBBY of 10,000,000 shares of common stock, plus rights to another 5,000,000 BBBY shares.

327.    Those 10,000,000 shares alone had a market value of $7,734,000 at the time the Exchange Agreement was signed.

328.    The Required Reserve Amount thus gave the Hudson Bay Defendants such formidable power over the disposition of the BBBY shares underlying the Preferred Warrants that BBBY had to pay more than $7 million to extinguish that power.

### 3.    Summary

329.    The blockers failed to limit the Hudson Bay Defendants' beneficial ownership of BBBY common stock for two reasons.

330.    First, the blockers were an illusory contrivance that placed no genuine constraint on the Hudson Bay Defendants' conversions and exercises of the Derivative Securities.  The blockers were effectively unenforceable, easily amended or waived, and repeatedly breached.  De facto, there was no limit on the Hudson Bay Defendants' right to acquire immediate beneficial ownership of all BBBY shares underlying the Derivative Securities.

331.    Second, the blockers left the Hudson Bay Defendants with significant investment power over the shares underlying the Derivative Securities.  The Hudson Bay Defendants retained the power to make sales of the underlying shares in unlimited amounts at any time.  They also had the power through the Required Reserve Amount to dictate the persons to whom BBBY could or could not transfer the underlying shares.

332. On either of these bases, the Hudson Bay Defendants enjoyed beneficial ownership of all shares of BBBY common stock underlying the Derivative Securities at all relevant times.

333. Those underlying shares amounted to more than 10% of BBBY's outstanding common stock at all times between February 7 and April 18, 2023.

334. As a result, each Hudson Bay Defendant beneficially owned more than 10% of BBBY's outstanding common stock, and thus was subject to Section 16(b) of the Act, at all times between February 7, 2023 and April 18, 2023.

IV.    THE SHORT-SWING TRANSACTIONS

335. While subject to Section 16(b) of the Act, the Hudson Bay Defendants engaged in ████████████████ transactions in BBBY's equity securities, all within a single period of less than six months.

██   ████████████████████████████████████

       ██   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

       ██   ████████████████████████████████

████████████████████████████████

       ██   ████████████████████████████████

████████████████████████████

**B.    The Series A Preferred Conversions (Section 16(b) Purchases)**

339. Table 3 below lists the date, conversion price, and quantity of underlying shares acquired for each conversion of Series A Preferred by the Hudson Bay Defendants from February 7, 2023 through April 18, 2023.

Table 3. Conversions of the Series A Preferred by the Hudson Bay
Defendants between February 7, 2023 and April 18, 2023.

| Date | Shares of Series A Preferred Converted | Conversion Price | Shares of BBBY Common Stock Acquired |
|---|---|---|---|
| 02/07/2023 | 900 | $2.3727 | 3,793,148 |
| 02/07/2023 | 900 | $2.3727 | 3,793,148 |
| 02/07/2023 | 900 | $2.3727 | 3,793,148 |
| 02/07/2023 | 900 | $2.3727 | 3,793,148 |
| 02/07/2023 | 900 | $2.3727 | 3,793,148 |
| 02/14/2023 | 810 | $1.7165 | 4,718,905 |
| 02/14/2023 | 540 | $1.7165 | 3,145,937 |
| 02/15/2023 | 850 | $1.7165 | 4,951,938 |
| 02/15/2023 | 850 | $1.7165 | 4,951,938 |
| 02/15/2023 | 100 | $1.7165 | 582,581 |
| 02/16/2023 | 197 | $1.6822 | 1,171,086 |
| 02/16/2023 | 197 | $1.6822 | 1,171,086 |
| 02/17/2023 | 400 | $1.6806 | 2,380,103 |
| 02/17/2023 | 400 | $1.6806 | 2,380,103 |
| 02/17/2023 | 400 | $1.6806 | 2,380,103 |
| 02/21/2023 | 365 | $1.5317 | 2,382,974 |
| 02/21/2023 | 365 | $1.5317 | 2,382,974 |
| 02/21/2023 | 228 | $1.5317 | 1,488,543 |
| 02/22/2023 | 325 | $1.4605 | 2,225,266 |
| 02/22/2023 | 325 | $1.4605 | 2,225,266 |
| 02/22/2023 | 325 | $1.4605 | 2,225,266 |
| 02/23/2023 | 343 | $1.3880 | 2,471,182 |
| 02/27/2023 | 352 | $1.3562 | 2,595,488 |
| 02/27/2023 | 352 | $1.3562 | 2,595,488 |
| 02/27/2023 | 352 | $1.3562 | 2,595,488 |
| 02/28/2023 | 307 | $1.2995 | 2,362,448 |
| 02/28/2023 | 307 | $1.2995 | 2,362,448 |
| 02/28/2023 | 307 | $1.2995 | 2,362,448 |
| 02/28/2023 | 307 | $1.2995 | 2,362,448 |
| 03/01/2023 | 1,040 | $1.2995 | 8,003,079 |
| 03/02/2023 | 1,040 | $1.2995 | 8,003,079 |
| 03/03/2023 | 1,040 | $1.2995 | 8,003,079 |
| 03/13/2023 | 320 | $1.1226 | 2,850,526 |

