# Exhibit G

**RULE 163B COMMUNICATION**

February 6, 2023

HBC Investments LLC
c/o Hudson Bay Capital Management LP
28 Havemeyer Place
Greenwich, CT 06830
Attn: Direct Investments Team

      Re: <u>Potential Offering of Preferred Stock, Preferred Warrants and Common Warrants</u>

Ladies and Gentlemen:

      This letter agreement (this "**Agreement**") relates to the forms of (a) Certificate of Amendment of the Certificate of Incorporation of the Company, dated as of February 6, 2023 (the "**Certificate of Amendment**") to create a new Series A Preferred Stock, $0.01 par value, of the Company (the "**Preferred Shares**", as converted, the "**Conversion Shares**", and the Preferred Shares to be issued at the closing of the Offering (as defined below), the "**Initial Preferred Shares**"), (b) warrant to purchase Preferred Shares of the Company (the "**Preferred Warrants**", as exercised, the "**Additional Preferred Shares**") and (c) warrant to purchase common stock, $0.01 par value (the "**Common Stock**") of the Company (the "**Common Warrants**", as exercised, the "**Warrant Common Shares**"), delivered by HBC Investments LLC (the "**Investor**", "**you**" or "**your**") to Bed Bath & Beyond Inc., a New York corporation (the "**Company**", "**we**" or "**us**"), in each case, prepared by your counsel and delivered to us. The Certificate of Amendment, the Preferred Warrants and the Common Warrants are collectively referred to herein as the "**Transaction Documents**". The Preferred Shares, the Conversion Shares, the Preferred Warrants, the Common Warrants and the Warrant Common Shares are collectively referred to herein as the "**Securities**".

      After our review of the Transaction Documents, the Company is currently contemplating an underwritten public offering (the "**Offering**") with B. Riley Securities, Inc. (the "**Underwriter**") consisting of up to $22,505,500 in aggregate purchase price of units (the "**Basic Units**") consisting of up to 2,369 Initial Preferred Shares and related Common Warrants and up to $225,007,500 million in aggregate purchase price of units (the "**Large Investor Units**") consisting of up to 23,685 Initial Preferred Shares, Preferred Warrants and related Common Warrants (subject to reduction upon any sale of Basic Units) to investors with an aggregate purchase price of at least $75 million.

      The Company desires that the Investor purchase from the Underwriter all of the Large Investor Units, and the Investor has expressed an interest in acquiring from the Underwriter all of the Large Investor Units, subject to (x) the filing by the Company of a prospectus (the "**Prospectus**") with respect to the Offering and (y) the Company's agreement to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Investor hereby agree as follows:

1.    **PARTICIPATION RIGHTS**

(a)    <u>Participation Right</u>.  Until the second anniversary of the closing date of the Offering (the "**Closing Date**"), neither the Company nor any of its Subsidiaries (as defined below) shall, directly or indirectly, effect any Subsequent Placement (as defined below) unless the Company shall have first complied with this Section 1(a).

(i)    At least five (5) Trading Days (as defined in the Certificate of Amendment) prior to any proposed or intended Subsequent Placement, the Company shall deliver to the Investor a written notice (each such notice, a "**Pre-Notice**"), which Pre-Notice shall not contain any information (including, without limitation, material, non-public information) other than: (A) if the proposed Offer Notice (as defined below) constitutes or contains material, non-public information, a statement asking whether the Investor is willing to accept material non-public information or (B) if the proposed Offer Notice does not constitute or contain material, non-public information, (x) a statement that the Company proposes or intends to effect a Subsequent Placement, (y) a statement that the statement in clause (x) above does not constitute material, non-public information and (z) a statement informing the Investor that it is entitled to receive an Offer Notice (as defined below) with respect to such Subsequent Placement upon its written request; provided, that the Investor hereby waives delivery of such Pre-Notice with respect to the Offering.  Upon the written request of the Investor within three (3) Trading Days after the Company's delivery to the Investor of such Pre-Notice and only upon a written request by the Investor (or, with respect to the Offering, on the date hereof), the Company shall promptly, but no later than one (1) Trading Day after such request (or, with respect to the Offering, on the date hereof), deliver to the Investor an irrevocable written notice (the "**Offer Notice**") of any proposed or intended issuance or sale or exchange (the "**Offer**") of the securities being offered (the "**Offered Securities**") in a Subsequent Placement, which Offer Notice shall (A) identify and describe the Offered Securities, (B) describe the price and other terms upon which they are to be issued, sold or exchanged, and the number or amount of the Offered Securities to be issued, sold or exchanged, (C) identify the Persons (as defined below) (if known) to which or with which the Offered Securities are to be offered, issued, sold or exchanged and (D) offer to issue and sell to or exchange with the Investor in accordance with the terms of the Offer (I) with respect to the Offering, no less than 90% or (II) with respect to any other Subsequent Placement, 35%, as applicable, of the Offered Securities.  "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and any Governmental Entity or any department or agency thereof.  "**Governmental Entity**" means any nation, state, county, city, town, village, district, or other political jurisdiction of any nature, federal, state, local, municipal, foreign, or other government, governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal), multi-national organization or body; or body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature or instrumentality of any of the foregoing,

2

including any entity or enterprise owned or controlled by a government or a public international organization or any of the foregoing.

(ii)    To accept an Offer, in whole or in part, the Investor must deliver a written notice to the Company prior to the end of the fifth (5th) Business Day after the Investor's receipt of the Offer Notice (or, with respect to the Offering, on or prior to the date of pricing of the Offering) (the "**Offer Period**"), setting forth the portion of the Offered Securities that the Investor elects to purchase (the "**Notice of Acceptance**").  Notwithstanding the foregoing, if the Company desires to modify or amend the terms and conditions of the Offer prior to the expiration of the Offer Period, the Company may deliver to the Investor a new Offer Notice and the Offer Period shall expire on the fifth (5th) Business Day after the Investor's receipt of such new Offer Notice (or one (1) Business Day (as defined in the Certificate of Amendment) with respect to the Offering).

