# Exhibit H

# 00-7630

THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

MARK LEVY, Derivatively on Behalf of ImmunoGen, Inc.,

*Plaintiff -Appellant,*

v.

SOUTHBROOK INTERNATIONAL INVESTMENTS, LTD.,

*Defendant-Appellee,*

and

IMMUNOGEN, INC.,

*Nominal Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
AMICUS CURIAE, IN SUPPORT OF APPELLEE ON ISSUES ADDRESSED

DAVID M. BECKER
General Counsel

ERIC SUMMERGRAD
Deputy Solicitor

ALLAN A. CAPUTE
Special Counsel to the Solicitor

Of Counsel
 MEYER EISENBERG
 Deputy General Counsel

Securities and Exchange Commission
Washington, D.C. 20549-0606
(202) 942-0837

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    District Court Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.     WHERE A BINDING CONVERSION CAP DENIES AN
      INVESTOR THE RIGHT TO ACQUIRE MORE THAN 10%
      OF THE UNDERLYING EQUITY SECURITIES OF AN
      ISSUER, THE INVESTOR IS NOT, BY VIRTUE OF HIS
      OR HER OWNERSHIP OF CONVERTIBLE SECURITIES,
      THE BENEFICIAL OWNER OF MORE THAN 10% OF
      THOSE EQUITY SECURITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.    THESE DERIVATIVE SECURITIES HAVE BOTH FIXED
      AND FLOATING RATE COMPONENTS . . . . . . . . . . . . . . . . . . . . . . . . 26

III.   FLOATING RATE DERIVATIVE SECURITIES ARE
      INCLUDED IN THE 10% BENEFICIAL OWNERSHIP
      DETERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

Auer v. Robbins, 519 U.S. 452 (1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Citadel Holding Corp. v. Roven, 26 F.3d 960 (9th Cir. 1994)  . . . . . . . . . . . . . . . .  8

Editek, Inc. v. Morgan Capital, L.L.C.,
    150 F.3d 830 (8th Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 30

Foremost-McKesson, Inc. v. Provident Securities Co.,
    423 U.S. 232 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 24

GAF Corp. v. Milstein, 453 F.2d 709 (2d Cir. 1971), cert. denied,
    406 U.S. 910 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Global Intellicom, Inc. v. Thomas Kernaghan & Co.,
    [1999 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶90,534,
    1999 WL 544708 (S.D.N.Y. July 27, 1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Gollust v. Mendell, 501 U.S. 115 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305 (2d Cir. 1998) . . . . . . .  16

Levner v. Prince Alwaleed, 61 F.3d 8 (2d Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . .  8

Levy v. Marshall Capital Management, Inc., No. 99 Civ. 3428
    (E.D.N.Y. July 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Levy v. Southbrook International Investments, Ltd.,
    [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶90,981,
    2000 WL 567008 (S.D.N.Y. May 10, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 12

Magma Power Co. v. Dow Chemical Co., 136 F.3d 316 (2d Cir. 1998)  . . . . . . .  23

**TABLE OF AUTHORITIES (CONTINUED)**

**Cases (Continued)**                                                        **Page**

Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 14

Reliance Electric Co. v. Emerson Electric Co.,
  404 U.S. 418 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Schaffer v. Capital Ventures International, No. 98 Civ. 3900
  (S.D.N.Y. Sept. 13, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Schaffer v. CC Investments, LDC, 115 F. Supp. 2d 440
  (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Transcon Lines v. A.G. Becker, Inc., 470 F. Supp. 356
  (S.D.N.Y. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Statutes and Rules**

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.

    Section 12, 15 U.S.C. 78l . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 13(d), 15 U.S.C. 78m(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 16
                                                                           passim
    Section 16, 15 U.S.C. 78p . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11,13
                                                                           passim
    Section 16(a), 15 U.S.C. 78p(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20
    Section 16(b), 15 U.S.C. 78p(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3
                                                                           passim
    Section 16(c), 15 U.S.C. 78p(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**TABLE OF AUTHORITIES (CONTINUED)**

**Statutes and Rules (Continued)**                                    **Page**

Rules Under the Securities Exchange Act of 1934, 17 C.F.R. 240.01, et seq.

    Rule 13d-1, 17 C.F.R. 240.13d-1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Rule 13d-3, 17 C.F.R. 240.13d-3  . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10
                                                passim
    Rule 13d-3(a), 17 C.F.R. 240.13d-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19
    Rule 13d-3(b), 17 C.F.R. 240.13d-3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Rule 13d-3(d)(1), 17 C.F.R. 240.13d-3(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . 9
    Rule 13d-3(d)(1)(i), 17 C.F.R. 240.13d-3(d)(1)(i)  . . . . . . . . . . . . . 17, 21, 30
    Rule 16a-1(a), 17 C.F.R. 240.16a-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Rule 16a-1(a)(1), 17 C.F.R. 240.16a-1(a)(1)  . . . . . . . . . . . . . . . . . . 9, 10, 16
                                                passim
    Rule 16a-1(a)(2), 17 C.F.R. 240.16a-1(a)(2)  . . . . . . . . . . . . . . . . . . . . 16, 27
    Rule 16a-1(a)(2)(ii)(F), 17 C.F.R. 240.16a-1(a)(2)(ii)(F) . . . . . . . . . . . . . 27
    Rule 16a-1(c)(6), 17 C.F.R. 240.16a-1(c)(6)  . . . . . . . . . . . . . . . . . . . . . . . 28

**Miscellaneous**

BancBoston Capital Inc., No-Action Letter, 1987 WL 108100
  (publicly available Aug. 10, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Filing and Disclosure Requirements Relating to Beneficial Ownership,
  Exchange Act Release No. 14692, 14 SEC Docket 862, 1978 WL 14827
  (April 21, 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

Ownership Reports and Trading by Officers, Directors and Principal
  Security Holders, Exchange Act  Release No. 28869,
  48 SEC Docket 234, 1991 WL 292000   (February 8, 1991) . . . . . . . . . . . . 17, 28

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

No. 00-7630

MARK LEVY, Derivatively on behalf of ImmunoGen, Inc.,

*Plaintiff-Appellant,*

v.

