**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| 20230930-DK-BUTTERFLY-1, INC.,<br>f/k/a BED BATH & BEYOND INC.,<br><br>         Plaintiff,<br><br>   -vs.-<br><br>HBC INVESTMENTS LLC and<br>HUDSON BAY CAPITAL MANAGEMENT LP,<br><br>        Defendants. | Civil Action No. 1:24-cv-03370-MKV |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS HBC INVESTMENTS**
**LLC'S AND HUDSON BAY CAPITAL MANAGEMENT LP'S MOTION TO DISMISS**

Douglas A. Rappaport
Kaitlin D. Shapiro
Richard J. D'Amato
Michael Chen
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036

*Counsel for Defendants HBC Investments LLC and*
*Hudson Bay Capital Management LP*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND ....................................................................................................4

    A.    The Parties .................................................................................................4

    B.    Hudson Bay's BBBY Investment ...........................................................4

    C.    Hudson Bay's BBBY Investment Was Subject to Blockers ...................6

ARGUMENT ...........................................................................................................................8

    I.    Section 16(b) is a Strict Liability Statute that Is Narrowly Construed ...................8

    II.    The Blockers Prevented Hudson Bay From Beneficially  Owning 10% or More of the Outstanding Common Stock ..............................................................11

        A.    Blockers Are Recognized and Respected Under the Securities Laws....................................................................................................11

        B.    The Blockers in This Case Unambiguously Prevented Hudson Bay from Beneficially Owning More Than 10% of BBBY's Stock as a Matter of Law ...........................................................................14

        C.    Contract Law Confirms That the Blockers' "Null and Void" Language Would Defeat Any Attempt to Convert or Exercise Above the Blockers' Limitations .......................................................19

    III.    Plaintiff Fails to Allege Facts Supporting an Inference that Hudson Bay Beneficially Owned More Than 10% of the Outstanding Common Stock ..........21

CONCLUSION....................................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Altidor v. Med. Knowledge Grp. LLC*,
  2023 WL 6124019 (S.D.N.Y. Sept. 16, 2023)...........................................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................................8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................................8

*Cathay Bank v. Bonilla*,
  2023 WL 6812274 (E.D.N.Y. Oct. 16, 2023).........................................................................19

*Chechele v. Standard General LP*,
  2021 WL 2853438 (S.D.N.Y. July 8, 2021) ...........................................................................23

*Decker v. Advantage Fund, Ltd.*,
  362 F.3d 593 (9th Cir. 2004) ..................................................................................................13

*Donoghue v. Local.com Corp.*,
  2009 WL 260797 (S.D.N.Y. Feb. 3, 2009), *aff'd sub nom. Donoghue v.*
  *Hearst Commc'ns, Inc.*, 355 F. App'x 520 (2d Cir. 2009) .....................................................22

*Donoghue v. Patterson Cos., Inc.*,
  990 F. Supp. 2d 421 (S.D.N.Y. 2013)......................................................................................10

*Foremost-McKesson, Inc. v. Provident Sec. Co.*,
  423 U.S. 232 (1976).......................................................................................................10, 13, 25

*Freedberg v. J.P. Morgan Chase & Co.*,
  2016 WL 7495181 (S.D.N.Y. Dec. 22, 2016) .........................................................................4

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*,
  1999 WL 544708 (S.D.N.Y. July 27, 1999) ...........................................................................11

*Gollust v. Mendell*,
  501 U.S. 115 (1991)...................................................................................................................10

*Greenberg v. Hudson Bay Master Fund Ltd.*,
  2015 WL 2212215 (S.D.N.Y. May 12, 2015) .........................................................................17

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*,
  156 F.3d 305 (2d Cir. 1998)..................................................................................................9, 10

ii

*Hong Qin Jiang v. Li Wan Wu*,
   179 A.D.3d 1035 (2d Dept. 2020) ................................................................19

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
   29 F.4th 118 (2d Cir. 2022) ...........................................................................8

*Klawonn v. YA Global Invs., L.P.*,
   2011 WL 3502022 (D.N.J. Aug. 10, 2011) ........................................13, 14, 18

*Levy v. Southbrook Int'l Invs., Ltd.*,
   263 F.3d 10 (2d Cir. 2001)....................................................................... *passim*

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
   223 F. Supp. 2d 435 (S.D.N.Y. 2001)................................................11, 13, 24

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
   86 N.Y.2d 685 (1995) ...................................................................................19

*Packer v. Raging Cap. Mgmt., LLC*,
   981 F.3d 148 (2d Cir. 2020)............................................................................8

*Probility Media Corp. v. Isen*,
   2018 WL 1726626 (S.D. Cal. Apr. 10, 2018) ................................................13

*Raad v. Bank Audi S.A.L.*,
   2024 WL 967172 (S.D.N.Y. Mar. 5, 2024) ....................................................8

*Reliance Elec. Co. v. Emerson Elec. Co.*,
   404 U.S. 418 (1972)................................................................................10, 19

*Roberts v. Weight Watchers Int'l, Inc.*,
   217 F. Supp. 3d 742 (S.D.N.Y. 2016)...........................................................16

*Rosen v. Brookhaven Cap. Mgmt. Co., Ltd.*,
   113 F. Supp. 2d 615 (S.D.N.Y. 2000)........................................................9, 10

*Rubenstein v. Int'l Value Advisers, LLC*,
   959 F.3d 541 (2d Cir. 2020)....................................................................8, 10, 25

*Scerba v. Allied Pilots Ass'n*,
   2013 WL 6481583 (S.D.N.Y. Dec. 10, 2013) .................................................4

*Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*,
   115 F. Supp. 2d 440 (S.D.N.Y. 2000)...............................................11, 13, 14

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019)............................................................................8

*Sure-Trip, Inc. v. Westinghouse Eng'g,*
47 F.3d 526 (2d Cir. 1995)......................................................................................19

**Statutes**

15 U.S.C. § 78p(a)(1).....................................................................................................9

15 U.S.C. § 78p(b) ............................................................................................. *passim*

UCC § 8-202(b)(1)........................................................................................................20

**Other Authorities**

17 C.F.R. § 240.13d-3....................................................................................................23

17 C.F.R. § 240.13d-3(a)..........................................................................................9, 21

17 C.F.R. § 240.13d-3(d)(1)......................................................................................9, 12

17 C.F.R. § 240.16a-1(a)(1)......................................................................................9, 21

Fed. R. Civ. P. 12(b)(6).................................................................................................8

Restatement (Second) of Contracts § 202(2)...............................................................19

Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide (5th ed.
2019) .......................................................................................................................9, 12

S. Rep. No. 1455, 73d Cong., 2d Sess. 55 (1934) .......................................................12

Defendants HBC Investments LLC and Hudson Bay Capital Management LP (together, "Hudson Bay") submit this memorandum of law in support of their motion to dismiss 20230930-DK-Butterfly-1, Inc.'s ("Plaintiff") Complaint (the "Cplt.").

