# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC., <br><br> Plaintiff, <br><br> v. <br><br> HBC INVESTMENTS LLC and HUDSON BAY CAPITAL MANAGEMENT LP, <br><br> Defendants. | No. 24 Civ. 3370 (MKV) |

**BRIEF OF *AMICUS CURIAE* SECURITIES REGULATION
PROFESSORS IN SUPPORT OF DEFENDANTS'
<u>MOTION TO DISMISS THE COMPLAINT</u>**

Justin M. Ellis
Jennifer E. Fischell
Sara Tofighbakhsh (*pro hac vice* forthcoming)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
Telephone: (212) 607-8160
Facsimile: (212) 607-8161
jellis@mololamken.com
jfischell@mololamken.com
stofighbakhsh@mololamken.com

*Attorneys for Amici Curiae Securities Regulation Professors*

## **TABLE OF CONTENTS**

Page

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................................... 1

INTRODUCTION .......................................................................................................................... 2

ARGUMENT .................................................................................................................................. 3

    I.       Precedent Enforces "Blockers" Like Other Contracts ....................................................... 3

    II.      Undermining Blockers Would Have Drastic, Unacceptable Consequences ...................... 6

CONCLUSION ............................................................................................................................. 11

i

# **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*159 MP Corp. v. Redbridge Bedford, LLC*,
    33 N.Y.3d 353 (2019) ..................................................................................................................5

*CBI Indus., Inc. v. Horton*,
    682 F.2d 643 (7th Cir. 1982) ......................................................................................................3

*Citadel Holding Corp. v. Roven*,
    26 F.3d 960 (9th Cir. 1994) ........................................................................................................5

*Decker v. Advantage Fund, Ltd.*,
    362 F.3d 593 (9th Cir. 2004) ......................................................................................................5

*Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*,
    No. 99 Civ. 342, 1999 WL 544708 (S.D.N.Y. July 27, 1999) ...................................................5

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*,
    156 F.3d 305 (2d Cir. 1998).......................................................................................................4

*ION Geophysical Corp. v. Fletcher Int'l, Ltd.*,
    No. 5050-VCP, 2010 WL 4378400 (Del. Ch. Nov. 5, 2010) .....................................................4

*Kisor v. Wilkie*,
    588 U.S. 558 (2019).....................................................................................................................6

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991).......................................................................................................9

*Levner v. Prince Alwaleed*,
    61 F.3d 8 (2d Cir. 1995).............................................................................................................5

*Levy v. Southbrook Int'l Invs., Ltd.*,
    263 F.3d 10 (2d Cir. 2001)................................................................................................ *passim*

*Magma Power Co. v. Dow Chem. Co.*,
    136 F.3d 316 (2d Cir. 1998).......................................................................................................3

*Reliance Elec. Co. v. Emerson Elec. Co.*,
    404 U.S. 418 (1972)..............................................................................................................3, 5

*Roth v. Armistice Cap. LLC*,
    No. 20 Civ. 8872 (JLR), 2024 WL 1313817 (S.D.N.Y. Mar. 27, 2024) ...................................6

*Schron v. Troutman Sanders LLP*,
    20 N.Y.3d 430 (2013) ............................................................................................. 5, 7

*SEC v. Cap. Gains Rsch. Bureau, Inc.*,
    375 U.S. 180 (1963) ..................................................................................................... 8

*Steel Partners II, L.P. v. Bell Indus., Inc.*,
    315 F.3d 120 (2d Cir. 2002) ........................................................................................ 3

## STATUTES AND RULES

15 U.S.C. § 78p ................................................................................................................... 2

15 U.S.C. § 78p(a)(1) ......................................................................................................... 2

15 U.S.C. § 78p(b) ..................................................................................................... 2, 3, 5

17 C.F.R. § 240.13d-3(a) .................................................................................................... 4

17 C.F.R. § 240.16a-1(a)(1) ............................................................................................... 4

17 C.F.R. § 240.16a-1(c) .................................................................................................... 4