| Date | Shares of Series A Preferred Converted | Conversion Price | Shares of BBBY Common Stock Acquired |
|------|---------------------------------------|------------------|--------------------------------------|
| 03/13/2023 | 320 | $1.1226 | 2,850,526 |
| 03/13/2023 | 320 | $1.1226 | 2,850,526 |
| 03/14/2023 | 308 | $1.0771 | 2,859,531 |
| 03/14/2023 | 308 | $1.0771 | 2,859,531 |
| 03/14/2023 | 154 | $1.0771 | 1,429,766 |
| 03/14/2023 | 154 | $1.0771 | 1,429,766 |
| 03/15/2023 | 269 | $0.9631 | 2,793,065 |
| 03/15/2023 | 144 | $0.9631 | 1,495,172 |
| 03/15/2023 | 144 | $0.9631 | 1,495,172 |
| 03/15/2023 | 72 | $0.9631 | 747,586 |
| 03/16/2023 | 200 | $0.9631 | 2,076,628 |
| 03/16/2023 | 200 | $0.9631 | 2,076,628 |
| 03/16/2023 | 200 | $0.9631 | 2,076,628 |
| 03/16/2023 | 100 | $0.9631 | 1,038,314 |
| 03/16/2023 | 20 | $0.9631 | 207,663 |
| 03/17/2023 | 198 | $0.9514 | 2,081,144 |
| 03/17/2023 | 99 | $0.9514 | 1,040,572 |
| 03/20/2023 | 164 | $0.7777 | 2,108,783 |
| 03/20/2023 | 164 | $0.7777 | 2,108,783 |
| 03/20/2023 | 164 | $0.7777 | 2,108,783 |
| 03/20/2023 | 82 | $0.7777 | 1,054,392 |
| 03/20/2023 | 82 | $0.7777 | 1,054,392 |
| 03/20/2023 | 1,700 | $0.7777 | 21,859,329 |
| 03/21/2023 | 1,200 | $0.7565 | 15,862,525 |
| 03/22/2023 | 600 | $0.7565 | 7,931,263 |
| 03/23/2023 | 900 | $0.7440 | 12,096,775 |
| 04/03/2023 | 850 | $0.7160 | 11,871,509 |
| 04/05/2023 | 650 | $0.7160 | 9,078,213 |
| 04/10/2023 | 1,419 | $0.7160 | 19,818,436 |
| 04/12/2023 | 2,100 | $0.7160 | 29,329,609 |
| 04/17/2023 | 1,800 | $0.7160 | 25,139,665 |

340.    Each conversion of the Series A Preferred was made at a floating conversion price and qualified as a nonexempt purchase of the underlying shares at that price for purposes of Section 16(b).

**C.    Acquisitions of Additional Common Warrants (Section 16(b) Purchases)**

341.    Each Preferred Warrant was exercisable at a price of $9,500.00 to receive (a) one share of Series A Preferred Stock, and (b) an additional number of Common Warrants equal to 50% of the number of shares of BBBY common stock underlying each share of Series A Preferred Stock at the then-effective conversion price.