(iii)    The Company shall have five (5) Business Days from the expiration of the Offer Period above (A) to offer, issue, sell or exchange all or any part of such Offered Securities as to which a Notice of Acceptance has not been given by the Investor (the "**Refused Securities**") pursuant to a definitive agreement(s) (the "**Subsequent Placement Agreement**"), but only to the offerees described in the Offer Notice (if so described therein) and only upon terms and conditions (including, without limitation, unit prices and interest rates) that are not more favorable to the acquiring Person or Persons or less favorable to the Company than those set forth in the Offer Notice and (B) to publicly announce (x) the execution of such Subsequent Placement Agreement, and (y) either (I) the consummation of the transactions contemplated by such Subsequent Placement Agreement or (II) the termination of such Subsequent Placement Agreement, which shall be filed with the Securities and Exchange Commission (the "**SEC**") on a Current Report on Form 8-K with such Subsequent Placement Agreement and any documents contemplated therein filed as exhibits thereto.

(iv)    In the event the Company shall propose to sell less than all the Refused Securities (any such sale to be in the manner and on the terms specified in Section 1(a)(iii) above), then the Investor may, at its sole option and in its sole discretion, withdraw its Notice of Acceptance or reduce the number or amount of the Offered Securities specified in its Notice of Acceptance to an amount that shall be not less than the number or amount of the Offered Securities that the Investor elected to purchase pursuant to Section 1(a)(ii) above multiplied by a fraction, (A) the numerator of which shall be the number or amount of Offered Securities the Company actually proposes to issue, sell or exchange (including Offered Securities to be issued or sold to the Investor pursuant to this Section 1(a) prior to such reduction) and (B) the denominator of which shall be the original amount of the Offered Securities.  In the event that the Investor so elects to reduce the number or amount of Offered Securities specified in its Notice of Acceptance, the Company may not issue, sell or exchange more than the reduced number or amount of the Offered Securities unless and until such securities have again been offered to the Investor in accordance with Section 1(a)(i) above.

(v)    Upon the closing of the issuance, sale or exchange of all or less than all of the Refused Securities, the Investor shall acquire from the Company, and the Company

Error! Unknown document property name.

shall issue to the Investor, the number or amount of Offered Securities specified in its Notice of Acceptance, as reduced pursuant to Section 1(a)(iv) above if the Investor has so elected, upon the terms and conditions specified in the Offer. The purchase by the Investor of any Offered Securities is subject in all cases to the preparation, execution and delivery by the Company and the Investor of a separate purchase agreement relating to such Offered Securities reasonably satisfactory in form and substance to the Investor and its counsel.

(vi)     Any Offered Securities not acquired by the Investor or other Persons in accordance with this Section 1(a) may not be issued, sold or exchanged until they are again offered to the Investor under the procedures specified in this Agreement.

(vii)     The Company and the Investor agree that if the Investor elects to participate in the Offer, neither the Subsequent Placement Agreement with respect to such Offer nor any other transaction documents related thereto (collectively, the "**Subsequent Placement Documents**") shall include any term or provision whereby the Investor shall be required to agree to any restrictions on trading as to any securities of the Company or be required to consent to any amendment to or termination of, or grant any waiver, release or the like under or in connection with, any agreement previously entered into with the Company or any instrument received from the Company.

(viii)     Notwithstanding anything to the contrary in this Section 1(a) and unless otherwise agreed to by the Investor, the Company shall either confirm in writing to the Investor that the transaction with respect to the Subsequent Placement has been abandoned or shall publicly disclose its intention to issue the Offered Securities, in either case, in such a manner such that the Investor will not be in possession of any material, non-public information, by the tenth (10th) Business Day following delivery of the Offer Notice. If by such tenth (10th) Business Day, no public disclosure regarding a transaction with respect to the Offered Securities has been made, and no notice regarding the abandonment of such transaction has been received by the Investor, such transaction shall be deemed to have been abandoned and the Investor shall not be in possession of any material, non-public information with respect to the Company or any of its Subsidiaries. Should the Company decide to pursue such transaction with respect to the Offered Securities, the Company shall provide the Investor with another Offer Notice and the Investor will again have the right of participation set forth in this Section 1(a). The Company shall not be permitted to deliver more than one such Offer Notice to the Investor in any sixty (60) day period, except as expressly contemplated by the last sentence of Section 1(a)(ii).

(ix)     The restrictions contained in this Section 1(a) shall not apply in connection with the issuance of any Excluded Securities (as defined below) or any bona fide firm commitment public offering (other than the Offering) in compliance with the terms and conditions of this Agreement. For the avoidance of doubt, except with respect to the Offering, the Investor may transfer its rights in this Section 1(a) to any of the Investor's affiliates (and/or allocate any allocations of Offered Securities granted to the Investor (or any of its affiliates) pursuant to this Section 1(a) other than with respect to the Offering) at any time by delivering written notice to the Company with respect thereto.

Error! Unknown document property name.

2.     **COVENANTS.**

(a)     <u>Reporting Status</u>.  Until the date on which the Investor shall have sold all of the Securities held by the Investor, if any (the "**Reporting Period**"), the Company shall timely file all reports required to be filed with the SEC pursuant to the Securities Exchange Act of 1934, as amended (the "**1934 Act**"), and the Company shall not terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would no longer require or otherwise permit such termination.

(b)     <u>Use of Proceeds</u>.  The Company will use the proceeds from the sale of the Securities as described in the Prospectus Supplement; provided, that, except as set forth in the Prospectus Supplement, no more than 50% of the gross proceeds of the Offering (or the exercise of any Preferred Warrants, as applicable) may be used to redeem or otherwise pay any amounts with respect any outstanding indebtedness for borrowed money (as defined in the Certificate of Amendment) of the Company.