SOUTHBROOK INTERNATIONAL INVESTMENTS, LTD.,

*Defendant-Appellee,*

and

IMMUNOGEN, INC.,

*Nominal Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York

BRIEF OF THE SECURITIES AND EXCHANGE
COMMISSION, AMICUS CURIAE, IN SUPPORT
OF APPELLEES ON ISSUES ADDRESSED

The Securities and Exchange Commission submits this brief as amicus curiae

in response to the December 27, 2000 invitation of the Court. This case was

brought under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.

78p(b). The plaintiff claims that the defendant, by virtue of holding convertible

preferred stock in a company, is the beneficial owner of more than 10% of the

common stock in the company, and thus is subject to the short-swing profit

recovery provision of Section 16(b) with respect to the company's common stock.

The term "beneficial owner" is defined for these purposes by Commission Rule

13d-3, 17 C.F.R. 240.13d-3, which provides, among other things, that a person is

the beneficial owner of equity securities if, through conversion rights, it can acquire

voting or investment power over the securities within sixty days.  The defendant

claims that because its conversion rights are limited so that it cannot hold more

than 4.9% of the common stock at any one time, it cannot be the beneficial owner

of more than 10% of the common stock. The Court has requested the

Commission's views on three specific issues:

> 1) whether an investor that holds convertible securities
> may be a more than ten percent beneficial owner of the
> underlying equity stock, under the investment power
> prong of the within 60 day rule (Rule 13d-3), despite the
> existence of a conversion limit of 4.9%;
>
> 2) whether preferred stock that is convertible into
> common stock by dividing $1,000 plus accrued dividends
> by the lesser of (a) a fixed price determined at the date of
> purchase of the particular issue of preferred stock or, (b)
> the applicable percentage of the average closing bid price
> of the common stock for the five consecutive trading
> days immediately preceding the date of conversion,
> where the applicable percentage is defined as (i) 100%

2

for the first forty days after the purchase of the particular issue of preferred stock, (ii) 90% for the next forty days, and (iii) 85% for any conversion thereafter, is properly considered a fixed rate derivative or a floating rate derivative security;

3) whether floating rate derivatives are included in the more than ten percent beneficial ownership determination.1/

## STATEMENT OF THE CASE

A.    Factual Background

Plaintiff Mark Levy, a shareholder of ImmunoGen, brought this Section 16(b) action on behalf of ImmunoGen alleging that Southbrook was a beneficial owner of more than 10% of ImmunoGen common stock and realized short-swing profits through the purchase and sale of the common stock within a six month period.  Plaintiff seeks disgorgement of Southbrook's profits.

On October 16, 1996, Southbrook entered into a Purchase Agreement with ImmunoGen to acquire convertible preferred stock.  The Agreement provided Southbrook with a right to convert the preferred stock into ImmunoGen common stock and to exercise certain warrants to purchase common stock.  These rights,

---

1/    A fourth question asked the Commission to inform this Court of "any other matter that the SEC may feel is relevant to a correct determination of the issue facing the panel."  The Commission does not believe discussion of any other issue is warranted.

3

however, were expressly limited by Section 3.10 of the Purchase Agreement (A36-37). 2/ Under Section 3.10 Southbrook could not convert preferred stock and warrants if their conversion or exercise would result in Southbrook owning more than 4.9% of ImmunoGen's outstanding shares of common stock at any one time:

> The Purchaser may not use its ability to convert Shares hereunder or under the terms of the Vote Certificate 3/ or to exercise its right to acquire shares of Common Stock under the Warrants to the extent that such conversion or exercise would result in the Purchaser owning more than 4.9% of the outstanding shares of Common Stock.

Section 3.10 further provides that the company will, at the time a conversion is requested, notify the purchaser of the number of outstanding shares of common stock the purchaser would hold after the conversion (A36-37). If it is determined that the conversion would result in the purchaser holding more that 4.9% of the company's outstanding shares of common stock, the purchaser may then exercise the conversion or revoke the conversion to the extent that full exercise would result in the purchaser owning more than 4.9% (A37).

---

2/    "A__" refers to a page number in the Joint Appendix.

3/    The "Vote Certificate" refers to the certification of the vote of the directors establishing the terms of the convertible preferred stock.

4

The Vote Certificate contains a similar revocation provision. Section 5(a)(i) of the Vote Certificate provides that a notice of intent to convert shall be irrevocable except that the holder of the preferred stock "may revoke the conversion requested * * * to the extent the conversion contemplated by [the holder] would result in such holder owning more than 4.9% of the outstanding shares of common stock" (A58, see also 227-28). In addition, the "Notice of Conversion At the Election Of Holder," sent to the company to request a conversion of preferred stock, contains similar language (A68 , 238).

Each preferred stock certificate states that the "securities represented by this certificate are subject to a Convertible Preferred Stock Purchase Agreement, as amended, between the Corporation and Southbrook International Investments, Ltd." (A205-24).