## PRELIMINARY STATEMENT

In attempting to assert a claim under Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)"), Plaintiff utterly disregards the unambiguous terms of the investment documents governing Hudson Bay's investment. These terms preclude Plaintiff's claim as a matter of law.

To state a claim under Section 16(b), the Complaint must plausibly allege that Hudson Bay was a statutory insider by beneficially owning more than 10% of the common stock (the "Common Stock") of Bed Bath & Beyond, Inc. ("BBBY" or the "Company"). The governing investment documents confirm that Hudson Bay never beneficially owned more than 9.99% of BBBY's outstanding shares, and any attempt to transfer shares to Hudson Bay above 9.99% would have been "null and void and cancelled ab initio." Those same documents provide that under no circumstances could Hudson Bay hold investment or voting discretion over such shares—the two essential elements of beneficial ownership. In light of these contractual barriers to more than 10% beneficial ownership, the Complaint fails to satisfy a fundamental element of Section 16(b) and therefore must be dismissed.

In February 2023, Hudson Bay, along with other investors, participated in an underwritten public offering of BBBY securities (the "Public Offering"). The Public Offering provided BBBY with critical rescue financing that allowed it to stay afloat at a time when it was under tremendous pressure from its creditors and was attempting to avoid bankruptcy. In connection with the Public Offering, Hudson Bay acquired several derivative securities consisting of BBBY preferred stock (the "Preferred Stock") and warrants to acquire Preferred Stock and Common Stock (the

1

"Warrants").  Hudson Bay's participation resulted in $225 million of net proceeds for BBBY.

Instead of using these proceeds to invest further in its business, however, certain of BBBY's creditors required BBBY to use these funds to repay its debt.  Ironically, some of the same creditors that approved the Public Offering are now behind this litigation, purporting to act for a post-bankruptcy wind-down entity whose function is to pursue claims on behalf of BBBY's former creditors.  Despite the rescue financing provided in the Public Offering, BBBY was unable to avoid bankruptcy and filed for Chapter 11 on April 23, 2023.  The Company ceased operations and liquidated its assets soon thereafter.  BBBY's remaining equity securities were extinguished without consideration.

Hudson Bay's BBBY securities and the laws and regulations governing beneficial ownership confirm that Hudson Bay never beneficially owned more than 9.99% of the outstanding Common Stock.  Specifically, the contracts that governed Hudson Bay's BBBY derivative securities contained beneficial ownership limitations, more commonly referred to as "blockers" (the "Blockers").  Blockers are commonly used contractual provisions that prevent holders of derivative securities from exceeding certain beneficial ownership thresholds that could render them Section 16 insiders.  Companies also use blockers to prevent holders from building control positions.  In this case, the Blockers prevented Hudson Bay from acquiring—and BBBY from providing—stock to the extent that Hudson Bay would beneficially own more than 9.99% of the outstanding Common Stock.

Under well-established law, the Blockers in Hudson Bay's BBBY securities were enforceable, valid, and binding.  These Blockers unambiguously prevented Hudson Bay from owning, or being deemed to have a right to acquire, more than 9.99% of the outstanding Common Stock.  Indeed, the Blockers dictate that even an *attempt* to convert or exercise derivative securities

that would have resulted in Hudson Bay beneficially owning more than 9.99% would have been deemed "null and void," "treated as if never made," and "cancelled ab initio."  Further, even if excess shares could have been issued—and the Complaint does not plausibly allege that they were—the Blockers provided that Hudson Bay would have no voting or investment power over the excess shares.  Voting and investment power are the essential prerequisites for beneficial ownership.

Importantly, these Blocker provisions were self-executing, requiring no action by, and providing no discretion to, either Hudson Bay or BBBY with respect to stock transfers that would cause Hudson Bay to exceed 9.99%.  Because these contracts definitively prevented Hudson Bay from becoming a statutory insider of BBBY for purposes of Section 16(b), Plaintiff's attempt to state a Section 16(b) claim against Hudson Bay fails as a matter of law.

Notwithstanding the clear contractual language to the contrary, Plaintiff nevertheless contends through "kitchen sink" allegations that Hudson Bay was a greater than 10% beneficial owner of Common Stock because the Blockers were "illusory."  But Plaintiff's allegations are not well-pled.  As a threshold matter, the Complaint fatally misrepresents the meaning of "beneficial ownership" under established law and regulations.  The Complaint also disregards fundamental precepts of contract law, obfuscates basic facts, and ignores fundamental mathematical principles.  Stripped of its conclusory and, indeed, contradictory allegations, the Complaint reflects an attempt to relitigate arguments that the Second Circuit and other courts have already squarely rejected regarding the validity of blockers and the calculation of shareholders' beneficial ownership.

This action is no more than an attempt by BBBY's bankruptcy creditors to cobble together a claim to claw back some value from their failed investment.  Plaintiff's allegations do not overcome the contracts' unambiguous terms as a matter of law.  The Complaint does not approach

pleading a viable claim under Section 16(b) and therefore must be dismissed.

## FACTUAL BACKGROUND

### A.  The Parties

Hudson Bay Capital Management LP is an SEC-registered investment manager that manages investments for its client funds, including HBC Investments LLC.  (Cplt. ¶¶ 28-29.)

Plaintiff is BBBY's post-bankruptcy wind-down entity, purportedly seeking to recover assets for distribution to BBBY's creditors.  (*In re Bed Bath & Beyond Inc. et al.*, Case No. 23-13359 (Bankr. D.N.J., Sept. 7, 2023) ("Bankr."), D.I. No. 2172 (Confirmation Order) ¶¶ 90-92.)[1] Plaintiff is controlled by a plan administrator and oversight committee appointed by former BBBY creditors, including Sixth Street Specialty Lending, Inc. ("Sixth Street").  (Bankr. D.I. No. 2161 (Bankruptcy Plan Supplement) at Exs. A-B; Bankr. D.I. 25 (DIP Mot.) ¶¶ 2-4.)

### B.  Hudson Bay's BBBY Investment

Prior to its bankruptcy, BBBY was a retail chain specializing in home goods.  (Cplt. ¶ 30.) In 2022, BBBY faced liquidity challenges due to a failed strategy shift and fallout from the COVID-19 pandemic.  (Bankr. D.I. 25 (DIP Mot.) ¶ 2.)  To fund a turnaround plan, BBBY entered into an amended credit agreement with Sixth Street and another creditor, securing $500 million of new financing.  (*Id.* ¶¶ 2-4.)  On January 13, 2023, BBBY defaulted on that debt, resulting in the debt's acceleration.  (*Id.* ¶¶ 5-6.)