Fed. R. App. P. 29(a)(4)(E) ................................................................................................ 1

## OTHER AUTHORITIES

*Bed Bath & Beyond Inc. Announces Completion of Public Equity Offering and
    Provides Strategic Update*, PR Newswire (Feb. 7, 2023),
    https://bit.ly/3SWrKqF ................................................................................................ 9

Bed, Bath & Beyond Inc. Second Amendment to Amended and Restated Credit
    Agreement and Waiver (2023), https://bit.ly/4dHV2lc ............................................... 9

BancBoston Cap. Inc., SEC Staff No-Action Letter,
    1987 WL 108100 (Aug. 10, 1987) ........................................................................... 4, 7

Eleazer Klein, *Fundamental PIPEs: Typical Structures and Transactions, in*
    PIPEs: A Guide to Private Investment in Public Equity 129
    (Steven Dresner, ed. 2006) .......................................................................................... 4

Harold S. Bloomenthal & Samuel Wolff, 1 *Sec. Law Handbook*
    (July 2024 Update) ...................................................................................................... 4

Hsiu-Kwang Wu, *An Economist Looks at Section 16 of the Securities Exchange
    Act of 1934*, 68 Colum. L. Rev. 260 (1968) ............................................................... 11

Michael Dessent, *Weapons to Fight Insider Trading in the 21st Century:
    A Call for the Repeal of Section 16(b)*, 33 Akron L. Rev. 481 (2000) ..................... 10

Michael W. Galligan, *Choosing N.Y. Law as Governing Law for Int'l Commercial Transactions*, 26 NYSBA Int'l Law Practicum 79 (Autumn 2013) ............................................. 7

Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide* (4th ed. 2012) ................................................................................................................. 3, 5

Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42 Duke L.J. 945 (1993) ................. 8

Simpson Thacher & Bartlett LLP, *Leveraged Finance 101: A Covenant Handbook* (2022), https://bit.ly/3XeAWJy .................................................................... 9

Steven R. Salbu, *Regulation of Insider Trading in a Global Marketplace: A Uniform Statutory Approach*, 66 Tul. L. Rev. 837 (1992) ............................................. 11

## **STATEMENT OF INTEREST OF *AMICI CURIAE*** [1]

This case concerns an issue of profound importance to the orderly functioning of the financial markets—the extent to which purchasers of securities can rely on the contracts they use to structure their transactions. The undersigned *amici curiae* are leading scholars with decades of experience in securities laws and empirical legal research. They have studied and written extensively about the proper scope of laws governing insider trading. They thus have a strong interest in the sound development of the applicable law.

Professor Bernard Black is Nicholas D. Chabraja Professor at Northwestern University, with positions in the Pritzker School of Law, the Kellogg School of Management, the Department of Finance, and the Institute for Policy Research. Among other topics, his research focuses on law and finance, securities law, corporate governance, and empirical legal studies.

Professor Jonathan R. Macey is the Sam Harris Professor of Corporate Law, Corporate Finance, and Securities Law at Yale University, a Professor in the Yale School of Management, and a Director of the Yale Law School Center for the Study of Corporate Governance. He previously served as Chair of the Yale University Advisory Committee on Investor Responsibility (ACIR) and as a member of the National Adjudicatory Council for FINRA. His research centers on the law of business organizations, finance, corporate governance, financial institutions, capital markets, and law and economics.

---

[1] While no disclosure is required by this Court's rules, out of an abundance of caution, *amici* hereby disclose that: (1) no party or party's counsel authored this brief; (2) no party or party's counsel contributed money to fund preparing or submitting this brief; and (3) Maxim Group LLC and Roth Capital Partners LLC, two market participants which rely on the enforceability of blocker provisions, contributed money to fund the preparation and submission of this brief. *Cf.* Fed. R. App. P. 29(a)(4)(E) (disclosure requirements for *amicus* briefs in the courts of appeals). The views expressed in this brief are solely based upon *amici*'s professional and independent judgment. *Amici* have not received any compensation in connection with the preparation or filing of this brief.