342.    Consider as an example the Hudson Bay Defendants' acquisition of 2,500 new shares of Series A Preferred upon exercise of the Preferred Warrants on February 15, 2023.  At the prevailing conversion rate of $1.7165, those shares of Series A Preferred were convertible into ($10,000 × 2,500) ÷ $1.7165 = 14,564,521 shares of BBBY common stock.  The Hudson Bay Defendants also received, therefore, 50% × 14,564,521 = 7,282,261 new Common Warrants.

343.    Whenever the Preferred Warrants were exercised, the Hudson Bay Defendants paid a fixed price for the underlying Series A Preferred: the same $9,500.00 exercise price always bought exactly one share of Series A Preferred.

344.    The price of the Common Warrants, however, was not fixed.  The number of Common Warrants issued upon exercise of a Preferred Warrant, and thus the cost per Common Warrant, varied with the conversion price of the Series A Preferred, which in turn floated with the market price of BBBY common stock.

345.    Because the Hudson Bay Defendants' acquisitions of the Common Warrants after February 7 were made at floating exercise prices, those acquisitions enjoy

no exemption from Section 16(b) of the Act.  For purposes of Section 16(b), those acquisitions for valuable consideration are treated as nonexempt purchases of the shares underlying the Common Warrants at the shares' contemporaneous market price.

346.    The contemporaneous market price of BBBY's common stock at the time of each exercise of the Preferred Warrants may be estimated from the closing price of BBBY's common stock on the date of exercise.  Discovery will determine the actual market price of BBBY's common stock at the time each exercise notice was delivered.

347.    Based on the closing price on the date of each exercise, the Hudson Bay Defendants are deemed to have purchased the following BBBY shares at the following prices upon exercises of the Preferred Warrants:

Table 4.  Section 16(b) Purchases Through Acquisitions
of Common Warrants Upon Exercises of Preferred Warrants.

| Date of Exercise | Common Warrants Acquired | Underlying Shares Deemed Purchased | Price per Underlying Share |
|---|---|---|---|
| 02/15/2023 | 7,282,261 | 7,282,261 | $1.9300 |
| 02/23/2023 | 9,005,764 | 9,005,764 | $1.5000 |
| 03/07/2023 | 37,304,610 | 37,304,610 | $1.3400 |

**D.    The Alternate Cashless Exercises of the Common Warrants (Section 16(b) Sales)**

348.    The Hudson Bay Defendants exercised all of their Common Warrants on an "alternate cashless" basis, surrendering 35% of the underlying shares to fund the exercise of the warrants.

349.     For purposes of Section 16(b) of the Act, the surrender of the shares used to fund the exercise of the warrants is treated as a sale of those shares back to BBBY at their market value.

350.     Table 5 below lists each alternate cashless exercise of the Common Warrants.  The table includes the date of exercise, the number of underlying shares, the number of shares surrendered to fund the exercise of the warrant, and the contemporaneous market price of BBBY's common stock.

Table 5.  Alternate Cashless Exercises of the Common Warrants.

| Date | Common Stock Warrants | Shares Issued | Surrendered Shares (Deemed Sold) | Contemporaneous Market Price |
|---|---|---|---|---|
| 02/07/23 | 5,000,000 | 3,250,000 | 1,750,000 | $3.2350 |
| 02/07/23 | 5,000,000 | 3,250,000 | 1,750,000 | $3.0350 |
| 02/07/23 | 5,000,000 | 3,250,000 | 1,750,000 | $3.2800 |
| 02/07/23 | 5,000,000 | 3,250,000 | 1,750,000 | $3.3550 |
| 02/08/23 | 5,000,000 | 3,250,000 | 1,750,000 | $3.0000 |
| 02/08/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.7450 |
| 02/08/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.6250 |
| 02/08/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.5750 |
| 02/08/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.6100 |
| 02/08/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.6050 |
| 02/09/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.9150 |
| 02/09/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.6250 |
| 02/09/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.5350 |
| 02/09/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.6000 |
| 02/10/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.3100 |
| 02/10/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.3100 |
| 02/13/23 | 5,000,000 | 3,250,000 | 1,750,000 | $2.0200 |
| 02/13/23 | 4,399,400 | 2,859,610 | 1,539,790 | $2.0550 |
| 02/16/23 | 7,281,280 | 4,732,832 | 2,548,448 | $1.8750 |
| 02/23/23 | 8,558,000 | 5,562,700 | 2,995,300 | $1.6100 |
| 02/24/23 | 447,764 | 291,047 | 156,717 | $1.4600 |
| 03/08/23 | 25,000,000 | 16,250,000 | 8,750,000 | $1.3250 |