(c)     <u>Financial Information</u>.  The Company agrees to send the following to each holder of Initial Preferred Shares, Preferred Warrants or Common Warrants, as applicable, (each, a "**Holder**") during the Reporting Period (i) unless the following are filed with the SEC through EDGAR and are available to the public through the EDGAR system, within one (1) Business Day after the filing thereof with the SEC, a copy of its Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, any interim reports or any consolidated balance sheets, income statements, shareholders' equity statements and/or cash flow statements for any period other than annual, any Current Reports on Form 8-K and any registration statements (other than on Form S-8) or amendments filed pursuant to the 1933 Act (as defined below), (ii) unless the following are either filed with the SEC through EDGAR or are otherwise widely disseminated via a recognized news release service (such as PR Newswire), on the same day as the release thereof, e-mail copies of all press releases issued by the Company or any of its Subsidiaries and (iii) unless the following are filed with the SEC through EDGAR, copies of any notices and other information made available or given to the shareholders of the Company generally, contemporaneously with the making available or giving thereof to the shareholders.

(d)     <u>Listing</u>.  The Company shall promptly secure the listing or designation for quotation (as the case may be) of all of the Underlying Securities (as defined below) upon each national securities exchange and automated quotation system, if any, upon which the Common Stock is then listed or designated for quotation (as the case may be) (subject to official notice of issuance) and shall maintain such listing or designation for quotation (as the case may be) of all Underlying Securities from time to time issuable under the terms of the Transaction Documents on such national securities exchange or automated quotation system.  The Company shall maintain the Common Stock's listing or authorization for quotation (as the case may be) on The New York Stock Exchange, the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market or the Nasdaq Global Select Market (each, an "**Eligible Market**").  Neither the Company nor any of its Subsidiaries shall take any action which could be reasonably expected to result in the delisting or suspension of the Common Stock on an Eligible Market.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 2(d).  "**Underlying Securities**" means the (i) the Conversion Shares, (ii) the Warrant Common Shares and (iii) any capital stock of the Company issued or issuable with respect to the Conversion Shares, the Warrant

Error! Unknown document property name.

Common Shares, the Certificate of Amendment, the Preferred Shares or the Common Warrants, respectively, including, without limitation, (1) as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise and (2) shares of capital stock of the Company into which the shares of Common Stock are converted or exchanged and shares of capital stock of a Successor Entity (as defined in the Common Warrants) into which the shares of Common Stock are converted or exchanged, in each case, without regard to any limitations on conversion of the Initial Preferred Shares or exercise of the Common Warrants.

(e)      Fees.  The Company shall reimburse the Investor a non-accountable amount of (x) $250,000 for all costs and expenses incurred by Kelley Drye & Warren, LLP, counsel to the Investor and $75,000 for all costs and expenses incurred by Akin Gump Straus Hauer & Feld LLP (the "**Transaction Expenses**").  The Company shall be responsible for the payment of any underwriter's fees, placement agent's fees, financial advisory fees, transfer agent fees, DTC (as defined below) fees or broker's commissions (other than for Persons engaged by the Investor) relating to or arising out of the transactions contemplated hereby (including, without limitation, any fees or commissions payable to the Underwriter).  The Company shall pay, and hold the Investor harmless against, any liability, loss or expense (including, without limitation, reasonable attorneys' fees and out-of-pocket expenses) arising in connection with any claim relating to any such payment.  Except as otherwise set forth in the Transaction Documents, each party to this Agreement shall bear its own expenses in connection with the Offering.

(f)      Disclosure of Transactions and Other Material Information.

(i)      Disclosure of Transaction.  The Company shall, on or before 9:30 a.m., New York time, on the first (1st) Business Day after the date of this Agreement, issue a press release (the "**Press Release**") reasonably acceptable to the Investor disclosing all the material terms of the transactions contemplated by the Transaction Documents. Concurrently with the issuance of the Press Release, on or before 9:30 a.m., New York time, on the first (1st) Business Day after the date of this Agreement, the Company shall file a Current Report on Form 8-K describing all the material terms of the transactions contemplated by the Transaction Documents in the form required by the 1934 Act and attaching all the material Transaction Documents (including, without limitation, the form of Certificate of Amendment, the form of the Preferred Warrants and the form of the Common Warrants) and including disclosure that neither the Company nor any of its Subsidiaries intends to voluntarily seek protection under any applicable federal, state or foreign bankruptcy, insolvency, reorganization or other similar law during at least the thirty (30) Trading Day period immediately following the Closing Date (including all attachments, the "**8-K Filing**").  From and after the filing of the 8-K Filing, the Company shall have disclosed all material, non-public information (if any) provided to the Investor by the Company or any of its Subsidiaries or any of their respective officers, directors, employees or agents in connection with the transactions contemplated by the Transaction Documents.  In addition, effective upon the filing of the 8-K Filing, the Company acknowledges and agrees that any and all confidentiality or similar obligations under any agreement, whether written or oral, between the Company, any of its Subsidiaries or any of their respective officers, directors, affiliates, employees or agents, on the one hand, and the Investor or any of its affiliates, on the other hand, shall terminate.

Error! Unknown document property name.

(ii)    <u>Limitations on Disclosure</u>.  The Company shall not, and the Company shall cause each of its Subsidiaries and each of its and their respective officers, directors, employees and agents not to, provide the Investor with any material, non-public information regarding the Company or any of its Subsidiaries from and after the date hereof without the express prior written consent of the Investor (which may be granted or withheld in the Investor's sole discretion).  In the event of a breach of any of the foregoing covenants, including, without limitation, Section 1(a) of this Agreement, or any of the covenants or agreements contained in any other Transaction Document, by the Company, any of its Subsidiaries, or any of its or their respective officers, directors, employees and agents (as determined in the reasonable good faith judgment of the Investor), in addition to any other remedy provided herein or in the Transaction Documents, the Investor shall have the right to make a public disclosure, in the form of a press release, public advertisement or otherwise, of such breach or such material, non-public information, as applicable, without the prior approval by the Company, any of its Subsidiaries, or any of its or their respective officers, directors, employees or agents.  The Investor shall not have any liability to the Company, any of its Subsidiaries, or any of its or their respective officers, directors, employees, affiliates, shareholders or agents, for any such disclosure.  To the extent that the Company delivers any material, non-public information to the Investor without the Investor's consent, the Company hereby covenants and agrees that the Investor shall not have any duty of confidentiality with respect to, or a duty not to trade on the basis of, such material, non-public information.  Subject to the foregoing, neither the Company, its Subsidiaries nor the Investor shall issue any press releases or any other public statements with respect to the transactions contemplated hereby; provided, however, the Company shall be entitled, without the prior approval of the Investor, to make the Press Release and any press release or other public disclosure with respect to such transactions (i) in substantial conformity with the 8-K Filing and contemporaneously therewith and (ii) as is required by applicable law and regulations (provided that in the case of clause (i) the Investor shall be consulted by the Company in connection with any such press release or other public disclosure prior to its release).  Without the prior written consent of the Investor (which may be granted or withheld in the Investor's sole discretion), the Company shall not (and shall cause each of its Subsidiaries and affiliates to not) disclose the name of the Investor in any filing, announcement, release or otherwise.  Notwithstanding anything contained in this Agreement to the contrary and without implication that the contrary would otherwise be true, the Company expressly acknowledges and agrees that the Investor shall not have any duty of confidentiality with respect to, or a duty not to trade on the basis of, any material, non-public information regarding the Company or any of its Subsidiaries.