There is no allegation that the conversion cap was ever modified or that the parties failed to comply with its prohibition.

Subsequently, Southbrook acquired 3,000 shares of ImmunoGen Series B Preferred Stock, 3,000 shares of Series C Preferred Stock, and 1,000 shares of Series D Preferred Stock. Each issue of preferred stock was convertible into common stock by dividing $1,000 plus accrued dividends by the lesser of (a) a

fixed price determined at the date of purchase or, (b) the "applicable percentage" of
the average closing bid price of the common stock for the five trading days
immediately preceding the date of conversion. The "applicable percentage" was
defined as (i) 100% for the first forty days after the purchase of the issue, (ii) 90%
for the next forty days, and (iii) 85% for any conversions thereafter (A9-12).

The preferred stock was subsequently converted by Southbrook at the
applicable percentage of the average closing bid price for the ImmunoGen common
stock during the five consecutive trading days immediately preceding the date of
conversion (A12).

The plaintiff filed his Section 16(b) action on February 26, 1999 (A1).
Plaintiff calculated that by February 21, 1997, Southbrook had the right to acquire
cumulatively over a sixty-day period, by exercising its conversion rights, a total of
2,673,742 shares of ImmunoGen common stock, or approximately 15% of the
outstanding shares (A10, 369). Plaintiff, therefore, alleges that between January 1
and February 4, 1997, Southbrook beneficially owned more than 10% of the
company's common stock. During this period, the plaintiff alleges, Southbrook
acquired 1,384,823 shares of common stock and then sold them (A10-11, 369).
Southbrook allegedly again engaged in short-swing trading in ImmunoGen

6

common stock while beneficially owning more than 10% – between January 27, 1997 and August 4, 1997, and again in October 1997 (A12, 369).

On February 11, 2000, Southbrook moved to dismiss plaintiff's complaint (A4). Southbrook argued that the conversion cap shielded it from Section 16(b) liability because the cap prohibited it from converting and holding any more than 4.9% of ImmunoGen's outstanding common stock at any one time. Accordingly, Southbrook contends that it never had the "right to acquire" more than 4.9% at any given time within sixty days and cannot be held liable as a more than 10% beneficial owner under Section 16(b).

B.    District Court Decision

On May 10, 2000, the district court granted defendant's motion and dismissed plaintiff's complaint. In its opinion, See Levy v. Southbrook International Investments, Ltd., [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶90,981, 2000 WL 567008 (S.D.N.Y. May 10, 2000), the district court noted that the issue to be decided is whether Southbrook, despite the existence of the 4.9% limitation, had the right to acquire more that 10% of ImmunoGen's common stock within sixty days. The district court offered several reasons for its determination that Southbrook did not have such a right.

7

"First, contrary to plaintiff's contention that conversion caps are invalid, * * * several courts in the Second Circuit have upheld conversion caps, such as the one present here, in the context of §16(b)" (A374). Foremost among the cases relied on by the district court is <u>Levner v. Prince Alwaleed</u>, 61 F.3d 8, 9-10 (2d Cir. 1995). While the sixty-day rule was not mentioned in <u>Levner</u>, the decision, nevertheless, endorses the effectiveness of conversion caps. This Court decided that a shareholder, who held both common stock and convertible securities of an issuer, was not liable for short-swing profits because a conversion cap limited his holding of equity securities to 4.9%. Thus, even though a hypothetical conversion of all the defendant's securities would have given him 14% of the company's outstanding common stock, the <u>Levner</u> court found it decisive that the cap limited his right to hold common stock to much less than 10%. <u>4/</u>  <u>See also</u> <u>Citadel Holding Corp. v.</u>

---

<u>4/</u>    While <u>Levner</u> did not concern the sixty-day rule, the district court also relied on  several district court decisions that have analyzed conversion limitations apparently within the sixty-day rule context and rejected the arguments put forward by plaintiff in this case.  <u>See</u> <u>Schaffer v. CC Investments, LDC</u>, 115 F. Supp. 2d 440, 442-43 (S.D.N.Y. 2000); <u>Levy v. Marshall Capital Management, Inc.</u>, No. 99 Civ. 3428, slip. op. pp. 8-9, 12, 17-18 (E.D.N.Y. July 26, 2000); <u>Global Intellicom, Inc. v. Thomson Kernaghan & Co.</u>, [1999 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶90,534, 1999 WL 544708 at *16 (S.D.N.Y. July 27, 1999)(construing Section 13(d)); <u>Transcon Lines v. A.G. Becker Inc.</u>, 470 F. Supp. 356, 370-71 (S.D.N.Y. 1979) (Section 13(d) case).

(continued...)

8

Roven, 26 F.3d 960, 965-67 (9th Cir. 1994) (holding that conversion caps are effective to avoid reporting requirements while construing the rules prior to the adoption of Rule 16a-1(a)(1)).

Secondly, the district court rejected the plaintiff's theory of beneficial ownership based upon its "independent analysis" of the Rule 13d-3. "Reading the rule within the broader statutory framework" the court concluded that "it is clear that only those holders of derivative securities, who could acquire ownership, by conversion or otherwise, of more than 10% of the common stock, at any one time, are subject to §16(b) liability" (A376) (emphasis in original).