In January 2023, as a last-ditch effort to avoid bankruptcy and offer the Company runway to pursue a turnaround plan, BBBY's advisors entered into discussions with Hudson Bay to invest

---

[1] "On a motion to dismiss, the Court may take judicial notice of public records and of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings," including bankruptcy filings.  *Freedberg v. J.P. Morgan Chase & Co.*, 2016 WL 7495181, at *1 & n.1 (S.D.N.Y. Dec. 22, 2016) (citation omitted); *see also Scerba v. Allied Pilots Ass'n*, 2013 WL 6481583, at *2 & n.2 (S.D.N.Y. Dec. 10, 2013) (collecting cases).

in the Public Offering, underwritten by B. Riley Securities, Inc.  (*Id.* ¶ 8.)  Following "extensive and hard-fought negotiations" among the parties, the Public Offering closed on February 7, 2023. (Bankr. D.I. 25 (DIP Mot.) ¶ 8; *see also* Bankr. D.I. 10 (First Day Decl.) ¶¶ 53-58; Bankr. D.I. 36 (DIP Mot. Decl.) ¶¶ 17-21.)  Upon closing, the Public Offering was promptly disclosed to the market.  (Declaration of Kaitlin D. Shapiro ("Shapiro Decl.") Ex. 1 (Feb. 10, 2023 BBBY Form 8-K/A).)  The Public Offering raised approximately $225 million for BBBY, with the potential to raise $800 million more through future issuances.  (Cplt. ¶ 65.)

Through the Public Offering, Hudson Bay acquired:  (1) Preferred Stock; (2) a warrant to purchase Preferred Stock (the "Preferred Stock Warrant"); and (3) a warrant to purchase shares of Common Stock (the "Common Stock Warrant").  (*See* Cplt. ¶ 36.)  Hudson Bay could convert the Preferred Stock or exercise the Warrants at any time by sending the Company a conversion or exercise notice, respectively.  (Cplt. Ex. A (Cert. of Inc.) § 4(c)(i); Ex. B (Preferred Stock Warrant) § 1(a); Ex. C (Common Stock Warrant) § 1(a).)  Upon the Company's receipt of a notice, Hudson Bay was deemed to own the converted or exercised shares, subject to the limitations imposed by the Blockers.  (Cplt. Ex. A § 4(c)(i); Ex. B § 1(a); Ex. C § 1(a).)

Ultimately, the infusion of rescue capital from the Public Offering did not provide the Company with enough runway to turn its business around.  As BBBY later explained, it lacked enough liquidity to implement management's turnaround plan because its creditors, including Sixth Street, required BBBY to use proceeds from the Public Offering to repay BBBY's debts. (Bankr. D.I. 25 (DIP Mot.) ¶¶ 8-9; Bankr. D.I. 10 (First Day Decl.) ¶ 56.)  After BBBY repaid these obligations, Sixth Street moved into position as BBBY's senior lender.  (Bankr. D.I. 25 (DIP Mot.) ¶ 9.)  When Sixth Street later refused to approve the Company's budget, the Company was "no longer eligible to seek an additional injection of capital" from Hudson Bay under the terms of

Sixth Street's agreements with BBBY.  (*Id.*)  BBBY continued to burn cash and suffer sales declines, ultimately filing for bankruptcy on April 23, 2023.  (Bankr. D.I. 10 (First Day Decl.) ¶ 61.)

### C. <u>Hudson Bay's BBBY Investment Was Subject to Blockers</u>

Hudson Bay's ability to acquire Common Stock upon the conversion of its Preferred Stock was governed by the terms of BBBY's Certificate of Incorporation.  (Cplt. Ex. A.)  Hudson Bay's ability to acquire Common Stock upon the exercise of its Common Stock Warrant was governed by the terms of the Warrant itself.  (Cplt. Ex. C.)  Plaintiff does not allege that Hudson Bay ever purchased any Common Stock on the open market, and indeed it did not.

The governing documents included the Blockers.  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)  The Blockers precluded Hudson Bay from converting its Preferred Stock or exercising its Common Stock Warrant if such conversion or exercise would cause Hudson Bay to beneficially own more than 9.99% of the outstanding Common Stock.  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)  Among other reasons, investors commonly use blockers to keep themselves below 10% beneficial ownership, thus preventing them from becoming "insiders" subject to Section 16.  Blockers also limit the amount of voting stock an investor can receive through the exercise of derivative securities like convertible preferred stock and warrants, limiting a holder's ability to acquire a control position.

By their plain language, the Blockers ensured that Hudson Bay could not beneficially own more than 9.99% of the outstanding Common Stock.  Specifically, the Blockers provided:

> The Company **shall not effect** the [conversion/exercise] of any [Preferred Shares/Common Stock Warrant], and such Holder **shall not have the right to** [convert Preferred Shares/exercise the Common Stock Warrant] . . . and any such [conversion/exercise] **shall be null and void and treated as if never made**, to the extent that after giving effect to such [conversion/exercise], such Holder together with the other Attribution Parties collectively would beneficially own in excess of 9.99% (the "Maximum Percentage") of the shares of Common Stock outstanding immediately after giving effect to such [conversion/exercise].

(Cplt. Ex. A § 4(d) (emphasis added); Ex. C § (1)(f) (same).)[2]  As further assurance that Hudson Bay could not and would never beneficially own more than 9.99% of BBBY's outstanding shares, even inadvertently, the Blockers provided that any *attempt* to convert or exercise shares in excess of 9.99% would be rendered null and void:

> In the event that the issuance of shares of Common Stock to [a] Holder upon [conversion of Preferred Shares/exercise of the Common Stock Warrant] results in [the] Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock. . . , the number of shares so issued . . . (the "Excess Shares") **shall be deemed null and void and shall be cancelled ab initio** . . .

(Cplt. Ex. A § 4(d) (emphasis added); Ex. C § (1)(f) (similar).)  To eliminate any doubt, the Blockers also provided that Hudson Bay "**shall not have the power to vote or transfer**" shares issued above the Maximum Percentage.  (Cplt. Ex. A § 4(d) (emphasis added); Ex. C § 1(f) (same).)  Moreover, "[f]or purposes of clarity," the Blockers provided that any Excess Shares "**shall not be deemed to be beneficially owned by [the] Holder for any purpose** including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act."  (Cplt. Ex. A § 4(d) (emphasis added); Ex. C § (1)(f) (same).)

The Blocker in BBBY's Certificate of Incorporation further provided that any Excess Shares resulting from a conversion of Preferred Stock would "be held in abeyance until such time as the delivery of such Blocked Shares would not result in such Holder and the other Attribution Parties exceeding the Maximum Percentage."  (Cplt. Ex. A § 4(d).)

Finally, the Blockers could "not be amended or waived" by either Hudson Bay or BBBY,

---

[2] "Attribution Parties" included not only Hudson Bay and its affiliates, but "any Person acting or who could be deemed to be acting as a Group" with Hudson Bay or any of its affiliates, and "any other Persons whose beneficial ownership . . . would or could be aggregated" with Hudson Bay's and its affiliates' beneficial ownership "for purposes of Section 13(d)."  (Cplt. Ex. A § 31(g); Ex. C § 19(d).)

and were binding on any successors.  (Cplt. Ex. A § 30(b); *see also* Ex. C § 11 (Blocker provision could not be amended); Ex. A § 4(d) (Blocker "may not be waived and shall apply to a successor holder" of the security); Ex. C § 1(f) (same).)