Professor Adam C. Pritchard is the Frances and George Skestos Professor of Law at the University of Michigan. Professor Pritchard previously served as senior counsel in the Office of the General Counsel of the SEC, where he received the SEC's Law and Policy Award for his work in *United States v. O'Hagan*, in which the U.S. Supreme Court upheld the misappropriation theory of insider trading. Professor Pritchard's research is focused on securities class actions, SEC enforcement, and the history of securities law in the U.S. Supreme Court.

*Amici* respectfully submit this brief to offer their unique perspective on the important policy ramifications of the issues presented. The views expressed are those of the individual *amici* and not of their affiliated organizations.

## **INTRODUCTION**

This case presents an important question regarding Section 16(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78p. That statute allows private lawsuits against any person who, while beneficially owning more than 10% of a non-exempt, registered security, conducts "short-swing" trades—purchases or sales of that security within six months of an earlier purchase or sale. 15 U.S.C. §§ 78p(a)(1), 78p(b). The question here is whether that statute applies when contractual clauses called "conversion caps" or "blockers" make it ***contractually impossible*** for the investor to beneficially own more than 10 percent of a company's securities. Plaintiff argues Section 16(b) applies despite such contracts. Defendants argue it does not, and that Plaintiff's complaint should be dismissed accordingly.

Defendants are right as a matter of both doctrine and sound policy. For almost 25 years, binding Second Circuit precedent has enforced blockers like any other contract. Market participants have relied on that precedent by investing billions of dollars based on the protections blockers offer. Indeed, in the last two years alone, issuers have used blockers in at least 76 financing transactions with nearly $12 billion in proceeds. Changing course now would have

2

drastic, destabilizing effects. It would upend markets and undermine established contractual protections. It would make it more difficult (if not impossible) for companies near bankruptcy to secure much-needed financing. It would turn Section 16(b) into a vexatious litigator's haven, creating perverse incentives for issuers to sue the same investors who provide them financing in reliance on blockers. And it would force Section 16(b) defendants to undergo years of expensive discovery and litigation even for the most meritless, barebones claims. That result does not serve Section 16(b)'s purpose and defies settled law. Defendants' motion to dismiss should be granted.

## ARGUMENT

### I. PRECEDENT ENFORCES "BLOCKERS" LIKE OTHER CONTRACTS

Section 16(b) is a "[d]raconian," "blunt instrument" for deterring insider trading. *CBI Indus., Inc. v. Horton*, 682 F.2d 643, 647 (7th Cir. 1982) (Posner, J.); *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998). Unlike other insider-trading rules, Section 16(b) imposes liability based on arbitrary, bright-line rules about share ownership and trade timing— regardless of knowledge or intent. *See* 15 U.S.C. § 78p(b); *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 123 (2d Cir. 2002); Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide* §§ 9.04[1][b], 9.04[3], at 966-67, 978-85 (4th ed. 2012) ("Romeo & Dye"). Specifically, Section 16(b) considers *any* person beneficially owning more than 10% of an issuer's securities to be an "insider" who can be sued for disgorgement of *any* profits derived from *any* paired security purchase and sale within six months. *See Magma Power*, 136 F.3d at 320-21; 15 U.S.C. § 78p(b). Under that "mechanical[ ]" rule, even "technical violators of pure heart" may be punished. *Magma Power*, 136 F.3d at 320.

Given those harsh consequences, courts interpret the statute narrowly. In particular, the Supreme Court has explicitly held that an investor may "structure[ ] his transaction with the intent of avoiding liability under § 16(b)." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422