| Date | Common Stock Warrants | Shares Issued | Surrendered Shares (Deemed Sold) | Contemporaneous Market Price |
|------|-----------------------|---------------|----------------------------------|------------------------------|
| 03/10/23 | 12,304,610 | 7,997,997 | 4,306,613 | $1.2500 |
| 03/30/23 | 1,000 | 650 | 350 | $0.7448 |

**E.  The Preferred Warrant Amendments (Section 16(b) Purchase and Sale)**

351.  On March 13, 2023, the Hudson Bay Defendants and BBBY agreed to amend the market price and volume conditions of the Preferred Warrants.

352.  These amendments were material in that they materially changed the risk and reward offered by the Preferred Warrants.  In particular, the reduction of the minimum price condition from $1.25 per share to $1.00 per share significantly increased the risk that the Hudson Bay Defendants would lose money from a stock decline after a forced exercise of the Preferred Warrants.

353.  The Hudson Bay Defendants' consent to lower the price threshold represented a calculated wager that BBBY's stock price was just firm enough for the Hudson Bay Defendants ████████████████████████████████████ ████████████████████████████████.

354.  For purposes of Section 16(b) and the SEC's rules and guidance thereunder, the material amendment of a derivative security is treated as the grant of a new security in consideration for the issuer's cancellation of the old one.

355.  The grant and cancellation of the derivative security are in turn treated as the purchase and sale of the underlying stock at the stock's contemporaneous market price.

356. At the time of the March 13 amendment, the Series A Preferred underlying the Preferred Warrants was convertible into as many as 623,588,100 shares of BBBY common stock.

357. At the time of the March 13 amendment, a full exercise of the Preferred Warrants also entitled the Hudson Bay Defendants to receive additional Common Warrants exercisable to acquire as many as 311,794,050 shares of BBBY common stock.

358. Thus, a total of 935,382,150 shares of BBBY common stock underlay the Preferred Warrants at the time of the March 13 amendment.

359. The contemporaneous market price of BBBY's common stock at that time was approximately $1.24 per share, based on the stock's closing price on March 13, 2023.

**F.    The Exchange Agreement (Section 16(b) Purchase and Sale)**

360. The Hudson Bay Defendants received 10,000,000 shares of BBBY common stock and 5,000,000 common stock rights in exchange for the cancellation of the Preferred Warrants under the Exchange Agreement.

361. For purposes of Section 16(b), the Exchange Agreement is treated as a purchase of 15,000,000 new BBBY shares at their market price and in consideration for the sale of the Preferred Warrants back to BBBY.

362. The sale of the Preferred Warrants is treated in turn as a sale of the underlying BBBY shares at their contemporaneous market price for purposes of Section 16(b) and the SEC's rules and regulations thereunder.

363. At the time of the March 30 Exchange Agreement, a total of 935,382,150 shares of BBBY common stock underlay the Preferred Warrants.

364. The contemporaneous market price of BBBY's common stock at that time was approximately $0.7734 per share, based on the stock's opening price on March 30.



## V. THE PROFIT

368. The Hudson Bay Defendants' short-swing transactions in BBBY's equity securities described above are matchable under Section 16(b) of the Act using the "lowest in, highest out" rule of profit calculation.

369. For purposes of this calculation, the Hudson Bay Defendants' transactions in the Preferred Warrants, Common Warrants, ░░░░░░░ are matchable as purchases and sales of the underlying common stock at the stock's contemporaneous price. *See* 17 C.F.R. §§ 240.16a-1(b), (c), 240.16b-6(c)(2).