(g)    <u>Additional Issuance of Securities</u>.  So long as the Investor beneficially owns any Securities, the Company will not, without the prior written consent of the Investor, issue any Preferred Shares (in each case, other than to the Investor as contemplated hereby) and the Company shall not issue any other securities that would cause a breach or default under the Certificate of Amendment or the Common Warrants.  The Company agrees that for the period commencing on the date hereof and ending on the date immediately following the 90th calendar day after the Closing Date (the "**Restricted Period**"), neither the Company nor any of its Subsidiaries shall directly or indirectly:

Error! Unknown document property name.

(i)      file a registration statement under the Securities Act of 1933, as amended (the "**1933 Act**") relating to securities that are not the Underlying Securities (other than a registration statement on Form S-8 or such supplements or amendments to registration statements that are outstanding and have been declared effective by the SEC as of the date hereof (solely to the extent necessary to keep such registration statements effective and available and not with respect to any Subsequent Placement));

(ii)      amend or modify (whether by an amendment, waiver, exchange of securities, or otherwise) any of the Company's Common Warrants to purchase Common Stock that are outstanding as of the date hereof; or

(iii)      issue, offer, sell, grant any option or right to purchase, or otherwise dispose of (or announce any issuance, offer, sale, grant of any option or right to purchase or other disposition of) for capital raising purposes any equity security or any equity-linked security (including, without limitation, any "equity security" (as that term is defined under Rule 405 promulgated under the 1933 Act)), any Convertible Securities (as defined below), any preferred stock or any purchase rights for equity or equity-linked securities (any such issuance, offer, sale, grant, disposition or announcement (whether occurring during the Restricted Period or at any time thereafter) is referred to as a "**Subsequent Placement**"). Notwithstanding the foregoing, this Section 2(g) shall not apply in respect of the issuance of (A) shares of Common Stock or standard options to purchase Common Stock to directors, officers or employees of the Company in their capacity as such pursuant to an Approved Stock Plan (as defined below), provided that the exercise price of any such options is not lowered, none of such options are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such options are otherwise materially changed in any manner that adversely affects any of the Investor; (B) shares of Common Stock issued upon the conversion or exercise of Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (A) above) issued prior to the date hereof, provided that the conversion, exercise or other method of issuance (as the case may be) of any such Convertible Security is made solely pursuant to the conversion, exercise or other method of issuance (as the case may be) provisions of such Convertible Security that were in effect on the date immediately prior to the date of this Agreement, the conversion, exercise or issuance price of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (A) above) is not lowered, none of such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (A) above) are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (A) above) are otherwise materially changed in any manner that adversely affects any of the Investor; (C) the Conversion Shares, (D) the Additional Preferred Shares, and (E) the Warrant Common Shares (each of the foregoing in clauses (C) through (E), collectively the "**Excluded Securities**").  "**Approved Stock Plan**" means any employee benefit plan which has been approved by the board of directors of the Company prior to or subsequent to the date hereof pursuant to which shares of Common Stock and standard options to purchase Common Stock may be issued to any employee,

Error! Unknown document property name.

officer or director for services provided to the Company in their capacity as such. "**Convertible Securities**" means any capital stock or other security of the Company or any of its Subsidiaries that is at any time and under any circumstances directly or indirectly convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any capital stock or other security of the Company (including, without limitation, Common Stock) or any of its Subsidiaries.

(h)    Reservation of Shares.  So long as any of the Preferred Shares, Preferred Warrants or Common Warrants remain outstanding, the Company shall take all action necessary to at all times have authorized, and reserved for the purpose of issuance, or treasury shares available for reissuance, no less than the sum of (A) 200% of the maximum number of Conversion Shares issuable upon conversion of all the Preferred Shares then outstanding and 150% of the maximum number of Conversion Shares issuable upon conversion of the Additional Preferred Shares then issuable upon exercise of the Preferred Warrants (assuming for purposes hereof that (x) the Preferred Warrants have been exercised in full, (y) the Preferred Shares are convertible at the Alternate Conversion Price (as defined in the Certificate of Amendment) then in effect, and (z) any such conversion shall not take into account any limitations on the conversion of the Preferred Shares set forth in the Certificate of Amendment), (B) 100% of the maximum number of Additional Preferred Shares initially issuable upon exercise of the Preferred Warrants (without taking into account any limitations on the exercise of the Preferred Warrants set forth therein) and (C) 100% of the maximum number of Warrant Common Shares issuable upon exercise of all the Common Warrants then outstanding (without regard to any limitations on the exercise of the Common Warrants set forth therein) (collectively, the "**Required Reserve Amount**"); provided that at no time shall the number of shares of Common Stock reserved pursuant to this Section 2(h) (i) be greater than 761,188,919 (as adjusted for stock splits, stock dividends, stock combinations, recapitalizations and similar events) or (ii) be reduced other than proportionally in connection with any conversion, exercise and/or redemption, as applicable of Preferred Shares and Common Warrants.  If at any time the number of shares of Common Stock authorized and reserved for issuance, or treasury shares of Common Stock available for reissuance, is not sufficient to meet the Required Reserve Amount, the Company will promptly take all corporate action necessary to authorize and reserve a sufficient number of shares, including, without limitation, calling a special meeting of shareholders to authorize additional shares to meet the Company's obligations pursuant to the Transaction Documents, in the case of an insufficient number of authorized shares, obtain shareholder approval of an increase in such authorized number of shares, and voting the management shares of the Company in favor of an increase in the authorized shares of the Company to ensure that the number of authorized shares is sufficient to meet the Required Reserve Amount.  Notwithstanding the foregoing, any Holder may allocate its allocation of the Required Reserve Amount to any other of the Securities held by the Holder (or any of its designees) by delivery of a written notice to the Company.