Finally, the district court viewed plaintiff's theory of liability under Rule 13d-3(d)(1) to be "extremely far reaching and overly broad." "Under plaintiff's theory, the person's mere ability to acquire more than 10% at different times within sixty days, while never resulting in his owning 10% at one time, would make him the beneficial owner of more than 10%." The court was confident that Section 16(b) "was not intended to reach this hypothetical investor" because such an

---

4/(...continued)
      In one oral decision, the court accepted the arguments advanced by the plaintiff here. See Schaffer v. Capital Ventures International, No. 98 Civ. 3900, transcript of proceedings p. 28-32 (S.D.N.Y. Sept. 13, 1999).

interpretation "would extend the statute's sweep beyond those with insider power and information" (A378).

Thus, the court found that, "in absence of a violation of the conversion cap, Southbrook did not beneficially own more than 4.9% of ImmunoGen's common stock" (A377-78).

## SUMMARY OF ARGUMENT

The plaintiff alleges that the defendant, Southbrook International Investments, is the beneficial owner of more than 10% of the common stock of ImmunoGen, Inc. and, therefore, subject to Section 16 of the Securities Exchange Act of 1934, 15 U.S.C. 78p. It is seeking to recover, under Section 16(b) of the Act, "short swing" profits realized by the defendant on its trades in ImmunoGen stock.

Section 16 does not define who is a "beneficial owner" of stock for purposes of its provisions. The Commission has by rule (Rule 16a-1(a)(1), 17 C.F.R. 240.16a-1(a)(1)), provided that whether a person is the beneficial owner of more than 10% of a class of equity securities under Section 16 is determined under Section 13(d), 15 U.S.C. 78m(d), and the rules thereunder. Rule 13d-3 generally provides that a person is a beneficial owner of stock if the person has (i) voting

power over the stock, (ii) investment power (including the power to dispose of

stock), or (iii) the right to acquire voting or investment power within sixty days. 5/

The plaintiff in this case argues that Southbrook could acquire, within sixty

days, investment power over more than 10% of ImmunoGen's stock. Southbrook

owns preferred stock in ImmunoGen that is convertible into common stock at

either a fixed price or, if lower, a floating price based on the recent market price of

the stock at the time of conversion. The conversion rights are limited, however, so

that Southbrook can hold no more than 4.9% of ImmunoGen stock at any one time.

Although the cap, if effective, operates to limit the amount of stock the defendant

can own at one time, the plaintiff argues that, because the defendant could serially

acquire and dispose of more than 10% of the stock during a sixty-day period,

Southbrook has the right to acquire investment power over more than 10% of the

stock and thus is subject to Section 16.

Following several courts that have held that such conversion caps can

prevent a person from holding more than the statutory amount at any one time, the

district court accepted Southbrook's arguments and granted its motion to dismiss

_____

5/    References in this discussion to "hold" or "held" include beneficial
      ownership through voting or investment power, but do not include the right
      to acquire those powers.

11

plaintiff's complaint. <u>Levy v. Southbrook International Investments, Ltd.,</u> [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 90,981, 2000 WL 567008 (S.D.N.Y. May 10, 2000).

The Commission believes that a 4.9% conversion cap, if valid and binding, prevents the convertible holder from being, by virtue of its conversion rights, a more than 10% beneficial owner. Rule 13d-3 defines beneficial ownership to include only voting or investment power over a security or the "right" to acquire the same within sixty days. Since Southbrook's right to hold common stock at any one time is limited to 4.9%, there is no time when it can hold more than 10%. Once it reaches 4.9%, it can have the "right" to acquire more only if it first divests itself of existing holdings, at which point it ceases to have either power over the divested shares. As a result, there is no one time when Southbrook could be the beneficial owner of more than 4.9% of the stock.

While the plaintiffs point out that a person who is in a position to serially dispose of large amounts of stock (especially newly issued stock) may be in a position to exert influence over the company, that general observation does not displace the clear language of Rule 13d-3. It would be especially inappropriate to

expand that language in the context of Section 16, which the Supreme Court has long held should be construed narrowly because it is a strict liability statute.

While the Commission believes that conversion caps may be effective in principle, such provisions should be examined on a case-by-case basis to determine whether they are binding and valid. If a cap is not effective in constraining conversion rights, it is not a basis for finding limits on beneficial ownership.

As to the second question, whether the convertible stock in this case, which could be converted at the lower of either a fixed price or a market-based price, "is properly considered a fixed rate derivative or a floating rate derivative security," it is the Commission's view that such a derivative has both fixed and floating rate components. The fixed rate component sets a floor below which the number of common shares received on a conversion will not decline. The floating rate component allows conversion into an increasing number of common shares as the market price of the common shares declines.

Finally, this Court has asked "whether floating rate derivative securities are included in the more than ten percent beneficial ownership determination for purposes of Section 16." It is our view that so long as the conversion rate gives the

13

holder the right to acquire more than 10% of the company's equity stock, the

holder is subject to Section 16 whether the conversion rate is fixed or floating.

## STANDARD OF REVIEW

This Court has held that it is "bound by the SEC's interpretations of its

regulations in its amicus briefs, unless they are 'plainly erroneous or inconsistent

with the regulation[s].'" Press v. Quick & Reilly, Inc., 218 F.3d 121, 128 (2d Cir.

2000) (quoting Auer v. Robbins, 519 U.S. 452, 461-63 (1997)).

## ARGUMENT

I.     WHERE A BINDING CONVERSION CAP DENIES AN INVESTOR THE
       RIGHT TO ACQUIRE MORE THAN 10% OF THE UNDERLYING
       EQUITY SECURITIES OF AN ISSUER, THE  INVESTOR IS NOT, BY
       VIRTUE OF HIS OR HER OWNERSHIP OF CONVERTIBLE
       SECURITIES, THE BENEFICIAL OWNER OF MORE THAN 10% OF
       THOSE EQUITY SECURITIES.