## ARGUMENT

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Altidor v. Med. Knowledge Grp. LLC*, 2023 WL 6124019, at *3 (S.D.N.Y. Sept. 16, 2023) (Vyskocil, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff must therefore "allege sufficient facts to show 'more than a sheer possibility that a defendant has acted unlawfully.'"  *Raad v. Bank Audi S.A.L.*, 2024 WL 967172, at *4 (S.D.N.Y. Mar. 5, 2024) (Vyskocil, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In making such a determination, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions."  *Id.* (quoting *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019)).

Under New York law, an agreement that is "complete, clear and unambiguous on its face," is "enforced according to the plain meaning of its terms."  *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 122 (2d Cir. 2022) (citation omitted).  Accordingly, "claims unambiguously barred by an agreement between the parties may be determined on a motion to dismiss."  *Id.*

## I.      Section 16(b) is a Strict Liability Statute that Is Narrowly Construed

Plaintiff brings this action under Section 16(b), which imposes "liability on certain insiders of an issuer, requiring them to disgorge to the issuer any profits they realize from short-swing trading in the issuer's securities."  *Rubenstein v. Int'l Value Advisers, LLC*, 959 F.3d 541, 543 (2d Cir. 2020); *see also Packer v. Raging Cap. Mgmt., LLC*, 981 F.3d 148, 150 (2d Cir. 2020) (citing 15 U.S.C. § 78p(b)).  Short-swing trading is "any purchase and sale, or any sale and purchase" of

an issuer's equity securities "within any period of less than six months."  15 U.S.C. § 78p(b).

Short-swing profits are the gains derived from a stock purchase and sale, or losses avoided through

a sale and purchase, within a six-month period.  *See Rosen v. Brookhaven Cap. Mgmt. Co., Ltd.*,

113 F. Supp. 2d 615, 617-18 (S.D.N.Y. 2000) (dismissing Section 16 claim).

To plead a claim under Section 16(b), a plaintiff *must* allege:  (1) a purchase of equity

securities; (2) a sale of equity securities; (3) by a "statutory insider"; (4) within less than six

months; and (5) a profit resulting from such purchase and sale or sale and purchase.  15 U.S.C.

§ 78p(b); Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide (hereinafter,

"Romeo & Dye") § 9.03[6][b] & n.237 (5th ed. 2019) (citations omitted); *see also Gwozdzinsky v.*

*Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

Section 16(b) therefore does not apply if an investor does not qualify as a statutory insider.

*Rosen*, 113 F. Supp. 2d at 617.   Courts must dismiss Section 16(b) claims under such

circumstances.   *Gwozdzinsky*, 156 F.3d at 308.   For purposes of Section 16(b), "statutory

insider[s]" include traditional insiders, such as a company's directors and officers, as well as

persons who beneficially own more than 10% of a company's stock.  15 U.S.C. §§ 78p(a)(1), (b).

A person beneficially owns a security if that person has "(1) Voting power which includes the

power to vote, or to direct the voting of, such security; and/or (2) Investment power which includes

the power to dispose, or direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a); *see*

*also id.* § 240.16a-1(a)(1).

"Beneficial ownership" includes securities that the investor owns outright *or* securities

which the investor has the right to acquire within 60 days, such as through the conversion of a

security or exercise of a warrant.  *Id.* § 240.13d-3(d)(1).  As discussed further below, blockers

prevent an investor from beneficially owning securities that it would otherwise have a right to

acquire within 60 days if such acquisition would exceed the beneficial ownership cap established by the blocker. *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 15-17 (2d Cir. 2001).

Given Section 16(b)'s strict liability regime, the Supreme Court has articulated that Section 16(b) liability must be confined within "narrowly drawn limits" and applied mechanically. *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976); *see also Gollust v. Mendell*, 501 U.S. 115, 122 (1991) (courts are "reluctant to exceed a literal, 'mechanical' application of the statutory text in determining . . . liability").

Recognizing Section 16(b)'s potentially "harsh results," the Second Circuit and other courts have similarly held that, as a matter of policy, its short-swing profit rule should be construed as an "exclusion from liability, not a rule of inclusion." *Rosen*, 113 F. Supp. 2d at 624 (quoting *Gwozdzinsky*, 156 F.3d at 310). Indeed, the Second Circuit has recognized that "Section 16(b) addresses only a narrow class" of trading. *Rubenstein*, 959 F.3d at 547 (dismissing Section 16 claims). Moreover, an investor may structure transactions with the purpose of avoiding or limiting Section 16(b) exposure. *See, e.g.*, *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972) (no liability where investor structured sales to limit Section 16(b) exposure).

Courts have accordingly rejected attempts to expand Section 16(b)'s scope through new theories of liability that are not explicitly supported by the statute. Critically, courts have cautioned that "[f]inancial instruments that do not fall *squarely* into [the Section 16(b)] framework are to be *construed narrowly* to favor the insider because of the strict-liability nature of Section 16(b)." *Donoghue v. Patterson Cos., Inc.*, 990 F. Supp. 2d 421, 424 (S.D.N.Y. 2013) (citing *Levy*, 263 F.3d at 16) (emphasis added). That principle applies with particular force in this case, where Plaintiff seeks to expand the reach of Section 16(b) beyond its permissible scope.

This motion turns on whether Plaintiff has plausibly alleged that Hudson Bay was a

statutory insider by virtue of beneficially owning more than 10% of the outstanding Common Stock.  Plaintiff has failed to do so, and the Complaint must accordingly be dismissed.

## II.      The Blockers Prevented Hudson Bay From Beneficially <u>Owning 10% or More of the Outstanding Common Stock</u>

The Blockers' unambiguous terms require dismissal of the Complaint.  Courts have routinely dismissed Section 16(b) claims when investors' agreements have provisions like the Blockers, which by their plain terms prevent the investor from acquiring beneficial ownership above 10%.  The only difference between this case and those is that the Blockers here are even *stronger*.  Specifically, the Blockers here:  (1) make clear that any conversions or exercises that would bring Hudson Bay's beneficial ownership above 9.99% are "null and void," "treated as if never made," and "cancelled ab initio"; and (2) contain numerous and cumulative protections to ensure their restrictions cannot be waived or evaded.  (*See* Cplt. Ex. A § 4(d); Ex. C § 1(f).) Because the Blockers ensured that Hudson Bay *was not*, and *could not* become, a greater than 10% beneficial owner as a matter of law, Plaintiff's Section 16(b) claim must be dismissed.