3

(1972).[2]  For decades, investors have taken up that invitation by entering into investment contracts with provisions called "blockers" or "conversion caps," *see* BancBoston Cap. Inc., SEC Staff No-Action Letter, 1987 WL 108100 (Aug. 10, 1987) (approving use of blockers).  Blockers avoid triggering Section 16(b)'s 10% threshold by prohibiting investors from exceeding a certain level of beneficial ownership.  *ION Geophysical Corp. v. Fletcher Int'l, Ltd.*, No. 5050-VCP, 2010 WL 4378400, at *13 (Del. Ch. Nov. 5, 2010); *see* Harold S. Bloomenthal & Samuel Wolff, 1 *Sec. Law Handbook* § 14.41 (July 2024 Update).  For example, one of the blocker provisions at issue here rendered "null and void" any "conversion" of preferred shares that would lead to beneficial ownership "in excess of 9.99%" of outstanding common stock.  Dkt. 1 ("Compl.") ¶ 129.  And it even barred **the issuer**—Plaintiff's predecessor-in-interest, Bed, Bath & Beyond Inc.—from "effect[ing]" any such conversion.  *Id.*

Blockers such as these are common:  A simple search of SEC filings shows that, in the last two years alone, issuers and investors have used blockers in at least 76 securities transactions with nearly **$12 billion** in proceeds.  Ellis Decl. ¶ 3 & Ex. B; *see also, e.g.*, Eleazer Klein, *Fundamental PIPEs: Typical Structures and Transactions*, *in* PIPEs: A Guide to Private Investment in Public Equity 129, 147-48 (Steven Dresner, ed. 2006) (explaining that "most transactions are structured" with blockers "so that the investors will not be subject to Section 16").

In *Levy v. Southbrook International Investments, Ltd.*, 263 F.3d 10 (2d Cir. 2001), the Second Circuit approved blockers as a way to avoid acquiring beneficial ownership.  "[W]here a binding conversion cap denies an investor the right to acquire more than 10% of the underlying

---

[2] Interpretive regulations issued over the years have only widened Section 16(b)'s already broad scope.  *See Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) (addressing 17 C.F.R. § 240.16a-1(c)).  For example, 17 C.F.R. § 240.13d-3(a), also known as Rule 13d-3, directs that **future** rights to ownership count towards Section 16(b)'s bright-line beneficial ownership rule.  *See* 17 C.F.R. § 240.16a-1(a)(1) (adopting Rule 13d-3 for purposes of Section 16).

4

equity securities of an issuer," the court held, "the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities." *Id.* at 12. Crucially, in deciding whether a conversion cap was "binding," the Second Circuit looked to ordinary contract-interpretation principles. *Id.* at 17-18. It considered the blocker's plain text, analyzed that text in the context of the "'instrument as a whole,'" and determined it contained an enforceable and "clear prohibition on [the investor's] ability to convert shares" if doing so "would result in it owning in excess of 4.9% of [the issuer's] outstanding common stock." *Id.*³

*Levy*'s use of ordinary contract law to interpret blockers is plainly correct. Case after case has reached the same result.⁴ And the undersigned are aware of no court or scholar questioning it. For good reason. *Levy* accords with state contract laws—including New York's, Dkt. 1-1 at 31, ¶ 26—that express a "strong public policy in favor of freedom of contract," *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 363 (2019). Unambiguous blocker contracts therefore must be "'enforced according to the[ir] plain meaning,'" just as other contracts would be. *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). Issuers and investors thus may achieve Section 16(b)'s goal of curbing insider trading by agreeing that corporate insiders will never come into existence—which is all blockers do. *Reliance*, 404 U.S. at 422, 424; *see* Romeo & Dye, § 9.01[9] at 846; 15 U.S.C. § 78p(b).

Despite *Levy*, Plaintiff urges that the blockers in this case are "'illusory or a sham'" based on "factors" articulated in a 23-year-old *amicus* brief submitted by the SEC. Compl. ¶ 153. Those factors include whether the blocker provision "is easily waivable by the parties (particularly the

---

³ *Levy* interpreted Rule 13d-3, which applies to Section 16(b). *See* p. 4, n.2, *supra*.

⁴ *See, e.g.*, *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 597 (9th Cir. 2004); *Levner v. Prince Alwaleed*, 61 F.3d 8, 9-10 (2d Cir. 1995); *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 967-68 (9th Cir. 1994); *Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 544708, at *16 & n.12 (S.D.N.Y. July 27, 1999).