370. So matched, the Hudson Bay Defendants' least expensive purchases of ░░░░░░ shares of BBBY common stock at a weighted average purchase price of approximately $0.8745 per share, and their most expensive sales ░░░░░░░

████████████████████████████████████████

████████████ , yielded the Hudson Bay Defendants a total profit of $310,061,851.69.

371.    Under Section 16(b), that profit belongs to BBBY, and BBBY will

recover it in this action.

**SOLE CLAIM FOR RELIEF:**
**RECOVERY OF SHORT-SWING PROFIT UNDER 15 U.S.C. § 78p(b)**
**(AGAINST EACH HUDSON BAY DEFENDANT)**

372.    BBBY realleges and incorporates by reference the allegations in

paragraphs 1-371 above.

373.    Section 16(b) of the Securities Exchange Act of 1934, as amended,

reads in pertinent part as follows:

> For the purpose of preventing the unfair use of information which
> may have been obtained by [a 10 percent] beneficial owner,
> director, or officer by reason of his relationship to the issuer, any
> profit realized by him from any purchase and sale, or any sale and
> purchase, of any equity security of such issuer (other than an
> exempted security) or a security-based swap agreement involving
> any such equity security within any period of less than six months,
> unless such security or security-based swap agreement was
> acquired in good faith in connection with a debt previously
> contracted, shall inure to and be recoverable by the issuer,
> irrespective of any intention on the part of such beneficial owner,
> director, or officer in entering into such transaction of holding the
> security or security-based swap agreement purchased or of not
> repurchasing the security or security-based swap agreement sold
> for a period exceeding six months.  Suit to recover such profit may
> be instituted at law or in equity in any court of competent
> jurisdiction by the issuer, or by the owner of any security of the
> issuer in the name and in behalf of the issuer if the issuer shall fail
> or refuse to bring such suit within sixty days after request or shall
> fail diligently to prosecute the same thereafter; but no such suit
> shall be brought more than two years after the date such profit was
> realized.

15 U.S.C. § 78p(b).

374. At all times between February 7, 2023 and the morning of April 18, 2023, each Hudson Bay Defendant beneficially owned more than 10% of BBBY's outstanding common stock and was subject to Section 16(b) of the Act.

375. While subject to Section 16(b) of the Act, the Hudson Bay Defendants purchased and sold BBBY's equity securities as further described herein.

376. Certain of the Hudson Bay Defendants' purchases of BBBY's equity securities were made at lower prices than certain of the Hudson Bay Defendants' sales of BBBY's equity securities.

377. All of the Hudson Bay Defendants' purchases and sales of BBBY's equity securities were made within a single period of less than six months.

378. Each Hudson Bay Defendant had a direct or indirect pecuniary interest in all of the purchases and sales of BBBY's equity securities described herein.

379. Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, the Hudson Bay Defendants realized a profit of not less than $310,061,851.69 from their transactions in BBBY's equity securities described herein.

380. Under Section 16(b) of the Act, the profit realized by the Hudson Bay Defendants as described herein inured to and is recoverable by BBBY.

## PRAYER FOR RELIEF

WHEREFORE, BBBY prays this Court for judgment:

(a) Requiring each Hudson Bay Defendant to account for and pay over to BBBY the short-swing profit realized and retained by such Hudson Bay Defendant in violation of Section 16(b) of the Act in an amount not less

than $310,061,851.69, together with appropriate pre- and post-judgment interest and the costs of this suit;

(b)     Awarding BBBY its costs and disbursements including reasonable attorney's, accountant's, and expert witness fees; and

(c)     Granting BBBY such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

To the extent BBBY's right to a trial by jury has not been effectively waived under the terms of the Derivative Securities, BBBY respectfully demands a trial by jury on every question so triable.

Dated: April 29, 2024

Respectfully submitted,

/s/ James A. Hunter

James A. Hunter
    S.D.N.Y. Bar No. JH–1910
LAW OFFICE OF JAMES A. HUNTER
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, Pennsylvania  19428
Phone: +1 (484) 214-4697
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.*