(i)    Variable Securities.  So long as any Preferred Shares or Preferred Warrants remain outstanding, the Company and each Subsidiary shall be prohibited from effecting or entering into an agreement to effect any Subsequent Placement involving a Variable Rate Transaction. "**Variable Rate Transaction**" means a transaction in which the Company or any Subsidiary (i) issues or sells any Convertible Securities either (A) at a conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such Convertible Securities, or (B) with

9

a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such Convertible Securities or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock, other than pursuant to a customary "weighted average" anti-dilution provision or (ii) enters into any agreement (including, without limitation, an equity line of credit or an "at-the-market" offering) whereby the Company or any Subsidiary may sell securities at a future determined price (other than standard and customary "preemptive" or "participation" rights).  The Investor shall be entitled to obtain injunctive relief against the Company and its Subsidiaries to preclude any such issuance, which remedy shall be in addition to any right to collect damages.  "**Subsidiaries**" means any Person in which the Company, directly or indirectly, (A) owns any of the outstanding capital stock or holds any equity or similar interest of such Person or (B) controls or operates all or any part of the business, operations or administration of such Person, and each of the foregoing, is individually referred to herein as a "**Subsidiary**".

(j)        Subsequent Placements.  For so long as any Preferred Shares, Preferred Warrants or Common Warrants remain outstanding, the Company shall not, in any manner, enter into or affect any Subsequent Placement if the effect of such Subsequent Placement is to cause the Company to be required to issue upon conversion of any Preferred Shares or exercise of any Common Warrant any shares of Common Stock in excess of that number of shares of Common Stock which the Company may issue upon conversion of the Preferred Shares and exercise of the Common Warrants without breaching the Company's obligations under the rules or regulations of the primary Eligible Market in which the Common Stock then trades.

(k)        Passive Foreign Investment Company.  The Company shall conduct its business, and shall cause its Subsidiaries to conduct their respective businesses, in such a manner as will ensure that the Company will not be deemed to constitute a passive foreign investment company within the meaning of Section 1297 of the Code.

(l)        Restriction on Redemption and Cash Dividends.  So long as any Preferred Shares are outstanding, the Company shall not, directly or indirectly, redeem, or declare or pay any cash dividend or distribution on, any securities of the Company without the prior express written consent of the Investor (other than as required by the Certificate of Amendment).

(m)        Corporate Existence.  So long as the Investor beneficially owns any Preferred Shares, Preferred Warrants or Common Warrants, the Company shall not be party to any Fundamental Transaction (as defined in the Common Warrants) unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Certificate of Amendment and the Common Warrants.

(n)        Conversion and Exercise Procedures.  Each of the form of Exercise Notice (as defined in the Common Warrants) included in the Common Warrants, the form of Exercise Notice (as defined in the Preferred Warrants) included in the Preferred Warrants and the form of Conversion Notice (as defined in the Certificate of Amendment) included in the Certificate of Amendment set forth the totality of the procedures required of the Investor in order to exercise the Preferred Warrants or the Common Warrants or convert the Preferred Shares.  No legal opinion, other information or instructions shall be required of the Investor to exercise their Preferred Warrants or Common Warrants or convert their Preferred Shares.  The Company shall honor

Error! Unknown document property name.

exercises of the Preferred Warrants and Common Warrants and conversions of the Preferred Shares and shall deliver the Conversion Shares, Additional Preferred Shares and Warrant Common Shares in accordance with the terms, conditions and time periods set forth in the Certificate of Amendment, Preferred Warrants and Common Warrants, respectively.  Without limiting the preceding sentences, no ink-original Conversion Notice or Exercise Notice shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Conversion Notice, Exercise Notice (as defined in the Preferred Warrants) or Exercise Notice (as defined in the Common Warrants) form be required in order to convert the Preferred Shares, exercise the Preferred Warrants or exercise the Common Warrants, respectively.

(o)    <u>Closing Documents</u>.  On or prior to fourteen (14) calendar days after the Closing Date, the Company agrees to deliver, or cause to be delivered, to the Investor and Kelley Drye & Warren, LLP a complete closing set of the executed Transaction Documents.

**3.    REGISTER; TRANSFER AGENT INSTRUCTIONS; LEGEND.**

(a)    <u>Register</u>.  The Company shall maintain at its principal executive offices (or such other office or agency of the Company as it may designate by notice to each holder of Securities), a register for the Preferred Shares, Preferred Warrants and the Common Warrants in which the Company shall record the name and address of the Person in whose name the Preferred Shares, Preferred Warrants and the Common Warrants have been issued (including the name and address of each transferee), the aggregate number of the Preferred Shares held by such Person, the number of Conversion Shares issuable pursuant to the terms of the Preferred Shares, the aggregate number of Additional Preferred Shares issuable upon exercise of the Preferred Warrants held by such Person and the aggregate number of Warrant Common Shares issuable upon exercise of the Common Warrants held by such Person.  The Company shall keep the register open and available at all times during business hours for inspection of the Investor or its legal representatives.