The first question posed by this Court is whether the 4.9% conversion cap

imposed on Southbrook operated to prevent Southbrook from becoming a more

than 10% beneficial owner of ImmunoGen common stock.  The issue arises

because under the applicable rules, beneficial ownership of a class of equity

securities includes not only existing voting or investment power over the security,

but also the right to acquire such power through, among other things, the exercise

of conversion rights, within 60 days.  Thus, ordinarily, a shareholder who owns

convertible preferred that may be converted into more than 10% of the company's common stock within sixty days would be deemed to beneficially own the underlying common.

Under Section 16(a) a beneficial owner (as well as any officer or director, regardless of share ownership) must report, at the time of registration of the securities under Section 12 of the Exchange Act, 15 U.S.C. 78l, or at the time he or she becomes a reporting person, the amount of all issuer securities he or she beneficially owns, and must thereafter report all purchases and sales of those securities.

Section 16(b) then provides that an issuer or a shareholder of an issuer may bring an action to recover short-swing profits (i.e., profits from the purchase and sale of the issuer's equity securities within a period of less that six months) realized by an officer, director or the beneficial owner of more than 10% of any class of the issuer's equity securities. This provision "seeks to deter [the statutory insiders defined in Section 16(a)], who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the

15

issuer's equity securities at an advantage over persons with whom they trade."

Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998). 6/

Section 16 does not define who is a "beneficial owner" of the issuer's

securities.  In 1991 the Commission promulgated Rule 16a-1(a)(1), 17 C.F.R.

240.16a-1(a)(1), which adopts the definition of "beneficial owner" found in Section

13(d) of the Exchange Act and the rules promulgated under Section 13(d), but only

for purpose of determining who is a beneficial owner of more than ten percent

under Section 16. 7/  While the purpose of Section 13(d) is to alert investors to a

rapid accumulation of shares that might potentially affect the control of a company,

GAF Corp. v. Milstein, 453 F.2d 709, 717 (2d Cir. 1971), cert. denied, 406 U.S.

910 (1972), the Commission decided to apply the Section 13(d) definition of

"beneficial owner" to Section 16 because the same considerations that extend to

control also are applicable or analogous to those that might lead to access to insider

---

6/    In addition, Section 16(c) restricts a reporting person's short sales of issuer
      equity securities.

7/    For all other Section 16 purposes the Commission adopted a definition of
      "beneficial owner" based on a person's direct or indirect pecuniary interest
      in the subject securities.  See Rule 16a-1(a)(2), 17 C.F.R. 240.16a-1(a)(2).
      See e.g., Editek, Inc. v. Morgan Capital, L.L.C., 150 F.3d 830, 834 (8th Cir.
      1998).  Thus, even if a person is deemed a beneficial owner of more than
      10% of common stock, he or she is only responsible for disgorgement of
      short-swing profits on those shares in which he has a pecuniary interest.

16

information.  See <u>Ownership Reports and Trading by Officers, Directors and</u>

<u>Principal Security Holders</u>, Exchange Act Release No. 28869, 48 SEC Docket 234,

236, 1991 WL 292000 at *5 (February 8, 1991).

     The critical rule here is Rule 13d-3, 17 C.F.R. 240.13d-3.  Rule 13d-3(a)

provides that a beneficial owner includes

> any person who, directly or indirectly, through any
> contract, arrangement, understanding, relationship, or
> otherwise has or shares:
>
> (1) Voting power which includes the power to vote, or to
> direct the voting of, such security; and/or
>
> (2) Investment power which includes the power to
> dispose, or to direct the disposition of, such security.

Most important for this case is Rule 13d-3(d)(1)(i), 17 C.F.R. 240.13d-3(d)(1)(i),

which goes on to provide that

> A person shall be deemed to be the beneficial owner of a
> security * * * if that person has the right to acquire
> beneficial ownership of such security, as defined in Rule
> 13d-3(a) * * * within sixty days, including but not limited
> to any right to acquire * * * through the conversion of a
> security * * *.

Accordingly, beneficial ownership includes currently having a voting or investment

power, or having the "right to acquire" either voting power or investment power

within sixty days. 8/ The purpose of the sixty-day rule was explained in the 1978

release adopting amendments to the rule. <u>Filing and Disclosure Requirements</u>

<u>Relating to Beneficial Ownership</u>, Exchange Act Release No. 14692, 14 SEC

Docket 862, 1978 WL 14827 (April 21, 1978) ("1978 Release"). In discussing

why it decided to adopt the sixty-day rule, and not to extend beneficial ownership

to include the right to acquire at any time, the Commission stated that it was

> mindful that as the point in time in which the right to
> acquire may come to fruition is extended into the future
> the relation of the right's ability to influence control is
> correspondingly attenuated. When sixty days or less are
> left until the right to acquire may be exercised, the
> Commission believes that the ability of the holder of such
> right to affect control is sufficient to warrant the
> imposition of an obligation to file under Rule 13d-1.

1978 Release at *15. The Commission, in other words, viewed the near-term right

to acquire voting or investment power over a security as the equivalent of having

current voting or investment power over the security. The near-term right to

acquire power may be just as influential, in terms of affecting control of a

---

8/    The rule encompasses options and other securities or arrangements that give
a person the right to acquire equity securities. It further provides that if the
option, convertible security, or other right is obtained with the purpose or
effect of affecting control, the sixty-day period under the rule does not apply,
and the owner will be deemed the beneficial owner of the underlying
securities regardless of when the right is exercisable.

corporation, as the present possession of those powers. And since Section 13(d) is intended to provide early warnings to investors of potential changes in control, it makes sense to advise investors of the incipient acquisition of these powers.