### A.  <u>Blockers Are Recognized and Respected Under the Securities Laws</u>

Courts have long and consistently recognized that beneficial ownership limitations like the Blockers unambiguously prevent holders of derivative securities from beneficially owning more than the applicable ownership cap.  *See, e.g.*, *Levy*, 263 F.3d at 15-17 (blockers prevented holder from acquiring beneficial ownership above the specified threshold); *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 448 (S.D.N.Y. 2001) (same); *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 115 F. Supp. 2d 440, 443 (S.D.N.Y. 2000) (same); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, 1999 WL 544708, at *15-16 (S.D.N.Y. July 27, 1999) (same).  Specifically, a blocker prevents a holder from beneficially owning shares they could otherwise acquire within 60 days through conversion or exercise of a derivative security like

convertible preferred stock or a warrant. *Levy*, 263 F.3d at 15-17; 17 C.F.R. § 240.13d-3(d)(1). Simply put, "a blocker provision prevents a holder" of derivative securities "from being the beneficial owner [of shares exceeding the applicable cap], for purposes of the ten percent owner calculation." Romeo & Dye § 2.03.

This well-established precedent makes sense.  Investors who cannot acquire more than 10% of an issuer's outstanding shares through a derivative security like the Preferred Stock or the Common Stock Warrant do not fit the rationale for Section 16(b).  The very purpose of blocker provisions is to prevent investors from gaining such a large position that "their control over the corporation and their consequent access to confidential information are such that they are the equivalent of directors," which would bring them within Section 16's ambit.  Romeo & Dye § 2.03 (citing S. Rep. No. 1455, 73d Cong., 2d Sess. 55 (1934)).  When an investor does *not* have such power, courts have rightly excluded them from Section 16(b)'s reach.

The Second Circuit's decision in *Levy v. Southbrook* is particularly instructive here.  In that case, the Second Circuit considered a blocker which provided that the holder "may not" convert preferred stock or exercise warrants "to the extent that such conversion or exercise would result in the [holder] owning more than 4.9%" of the issuer's common stock.   263 F.3d at 13. Notwithstanding the blocker, the plaintiff in *Levy* argued that beneficial ownership should be calculated by aggregating the securities an investor could acquire through serial conversions over a 60-day period.  *Id.* at 16.  In rejecting this argument, the *Levy* court held that "where a binding conversion cap denies an investor the right to acquire more than 10% of the underlying equity securities of an issuer, at any one time, the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities."  *Id.* at 12.  "[C]onsistent with the Supreme Court's instruction that Section 16(b) operate only within

12

'narrowly drawn limits,'" the court further held that "beneficial ownership is determined at any one time, not cumulatively" through aggregation.  *Id.* at 16 (quoting *Foremost-McKesson*, 423 U.S. at 251).

Interpreting the blocker "as a whole," the *Levy* court found that it was valid and binding. Specifically, the court found the blocker effectuated "a clear prohibition" on the investor's "ability to convert shares to the extent that conversion would result in it owning in excess of 4.9%" of the issuer's common stock.  *Id.* at 17-18.  Other cases in this District, both before and since *Levy*, have held likewise.  *See, e.g.*, *Log On Am.*, 223 F. Supp. 2d at 448 (similar blocker was "clearly written and enforceable as a matter of law"); *Schaffer*, 115 F. Supp. 2d at 443 (blocker "proves" that plaintiff's allegations of 10% beneficial ownership were "insufficient as a matter of law").

The Complaint's allegations ignore this body of case law.  Instead, Plaintiff relies almost entirely on a set of "factors" from an amicus brief filed by the SEC in the *Levy* case, which Plaintiff claims are "relevant to determining whether a blocker . . . is *illusory* or *binding*."  (Cplt. ¶ 157.) As a preliminary matter, the *Levy* court never mentioned these factors and, indeed, courts have subsequently found no indication "that the Second Circuit paid any attention to the SEC's list of factors."  *Klawonn v. YA Global Invs., L.P.*, 2011 WL 3502022, at *4 (D.N.J. Aug. 10, 2011). Instead, "[t]he Second Circuit made a judgment on whether the conversion cap was valid and binding, and it did so based on its interpretation of the writing as a whole"—in other words, the Second Circuit interpreted the blocker as it would any other contractual provision.  *Id.*  In the nearly quarter-century since *Levy*, other courts have taken the same approach and conducted a contractual analysis without relying on the amicus brief's so-called "factors."  *See, e.g.*, *Log On Am.*, 223 F. Supp. 2d at 448; *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 506-97 (9th Cir. 2004); *Probility Media Corp. v. Isen*, 2018 WL 1726626, at *2 (S.D. Cal. Apr. 10, 2018).  Like the plaintiff

13

in *Klawonn*, Plaintiff here is "recommending not that this Court look to what the Second Circuit said, but that this Court should look at an incidental portion of an amicus brief that appears to have played no role in the Second Circuit's decision." 2011 WL 3502022, at *4. This Court should decline Plaintiff's suggestion and apply the Second Circuit's controlling standard in *Levy*.[3]

The applicable law is clear and consistent: like any other contractual provision, blockers are enforced as written. Where they unambiguously bar an investor from acquiring beneficial ownership of more than 10% of the issuer's common stock, the investor *cannot* be a greater than 10% beneficial owner as a matter of law. Absent more than 10% beneficial ownership, the case must be dismissed.

### B.  The Blockers in This Case Unambiguously Prevented Hudson Bay from Beneficially Owning More Than 10% of BBBY's Stock as a Matter of Law

Here, the Blockers are *even more* robust than those approved by the court in *Levy* and other cases. Like the blockers in these other cases, the Blockers here provided that BBBY "shall not effect," and Hudson Bay "shall not have the right to," any conversion or exercise that would cause Hudson Bay to "beneficially own in excess of 9.99%" of the outstanding Common Stock. (Cplt. Ex. A § 4(d); Ex. C § 1(f).) As courts have found time and again when addressing similar language, these terms provided "a clear prohibition" on Hudson Bay's ability to become a greater than 10% beneficial owner of Common Stock. *See Levy*, 263 F.3d at 17-18. This language alone demonstrates that Plaintiff's allegations are "insufficient as a matter of law." *Schaffer*, 115 F. Supp.

---

[3] In any event, the SEC's proposed factors in its *Levy* amicus brief do not alter, and indeed only confirm, the conclusion that the Blockers were valid and binding here. Among other factors, the SEC proposed considering whether a blocker:  (1) is easily waivable by the parties; (2) lacks an enforcement mechanism; (3) has not been adhered to in practice; (4) can be avoided by transferring the securities to an affiliate holder; or (5) is the product of bona fide negotiations between the parties.  (Cplt. Ex. H (Br. of SEC as Amicus Curiae at 25, *Levy v. Southbrook Int'l Invs., Ltd.* (2d Cir. 2001) (No. 00-7630)).)

2d at 443.

The Blockers here, however, went considerably further.  In unambiguous terms, the Blockers explicitly precluded the exercise of voting or investment power—the hallmarks of beneficial ownership—in excess of the 9.99% threshold, expressly providing that Hudson Bay "shall not have the power to vote or to transfer" any such shares.  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)  The Blockers further stated that such Excess Shares "shall not be deemed to be beneficially owned by [Hudson Bay] for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act."  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)

To make these limitations even *more* clear, the Blockers specified that any conversion or exercise that would take Hudson Bay above the 9.99% threshold "shall be null and void and treated as if never made," and that any Excess Shares issued as a result "shall be deemed null and void and shall be cancelled ab initio."  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)  The Blockers in the Certificate of Incorporation, which governed conversions of Preferred Stock, further provided that any Excess Shares "shall be held in abeyance until such time as" their delivery "would not result in" Hudson Bay exceeding the 9.99% threshold.  (Cplt. Ex. A § 4(d).)