5

holder of the convertible securities); lacks an enforcement mechanism; has not been adhered to in practice; or can be avoided by transferring the securities to an affiliate of the holder." Br. of the SEC as *Amicus Curiae* Supporting Appellees, *Levy v. Southbrook Int'l Invs.*, 263 F.3d 10 (2d Cir. 2001), No. 00-7630, 2001 WL 34120374, at 24-25 (2d Cir. Mar. 23, 2001) ("SEC Amicus Brief"); *see* Compl. ¶ 157.  Plaintiff appears to argue in its complaint (Compl. ¶ 153) that a footnote in *Levy* endorses the SEC's multi-factor approach for assessing when "illusory" conversion caps may be "disregarded." *Levy*, 263 F.3d at 17 n.4.  The footnote Plaintiff cites, however, did **not** endorse the SEC's position.  It merely explained what the ***plaintiff's argument*** in that case was, because the "plaintiff-appellant argue[d] that the Purchase Agreement [was] a sham." *Levy*, 263 F.3d at 17.  But the Court then "***reject[ed]*** plaintiff-appellant's argument." *Id.* (emphasis added).  It said nothing about the SEC's factors.  To the contrary, it applied contract principles, including the Restatement (Second) of Contracts, to find that the blockers at issue were binding. *Id.* at 17-18.  Thus, under *Levy*, whether blockers are enforceable thus turns on state contract law, not a 23-year-old *amicus* brief.[5]

## II.   UNDERMINING BLOCKERS WOULD HAVE DRASTIC, UNACCEPTABLE CONSEQUENCES

Even if *Levy* were not binding—and it is—this Court should not endorse any standard that would permit Section 16(b) cases like this one to survive motions to dismiss.  The blockers at issue here are undisputedly clear, enforceable under state law, and binding on the issuer.  Allowing Section 16(b) claims to move forward despite such blockers would wreak havoc among investors and securities issuers.  It would also open the doors to costly, wasteful, and meritless strike suits.

---

[5] It is now settled that this Court need not defer to the SEC's *amicus* brief in light of *Kisor v. Wilkie*, 588 U.S. 558 (2019), which held that the "general rule" is "not to give deference to agency interpretations advanced for the first time in legal briefs." *Id.* at 579 n.6; *see Roth v. Armistice Cap. LLC*, No. 20 Civ. 8872 (JLR), 2024 WL 1313817, at *11 n.5 (S.D.N.Y. Mar. 27, 2024) (recognizing that *Kisor* abrogated *Press* and similar cases).

Investors and issuers around the world rely on certainty and predictability. That is why they routinely choose New York law to govern securities agreements. *See, e.g.*, Michael W. Galligan, *Choosing N.Y. Law as Governing Law for Int'l Commercial Transactions*, 26 NYSBA Int'l Law Practicum 79 (Autumn 2013). The securities industry knows and has relied for decades on the fact that clear contracts—including those with blockers—will be enforced according to their terms. *See Schron*, 20 N.Y.3d at 436; *see also* BancBoston Cap., 1987 WL 108000, at *1 (issuing a no-action letter for a blocker in 1987). The certainty that blockers offer has helped encourage investors to invest billions of dollars yearly in transactions that might otherwise implicate Section 16(b). *See* p. 4, *supra*.

Enabling suits like this one to proceed to discovery would turn that certainty on its head. Plaintiff concedes Defendants are subject to blockers, that the blockers here prevent both the issuer and the investor from allowing the investor to acquire securities above the 10% threshold, and that, under *Levy*, blockers may be enforceable. *See* Compl. ¶¶ 152-153. Plaintiff's complaint also does not dispute that the blockers here are enforceable under governing New York law. Yet Plaintiff argues that they were "illusory" based on various extra-contractual factors. Compl. ¶ 155. Plaintiff alleges, for example, that Bed, Bath & Beyond was too distracted by its financial distress to keep track of its obligations, was not motivated to track whether rapid conversion requests by Defendants pushed it above the 9.99% cap, and that the blockers were not actually binding because the parties could have later agreed to amend or waive the blockers. Compl. ¶¶ 162-177, 212-228. But those barebones allegations could apply to *any* issuer and investor. If they are enough to survive a motion to dismiss, then *every* Section 16(b) case could proceed to costly discovery, even if (as here) the issuer and investor agreed to unambiguous, enforceable blockers. That would

7

expose every deal to exactly the risks of Section 16(b) litigation and liability that blockers seek to prevent.