(b)    <u>Transfer Agent Instructions</u>.  The Company shall issue irrevocable instructions to its transfer agent and any subsequent transfer agent in a form acceptable to each of the Investor (the "**Irrevocable Transfer Agent Instructions**") to issue certificates or credit shares to the applicable balance accounts at the Depositary Trust Company ("**DTC**"), registered in the name of the Investor or its respective nominee(s), for the Conversion Shares and the Warrant Common Shares in such amounts as specified from time to time by the Investor to the Company upon conversion of the Preferred Shares or the exercise of the Common Warrants (as the case may be). The Company represents and warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 3(b) will be given by the Company to its transfer agent with respect to the Securities, and that the Securities shall otherwise be freely transferable on the books and records of the Company, as applicable, to the extent provided in this Agreement and the other Transaction Documents.  If the Investor effects a sale, assignment or transfer of the Securities, the Company shall permit the transfer and shall promptly instruct its transfer agent to issue one or more certificates or credit shares to the applicable balance accounts at DTC in such name and in such denominations as specified by the Investor to effect such sale, transfer or assignment.  In the event that such sale, assignment or transfer involves the Conversion Shares, the transfer agent shall issue such shares to the Investor, assignee or transferee (as the case may be) without any restrictive legend in accordance with Section 3(c) below.  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Investor.  Accordingly, the Company

Error! Unknown document property name.

acknowledges that the remedy at law for a breach of its obligations under this Section 3(b) will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 3(b), that the Investor shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required. The Company shall cause its counsel to issue each legal opinion referred to in the Irrevocable Transfer Agent Instructions to the Company's transfer agent as follows: (i) upon each conversion of the Preferred Shares or exercise of the Common Warrants (unless such issuance covered by a prior legal opinion previously delivered to the transfer agent of the Company (the "**Transfer Agent**")), and (ii) on each date a registration statement with respect to the issuance or resale of any of the Securities is declared effective by the SEC. Any fees (with respect to the transfer agent, counsel to the Company or otherwise) associated with the issuance of such opinions or the removal of any legends on any of the Securities shall be borne by the Company.

(c)     <u>Legends</u>.  Certificates and any other instruments evidencing the Securities shall not bear any restrictive or other legend.

(d)     <u>FAST Compliance</u>.  While any Common Warrants remain outstanding, the Company shall maintain a transfer agent that participates in the DTC Fast Automated Securities Transfer Program.

**4.     MISCELLANEOUS.**

(a)     <u>Governing Law; Jurisdiction; Jury Trial</u>.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, for the adjudication of any dispute hereunder or in connection herewith or under any of the other Transaction Documents or with any transaction contemplated hereby or thereby, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Investor from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Investor or to enforce a judgment or other court ruling in favor of the Investor.  **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR UNDER ANY OTHER TRANSACTION DOCUMENT OR IN CONNECTION WITH OR ARISING OUT OF**

Error! Unknown document property name.

**THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY.**

(b)  <u>Counterparts</u>.  This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party.  In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

(c)  <u>Headings; Gender</u>.  The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.  Unless the context clearly indicates otherwise, each pronoun herein shall be deemed to include the masculine, feminine, neuter, singular and plural forms thereof.  The terms "including," "includes," "include" and words of like import shall be construed broadly as if followed by the words "without limitation." The terms "herein," "hereunder," "hereof" and words of like import refer to this entire Agreement instead of just the provision in which they are found.

(d)  <u>Severability; Maximum Payment Amounts</u>.  If any provision of this Agreement is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Agreement so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.  The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).  Notwithstanding anything to the contrary contained in this Agreement or any other Transaction Document (and without implication that the following is required or applicable), it is the intention of the parties that in no event shall amounts and value paid by the Company and/or any of its Subsidiaries (as the case may be), or payable to or received by any of the Investor, under the Transaction Documents (including without limitation, any amounts that would be characterized as "interest" under applicable law) exceed amounts permitted under any applicable law.  Accordingly, if any obligation to pay, payment made to the Investor, or collection by the Investor pursuant the Transaction Documents is finally judicially determined to be contrary to any such applicable law, such obligation to pay, payment or collection shall be deemed to have been made by mutual mistake of the Investor, the Company and its Subsidiaries and such amount shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by the applicable law.  Such adjustment shall be effected, to the extent necessary, by reducing or refunding, at the option of the Investor, the amount of interest or any other amounts which would constitute unlawful amounts required to be paid or actually paid to the Investor under the Transaction Documents.  For greater certainty, to the extent that any interest, charges, fees,

Error! Unknown document property name.

expenses or other amounts required to be paid to or received by the Investor under any of the Transaction Documents or related thereto are held to be within the meaning of "interest" or another applicable term to otherwise be violative of applicable law, such amounts shall be pro-rated over the period of time to which they relate.

(e) <u>Entire Agreement; Amendments</u>.    This Agreement, the other Transaction Documents and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein supersede all other prior oral or written agreements between the Investor, the Company, its Subsidiaries, their affiliates and Persons acting on their behalf, including, without limitation, any transactions by the Investor with respect to Common Stock or the Securities, and the other matters contained herein and therein, and this Agreement, the other Transaction Documents, the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein contain the entire understanding of the parties solely with respect to the matters covered herein and therein; provided, however, nothing contained in this Agreement or any other Transaction Document shall (or shall be deemed to) (i) have any effect on any agreements the Investor has entered into with, or any instruments the Investor has received from, the Company or any of its Subsidiaries prior to the date hereof with respect to any prior investment made by the Investor in the Company or (ii) waive, alter, modify or amend in any respect any obligations of the Company or any of its Subsidiaries, or any rights of or benefits to the Investor or any other Person, in any agreement entered into prior to the date hereof between or among the Company and/or any of its Subsidiaries and the Investor, or any instruments the Investor received from the Company and/or any of its Subsidiaries prior to the date hereof, and all such agreements and instruments shall continue in full force and effect.  Except as specifically set forth herein or therein, neither the Company nor the Investor makes any representation, warranty, covenant or undertaking with respect to such matters.  For clarification purposes, the Recitals are part of this Agreement.  No provision of this Agreement may be amended other than by an instrument in writing signed by the Company and the Investor, and any amendment to any provision of this Agreement made in conformity with the provisions of this Section 4(e) shall be binding on the Investor and holders of Securities, as applicable, provided that no such amendment shall be effective to the extent that it (A) applies to less than all of the Holders of Securities then outstanding or (B) imposes any obligation or liability on the Investor without the Investor's prior written consent (which may be granted or withheld in the Investor's sole discretion).  No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party, provided that the Investor may waive any provision of this Agreement, and any waiver of any provision of this Agreement made in conformity with the provisions of this Section 4(e) shall be binding on all Investor and all Holders, as applicable, provided that no such waiver shall be effective to the extent that it (1) applies to less than all of the holders of the Securities then outstanding (unless a party gives a waiver as to itself only) or (2) imposes any obligation or liability on the Investor without the Investor's prior written consent (which may be granted or withheld in the Investor's sole discretion).  The Company has not, directly or indirectly, made any agreements with the Investor relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents.  As a material inducement for the Investor to enter into this Agreement, the Company expressly acknowledges and agrees that no due diligence or other investigation or inquiry conducted by the Investor, any of its advisors or any of its representatives shall affect the Investor's right to rely on, or shall modify or qualify in any manner or be an exception to any of, the Company's representations and warranties contained in this Agreement or any other Transaction Document.