Plaintiff contends that Southbrook was the beneficial owner of more than 10% of ImmunoGen's common stock because within sixty days Southbrook could acquire and dispose of more than that amount of common stock. Plaintiff argues that the power to dispose of stock within sixty days should be viewed cumulatively, so that if a person can acquire and dispose of stock, and then acquire and dispose of more stock, all within sixty days, those acquisitions should be combined.

This argument turns on a construction of the term "investment power" as used in Rule 13d-3(a). 9/ The rule explicitly includes, as part of investment power, the power to dispose. In explaining its decision to retain this in 1978, the Commission explained the significance of the power to dispose as follows:

> * * * [T]he power to dispose, without more, gives its holder the ability to change or influence control and is therefore essential to eliciting the type of information within the purview of Section 13(d). This is attributable to the fact that the power to vote inheres in the security

---

9/    The plaintiff does not claim that voting power should be calculated cumulatively. Once a security is sold and the voting power is gone, of course, that power cannot be exercised. The fact that a person at one time had voting power has no lingering effects in terms of control.

19

> and may be relocated in the hands of any person to whom
> the holder of the power to dispose wishes to sell. Thus,
> the holder of the power to dispose potentially has the
> ability to bring about the rapid shift in control at which
> Section 13(d) is aimed even though he does not have the
> power to vote or to direct the voting of the security.

1978 Release at *13. Among other things, the plaintiff argues that the holder of

convertible preferred stock could, by serially converting and selling common stock

to a single person, effect a change in control within a short period of time.

The language of Rule 13d-3 cannot, however, be stretched to encompass this

situation. The rule provides that a person is deemed the beneficial owner of stock

when that person has voting power, investment power, or the "right to acquire" the

same within sixty days. Furthermore, clearly the powers and "rights" one has must

be evaluated as of the time of a transaction to determine whether one is required to

file a report under Sections 13(d) and/or 16(a), and whether the transaction is

subject to short-swing profit recovery under Section 16(b).

If the conversion cap is effective, Southbrook does not have the "right" to

hold more than 4.9% of the common stock. While subject to the cap, if Southbrook

owns no common stock, it can acquire up to 4.9%. But to the extent Southbrook

holds any common stock, its right to acquire more shares through conversion is correspondingly reduced. 10/

The plaintiff's argument focuses (Plaintiff's Opening Brief 7, 12) on what plaintiff calls Southbrook's "ability" to acquire more stock over a sixty-day period. Rule 13d-3(d)(1)(i), however, speaks of the "right," not the "ability," to acquire, and Southbrook's right to acquire stock is at all times subject to the conversion cap. If Southbrook at some time in the future were to divest itself of some holdings, it could then acquire the right to buy more stock. The rule, however, speaks of a *right* -- a current right -- to acquire stock, not the possibility that one may acquire a right to acquire more stock in the future. At the time any such new rights come into being, it will be only because Southbrook has divested itself of shares of common stock. At that point Southbrook will not have voting power, investment power, or the right to acquire those powers, with respect to the divested shares. At no point will Southbrook's conversion rights give it the right to hold more than

---

10/    The defendant cites in support of his position a Commission staff no-action letter in <u>BancBoston Capital Inc.</u>, No-Action Letter, 1987 WL 108100 (publicly available Aug. 10, 1987). Although the position taken by the Commission in this brief is consistent with the position taken by the staff in that letter, the letter was an expression of the staff's views only and, was not precedential authority of the Commission.

4.9% of the stock. The plaintiff's argument ignores the plain language of the rule and substitutes its own language.

Thus, so long as the cap is binding (and the Commission takes no position on that issue), Southbrook cannot be the beneficial owner of more than 4.9% of ImmunoGen stock. At any one time, it cannot hold more than that amount of stock because it does not have the "right to acquire" more than that amount.

This is not to say that the plaintiff does not raise an issue of concern from a policy standpoint. As noted, a person in Southbrook's position may be able to affect control by serially converting and selling shares to a single person -- although if it did so as part of a pre-arranged plan, it likely would be deemed part of a Section 13(d) group and on that basis would need to report under Section 13(d) and Section 16 as well. The plaintiff also contends that one who can dispose of more than 10% of the company's stock within a sixty-day period has significant influence over the company. This, plaintiff contends, gives the defendant the power to dilute existing holdings and drive down the stock price, and that may well give the defendant sufficient influence to acquire access to inside information, making it appropriate to apply Section 16 to the defendant.

Whatever the merits of that contention, we do not believe that the holders of these types of preferred stock can fall within the definition of a more than 10% beneficial owner of securities solely by virtue of their cumulative power to dispose of stock. The situation does not fit within the rules under Section 13(d), which control the determination of a person's status as a more than 10% beneficial owner under Section 16(b). Whatever the policy weight of the plaintiff's argument, the courts favor a narrow, more literal construction of Section 16(b), which is a strict liability provision. "No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement" under Section 16(b). Magma Power Co. v. Dow Chemical Co., 136 F.3d 316, 320 (2d Cir. 1998). It "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." Id. at 320-21. In Gollust v. Mendell, 501 U.S. 115, 122 (1991) the Supreme Court emphasized:

> Because the statute imposes "liability without fault within its narrowly drawn limits," Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. [232, 251 (1976)], we have been reluctant to exceed a literal, "mechanical" application of the statutory text in determining who may be subject to liability, even though in some cases a broader view of statutory liability could work to eliminate an "evil Congress sought to correct through § 16(b)."