The Blockers' provisions were self-effectuating—they did not depend on any action or inaction by BBBY or Hudson Bay.  Instead, on their face, they plainly barred Hudson Bay from ever acquiring voting or investment power, and thus beneficial ownership, over more than 9.99% of the outstanding Common Stock.  Specifically, they provided that any attempt to do so—whether inadvertent or intentional—would be "null," "void," and "cancelled ab initio."  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)  They therefore reflect the parties' mutual, clear intent that Hudson Bay could not, under any circumstance, beneficially own more than 9.99% of the outstanding Common Stock.  Plaintiff's assertion that the Blockers lacked an enforcement mechanism is thus belied by their

15

very terms.  (*Compare* Cplt. ¶¶ 178-85, *with* Cplt. Ex. A § 4(d), Ex. C § 1(f).)

But the parties went even *further*, adding more protections to ensure that there was no way to evade the Blockers' strict limitations by waiving or amending them, transferring ownership to other entities, or coordinating with other investors.  *First*, the Blockers made clear that they could not be waived or amended by either Hudson Bay or BBBY.  (Cplt. Ex. A § 30(b) (Blocker "may not be amended or waived"); Ex. C § 11 (Blocker provision could not be amended); *see also* Ex. A § 4(d) ("[t]he limitation contained in this paragraph may not be waived and shall apply to a successor holder" of the security); Ex. C § 1(f) (same).)

Given these unambiguous provisions, Plaintiff's conclusory allegation that the Common Stock Warrant's blocker was "purely contractual," and thus "waiv[able]" or "amend[able]" at any time, is simply not well-pled.  (Cplt. ¶¶ 162-65.)  Plaintiff, in essence, argues that a contractual bar on amendment or waiver can *never* be enforceable or binding, and is always inherently illusory, since parties can always choose to ignore their contracts and remove such a bar.  That premise flies in the face of basic contract law.  *See, e.g.*, *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016) (courts enforce contracts as written and disfavor "interpretation that renders a contract illusory and therefore unenforceable").  Notably, Plaintiff does not even attempt to allege that the same no-waiver language in the Certificate of Incorporation was ineffective. Regardless, Plaintiff's baseless argument that the Blockers were waivable by the parties is contrary to the plain terms of the Certificate of Incorporation and the Common Stock Warrant.

*Second*, the Blockers made clear that the calculation of the Maximum Percentage of Common Stock Hudson Bay could receive included not only shares of Common Stock held by Hudson Bay and its affiliates, but also shares held by any other "Attribution Party."  (Cplt. Ex. A § 4(d) (9.99% limit applies "collectively" to Hudson Bay "and the other Attribution Parties"); Ex.

C § 1(f) (same).)  An Attribution Party included any person "who could be deemed to be acting as a Group" with Hudson Bay or any of its affiliates, or "whose beneficial ownership of [BBBY's] [C]ommon [S]tock would or could be aggregated with," Hudson Bay's and its affiliates' beneficial ownership.  (Cplt. Ex. A § 31(g) (defining "Attribution Parties"); Ex. C § 19(d) (same).)

Thus, Plaintiff's contentions that the Blockers were not binding because the conversion and exercise notices did not account for possible "group" activity are refuted by the very documents cited in the Complaint, which confirm that the notices accounted for such activity. (*Compare* Cplt. ¶¶ 178-90, *with* Cplt. Ex. I at 1 (notice required Hudson Bay to affirm compliance with the "Maximum Percentage"); Ex. J. at 1 (same); Ex. A § 4(d) (defining "Maximum Percentage" with reference to "Attribution Parties"); Ex. C § (1)(f) (same).)  The inclusion of Attribution Parties places the Blockers here in sharp contrast to those at issue in *Greenberg v. Hudson Bay Master Fund Ltd.*, 2015 WL 2212215 (S.D.N.Y. May 12, 2015), a case cited in the Complaint.  Unlike the Blockers here, in *Greenberg* the plaintiff challenged the validity of blocker provisions that did not account for alleged "group" conduct because the blockers were allegedly limited to only the "Holder" and its "affiliates."  *Id.* at *6.  In any event, Plaintiff's argument is irrelevant, because the Complaint alleges no "group" activity here.[4]

Plaintiff's other attacks on the Blockers' validity or effectiveness are similarly infirm.  For example, Plaintiff's conclusory, threadbare allegations that BBBY had no interest in the Blockers

_____

[4] In an apparent alternative to its "group" argument, Plaintiff additionally argues that the Blockers were invalid because they required BBBY to maintain shares in reserve, rendering Hudson Bay a beneficial owner of those underlying shares.  (Cplt. ¶¶ 303-28.)  Holding shares in reserve is an essential feature of virtually all derivative securities, to assure the investor that the issuer will be able to meet its obligations to provide shares.  Courts consequently have routinely upheld blocker provisions that included such a feature, including in *Levy*, where the blocker required the issuer to "at all times . . . maintain an adequate reserve of duly authorized shares of Common Stock to enable it to perform its obligations under this Agreement."  (*See* Shapiro Decl. Ex. 2 (Nov. 8, 1996 Immunogen, Inc., Form 10-Q, Ex. 10.34) § 2.1(d).)

or incentive to enforce them are irrelevant.  (Cplt. ¶ 155.)  BBBY had an unambiguous contractual obligation not to issue shares to Hudson Bay, or allow Hudson Bay to vote any shares, if such issuance or vote would result in Hudson Bay beneficially owning greater than 9.99% of the outstanding shares.   Plaintiff's conclusory allegations that BBBY had no "interest" in, or "incentive" to comply with, its contractual obligations do not render those obligations ineffective.  Indeed, Plaintiff's argument would require courts to assess the parties' "incentives" before declaring the enforceability of every contract—clearly an untenable proposition.  In any event, as explained above, the Blockers are self-executing, meaning they would render any conversions or exercises in excess of the threshold "null and void" regardless of whether BBBY chose to act.  (*See* Cplt. Ex. A § 4(d); Ex. C § (1)(f).)

Plaintiff's allegation that the Blockers were unenforceable because they were "drafted by and for the benefit of" Hudson Bay fares no better.  (Cplt. ¶¶168-177.)  As a threshold matter, the governing contracts make clear that the Blockers were "jointly drafted by" BBBY and Hudson Bay.  (Cplt. Ex. A. § 21; Ex. C § 14.)  Moreover, BBBY admitted in its bankruptcy proceedings that the investment terms were arrived at following "hard-fought," "extensive," and "difficult" negotiations, further invalidating Plaintiff's allegations.  (*See* Bankr. D.I. 25 (DIP Mot.) ¶ 8; Bankr. D.I. 10 (First Day Decl.) ¶¶ 53-58; Bankr. D.I. 36 (DIP Mot. Decl.) ¶¶ 17-21.)  Plaintiff is bound by BBBY's prior admissions, and its conclusory allegations to the contrary are not well-pled.