The financial markets would also be harmed by allowing Section 16(b) plaintiffs to circumvent clear blockers.  If enterprising plaintiffs' attorneys can routinely avoid blockers through the formulaic allegations Plaintiff proposes, then investors looking to buy securities will have to price in the increased risk that they will have to face meritless Section 16(b) litigation. Those risks will raise the cost of capital and deter investment.  *See* Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42 Duke L.J. 945, 948 (1993) (describing how "[u]nnecessary civil or criminal liability diminishes the return to, and increases the cost of, capital").  In particular, investment advisers, which owe fiduciary duties of care to their investors, will be especially hesitant to risk meritless Section 16(b) liability if they cannot trust that blockers will be enforceable.  *See SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963).  And undermining blockers now will impose enormous costs on market participants who have already relied on *Levy* by using blockers to structure their securities purchases.

Issuers in financial distress would be hardest hit.  For companies on the brink of bankruptcy, blockers can make raising capital easier because they allow distressed issuers to balance the rights and obligations of their existing lenders and their potential new financing counterparties. Indeed, that is exactly what happened here.  Bed, Bath & Beyond was heading for bankruptcy until it announced a last-minute public offering of convertible preferred stock and warrants, subscribed largely by Defendants.  Those securities were subject to blockers.  Compl. ¶127.  With its lenders' approval, Bed, Bath & Beyond promised Defendants that the blockers would protect them from exposure to Section 16(b) liability.  In turn, the lenders agreed to amend

their defaulted credit facilities in exchange for receiving the proceeds of Defendants' investment.[6] The blockers were part of that "'hard-fought'" deal, Dkt. 25 at 18, which allowed Bed, Bath & Beyond to service its debts and continue as a going concern. Without the shield blockers offered against Section 16(b) litigation, that deal might not have happened. But under Plaintiff's argument, blockers would offer almost no protection to distressed investors at all.

More broadly, undermining blockers would prevent the flexibility both issuers and investors need to structure financial transactions. For example, because blocker provisions limit the amount of beneficial ownership any one investor may have, blockers let an investor offer more financing without risking a change of control that could have consequences under the company's debt documents. *See* Simpson Thacher & Bartlett LLP, *Leveraged Finance 101: A Covenant Handbook* 14-15 (2022), https://bit.ly/3XeAWJy (describing change-of-control covenants). Issuers also benefit because they can offer larger transactions using derivative securities than they could if blockers were ineffective. And at the same time, blockers allow issuers to avoid having any one investor gain undue influence and potentially trigger proxy contests for board seats. Rendering blockers potentially useless, as Plaintiff seeks to do, will frustrate all these purposes.

In fact, Plaintiff's rule would generate perverse incentives. Issuers could promise investors one day that blockers would prevent Section 16(b) liability, and then turn around and sue those

---

[6] *See* Press Release, *Bed Bath & Beyond Inc. Announces Completion of Public Equity Offering and Provides Strategic Update*, PR Newswire (Feb. 7, 2023), https://bit.ly/3SWrKqF (announcing that proceeds of Bed, Bath & Beyond's offering would be "used immediately to repay outstanding borrowings" and that an amendment to its credit facility had been entered into concurrently with the closing of the offering); Bed, Bath & Beyond Inc. Second Amendment to Amended and Restated Credit Agreement and Waiver 2-5, §§ 3(i), 5(a) (2023), https://bit.ly/4dHV2lc (conditioning effectiveness of the amendment to the credit agreement on Bed, Bath & Beyond receiving the initial tranche of $225 million, and requiring it to use that tranche to prepay outstanding advances and loans); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (courts may take "judicial notice of the contents of relevant public disclosure documents . . . required by law to be filed, and actually filed, with the SEC").