Error! Unknown document property name.

(f)    Notices.  Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered:  (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by electronic mail (provided that such sent email is kept on file (whether electronically or otherwise) by the sending party and the sending party does not receive an automatically generated message from the recipient's email server that such e-mail could not be delivered to such recipient); or (iii) one (1) Business Day after deposit with an overnight courier service with next day delivery specified, in each case, properly addressed to the party to receive the same.  The mailing addresses and e-mail addresses for such communications shall be:

If to the Company:

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Telephone: (908) 688-0888
Attention: Sue Gove, Chief Executive Officer
E-Mail: Sue.Gove@bedbath.com

With a copy (for informational purposes only) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Telephone: 212-446-4800-
Attention: Sophia Hudson, Esq.
E-Mail: sophia.hudson@kirkland.com

If to the Transfer Agent:

American Stock Transfer & Trust Company
6201 15th Avenue
Brooklyn, New York 11219
Telephone: (718) 921-8300 (x6449)
Attention: Vito A. Cirone, Senior Relationship Manager
E-Mail: admin5@equiniti.com

If to the Investor

Hudson Bay Master Fund Ltd
c/o Hudson Bay Capital Management LP
28 Havemeyer Place
Greenwich, CT 06830
Attn: Direct Investments Team
E-mail:  investments@hudsonbaycapital.com

Error! Unknown document property name.

with a copy (for informational purposes only) to:

> Kelley Drye & Warren LLP
> 3 World Trade Center
> 175 Greenwich Street
> New York, NY 10007
> Telephone:  (212) 808-7540
> Attention:  Michael A. Adelstein, Esq.
> E-mail:  madelstein@kelleydrye.com

or to such other mailing address and/or e-mail address and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change.  Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's e-mail containing the time, date and recipient's e-mail or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by e-mail or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

(g)     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, including any purchasers of any of the Preferred Shares, Preferred Warrants and Common Warrants.  The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Investor, including, without limitation, by way of a Fundamental Transaction (as defined in the Preferred Warrants) (unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Preferred Warrants), a Fundamental Transaction (as defined in the Common Warrants) (unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Common Warrants) or a Fundamental Transaction (unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Certificate of Amendment).  The Investor may assign some or all of its rights hereunder in connection with any transfer of any of its Securities without the consent of the Company, in which event such assignee shall be deemed to be the Investor hereunder with respect to such assigned rights.

(h)     <u>No Third Party Beneficiaries</u>.  This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, other than the Indemnitees (as defined below) referred to in Section 4(k).

(i)     <u>Survival</u>.  The representations, warranties, agreements and covenants shall survive the closing of the Offering.  The Investor shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

(j)     <u>Further Assurances</u>.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to

Error! Unknown document property name.

carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k)    Indemnification.

(i)    In consideration of the Investor's execution and delivery of the Transaction Documents and acquiring the Securities thereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless the Investor and each holder of any Securities and all of their shareholders, partners, members, officers, directors, employees and direct or indirect Holders and any of the foregoing Persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "**Indemnitees**") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "**Indemnified Liabilities**"), incurred by any Indemnitee as a result of, or arising out of, or relating to (i) any misrepresentation or breach of any representation or warranty made by the Company or any Subsidiary in any of the Transaction Documents, (ii) any breach of any covenant, agreement or obligation of the Company or any Subsidiary contained in any of the Transaction Documents or (iii) any cause of action, suit, proceeding or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company or any Subsidiary) or which otherwise involves such Indemnitee that arises out of or results from (A) the execution, delivery, performance or enforcement of any of the Transaction Documents, (B) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities, (C) any disclosure properly made by the Investor pursuant to Section 2(f), or (D) the status of the Investor or holder of the Securities either as an Holder in the Company pursuant to the transactions contemplated by the Transaction Documents or as a party to this Agreement (including, without limitation, as a party in interest or otherwise in any action or proceeding for injunctive or other equitable relief).  To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.

(ii)    Promptly after receipt by an Indemnitee under this Section 4(k) of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving an Indemnified Liability, such Indemnitee shall, if a claim in respect thereof is to be made against the Company under this Section 4(k), deliver to the Company a written notice of the commencement thereof, and the Company shall have the right to participate in, and, to the extent the Company so desires, to assume control of the defense thereof with counsel mutually satisfactory to the Company and the Indemnitee; provided, however, that an Indemnitee shall have the right to retain its own counsel with the fees and expenses of such counsel to be paid by the Company if: (A) the Company has agreed in writing to pay such fees and expenses; (B) the Company shall have failed promptly to assume the defense of such Indemnified Liability and to employ counsel reasonably

17

satisfactory to such Indemnitee in any such Indemnified Liability; or (C) the named parties to any such Indemnified Liability (including any impleaded parties) include both such Indemnitee and the Company, and such Indemnitee shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnitee and the Company (in which case, if such Indemnitee notifies the Company in writing that it elects to employ separate counsel at the expense of the Company, then the Company shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Company), provided further, that in the case of clause (C) above the Company shall not be responsible for the reasonable fees and expenses of more than one (1) separate legal counsel for the Indemnitees.  The Indemnitee shall reasonably cooperate with the Company in connection with any negotiation or defense of any such action or Indemnified Liability by the Company and shall furnish to the Company all information reasonably available to the Indemnitee which relates to such action or Indemnified Liability.  The Company shall keep the Indemnitee reasonably apprised at all times as to the status of the defense or any settlement negotiations with respect thereto.  The Company shall not be liable for any settlement of any action, claim or proceeding effected without its prior written consent, provided, however, that the Company shall not unreasonably withhold, delay or condition its consent.  The Company shall not, without the prior written consent of the Indemnitee, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnitee of a release from all liability in respect to such Indemnified Liability or litigation, and such settlement shall not include any admission as to fault on the part of the Indemnitee.  Following indemnification as provided for hereunder, the Company shall be subrogated to all rights of the Indemnitee with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made.  The failure to deliver written notice to the Company within a reasonable time of the commencement of any such action shall not relieve the Company of any liability to the Indemnitee under this Section 4(k), except to the extent that the Company is materially and adversely prejudiced in its ability to defend such action.