23

Reliance Electric Co. v. Emerson Electric Co., 404 U.S.
[418, 425 (1972)].

Thus, while an argument can be made that Southbrook could have access to

inside information by virtue of its power to dispose of stock, that is not enough to

bring it under Section 16. That section was not intended to be so broad in scope as

to reach each and every person with potential access to inside information. In

particular, Section 16(b) was intended to operate only within "narrowly drawn

limits." Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. at 251. As

to 10% beneficial ownership, the Commission has limited the term to persons who

fit within the Section 13(d) and Rule 13d-3 definition. If the conversion cap in this

case is binding, Southbrook is not, by virtue of holding convertible securities, a

beneficial owner of more than 10% of ImmunoGen's common stock, and thus is

not subject to Section 16.

Finally, while we take no position on the validity of the conversion cap in

this case, 11/ we believe that such provisions must be examined on a case-by-case

_____

11/  Plaintiff contends that the conversion caps found in Section 3.10 of the
Purchase Agreement are void under the sham doctrine. This is a fact specific
inquiry at a stage in the litigation when there has been little discovery. The
Commission takes no position on this issue. Plaintiff similarly argues that
the conversion cap is a nullity under Rule 13d-3(b), 17 C.F.R. 240.13d-3(b),
which prohibits "contract[s], arrangement[s], or device[s]" that are "part of a
(continued...)

24

basis to determine whether they are binding and valid.  Factors that may indicate

that a conversion cap is *illusory* include whether the cap:

* is easily waivable by the parties (particularly the holder of the convertible securities);

* lacks an enforcement mechanism;

* has not been adhered to in practice; or

* can be avoided by transferring the securities to an affiliate of the holder.

Factors that may indicate that a cap is *binding* include whether it:

* is provided in the certificate of designation or the issuer's governing instruments;

* reflects limitations established by another regulatory scheme applicable to the issuer; or

* is the product of bona fide negotiations between the parties.

Limitations on the number of conversions that may take place over a period of time

may add integrity to such provisions, although they are not essential.  When the

limitations provided by conversion caps are discovered to be illusory or a sham,

---

11/(...continued)
plan or scheme to evade the [applicable] reporting requirements."  There is
no allegation in this case, however,  that Southbrook ever held more than
4.9% of ImmunoGen's outstanding common stock at one time or attempted
to conceal that ownership.

25

they should be disregarded and the courts should analyze the case as though no such limitations existed.

II.    THESE DERIVATIVE SECURITIES HAVE BOTH FIXED AND FLOATING RATE COMPONENTS.

The Court's second question is whether the convertible preferred stock purchased by Southbrook in this case has a fixed or floating conversion rate. These securities have both a fixed rate component and a floating rate component. The fixed rate component is convertible into common stock by dividing $1,000, plus accrued dividends, by a fixed rate determined at the date of purchase of the particular issue of convertible preferred stock. This fixed rate component establishes the minimum number of shares of common stock into which the convertible preferred stock will be converted. Conversion will never result in receipt of fewer shares of common stock. To that extent, the holder's minimum opportunity to profit from the underlying common stock is established at the time the holder acquires the convertible preferred stock.

Under the floating rate component, the convertible preferred stock is convertible by dividing $1,000, plus accrued dividends, by the applicable percentage of the average closing bid price of the common stock for the five consecutive trading days immediately preceding the date of conversion. The

26

applicable percentage is defined as (i) 100% for the first forty days after the purchase of the particular issue of convertible preferred stock, (ii) 90% for the next forty days, and (iii) 85% for any conversion thereafter. The floating rate component thus provides for the investor to convert into an increasing number of common shares as the market price of the common shares declines.

Whether the fixed rate or floating rate component determines the ultimate number of common shares to be received upon conversion depends on which component determines the lower price. The fixed rate component sets a floor below which the number of common shares received on conversion will not decline. The holder's opportunity to profit with respect to any additional shares of common that it may acquire through the floating rate component is not fixed until conversion.

Under Rule 16a-1(a)(2), 17 C.F.R. 240.16a-1(a)(2), a person beneficially owns a security, for all purposes other than determining the person's status as a more than ten percent beneficial owner, only if the person has a direct or indirect pecuniary interest in the security. Rule 16a-1(a)(2)(ii)(F) defines "indirect pecuniary interest" to include "[a] person's right to acquire equity securities

27

through the exercise or conversion of any derivative security, whether or not it is presently exercisable."

However, Rule 16a-1(c)(6), 17 C.F.R. 240.16a-1(c)(6),  provides that a "derivative security" does not include "rights with an exercise or conversion privilege at a price that is not fixed."  This is because "[r]ights without a fixed exercise price do not provide an insider the same kind of opportunity for short-swing profits since the purchase price [of the underlying security] is not known in advance."  <u>Ownership Reports and Trading by Officers, Directors, and Principal Security Holders</u>, Exchange Act Release No. 28869, 48 SEC Docket 234, 1991 WL 292000 at * 17 (February 8, 1991).   Unless and until these rights are exercised or converted, their holder does not have a pecuniary interest in the underlying equity securities because the number of additional underlying securities that may be acquired – and hence the holder's opportunity to profit from them – is not known until then.

Thus, acquisition of convertible preferred stock with a fixed conversion price establishes an indirect pecuniary interest in the underlying common stock, whereas acquisition of convertible preferred stock with a floating conversion price does not.