Plaintiff's next argument, that the Blockers were ineffective because they "served no independent compliance function" and their "sole purpose . . . was to help the Hudson Bay Defendants" stay under 10% beneficial ownership, also fails.  (Cplt. ¶¶160-161.)  Neither the *Levy* court, nor any other court, has held that a blocker needs to serve an independent compliance function, which would render virtually every blocker ineffective.  *Levy*, 263 F.3d at 16-17; *see also*

*Klawonn*, 2011 WL 3502022, at \*4.  Moreover, the Supreme Court itself has made clear that "structur[ing] a transaction with the intent of avoiding liability under § 16(b)" is entirely permissible.  *Reliance Elec. Co.*, 404 U.S. at 422.

This Court should follow the lead of *Levy* and numerous other courts and find that the Blockers, viewed "as a whole," unambiguously and unequivocally prevented Hudson Bay from becoming a greater than 10% beneficial owner.  *Levy*, 263 F.3d at 17-18.  Such an interpretation bars Plaintiff's claim as a matter of law.

### C. Contract Law Confirms That the Blockers' "Null and Void" Language Would Defeat Any Attempt to Convert or Exercise Above the Blockers' Limitations

Fundamental principles of contract law mandate enforcing the Blockers in accordance with their terms.  *Levy*, 263 F.3d at 17-18 (citing Restatement (Second) of Contracts § 202(2) and *Sure-Trip, Inc. v. Westinghouse Eng'g*, 47 F.3d 526, 533 (2d Cir. 1995)).  Under those terms, any conversion or exercise in excess of 9.99% would have been "null and void," "treated as if never made," and "cancelled ab initio."  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)  These basic principles confirm that it was impossible for Hudson Bay to become a greater than 10% beneficial owner.

Courts routinely enforce "null and void" language as creating a condition precedent which, if not satisfied, requires the subject transactions to be set aside and treated as if they never occurred.  *See, e.g.*, *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 688, 691 (1995) (provision that lease "shall be deemed null and void and of no further force and effect" "unless and until" conditions were satisfied "unambiguously establishes an express condition precedent"); *Hong Qin Jiang v. Li Wan Wu*, 179 A.D.3d 1035, 1038 (2d Dept. 2020) (finding plaintiff never transferred stock under the relevant shareholder agreement because "a purported transfer in violation of the agreement is 'null and void' and not recognized"); *Cathay Bank v. Bonilla*, 2023 WL 6812274, at \*13-14 (E.D.N.Y. Oct. 16, 2023) (transfer "must be nullified and set aside"

19

because agreement deemed any transfer invalid, null and void, and of no force or effect).

Here, had Hudson Bay attempted to convert or exercise to acquire beneficial ownership of more than 9.99% of the outstanding Common Stock—and it did not—the Blockers' clear language would have rendered those transactions null, void, and of no legal effect.  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)  Further, Hudson Bay would "not have the power to vote or transfer" those shares, which in all events would "not be deemed to be beneficially owned" by Hudson Bay.  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)  And lastly, any Common Stock resulting from Preferred Stock conversions would have needed to be "held in abeyance" until such time as their delivery would not violate the threshold.  (Cplt. Ex. A § 4(d).)

Plaintiff's claims to the contrary depend entirely on the argument that "null and void" does not in fact mean "null and void"; that the contracts do not mean what they say.  Plaintiff cannot allege that either Hudson Bay or BBBY waived the beneficial ownership threshold the Blockers established, as the Blockers themselves specifically and unambiguously *barred* such a waiver.  (*See* Cplt. Ex. A § 4(d) (blocker provisions "may not be waived"); Ex. C § 1(f) (same).)

Put simply, the Blockers' plain language operated to preclude Hudson Bay from ever acquiring beneficial ownership of more than 9.99% of the outstanding Common Stock.  That was the parties' mutual intent, as expressed through the clear terms of their written agreements.  Because Plaintiff cannot plausibly allege that Hudson Bay ever became a greater than 10% beneficial owner given the Blockers' preclusive terms, its claim must be dismissed.[5]

---

[5] Even if BBBY *had* purported to issue "null and void" Common Stock to Hudson Bay, and Hudson Bay then purported to sell that hypothetical "null and void" stock to a third-party purchaser, that third party would be deemed a holder in due course and the stock would have been considered "valid in the hands of" that third party.  *See* UCC § 8-202(b)(1).

### III.     Plaintiff Fails to Allege Facts Supporting an Inference that Hudson Bay Beneficially Owned More Than 10% of the Outstanding Common Stock

Attempting to evade the Blockers' unambiguous terms, Plaintiff argues that Hudson Bay nevertheless actually acquired beneficial ownership of shares exceeding the Blockers. Plaintiff's allegations fail as a matter of law because they rely on calculations that are patently incorrect and conflict with established law.

As noted above, to be a statutory insider as a greater than 10% beneficial owner, an investor must have voting power and/or investment power over more than 10% of the issuer's outstanding shares. 17 C.F.R. §§ 240.13d-3(a), 240.16a-1(a)(1). The beneficial ownership calculation thus divides the number of shares that the investor can vote or invest (the numerator) by the number of the issuer's outstanding shares (the denominator).

The Complaint's allegations that Hudson Bay acquired beneficial ownership of more than 10% of the outstanding Common Stock at any one time rests on manipulated and contradictory calculations of beneficial ownership. These illogical calculations defy both established law and the express terms of the contracts governing Hudson Bay's investment. As a result, Plaintiff's allegations that Hudson Bay surpassed 10% beneficial ownership are not well-pled, and its argument that the Blockers were not binding because they were not adhered to in practice fails.

*First*, Plaintiff's calculations rely entirely on the false premise that Hudson Bay's converted or exercised shares should be immediately included in the "numerator" (i.e. shares beneficially owned by Hudson Bay), but *not* the "denominator" (i.e. total BBBY shares outstanding) when calculating beneficial ownership. (*See* Cplt. ¶¶ 191-211.) Plaintiff premises this fuzzy math on the notion that the shares should not be included in the denominator of total shares outstanding until they "settle" into Hudson Bay's account one or two days *after* conversion or exercise. (*Id.*) This is nonsense, and fails for several reasons.

As a preliminary matter, the Blockers themselves rebut this contention. They provide that beneficial ownership shall be calculated "after giving effect to the conversion or exercise of securities." (Cplt. Ex. A § 4(d); Ex. C § 1(f) (same).) This language in the Blockers is also consistent with courts' interpretation of when shares are considered "outstanding"—and therefore part of the denominator—for purposes of calculating Section 16(b) beneficial ownership. *See Donoghue v. Local.com Corp.*, 2009 WL 260797, at *3 (S.D.N.Y. Feb. 3, 2009) (rejecting argument that shares were not "outstanding" until the newly-issued stock certificates settled in the owners' accounts), *aff'd sub nom. Donoghue v. Hearst Commc'ns, Inc.*, 355 F. App'x 520, 523 (2d Cir. 2009) (stating that there is "ample authority" that stock certificates are not required to have settled into an investor's account "to be considered 'outstanding' for purposes of Section 16(b)").