same investors under Section 16(b) the next. In this case, for example, Bed, Bath & Beyond agreed to $225 million in rescue financing from Defendants, with the potential for $800 million more. *See* Compl. ¶65. That financing allowed Bed, Bath & Beyond to help pay its existing creditors and buy much-needed runway. *See* pp. 8-9, *supra*. But now, having already reaped the financing's benefit, Bed Bath and Beyond's successor-in-interest now seeks to extract an additional ***$300 million*** from Defendants under Section 16(b). The possibility of such windfalls encourages issuers in Plaintiff's position to attack ***every*** blocker provision, no matter how ironclad. That, in turn, will further discourage investors from making deals with blockers, ironically making it less likely that distressed issuers like Plaintiff can raise capital going forward.

Worse, if courts look beyond unambiguous—and unambiguously enforceable—blocker provisions, more suits will survive motions to dismiss, no matter whether the plaintiffs can ultimately prevail on the merits. That will reward counsel and parties who clog the courts with meritless litigation. And even if Section 16(b) strike suits are doomed to eventually fail on the merits, plaintiffs' lawyers can still use the threat of time-consuming, costly, and intrusive discovery to extract settlements from investors. That results in a deadweight loss for the capital markets, disincentivizes investment, redistributes value from blameless investors to plaintiffs and lawyers, and undermines the predictability for which New York contract law is prized.

Nothing in Section 16(b) justifies, let alone requires, such a result. Nor is there any basis to expand Section 16(b) beyond its current limits, even if the Court had authority to do so. As one commentator has argued, Section 16(b) already creates "an excessive incentive to litigate . . . not to right a true 'wrong' or help a truly aggrieved plaintiff recover a loss," but to opportunistically squeeze investors. Michael Dessent, *Weapons to Fight Insider Trading in the 21st Century: A Call for the Repeal of Section 16(b)*, 33 Akron L. Rev. 481, 482 (2000) (arguing that Section 16(b)

10

"puts blame on innocent people and essentially legalizes champerty"). Other scholars have long noted the potentially severe social and economic costs of Section 16(b)'s blunt approach, including how Section 16(b) is both overinclusive and underinclusive, deters legitimate business activity and investment, fails to prevent socially harmful insider trading, and encourages strategic litigation.[7]

Of course, whether to keep Section 16(b) in its current form is a question left to Congress, not the courts. But undermining blockers in the way Plaintiff proposes would only increase Section 16(b)'s social costs and undermine market participants' reasonable expectations. There is no reason to do so—especially when binding precedent makes blockers fully enforceable. The Court should enforce the blockers at issue under *Levy* according to ordinary contract principles.

## CONCLUSION

Defendants' motion to dismiss should be granted.

Dated: August 30, 2024
New York, New York

Respectfully submitted,

　/s/ Justin M. Ellis　
Justin M. Ellis
Jennifer E. Fischell
Sara Tofighbakhsh (*pro hac vice* forthcoming)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160
Facsimile: (212) 607-8161
jellis@mololamken.com
jfischell@mololamken.com
stofighbakhsh@mololamken.com

*Attorneys for Amici Curiae Securities Regulation Professors*

---

[7] *See, e.g.*, Steven R. Salbu, *Regulation of Insider Trading in a Global Marketplace: A Uniform Statutory Approach*, 66 Tul. L. Rev. 837, 862-63 (1992) (arguing that Section 16(b)'s chilling effect is "detrimental to good leadership and management, and harmful to market efficiency," and that "[t]he costs of regulating short-swing profits by insiders outweigh the potential benefits"); Hsiu-Kwang Wu, *An Economist Looks at Section 16 of the Securities Exchange Act of 1934*, 68 Colum. L. Rev. 260, 269 (1968) (describing how the "arbitrary short-term restrictions provided by Section 16(b) . . . may be harmful to the economy").

11