(iii)     The indemnification required by this Section 4(k) shall be made by periodic payments of the amount thereof during the course of the investigation or defense, within ten (10) days after bills are received or Indemnified Liabilities are incurred.

(iv)     The indemnity agreement contained herein shall be in addition to (A) any cause of action or similar right of the Indemnitee against the Company or others, and (B) any liabilities the Company may be subject to pursuant to the law.

(l)     <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.  No specific representation or warranty shall limit the generality or applicability of a more general representation or warranty.  Each and every reference to share prices, shares of Common Stock and any other numbers in this Agreement that relate to the Common Stock shall be automatically adjusted for any stock splits, stock dividends, stock combinations, recapitalizations or other similar transactions that occur with respect to the Common Stock after the date of this Agreement.  Notwithstanding anything in this Agreement to the contrary, for the avoidance of doubt, nothing contained herein shall constitute a representation or

18

warranty against, or a prohibition of, any actions with respect to the borrowing of, arrangement to borrow, identification of the availability of, and/or securing of, securities of the Company in order for the Investor (or its broker or other financial representative) to effect short sales or similar transactions in the future.

(m)    <u>Remedies</u>.  The Investor and in the event of assignment by the Investor, in whole or in part, of its rights and obligations hereunder, each Holder of Securities, shall have all rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law.  Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  Furthermore, the Company recognizes that in the event that it or any Subsidiary fails to perform, observe, or discharge any or all of its or such Subsidiary's (as the case may be) obligations under the Transaction Documents, any remedy at law would inadequate relief to the Investor.  The Company therefore agrees that the Investor shall be entitled to specific performance and/or temporary, preliminary and permanent injunctive or other equitable relief from any court of competent jurisdiction in any such case without the necessity of proving actual damages and without posting a bond or other security.  The remedies provided in this Agreement and the other Transaction Documents shall be cumulative and in addition to all other remedies available under this Agreement and the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief).

(n)    <u>Withdrawal Right</u>.  Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) the Transaction Documents, whenever the Investor exercises a right, election, demand or option under a Transaction Document and the Company or any Subsidiary does not timely perform its related obligations within the periods therein provided, then the Investor may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company or such Subsidiary (as the case may be), any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights.

(o)    <u>Payment Set Aside; Currency</u>.  To the extent that the Company makes a payment or payments to the Investor hereunder or pursuant to any of the other Transaction Documents or any of the Investor enforce or exercise their rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, foreign, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.  Unless otherwise expressly indicated, all dollar amounts referred to in this Agreement and the other Transaction Documents are in United States Dollars ("**U.S. Dollars**"), and all amounts owing under this Agreement and all other Transaction Documents shall be paid in U.S. Dollars.  All amounts denominated in other currencies (if any) shall be converted into the U.S. Dollar equivalent amount in accordance with the Exchange Rate on the date of calculation.  "**Exchange Rate**" means, in relation to any amount of currency to be converted into U.S. Dollars

pursuant to this Agreement, the U.S. Dollar exchange rate as published in the Wall Street Journal on the relevant date of calculation.

(p)     <u>Judgment Currency</u>.

(i)     If for the purpose of obtaining or enforcing judgment against the Company in connection with this Agreement or any other Transaction Document in any court in any jurisdiction it becomes necessary to convert into any other currency (such other currency being hereinafter in this Section 4(p) referred to as the "**Judgment Currency**") an amount due in US Dollars under this Agreement, the conversion shall be made at the Exchange Rate prevailing on the Trading Day immediately preceding:

(1)     the date actual payment of the amount due, in the case of any proceeding in the courts of Delaware or in the courts of any other jurisdiction that will give effect to such conversion being made on such date: or

(2)     the date on which the foreign court determines, in the case of any proceeding in the courts of any other jurisdiction (the date as of which such conversion is made pursuant to this Section 4(p)(i)(2) being hereinafter referred to as the "**Judgment Conversion Date**").

(ii)     If in the case of any proceeding in the court of any jurisdiction referred to in Section 4(p)(i)(1) above, there is a change in the Exchange Rate prevailing between the Judgment Conversion Date and the date of actual payment of the amount due, the applicable party shall pay such adjusted amount as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the Exchange Rate prevailing on the date of payment, will produce the amount of US Dollars which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial order at the Exchange Rate prevailing on the Judgment Conversion Date.

(iii)     Any amount due from the Company under this provision shall be due as a separate debt and shall not be affected by judgment being obtained for any other amounts due under or in respect of this Agreement or any other Transaction Document.

*[signature pages follow]*

Error! Unknown document property name.

**IN WITNESS WHEREOF,** the Investor and the Company have caused their respective signature page to this Agreement to be duly executed as of the date first written above.

**COMPANY:**

**BED BATH & BEYOND INC.**

By: _____

DocuSigned by:

*Sue Gove*

55C85A5858324E1...

Name: Sue Gove

Title:   Chief Executive Officer

[*Signature Page to Side Letter*]

**IN WITNESS WHEREOF,** the Investor and the Company have caused their respective signature page to this Agreement to be duly executed as of the date first written above.

**INVESTOR:**

**HBC INVESTMENTS LLC**

By: _____
     Name: Richard Allison
     Title: Authorized Signatory*

     *Authorized Signatory Hudson Bay Capital Management LP not individually, but solely as Investment Advisor to HBC Investments LLC.