28

With respect to the ImmunoGen convertible preferred stock purchased by Southbrook, the fixed price component establishes the minimum number of shares of common stock into which the convertible preferred stock will be converted. Accordingly, Southbrook acquired an indirect pecuniary interest in that minimum number of common shares at the time Southbrook acquired the convertible preferred stock. However, Southbrook would not acquire a pecuniary interest in any additional shares of common stock through the convertible preferred stock before its conversion, at which time the conversion price would fix to determine what − if any − additional shares of common would be obtained through the floating price component.

III.    FLOATING RATE DERIVATIVE SECURITIES ARE INCLUDED IN THE 10% BENEFICIAL OWNERSHIP DETERMINATION.

Finally, the Court asked whether floating rate derivatives are included in the determination of whether an investor is a 10% beneficial owner. Here, again, it is important to keep in mind that Rule 16a-1(a) provides two definitions of beneficial ownership: one for purposes of determining a person's status as a 10% beneficial owner under Section 16 and a second definition of beneficial ownership for all other purposes. This second definition focuses on whether the person has a

29

pecuniary interest in the securities. The owner of floating rate derivative securities does not have a pecuniary interest in the underlying equity securities until the exercise price becomes fixed.

This Court's question concerns the definition pertaining to a person's status as a 10% beneficial owner. Floating rate derivative securities are considered in making this determination. As noted earlier, Rule 16a-1(a)(1) adopts the Section 13(d) definition of beneficial owner for purposes of determining an investor's status as a more than 10% holder. Section 13(d) and the rules promulgated under that section make no special provision for floating rate securities. Whether the conversion rate is fixed or floating, if the investor has the right to acquire the underlying voting securities at any time within sixty days under Rule 13d-3(d)(1)(i), the investor is deemed to be the beneficial owner of those securities for the purpose of determining whether the investor is a more than 10% beneficial owner. See e.g., Editek v. Morgan Capital, L.L.C., 150 F.3d 830, 833-34 (8th Cir. 1998).

## CONCLUSION

The Commission concludes that where the Court finds that a conversion cap would deny an investor holding convertible securities the right to hold more than

30

10% of the underlying equity securities of an issuer at any one time, the investor

would not be, by virtue of his ownership of convertible securities, the beneficial

owner of more than 10% of the underlying equity securities of the issuer such that

he is subject to Section 16. We take no position as to whether as a factual matter

the cap in this case is sufficiently binding to limit Southbrook's Section 16(b)

liability. The Commission further urges this Court to view the derivative securities

at issue in this case as having both fixed rate and floating rate components, and that

floating rate derivative securities are included in the more than 10% beneficial

ownership determination.

> Respectfully submitted,
>
> DAVID M. BECKER
> General Counsel
>
> ERIC SUMMERGRAD
> Deputy Solicitor
>
> ALLAN A. CAPUTE
> Special Counsel to the Solicitor

Of Counsel
 MEYER EISENBERG
 Deputy General Counsel

> Securities and Exchange Commission
> Washington, D.C. 20549-0606
> (202) 942-0837 (Capute)

March 2001

31

No. 00-7630

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

MARK LEVY, Derivatively on behalf of ImmunoGen, Inc.,

*Plaintiff -Appellant,*

v.

SOUTHBROOK INTERNATIONAL INVESTMENTS, LTD.,

*Defendant-Appellee,*

and

IMMUNOGEN, INC.,

*Nominal Defendant-Appellee.*

---

CERTIFICATE OF COMPLIANCE
WITH CIRCUIT RULE 32(a)(7)(B)

---

I, Allan A. Capute, certify, in accordance with Circuit Rule 32(a)(7)(B), that the Brief of the Securities and Exchange Commission, Amicus Curiae, in Support of Appellees on Issues Addressed is 6812 words in length, as determined by the word count system provided by the WordPerfect 8 word processing system.

Allan A. Capute
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549-0606
(202) 942-0837

March 15, 2001

No. 00-7630

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

MARK LEVY, Derivatively on behalf of ImmunoGen, Inc.,

*Plaintiff -Appellant,*

v.

SOUTHBROOK INTERNATIONAL INVESTMENTS, LTD.,

*Defendant-Appellee,*

and

IMMUNOGEN, INC.,

*Nominal Defendant-Appellee.*

---

CERTIFICATE OF SERVICE

---

I, Allan A. Capute, am a member of the bars of Maryland and the District of Columbia, and I hereby certify that on March 15, 2001 I caused to be served three copies of the Brief of the Securities and Exchange Commission, Amicus Curiae, in Support of Appellee on Issues Addressed by overnight Federal Express or by hand to:

Herbert Teitelbaum, Esq.
Robinson, Silverman, Pearce
  Aronsohn & Berman, L.L.P.
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000

Hilary Claudette Lane, Esq.
Rogers & Wells
200 Park Avenue
New York, New York 10166
(212) 878-8000

Paul Gonson, Esq. (By Hand)
Kirkpatrick & Lockhart, L.L.P.
1800 Massachusetts Avenue, N.W.
2nd Floor
Washington, D.C. 20036-1800
(202) 778-9434

Mitchell M.Z. Twersky, Esq.
Jack G. Fruchter, Esq.
Fruchter & Twersky
60 East 42nd Street
New York, New York 10165
(212) 687-6655

Jeffrey S. Abraham, Esq.
Law Offices of Jeffrey S. Abraham, Esq.
60 East 42nd Street
New York, New York 10165
(212) 692-0555

Allan A. Capute
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549-0606

-2-