In any event, Plaintiff's own allegations refute its argument. Plaintiff alleges that Hudson Bay was the "holder of record" of new shares of Common Stock immediately upon delivery of a conversion or exercise notice to BBBY. (Cplt. ¶¶ 240-46.) By necessity, a "holder of record's" shares must be "outstanding." Plaintiff therefore cannot simultaneously argue that the shares it alleges Hudson Bay owned as "holder of record" were not simultaneously "outstanding" for purposes of Section 16(b). (*Id.* ¶¶ 194-211.)

*Second*, Plaintiff argues that, even where Hudson Bay immediately sold converted or exercised shares, it retained voting and investment power over, and therefore beneficial ownership of, the sold shares until the shares settled and were transferred to the buyer's account. (Cplt. ¶¶ 230-46.) This argument similarly distorts the concept of beneficial ownership beyond recognition. Beneficial ownership consists of two prongs: (1) investment power and/or (2) voting power. 17 C.F.R. § 240.13d-3. Once Hudson Bay sold the shares it had acquired through a conversion or exercise, it simultaneously surrendered all investment power over those shares. To

state the obvious, Hudson Bay could not sell the same shares twice.  Upon such a sale, it is simply irrelevant when the sold shares were settled or transferred into the buyer's account because Hudson Bay had already disposed of its investment power over the shares when it sold them.  For investment power purposes, the shares were gone.

With respect to voting power, Plaintiff alleges that Hudson Bay retained residual voting power over shares it had already sold, and that such residual power could be combined with voting or investment power acquired from *subsequent* conversions or exercises to push Hudson Bay over 10% beneficial ownership.  These contentions are similarly meritless.  As an initial matter, Plaintiff fails to allege that Hudson Bay ever submitted a vote for—or even could have voted—over 10% of the outstanding Common Stock.

Moreover, the Blockers refute Plaintiff's contention, making it clear that under no circumstances could Hudson Bay vote more than 9.99% of BBBY's shares or vote *any* shares that would result in Hudson Bay becoming a greater than 9.99% beneficial owner.  Indeed, the Blockers state specifically that Hudson Bay "shall not have the power to vote" any shares in excess of the 9.99% beneficial ownership threshold.  (*See* Cplt. Ex. A § 4(d); Ex. C § 1(f).)  In other words, even if Hudson Bay theoretically could have some amorphous "residual voting power" over shares it had sold, the Blockers made clear that Hudson Bay necessarily would *lose* any possible "residual voting power" that would result in its total beneficial ownership exceeding 9.99%.  The Blockers thus voided any attempt by Hudson Bay to vote in excess of the 9.99% threshold.[6]

---

[6] This case stands in stark contrast to *Chechele v. Standard General LP*, 2021 WL 2853438 (S.D.N.Y. July 8, 2021).  First, unlike here, there were no blocker provisions at issue in *Chechele* that extinguished alleged residual voting power.  Second, in *Chechele*, the defendant sold its shares after the issuer had established a record date for a shareholder meeting, and then *actually exercised* its "residual" rights by voting the shares it had already sold.  By contrast, here, as stated previously, no vote took place, and even if a vote had occurred, Hudson Bay could not have voted shares above the 9.99% beneficial ownership limitation.  (Cplt. Ex. A § 4(d); Ex. C § 1(f).)

Indeed, Plaintiff's allegation that Hudson Bay beneficially owned more than 10% of the outstanding Common Stock relies on aggregating *new* shares that Hudson Bay obtained through conversions or exercises with shares that Hudson Bay had already sold.  The Second Circuit and other courts have repeatedly and resoundingly rejected such an aggregation theory, and found that Section 16(b) applies only to investors who acquire or have the right to acquire more than 10% beneficial ownership *at a single point in time*.  *See Levy*, 263 F.3d at 16 (holding that "beneficial ownership is determined at any one time, not cumulatively"); *Log On Am.*, 223 F. Supp. 2d at 448 ("seriat[i]m conversions are not proscribed by the [applicable blocker provisions] or Section 13(d)").  Accordingly, Plaintiff's allegations are nothing more than an attempt to relitigate an argument that the Second Circuit has already rejected.  These contentions cannot invalidate the Blockers for the same reasons articulated by the courts in *Levy* and *Log On America*.

Stripped of its baseless legal theories and factual obfuscation, the Complaint is left with nothing more than noise intended to distract the Court from its essential legal defects.  Among other things, Plaintiff:  (1) emphasizes the size and scope of Hudson Bay's trading activity and hyperbolically suggests, without support, that such activity was unprecedented in the capital markets; (2) complains of the purported economic bargain Hudson Bay received from its rescue financing investment; (3) accuses Hudson Bay of taking advantage of BBBY's status as a "meme stock"; and (4) blames BBBY's eventual bankruptcy on Hudson Bay's sales.  (Cplt. ¶¶ 19, 22-25, 65-100, 109-111, 137-50.)  Plaintiff's attacks are ironic, given that this litigation is being driven by BBBY's creditors such as Sixth Street, whose actions *actually* drove BBBY into bankruptcy by, among other things, preventing it from seeking additional capital to avoid bankruptcy.  (Bankr. D.I. 25 (DIP Mot.) ¶¶ 8-9; Bankr. D.I. 10 (First Day Decl.) ¶ 56.)

In any event, none of this noise is remotely relevant.  As explained above, Section 16(b) is

a strict liability statute that operates only within "narrowly drawn limits," is applied mechanically, and has no application to conduct outside its limited scope.  *See, e.g.*, *Foremost-McKesson*, 423 U.S. at 251; *see also Rubenstein*, 959 F.3d at 547.  Section 16(b) simply does not apply to the conduct Plaintiff alleges Hudson Bay engaged in here.  Plaintiff cannot expand Section 16(b)'s scope, or save its fundamentally infirm claim, by resorting to ad hominem and irrelevant attacks on Hudson Bay.  Put simply, Plaintiff has failed to plead a Section 16(b) claim, and its Complaint must be dismissed.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should grant Hudson Bay's motion to dismiss; dismiss the claim against Hudson Bay with prejudice; and grant any such other relief as the Court deems just and proper.

Dated: July 11, 2024
      New York, New York

                        Respectfully Submitted,

                              /s/ *Douglas A. Rappaport*
                        Douglas A. Rappaport
                        Kaitlin D. Shapiro
                        Richard J. D'Amato
                        Michael Chen
                        AKIN GUMP STRAUSS HAUER & FELD LLP
                        One Bryant Park
                        New York, NY 10036

                        *Counsel for the Defendants HBC Investments LLC and Hudson Bay Capital Management LP*