# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

20230930-DK-BUTTERFLY-1, INC., f/k/a
BED BATH & BEYOND INC.,

      Plaintiff,

      – v. –

HBC INVESTMENTS LLC and
HUDSON BAY CAPITAL
MANAGEMENT LP,

      Defendants.

ECF CASE

No. 24-cv-3370 (MKV) (SN)

## MEMORANDUM OF LAW OF PLAINTIFF
## 20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC.,
## IN OPPOSITION TO HUDSON BAY'S MOTION TO DISMISS

James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Phone: +1 (484) 214-4697
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1,
Inc., f/k/a Bed Bath & Beyond Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

      A.     The Hudson Bay Financing ...................................................................... 2

      B.     Hudson Bay's Trading Program ............................................................... 3

      C.     The Blockers ............................................................................................ 5

      D.     The Complaint and This Motion ............................................................... 5

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 6

I.      THERE IS NO PER SE RULE ENFORCING BLOCKERS WITHOUT REGARD
      TO THE UNDERLYING FACTS OF THEIR ADOPTION AND OPERATION ............ 6

II.     THE FACTS ALLEGED IN THE COMPLAINT RAISE A MORE THAN
      PLAUSIBLE CLAIM THAT HUDSON BAY'S BLOCKERS WERE ILLUSORY ....... 12

      A.     No Independent Regulatory Scheme Required the Blockers, Which Hudson
            Bay Drafted Solely to Avoid Disclosure and Disgorgement Obligations ............ 12

      B.     The Blockers Were Not the Product of Bona Fide Negotiations .......................... 13

      C.     The Common Warrant Blockers Were Not Fixed in BBBY's Certificate
            of Incorporation but Could Be Freely Waived or Amended by the Parties ........... 14

      D.     BBBY Had No Way to Enforce the Blockers or Prevent Breaches of the Cap ..... 16

      E.     The Blockers Placed No Limit on the Number of Conversions or Exercises ........ 17

      F.     Hudson Bay Repeatedly Tore Through the 9.99% Cap, Beneficially Owning
            More than 10% and Materially Breaching Its Representations to BBBY ............. 18

III.    RULE 13d-3(b) INVALIDATES THE BLOCKERS AS A MATTER OF LAW ........... 22

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

### Cases

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
    684 F.3d 36 (2d Cir. 2012) .......................................................................... 21

*Auer v. Robbins*, 519 U.S. 452 (1997) ...................................................................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 6

*Canoo Inc. v. DD Glob. Holdings Ltd.*, No. 22-cv-3747,
    2023 U.S. Dist. LEXIS 167916 (S.D.N.Y. Sept. 21, 2023) ............................... 6

*Chechele v. Standard Gen. L.P.*, No. 20 Civ. 3177 (KPF),
    2021 U.S. Dist. LEXIS 127588 (S.D.N.Y. July 8, 2021) ................................. 20

*Citadel Holding Corp. v. Roven*, 26 F.3d 960 (9th Cir. 1994) .................................... 13

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
    562 F. Supp. 2d 511 (S.D.N.Y. 2008),
    *rev'd on other grounds*, 654 F.3d 276 (2d Cir. 2011) ........................... 23, 24, 25

*Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183 (2d Cir. 2020) .................................. 6

*Decker v. Advantage Fund, Ltd.*, 362 F.3d 593 (9th Cir. 2004) ............................ 11, 18

*Feder v. Frost*, 220 F.3d 29 (2d Cir. 2000) .................................................................. 7

*Fla. Rock Indus. v. Escambia Sand & Gravel Co.*, No. CIVIL ACTION 13-0499-WS-B,
    2014 U.S. Dist. LEXIS 77154 (S.D. Ala. June 6, 2014) .................................. 15

*Flores v. Sessions*, No. CV 85-4544-DMG (AGRx),
    2018 U.S. Dist. LEXIS 115488 (C.D. Cal. July 9, 2018) ................................. 15

*Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232 (1976) ......................... 7

*Frankel v. Slotkin*, 984 F.2d 1328 (2d Cir. 1993) ...................................................... 22

*Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 CIV. 342 (DLC),
    1999 U.S. Dist. LEXIS 11378 (S.D.N.Y. July 27, 1999) ........................... 11, 18

*Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14cv5226 (DLC),
    2015 U.S. Dist. LEXIS 62236 (S.D.N.Y. May 12, 2015) ....................... 2, 11, 17

*Halleran v. New York*, 132 Misc. 73 (N.Y. Sup. Ct. 1928) ....................................... 14

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) .................................................................... 10

*Klawonn v. YA Global Invs., L.P.*, No. 10-2108 (SRC),
    2011 U.S. Dist. LEXIS 88535 (D.N.J. Aug. 10, 2011)........................................ 10, 11, 23

*Levner v. Prince Alwaleed*, 61 F.3d 8 (2d Cir. 1995) .................................................... 13

*Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10 (2d Cir. 2001).......................... passim

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
    223 F. Supp. 2d 435 (S.D.N.Y. 2001)................................................................. 11

*Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999)......................................................... 16

*Olagues v. Perceptive Advisors LLC*, 902 F.3d 121 (2d Cir. 2018) ............................... 7

*Probility Media Corp. v. Isen*, No. 17-CV-2583-CAB-WVG,
    2018 U.S. Dist. LEXIS 60902 (S.D. Cal. Apr. 10, 2018)................................... 11

*Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418 (1972) ..................................... 9

*Roth v. Armistice Cap., LLC*, No. 20-cv-8872 (JLR),
    2024 U.S. Dist. LEXIS 56887 (S.D.N.Y. Mar. 27, 2024) ................................ 10

*Roth v. Solus Alt. Asset Mgmt. LP*, 124 F. Supp. 3d 315 (S.D.N.Y. 2015) .......................... passim

*Roth v. Solus Alt. Asset Mgmt. LP*, 258 F. Supp. 3d 364 (S.D.N.Y. 2017) ................................. 11

*Schaffer v. CC Invs., LDC*, 115 F. Supp. 2d 440 (S.D.N.Y. 2000)................................. 11

*SM Kids, LLC v. Google LLC*, 963 F.3d 206 (2d Cir. 2020)........................................... 6

*United States v. G-I Holdings, Inc.*, 369 B.R. 832 (D.N.J. 2007)................................. 15

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) .................................................. 21

## Statutes

15 U.S.C. § 78p...........................................................................................................6-7

15 U.S.C. § 78p(b) .................................................................................................. passim

## Other Authorities

Br. of SEC as Amicus Curiae, *Levy v. Southbrook Int'l Invs., Ltd.*,
    263 F.3d 10 (2d Cir. 2001) (No. 00-7630)................................................... passim

## Treatises

Peter J. Romeo & Alan L. Dye,
    Section 16 Treatise and Reporting Guide (5th ed. 2019)........................................ 9, 11, 21

## Regulations

17 C.F.R. § 240.13d-3................................................................................................... passim

17 C.F.R. § 240.13d-3(a) ............................................................................................ 7, 21

17 C.F.R. § 240.13d-3(b) ............................................................................................ 22, 23

17 C.F.R. § 240.13d-3(d)(1)(i)..................................................................................... 7, 19, 25

17 C.F.R. § 240.13d-5(b)(1) ........................................................................................ 16

17 C.F.R. § 240.16a-1(a)(1).......................................................................................... 7

Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc. ("BBBY"),

respectfully submits this brief in opposition to the motion to dismiss filed by Defendants HBC

Investments LLC and Hudson Bay Capital Management LP (collectively, "Hudson Bay").[1]

### PRELIMINARY STATEMENT

Hudson Bay's entire motion rests on a misstatement of law. The motion invokes Second

Circuit authority for its essential premise, that "blockers are enforced as written." Mem. of Law

in Supp. of Motion to Dismiss ("Mem.") at 14. But that is not the law. What the Second Circuit

actually held — and what the Complaint forthrightly acknowledges — is that *effective, binding*

blockers are enforceable. *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001)

("An Investor Subject to an *Effective, Binding* Conversion Cap of 4.9% is Not a More Than 10%

Beneficial Owner . . . ." (emphasis added)); Compl. ¶ 152 (acknowledging the enforceability of

"binding blockers that effectively deny an investor the right to acquire beneficial ownership").

This distinction makes all the difference. The Complaint alleges abundant facts that

Hudson Bay's blockers were not "binding" and "effective." It exposes the blockers as a feckless

honor system of self-policing by Hudson Bay, which concealed its holdings from BBBY,

habitually miscalculated its beneficial ownership, and repeatedly breached the 9.99% cap. While

the public deal documents purported to bar BBBY from issuing shares in excess of the cap, a

private Side Letter obligated BBBY to issue shares only "in such amounts as specified by"

Hudson Bay, no questions asked. All this was done in service of ███████████████

██████  that, in a matter of weeks, buried BBBY under scores of conversion and exercise

requests ██████████████████████████████████.

There is no per se rule of law that the blockers must be blindly "enforced as written,"

---

[1] Other capitalized terms in this brief are used as defined in the Complaint. *See* Dkt. 1.

without regard to these alleged facts.  Mem. at 14.  The Court has already rejected that rule.  *See Roth v. Solus Alt. Asset Mgmt. LP*, 124 F. Supp. 3d 315, 324 (S.D.N.Y. 2015) (denying a motion to dismiss because "the Blocker Provision was not necessarily effective" if its limitations were "'illusory or a sham'" (quoting *Levy*, 263 F.3d at 17 n.5)).  Despite Hudson Bay's strawman arguments, this is not a case about whether blockers *can* work in the abstract.  It's a case about whether Hudson Bay's blockers *did* work based on the specific facts alleged.

They did not.  The Complaint pleads a more than plausible claim that the blockers in this case failed to place an effective, binding cap on Hudson Bay's beneficial ownership.  Hudson Bay's motion to dismiss should be denied.

## STATEMENT OF FACTS

BBBY is the issuer formerly known as Bed Bath & Beyond Inc.  Compl. ¶ 6.  It sold home goods through a national chain of stores until its bankruptcy in April 2023.  *Id.* ¶ 30. Shortly before that bankruptcy, while desperate for cash and struggling to survive, BBBY was approached by Hudson Bay,[2] which proposed the extraordinary financing at issue in this case. *Id.* ¶ 35.  Although Hudson Bay had no prior investment in BBBY, the deal it proposed would soon hand it rights over the vast majority of BBBY's fully diluted common stock.  *Id.*

### A.    The Hudson Bay Financing

The terms of the Hudson Bay financing called for BBBY to issue three new classes of derivative securities: (a) Series A Preferred, convertible into BBBY common stock at a floating discount to market (subject to a floor of $0.7160 per share); (b) Common Warrants to acquire BBBY common stock at the holder's option; and (c) Preferred Warrants to acquire additional

---

[2] Hudson Bay is a multibillion-dollar investment firm and no stranger to Section 16(b). *See* Hudson Bay Capital Management LP Form 13F (Aug. 14, 2024) (reporting holdings of $21 billion), *at* https://www.sec.gov/Archives/edgar/data/1393825/000139382524000134/ xslForm13F_X02/primary_doc.xml; *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14cv5226 (DLC), 2015 U.S. Dist. LEXIS 62236 (S.D.N.Y. May 12, 2015).

Series A Preferred and Common Warrants either at the holder's option or, if numerous
conditions could be satisfied, through an exercise "forced" by BBBY.  *See id.* ¶¶ 36-64.  BBBY
raised around $225 million at the close of the deal and stood to raise up to $800 million more
over the following months if it could force exercise of all of the Preferred Warrants.  *Id.* ¶ 65.

Hudson Bay took pains to conceal its role in the deal.  *See id.* ¶¶ 132-50.  Among other
steps, it had BBBY sign the Side Letter, a private agreement disclosed for the first time in this
litigation, which expressly barred BBBY from mentioning Hudson Bay in any public document.
*Id.* ¶¶ 139-141.  But behind the curtain, Hudson Bay led the deal, acquiring the vast majority of
the offered securities, including all of the Preferred Warrants.  *See id.* ¶¶ 37, 50.  Hudson Bay
also negotiated the financing terms, drafted the main deal documents,[3] and tailored many of the
key legal terms — including the 9.99% blockers at issue here — to suit its needs.  *Id.* ¶¶ 37, 137.

## B.    Hudson Bay's Trading Program

The financing launched on February 7, 2023,



.  *Id.* ¶¶ 8, 19.  Within a matter of
weeks, Hudson Bay converted or exercised its Derivative Securities 90 times, acquiring a total of
444 million new BBBY shares.  *Id.* ¶¶ 21, 215.

*Id.* ¶¶ 72, 336.

BBBY's shares outstanding from around
117 million when the financing began to more than 782 million at the time of BBBY's
bankruptcy.  *See id.* ¶¶ 79, 81.                                                            ,

---

[3] Hudson Bay impermissibly denies that it drafted the documents, insisting that "the
governing contracts make clear that the Blockers were 'jointly drafted.'"  Mem. at 18.  Hudson
Bay overlooks that the "governing contracts" include the Side Letter.  Addressed to Hudson Bay
(which is defined as "you"), the Side Letter recites unambiguously that the deal documents were
"***prepared by your counsel and delivered to us***."  Compl. ex. G at 1 (emphasis added).

from more than $5 per share on February 6 to just $0.8125 per share six weeks later.  *See id.*

¶¶ 90, 94, 102.  ███████████████████████████████████████████████████

███████████████████████████████  *Id.* ¶ 23.

     The Derivative Securities shielded Hudson Bay from the bloodbath by allowing it to

acquire BBBY stock at a steep discount to market.  *Id.* ¶ 24.  In addition to a floating conversion

price (which let Hudson Bay convert its Series A Preferred at an 8% discount, subject only to a

low floor price), the deal built in several other discounts or "sweeteners."  *See id.* ¶¶ 41-42, 57,

67-70.  These terms ensured that ████████████████████████████████████████

████████████████████████████████.  *Id.* ¶ 24.

     ██████████████████████████████████████████████████

█████████████████████  *Id.* ¶ 72.  ████████████████████████  SEC rules

applicable at the time gave investors two business days to make delivery on stock trades.  *Id.*

¶ 74.  BBBY had to satisfy conversion or exercise requests on this same "T+2" schedule.  *See id.*

¶ 232, ex. A § 4(c)(i), ex. C § 1(a).  ████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████  *See id.* ¶ 75.  ████████████

██████████████████████████████████████████  between February 7 and

BBBY's April 23 bankruptcy.  *See id.* ¶¶ 75-78.  BBBY was given no information about the size

of Hudson Bay's holdings ██████████████████████.  *See id.* ¶¶ 181-182.  The Side Letter

expressly barred BBBY from asking for this information or from issuing shares in any amount

except as requested by Hudson Bay.  *Id.* ¶¶ 183-184 (citing *id.* ex. G §§ 2(n), 3(b)).

     ████████████████████████████████  the price of BBBY's common stock below

the minimum necessary for BBBY to raise additional capital through "forced exercise" of the

Preferred Warrants. *See id.* ¶¶ 90, 95-96. Although BBBY and Hudson Bay agreed to lower this minimum price, the stock soon crashed below even the amended minimum. *See id.* ¶¶ 97-102. On March 30, 2023, after it became clear that BBBY would not be able to force further exercises of the Preferred Warrants, the parties agreed to terminate the financing. *Id.* ¶ 103.

BBBY tried to replace the Hudson Bay financing but could not raise sufficient funds to stay afloat. *See id.* ¶¶ 109-110. It filed for bankruptcy protection on April 23, 2023, and its business was ultimately liquidated. *Id.* ¶ 111. By that time, Hudson Bay had realized a profit of more than $310 million from its purchases and sales of BBBY's equity securities. *Id.* ¶ 370.

### C.    The Blockers

When the financing began on February 7, 2023, the Derivative Securities gave Hudson Bay rights in a total of 711,648,336 BBBY shares, or 85% of shares outstanding on an as-converted, as-exercised basis. *Id.* ¶ 114. In an attempt to limit its beneficial ownership of these shares (and avoid disclosure and disgorgement obligations under Sections 13 and 16 of the Act), Hudson Bay drafted limitations on conversion and exercise — the so-called "blockers" — into the terms of the Derivative Securities. *Id.* ¶¶ 127, 150. The blockers purported to bar Hudson Bay from converting or exercising Derivative Securities to the extent the acquisition of the underlying shares would leave Hudson Bay beneficially owning more than 10% of BBBY's outstanding common stock. *Id.* ¶ 128; *see also id.* ¶¶ 129-130 (reproducing the blockers' text). Hudson Bay could elect to lift the 9.99% cap whenever it wanted, but any election would be effective only after 61 days — just outside the 60-day window within which a right to acquire stock would constitute beneficial ownership. *Id.* ¶ 131.

### D.    The Complaint and This Motion

BBBY filed its Complaint on May 2, 2024, and Hudson Bay filed its motion to dismiss on July 11, 2024. Dkts. 1, 24. The Complaint acknowledges that binding and effective blockers

are a respected means of structuring around Section 16(b) liability.  Compl. ¶¶ 151-152.  It alleges, however, that Hudson Bay's blockers were not binding and effective but an illusory contrivance that placed no genuine constraint on Hudson Bay's beneficial ownership.  *Id.* ¶¶ 153-155.  Without the blockers, Hudson Bay beneficially owned more than 10% of BBBY's common stock, and was subject to Section 16(b), from February 7 to April 18, 2023.  *Id.* ¶ 334. The Complaint seeks recovery of the $310 million profit Hudson Bay realized from its matchable purchases and sales of BBBY's equity securities during this period.  *See id.* ¶¶ 372-380.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "'enough facts to state a claim to relief that is plausible on its face.'"  *Canoo Inc. v. DD Glob. Holdings Ltd.*, No. 22-cv-3747, 2023 U.S. Dist. LEXIS 167916, at *5 (S.D.N.Y. Sept. 21, 2023) (Vyskocil, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must accept a complaint's factual allegations as true and draw all reasonable inferences in the nonmovant's favor.  *E.g.*, *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020).  But the Court is not required to accept legal conclusions couched as fact or "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'"  *Canoo*, 2023 U.S. Dist. LEXIS 167916, at *5-*6 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The movant bears the burden of showing that a complaint fails to state a claim.  *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 214 (2d Cir. 2020).

## ARGUMENT

**I.    THERE IS NO PER SE RULE ENFORCING BLOCKERS WITHOUT REGARD TO THE UNDERLYING FACTS OF THEIR ADOPTION AND OPERATION**

Section 16 applies to the directors and officers of every issuer of a class of registered equity securities, as well as every "beneficial owner" of more than 10% of any such class.  15

U.S.C. § 78p. Under Section 16(b), these "insiders" must repay the issuer any profit realized from any purchase and sale of the issuer's equity securities within a period of less than six months. *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243-44 (1976). To state a claim under Section 16(b), a plaintiff must plead (1) a purchase and (2) sale of equity securities (3) within a period of less than six months (4) by a director or officer of the issuer or by a beneficial owner of more than 10% of any class of the issuer's registered equity securities. *E.g.*, *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 125 (2d Cir. 2018). Hudson Bay concedes the Complaint's sufficiency as to all elements except the last, arguing that the blockers prevented it from being a "beneficial owner" of more than 10% of BBBY's common stock. Mem. at 2.

The SEC has defined "beneficial owner" in Rule 13d-3, two parts of which are relevant here. 17 C.F.R. § 240.13d-3; *see also id.* § 240.16a-1(a)(1) (adopting Rule 13d-3's definition for use in determining Section 16's 10% beneficial owners). *First*, Rule 13d-3(a) defines "beneficial owner" to include anyone who has or shares, directly or indirectly, (1) "[v]oting power which includes the power to vote, or to direct the voting of," a security; or (2) "[i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." *Id.* § 240.13d-3(a). *Second*, Rule 13d-3(d)(1)(i) provides that a person without immediate voting or investment power will still be deemed a beneficial owner of a security if the person has "the right to acquire beneficial ownership of such security . . . within sixty days" through "the exercise of any . . . warrant" or "the conversion of a security." *Id.* § 240.13d-3(d)(1)(i).

The Second Circuit has upheld these rules as a lawful exercise of the SEC's rulemaking authority, *see Feder v. Frost*, 220 F.3d 29, 34 (2d Cir. 2000), and Hudson Bay does not challenge them. Hudson Bay concedes beneficial ownership of any security it "owns outright *or* . . . has the right to acquire within 60 days, such as through the conversion of a security or exercise of a

warrant." Mem. at 9. Hudson Bay argues, however, that the blockers denied it the "right to acquire" beneficial ownership of more than 9.99% of BBBY's shares outstanding within 60 days, thus capping its beneficial ownership below Section 16's 10% threshold. *Id.* at 9-10.

Hudson Bay's argument rests on the premise that "blockers are enforced as written." *Id.* at 14. Starting from that premise, the motion focuses almost exclusively on the blockers' text, arguing that enforceability depends on text alone and nothing more. *See id.* ("Where they unambiguously bar an investor from acquiring beneficial ownership of more than 10% of the issuer's common stock, the investor *cannot* be a greater than 10% beneficial owner as a matter of law."). The cornucopia of facts BBBY offers to show how the blockers actually worked is dismissed as "kitchen sink" and "noise" to be ignored by this Court. *Id.* at 3, 14.

But the first premise of Hudson Bay's motion is false: blockers are not categorically enforceable. The seminal Second Circuit case relied on by both the motion and the Complaint held that blockers are enforceable only if they are "effective" and "binding." *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001). *Levy* rejects Hudson Bay's textual supremacy and requires courts to consider not only what a blocker *says* but also whether it *does* what it says. *See id.* at 17 n.5 ("'The commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions.'" (quoting *Bershad v. McDonough*, 428 F.2d 693, 697 (7th Cir. 1970) (cleaned up))). Thus, "when the limitations provided by conversion caps are discovered to be illusory or a sham, they should be disregarded and the courts should analyze the case as though no such limitations existed." *Id.* (cleaned up).

*Levy* gives the lie to Hudson Bay's argument that a narrow construction of the statute requires dismissal. Mem. at 8, 10. True, investors enjoy wide latitude to structure transactions "with the purpose of avoiding or limiting Section 16(b) exposure," *id.* at 10, but wide is not the

same as unlimited.  The cases plot a graveyard of "unacceptable structuring methods" that courts

have rejected.  Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide 846-48

(5th ed. 2019) (listing 12 such methods rejected by as many authorities).  These unacceptable

structuring methods include "[e]ngaging in a sham transaction" and making a "contract . . . that

has the purpose or effect of evading beneficial ownership."  *Id.* at 847, 848 (citing several

authorities); *cf. Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972) ("The

question is, rather, whether the method used to 'avoid' liability is one permitted by the statute.").

*Levy* confirms that concealing a de facto right to acquire stock behind an "illusory" or "sham"

blocker is *not* an acceptable structuring method.  263 F.3d at 17 n.5; *see also Roth v. Solus Alt.

Asset Mgmt. LP*, 124 F. Supp. 3d 315, 324 (S.D.N.Y. 2015) (same).

　　　　The Second Circuit's conclusion that "illusory" blockers must be "disregarded" was

based on an SEC amicus brief submitted at the Court's invitation.  *See Levy*, 263 F.3d at 17 n.5

(quoting Br. of SEC as Amicus Curiae at 25-26 ("<u>SEC Amicus Br.</u>")), *reproduced in* Compl.

ex. H).  Interpreting Rule 13d-3, the SEC advised courts to evaluate blockers on a "case-by-case

basis" to determine whether an instrument raised a "binding and valid" impediment to beneficial

ownership.  SEC Amicus Br. at 24-25; *see also id.* at 13 ("If a cap is not effective in constraining

conversion rights, it is not a basis for finding limits on beneficial ownership.").  This case-by-

case determination must go beyond the blockers' text to consider whether the apparent textual

limitations are "illusory or a sham."  *Id.* at 25-26, *quoted with approval in Levy*, 263 F.3d at 17

n.5.  The SEC offered a list of factors, reproduced in the Complaint and discussed below, to help

distinguish "binding" from "illusory" blockers.  *Id.* at 24-25; Compl. ¶ 157; *infra* Part II.[4]

---

[4] The SEC's interpretation of its own regulations binds the Court unless the interpretation
is "'plainly erroneous or inconsistent with the regulations.'"  *Levy*, 263 F.3d at 14 (quoting *Press
v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir. 2000)).  This rule extends to interpretations

Rather than address these factors and their extensive application in the Complaint, *see* Compl. ¶¶ 157-270, Hudson Bay urges the Court to ignore the SEC's guidance entirely because it "'appears to have played no role in the Second Circuit's decision.'" Mem. at 14 (quoting *Klawonn v. YA Global Invs., L.P.*, No. 10-2108 (SRC), 2011 U.S. Dist. LEXIS 88535, at *12 (D.N.J. Aug. 10, 2011)). Again, Hudson Bay's premise is wrong: the *Levy* Court relied heavily on the SEC's amicus brief. It cited and quoted the brief several times, even repeating the SEC's advice that blockers should be disregarded when their limitations "'are discovered to be illusory or a sham.'" 263 F.3d at 17 n.5 (quoting SEC Amicus Br. at 25-26); *see also id.* at 15, 16.

But even if Hudson Bay's premise were true, its conclusion would not follow. Binding agency guidance does not cease to be so just because a court has no record to apply it. The *Levy* Court never applied the SEC's factors because the parties never applied them. The case had been fully briefed and argued before the SEC appeared. *See id.* at 14 (relating the Court's request for an amicus brief "[a]fter hearing oral argument"). The *Levy* plaintiff staked his appeal (much as Hudson Bay stakes its defense) not on the SEC's factors but on the text of the contract. *See, e.g.*, *id.* at 15 (summarizing plaintiff's argument that the cap's terms did not bar the investor from cumulatively acquiring more than 10% "through seriatum conversions and sales" within 60 days). The plaintiff's argument sought to invalidate blockers categorically, and the Second Circuit followed the SEC's reasoning in rejecting it. *See id.*; SEC Amicus Br. at 21-22.

Hudson Bay must forage out of circuit to find even a single case that refused to apply the

---

(continued…)

first offered in an amicus brief. *See Auer v. Robbins*, 519 U.S. 452, 461-62 (1997). Even as *Chevron* deference is in retreat, the Supreme Court has reaffirmed the *Auer* doctrine. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2417-18 & n.6 (2019); *Roth v. Armistice Cap., LLC*, No. 20-cv-8872 (JLR), 2024 U.S. Dist. LEXIS 56887, at *33 & n.5 (S.D.N.Y. Mar. 27, 2024). Hudson Bay does not argue that the SEC's interpretation of its beneficial ownership rules is "plainly erroneous or inconsistent with the regulations." Nor does it deny that deference extends to the SEC's interpretation of its rules (as opposed to its statutory interpretation under *Chevron*).

SEC's factors, and that opinion is undercut by its own authorities.  *See Klawonn*, 2011 U.S. Dist. LEXIS 88535, at \*12, *cited in* Mem. at 13-14.[5]  Where *Klawonn* found the SEC's amicus brief of "little persuasive value," *id.*, the Second Circuit begged to differ, "find[ing] reasonable the SEC's reading" of its rules.  263 F.3d at 16.  The leading treatise also criticizes *Klawonn*, concluding that it "applied an incorrect standard of review in determining the level of deference to which the SEC's amicus brief was entitled."  Romeo & Dye, *supra*, at 164 n.264.  Hudson Bay acknowledges Romeo and Dye as authorities.  *See* Mem. at 9, 12.

Romeo and Dye go on to endorse the principle, followed by the Second Circuit in *Levy*, that the agency's amicus brief "was entitled to 'controlling weight' unless it was plainly erroneous or inconsistent with the statute or regulation."  Romeo & Dye, *supra*, at 164 n.264.  The treatise adds that "[m]ore recent decisions" than *Klawonn* "have shown a greater willingness to consider the SEC's criteria."  *Id.* at 164 (citing *Roth v. Solus Alt. Asset Mgmt. LP*, 258 F. Supp. 3d 364 (S.D.N.Y. 2017); and *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14cv5226 (DLC), 2015 U.S. Dist. LEXIS 62236 (S.D.N.Y. May 12, 2015)).

This Court's opinion in *Roth*, the most recent Second Circuit case on the subject, made good use of the SEC's factors.  Following *Levy*'s lead, the *Roth* Court found the SEC's brief

---

[5] Most of the cases Hudson Bay cites, *see* Mem. at 11, 13, do not address the SEC's factors, but that is unremarkable.  At least two of the cases predate *Levy*.  *See Schaffer v. CC Invs., LDC*, 115 F. Supp. 2d 440 (S.D.N.Y. 2000); *Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 CIV. 342 (DLC), 1999 U.S. Dist. LEXIS 11378 (S.D.N.Y. July 27, 1999), *cited in* Mem. at 11.  A third case, heavily relied on by Hudson Bay, came down less than four months after *Levy* and appears to have been unaware of it.  *See Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435 (S.D.N.Y. 2001), *cited in* Mem. at 11, 13, 24.  The opinion in *Log On America* cites the District Court's decision in *Levy* but not the appellate one.  *See* 223 F. Supp. 2d at 448.  The motion to dismiss was briefed months before the *Levy* amicus brief was filed, and there is no record on the docket that any of the parties brought the amicus brief or the Second Circuit's opinion to the Court's attention.  There is no indication that the plaintiffs in *Decker* or *Probility Media* ever asked the Court to apply the SEC's factors either.  *See Decker v. Advantage Fund, Ltd.*, 362 F.3d 593 (9th Cir. 2004); *Probility Media Corp. v. Isen*, No. 17-CV-2583-CAB-WVG, 2018 U.S. Dist. LEXIS 60902 (S.D. Cal. Apr. 10, 2018), *cited in* Mem. at 13.

"persuasive." 258 F. Supp. 3d at 370. It summarized the factors and applied them to a blocker, observing that the only disagreement between the parties was "whether an effective enforcement mechanism existed." *Id.* Although *Roth* ruled for the defendant, it did so at summary judgment; the motion to dismiss had been denied. *See Roth*, 124 F. Supp. 3d at 317.

In sum, blockers are not per se enforceable as Hudson Bay argues. The Court must also consider the circumstances of the blockers' adoption and operation to determine whether they were "binding" or "illusory," and it should do so using the factors given by the SEC in its controlling agency guidance. The question is not whether the Complaint "expand[s] the reach of Section 16(b) beyond its permissible scope," Mem. at 10, for the statute clearly reaches "illusory" blockers. *Levy*, 263 F.3d at 17 n.5; *Roth*, 124 F. Supp. 3d at 324. Rather, the question is whether the Complaint plausibly alleges that Hudson Bay's blockers were "illusory" rather than "binding." *Levy*, 263 F.3d at 14, 17 n.5. The answer is that it does.

## II.    THE FACTS ALLEGED IN THE COMPLAINT RAISE A MORE THAN PLAUSIBLE CLAIM THAT HUDSON BAY'S BLOCKERS WERE ILLUSORY

The Complaint reproduces the SEC's factors and applies them at length to the facts. *See* Compl. ¶¶ 157-270. While the SEC characterized its factors as nonexclusive, *see* SEC Amicus Br. at 25, the motion fails to identify any other factors the Court should consider, so we confine ourselves to the SEC's list. As alleged in the Complaint and summarized below, essentially all of the SEC's factors cast the blockers as "illusory" rather than "binding."[6]

### A.    No Independent Regulatory Scheme Required the Blockers, Which Hudson Bay Drafted Solely to Avoid Disclosure and Disgorgement Obligations

The blockers served no regulatory purpose other than regulatory evasion. Compl. ¶¶ 160-

---

[6] The only factor weighing in Hudson Bay's favor is that its blockers took account of securities "transferr[ed] . . . to an affiliate." SEC Amicus Br. at 25; *see also* Mem. at 16. That factor deserves little weight because Hudson Bay did not need affiliate transfers to evade the blockers, often crossing the 9.99% line all by itself. *See* Compl. ¶¶ 230-270; *infra* Section II.F.

161.  Hudson Bay does not challenge this allegation so much as the SEC's guidance, arguing that "need[ing] . . . an independent compliance function" would invalidate "virtually every blocker." Mem. at 18.  That argument misstates the guidance, which treats an independent compliance function not as a "need[]" but as one "factor" among others.  The argument also invents its own facts.  Nothing in the Complaint permits the inference that "virtually every blocker" lacks an independent compliance function, and the cases suggest otherwise.  *See Levner v. Prince Alwaleed*, 61 F.3d 8, 9 (2d Cir. 1995) (blocker required by Federal Reserve Board); *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 962 (9th Cir. 1994) (blocker required by Federal Home Loan Bank Board).  Hudson Bay admits that blockers are also used to "limit[] a holder's ability to acquire a control position," Mem. at 6, so clearly regulatory avoidance is not a blocker's only purpose.  It was just the only purpose of Hudson Bay's blockers.

### B.    The Blockers Were Not the Product of Bona Fide Negotiations

BBBY had no interest in the blockers and, on the contrary, would have been delighted to sell Hudson Bay more than 9.99% of its stock.  Compl. ¶¶ 168, 171.  In support of this allegation, the Complaint offers the well-pleaded facts that BBBY (1) desperately needed cash, and was prepared to sell its stock to whoever would buy it, *see id.* ¶ 170; (2) had already tried to sell 100% of its stock to a strategic buyer, *see id.*; and (3) preferred a long-term investor over ███, *id.* ¶ 172.  None of Hudson Bay's precedents had facts remotely like these.  On the contrary, Hudson Bay omits to cite a case where this Court denied a motion to dismiss on similar facts.  *See Roth*, 124 F. Supp. at 325 (branding a blocker "inherently suspect" because it "was negotiated as part of the rescue of [the issuer], and its enforcement is largely limited to [the investor's] own promises").

References in BBBY's bankruptcy filings to "hard-fought," "extensive," and "difficult" negotiations, Mem. at 18, are irrelevant because the filings were discussing the deal's economic

terms, not the blockers.  *See, e.g.*, Bankr. D.I. 10 (First Day Decl.) ¶ 54 (quantifying the proceeds raised).  The bona fides of the negotiation of the price and other terms do not matter; the SEC's guidance looks to the negotiation of the blockers, not the investment as a whole.  *See* SEC Amicus Br. at 25 ("Factors that may indicate that a cap is *binding* include whether *it* [i.e., the cap] . . . is the product of bona fide negotiations." (second emphasis added)).  The bankruptcy filings do not even mention the blockers, which had no bearing on the debtors' finances.

Issuers are often interested in limiting accumulations of their stock, as Hudson Bay concedes.  *See* Mem. at 2 ("Companies also use blockers to prevent holders from building control positions.").  But BBBY in early 2023 was not a typical issuer "scrutinizing every stock accumulation" to "preempt a change in control."  Compl. ¶ 169.  BBBY cared about cash, not stock accumulations, leaving Hudson Bay to "negotiate" the blockers — with itself.  Thus, the one party that cared about the blockers was the same party the blockers were supposed to constrain, while the one party that might enforce that constraint didn't care about it at all.

### C.    The Common Warrant Blockers Were Not Fixed in BBBY's Certificate of Incorporation but Could Be Freely Waived or Amended by the Parties

BBBY's Certificate of Incorporation fixed the terms of the Series A Preferred but not the Common Warrants.  The Common Warrants and their blockers were "purely contractual," *id.* ¶ 162, and, like any agreement under New York law, could be freely amended or waived by the parties.  *See, e.g.*, *Halleran v. New York*, 132 Misc. 73, 80 (N.Y. Sup. Ct. 1928) ("Power to modify the contracts exists in the parties to them if they see fit to do so.").  The BBBY shares underlying Hudson Bay's Common Warrants (including the Common Warrants issuable upon exercise of its Preferred Warrants) exceeded 10% of shares outstanding from February 7 to March 30, 2023.  *See* Compl. ¶ 166.  Any amendment or waiver that lifted the Common Warrant blockers during this period would have given Hudson Bay an immediate right to acquire more

than 10% of BBBY's common stock.

Hudson Bay invokes language in the Common Warrants purporting to ban waiver or amendment of the blockers. Mem. at 16 (citing Compl. ex. C §§ 1(f), 11). As Hudson Bay sees it, acknowledging the parties' power to amend the blockers in spite of this language would mean "a contractual bar on amendment or waiver can *never* be enforceable or binding." *Id.* But a contract does not become "unenforceable" or nonbinding merely because its parties have the power to amend it. *See United States v. G-I Holdings, Inc.*, 369 B.R. 832, 838 n.12 (D.N.J. 2007) ("[P]arties to an executory contract are always free to amend the contract. The possibility that the parties may do so by mutual consent does not render the original agreement either 'legally indefinite' or 'unenforceable.'"). Rather, it is Hudson Bay's argument that renders contracts "unenforceable" by presuming that an agreement to amend the blockers could never be enforced. In 800 years of common law, Hudson Bay cannot find a single case to support its "no amendments allowed" theory of contract. Every case BBBY found rejects it. *See, e.g., id.*[7]

The possibility of amendment opened a gaping vulnerability in the Common Warrant blockers because BBBY cared naught for the blockers but a lot about selling stock. BBBY would have gladly amended the Common Warrants to keep Hudson Bay in the deal, just as it did with the Preferred Warrants. *See* Comp. ¶¶ 174-175. BBBY's indifference to the Common Warrant blockers meant that they remained in force essentially at Hudson Bay's pleasure: "[I]f the Hudson Bay Defendants decided they'd be happier without them, the blockers in the Common Warrants would be gone." *Id.* ¶ 177.

---

[7] *See also Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 U.S. Dist. LEXIS 115488, at *15 (C.D. Cal. July 9, 2018) ("Of course, the parties are always free to meet and confer regarding any contractual amendments on which they can mutually agree. This is basic contract law."); *Fla. Rock Indus. v. Escambia Sand & Gravel Co.*, No. CIVIL ACTION 13-0499-WS-B, 2014 U.S. Dist. LEXIS 77154, at *36 (S.D. Ala. June 6, 2014) ("Of course, parties are always free to modify or amend the terms of their contract." (citing cases)).

Rather than make the blockers "binding," the anti-amendment language only furthered the "illusion." Under black-letter contract law, the parties always had a free hand to amend the Common Warrant blockers; Hudson Bay just wanted it to *look* like their hands were tied.

### D. BBBY Had No Way to Enforce the Blockers or Prevent Breaches of the Cap

Even if BBBY had the will to enforce the blockers, it lacked the means. The Derivative Securities gave it no right to information about Hudson Bay's trades or holdings. *See id.* ¶¶ 181-182. The Side Letter expressly barred BBBY from demanding this information before satisfying a request, and it further barred BBBY from issuing shares in any amount except as requested by Hudson Bay. *See id.* ¶ 183; *id.* ex. G §§ 2(n), 3(b). Rather than an enforcement system, the blockers relied on an honor system. *See id.* ¶¶ 155, 185. Compliance had to be taken on faith — and quite a leap of faith, given the size and velocity of Hudson Bay's transactions. ███

████████████████████████████████████████████████████████████

████████████████████████████ *See id.* ¶¶ 78, 217. These shares amounted to more than 90% of the 117 million shares BBBY had outstanding before the deal began. *See id.* ¶ 79. None of Hudson Bay's precedents involved trading remotely similar in size or speed.

The one nod the blockers made to enforcement was a compliance representation boiler-plated to each conversion or exercise request. *See id.* ¶ 186; *id.* ex. I at 1, ex. J at 1. That perfunctory representation was unreliable on its face because it calculated beneficial ownership only by adding the beneficial ownership of Hudson Bay "together with its affiliates." *Id.* ¶¶ 186-187. Such a calculation was underinclusive because it failed to account for shares that might be held by nonaffiliates acting with Hudson Bay as a stockholder group. Under Rule 13d-5, such "group" shares would need to be included in the calculation for a full accounting of Hudson Bay's beneficial ownership. *See* 17 C.F.R. § 240.13d-5(b)(1); *Morales v. Freund*, 163 F.3d 763, 767 (2d Cir. 1999). This Court found a similar blocker inadequate in another Section 16(b) case

brought against Hudson Bay.  *See Greenberg*, 2015 U.S. Dist. LEXIS 62236, at *6 (rejecting a blocker that counted beneficial ownership of the holder "together with its affiliates").  *Greenberg* is on all fours: same defendant, same statute, same claim, virtually the same verbiage.

Hudson Bay tries to distinguish its earlier run-in with Section 16(b) on the ground that the Complaint does not allege a stockholder group, Mem. at 17, but that is irrelevant.  BBBY had no way to know as it was fulfilling requests whether or not Hudson Bay was acting as part of a stockholder group.  In the absence of such knowledge, the omission of group shares from the calculation of beneficial ownership made the compliance representation facially unreliable.  Hudson Bay also argues that the Derivative Securities define "Maximum Percentage" to include group shares, *see id.*, but that argument makes no sense.  The "Maximum Percentage" was a fixed value, set at 9.99%, and required no calculation.  *See* Compl. ex. A § 4(d); *id.* ex. C § 1(f).  The term was not defined "with reference" to anything.  Mem. at 17.

Hudson Bay exalted form over substance only to get the form wrong.  The plain terms of the request forms let it beneficially own more than 10% of BBBY's common stock through a group while accurately representing that it beneficially owned, "together with its affiliates," less than 9.99%.  The peremptory terms of the Side Letter required BBBY to fill these cap-busting requests, no questions asked.  The facial defect in the forms marks the blockers as "illusory" under the SEC's guidance, and it renders the blockers ineffective under *Greenberg* to boot.

### E.    The Blockers Placed No Limit on the Number of Conversions or Exercises

According to the SEC, limits on the number of conversions and exercises "are not essential" but may "add integrity" to the blockers.  SEC Amicus Br. at 25.  Hudson Bay's blockers had none of this integrity.  They gave Hudson Bay license to convert and exercise the Derivative Securities at any time and any number of times, and Hudson Bay took full advantage.  In the 52 trading days between February 7 and April 23, Hudson Bay submitted a total of

106 original or revised requests, most of them early in the deal.  *See* Compl. ¶¶ 215-216, 226.

███████████████████████████████████████████████████████████████

███████████████████████████████████ *Id.* ¶ 218.  Including the requests

submitted by the other 28 minority investors, BBBY had to process a total of 47 conversion or

exercise requests over just the first two days of the deal.  *See id.* ¶ 219.

These numbers differ by orders of magnitude from anything in the precedents.  *See Levy*,

263 F.3d at 13 (three conversions over 10 months); *Decker v. Advantage Fund Ltd.*, 362 F.3d

593, 595 (9th Cir. 2004) (one conversion); *Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*,

No. 99 CIV. 342 (DLC), 1999 U.S. Dist. LEXIS 11378, at *16 (S.D.N.Y. July 26, 1999) ("some

conversions" by some defendants, and only "attempted conversions" by others).

### F.     Hudson Bay Repeatedly Tore Through the 9.99% Cap, Beneficially Owning More than 10% and Materially Breaching Its Representations to BBBY

In none of Hudson Bay's precedents was a blocker ever alleged to have been breached.

*Cf. Levy*, 263 F.3d at 12 ("There is no claim that Southbrook ever exceeded the conversion

cap.").  By contrast, the Complaint alleges that Hudson Bay repeatedly exceeded the 9.99% cap,

beneficially owning more than 10% of BBBY's common stock from approximately 9:45 a.m. on

February 7, 2023 until about 2 p.m. on February 10, 2023, and then again from about 4:25 p.m.

on March 20 until the early afternoon of March 22.  Compl. ¶ 263.  Hudson Bay beneficially

owned this stock because it had the right to acquire the stock within two business days upon the

satisfaction of its pending conversion or exercise requests.  *See id.* ¶¶ 199, 232-233, 255-256.

To flesh out these allegations, the Complaint gives snapshot calculations of Hudson

Bay's beneficial ownership at 4 p.m. on each of February 7, February 8, February 9, and

March 21, 2023.  *See id.* ¶¶ 258-261.  In conformity with Rule 13d-3(d)(1)(i), each calculation

divides (x) the total number of shares Hudson Bay had the right to acquire within two business

days through pending conversion and exercise requests, *by* (y) the sum of that total number *plus* shares outstanding.  Table 1 below lists the results, showing that on each date Hudson Bay beneficially owned more — often far more — than 10% of BBBY's outstanding shares.

**Table 1.  Selected Breaches of the 9.99% Cap.  *See* Compl. ¶¶ 258-261.**

| As of 4 p.m. on . . . | HB Had the Right to Acquire the Following Number of Shares Within Two Business Days . . . | And BBBY Had Approximately the Following Number of Shares Outstanding . . . | So HB Beneficially Owned Approximately the Following % of Shares Outstanding . . . |
|---|---|---|---|
| February 7, 2023 | 31,965,740 | 116,837,942 | 21.48% |
| February 8, 2023 | 48,215,740 | 122,532,421 | 28.24% |
| February 9, 2023 | 32,500,000 | 154,262,331 | 17.40% |
| March 21, 2023 | 46,156,987 | 360,698,965 | 11.34% |

Hudson Bay cannot challenge the inputs to these calculations (which come straight from its conversion and exercise requests), so it attacks the "math" instead.  Mem. at 21.  According to Hudson Bay, BBBY's math "rel[ies] entirely on the false premise that Hudson Bay's converted or exercised shares should be immediately included in the 'numerator' (i.e. shares beneficially owned by Hudson Bay), but not the 'denominator' (i.e. total BBBY shares outstanding)."  *Id.* This is a bald misreading of the Complaint, which plainly alleges that shares noticed for conversion or exercise had to be included in *both* the numerator *and* denominator.  *See* Compl. ¶¶ 195-196.  The Complaint could not be clearer:

> 195.    [T]he rule requires an investor to include in the numerator any securities the investor has "the right to acquire . . . within sixty days," as through conversion or exercise of a derivative security.  17 C.F.R. § 240.13d-3(d)(1)(i).
>
> ***196.    The rule also requires the investor to include those same acquirable shares in the denominator. . . .***

*Id.* (emphasis added).  That is exactly how beneficial ownership is calculated in Table 1 above. The table includes in the numerator any shares Hudson Bay had the right to acquire through pending conversion or exercise requests, and it also adds those shares to shares outstanding in the denominator.  The figures in Table 1 above are the same ones that appear in the Complaint, *see*

*Id.* ¶¶ 258-261, and the arithmetic behind those figures is easily confirmed with a calculator.[8]

Hudson Bay's real argument seems to be that the Court should allow it to subtract from the numerator any shares Hudson Bay agreed to sell while awaiting delivery of the shares from BBBY. *See* Mem. at 22-23. This "funny math," Compl. ¶ 228, lacks merit for two reasons. First, it is exactly what *Levy* said *not* to do. *Levy* squarely rejected the argument that beneficial ownership could be calculated "cumulatively" by adding up "seriatum conversions and sales." 263 F.3d at 15. What *Levy* requires is not a calculation that "cumulat[es]" transactions over time but a snapshot that adds up the shares the investor has the "right to acquire" at "any one time." *Id.* at 16. Unlike Hudson Bay, BBBY follows this binding authority. The Complaint and Table 1 above take snapshots of Hudson Bay's beneficial ownership at 4 p.m. on each day, adding up the total number of shares Hudson Bay then had the "right to acquire" within 60 days. Hudson Bay's attempt to reduce this total by subtracting out prior sales is no different from the *Levy* plaintiff's attempt to goose the total by adding in subsequent conversions. Both maneuvers calculate over "seriatum conversions and sales," *id.* at 15, and both are forbidden by *Levy*.

But Hudson Bay's argument suffers an even more fundamental flaw: it flouts the plain terms of the SEC's rules. Hudson Bay reasons that it was allowed to subtract out any shares committed to sell because it no longer had "investment power" over them. *See* Mem. at 23 ("For investment power purposes, the shares were gone."). But "'[b]eneficial ownership of securities for purposes of Section 13(d) does not necessarily terminate when the securities are sold.'" *Chechele v. Standard Gen. L.P.*, No. 20 Civ. 3177 (KPF), 2021 U.S. Dist. LEXIS 127588, at *16 (S.D.N.Y. July 8, 2021) (quoting Peter J. Romeo & Alan L. Dye, Section 16 Deskbook 96

---

[8] Because Hudson Bay's argument relies on a misreading of the Complaint, its discussion on the metaphysics of when shares "'settle[d]' into Hudson Bay's account," Mem. at 21-22, is beside the point. Regardless of when a conversion or exercise "settles," the Complaint alleges that the requested shares had to be included in both the numerator and denominator immediately.

(Winter 2012)).  And the plain terms of Rule 13d-3 define "investment power" to include "the power to dispose, or to direct the disposition of" shares.  17 C.F.R. § 240.13d-3(a)(2).  It follows that, as long as Hudson Bay had *any* dispositive power over the shares it requested from BBBY, then it beneficially owned those shares, notwithstanding that it had committed to sell a portion of them.  *See Wellman v. Dickinson*, 682 F.2d 355, 365 & n.12 (2d Cir. 1982) (finding sufficient evidence of beneficial ownership in the "power to dispose of a block of securities").

The Complaint plausibly alleges that Hudson Bay not only had but actually exercised dispositive power over the BBBY shares subject to its pending conversion and exercise requests up to the point ███████████████████████████████████████████████████

██████.  None of Hudson Bay's requests directed BBBY to issue the underlying stock directly to Hudson Bay's buyers.  *See* Compl. ¶ 249.  Every single request directed BBBY to issue, and BBBY did in fact issue,[9] the underlying shares to Hudson Bay's brokerage account at Fidelity.

*Id.* ¶ 250.  ████████████████████████████████████████████████████████

████████████████████████████████████████.  *See id.* ¶ 75.  This dispositive power invested Hudson Bay with beneficial ownership of the stock under the plain terms of Rule 13d-3(a).

Significantly, nothing compelled Hudson Bay to use the stock issued by BBBY ████████

████████████████████████████.  Stock is fungible, *see, e.g.*, *Frankel v. Slotkin*, 984 F.2d 1328, 1338

---

[9] There is no merit to Hudson Bay's insinuation that BBBY bears responsibility for the shares issued in excess of the 9.99% cap because "BBBY had an unambiguous contractual obligation not to issue" them.  Mem. at 18.  The plain terms of the Side Letter gave BBBY no discretion over the number of shares issued, requiring it to issue shares "in such amounts as specified from time to time by" Hudson Bay.  Comp. ex. G § 3(b).  Section 16(b) imposes strict liability, and courts have repeatedly held that an issuer's consent to or participation in a transaction cannot estop its recovery.  *See* Romeo & Dye, *supra*, at 967-68 ("While many of the arguments for estoppel may be appealing on the surface, the courts predictably have not been moved by any of them." (citing many cases)).  Issuers have often prevailed in recovering profit from transactions in which they participated.  *See, e.g.*, *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 39-40 (2d Cir. 2012).

(2d Cir. 1993), and Hudson Bay always had the right ██████████████ with stock from other

sources. *See* Compl. ¶ 239.  For example, Hudson Bay could have entered the open market,

████████████████████████████, and then kept the stock it had requested from BBBY.  *Id.*

Hudson Bay's decision ██████████████████████████████████████ was a choice —

the exercise of dispositive power over that stock within the plain terms of Rule 13d-3(a)(2).

The Complaint gives an example of how Hudson Bay exercised dispositive power over

shares it requested from BBBY ████████████████████████████.  On February 8, 2023,

Hudson Bay submitted six exercise requests to acquire a total of 19.5 million shares.  *Id.* ¶¶ 282-

283. ████████████████████████████████████████████████████████████

*See id.* ¶ 284.  Hudson Bay would not receive delivery of the requested shares until 9:27 a.m. on

February 10, when BBBY issued all 19.5 million of them — 10.1% of its shares outstanding —

to Hudson Bay's account at Fidelity.  *Id.* ¶¶ 284-285.  So at 9:27 a.m. on February 10, Hudson

Bay had 10.1% of BBBY's common stock just sitting in its Fidelity account.  *Id.* ¶ 286.  ████

████████████████████████████████████████████████████████████

Had the 9.99% cap been binding and effective, Hudson Bay would not have had 10.1% of

BBBY's common stock sitting in its brokerage account.  And had the 9.99% cap been binding

and effective, Hudson Bay would not have had the power to dispose of that 10.1% block.  Yet in

each case, it did.  Hudson Bay's excursions above the 9.99% line are not the only proof of the

blockers' ineffectiveness, but they are proof positive.  Compl. ¶ 270.  Hudson Bay made nearly

20 violative conversion or exercise requests, *id.* ¶ 264, and the blockers failed to block every one.

**III.    RULE 13d-3(b) INVALIDATES THE BLOCKERS AS A MATTER OF LAW**

Rule 13d-3(b) invalidates any "contract, arrangement, or device" used with the purpose

or effect of "preventing the vesting of . . . beneficial ownership as part of a plan or scheme to

evade the reporting requirements of section 13(d) or (g) of the Act."  17 C.F.R. § 240.13d-3(b).

The rule debunks anew Hudson Bay's theory that "like any other contractual provision, blockers are enforced as written," Mem. at 14, for the rule makes clear that at least some such "contractual provision[s]" are unenforceable.  In fact, this Court invoked the rule as a "catchall evasion provision" to deny a motion to dismiss in another Section 16(b) case involving a blocker.  *Roth*, 124 F. Supp. 3d at 325.  Because the rule likewise "catches" Hudson Bay's evasive blockers, the rule gives the Court an alternative ground for denying Hudson Bay's motion to dismiss.

The clear purpose of the blockers was regulatory evasion.  *See* Compl. ¶¶ 132-150.  Among the many other well-pleaded facts offered to show disclosure avoidance, the Complaint alleges that Section 2(f)(ii) of the Side Letter ("Limitations on Disclosure") expressly forbad BBBY to "disclose the name of [Hudson Bay] in any filing, announcement, release or otherwise."  *Id.* ex. G at 7.  These well-pleaded allegations materially distinguish Hudson Bay's precedents.  *See, e.g.*, *Levy*, 263 F.3d at 13-14 (observing that plaintiff did not allege disclosure avoidance); *Klawonn*, 2011 U.S. Dist. LEXIS 88535, at *13-*14.  The only question is whether Hudson Bay's efforts at disclosure avoidance plausibly qualified as a "plan or scheme" of which "preventing the vesting of . . . beneficial ownership" formed a "part."  17 C.F.R. § 240.13d-3(b).

As the Complaint candidly admits, Compl. ¶¶ 151-152, investors enjoy significant latitude to structure around reporting obligations, and courts have not found it easy to distinguish legitimate "structuring" from a "scheme to evade" disclosure.  The line-drawing bedeviled this Court in *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, and the Court's decision fractured an appellate panel, which had to avoid the question.  562 F. Supp. 2d 511, 548-52 (S.D.N.Y. 2008), *rev'd on other grounds*, 654 F.3d 276, 279 (2d Cir. 2011).  But the late securities expert Judge Ralph Winter penned a thorough concurrence on the question that this Court has followed.  *CSX*, 654 F.3d at 288-310 (Winter, J., concurring), *followed by Roth*, 124 F. Supp. 3d at 324-25.

In Judge Winter's view, the distinction between legitimate "structure" and "scheme to evade" lay in whether the contract genuinely shed the "characteristics or expected benefits that are intended to be regulated." *CSX*, 654 F.3d at 306 (Winter, J., concurring), *followed by Roth*, 124 F. Supp. 3d at 324-25. Thus, a blocker lapses from "structure" to "scheme" if it retains a "'component that provides a substantial equivalence of the rights of ownership relevant to control, or includes steps that stop short of, or conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner.'" *Roth*, 124 F. Supp. 3d at 325 (quoting *CSX*, 654 F.3d at 305 (Winter, J., concurring) (cleaned up)).

The Complaint plausibly alleges that the blockers crossed that line. While the public terms of the blockers purported to bar BBBY from issuing stock in excess of the 9.99% cap, the private terms of the Side Letter said something quite different. The Side Letter obligated BBBY to issue stock in whatever amount Hudson Bay demanded, whenever Hudson Bay demanded it. *See* Compl. ex. G §§ 2(n), 3(b). BBBY could not inquire into compliance with the blockers, for the Side Letter barred it from demanding such "information." *Id.* § 2(n). BBBY could not call a time-out or halt a dubious conversion or exercise, for the Side Letter barred it from imposing any "procedures" beyond the bare request forms. *Id.* BBBY could not reduce an excessive request, for the Side Letter barred it from issuing transfer instructions except "in such amounts as specified from time to time by [Hudson Bay]." *Id.* § 3(b). From the moment Hudson Bay submitted a conversion or exercise request, the Side Letter bound BBBY to issue the requested stock in the amount requested and within two trading days — no questions asked. Beneficial ownership vested at nothing more than, in Judge Winter's words, "'the signal of the would-be owner.'" *Roth*, 124 F. Supp. 3d at 325 (quoting *CSX*, 654 F.3d at 305 (Winter, J., concurring)).

What Hudson Bay touts as "self-executi[on]," Mem. at 3, 18, was in fact the elimination

of all of BBBY's autonomy and discretion, with the result that Hudson Bay enjoyed an effective right to acquire stock by fiat. This arrangement, which turned BBBY into an inert vending machine of stock, has no precedent. The authorities have never required an issuer to scrutinize its investor's stock demands, but neither have they allowed the investor to ban such scrutiny altogether. Hudson Bay set itself above even its co-investors, none of whom enjoyed the benefits of the Side Letter or, presumably, knew about it. BBBY could condition a minority investor's acquisition on receipt of "legal opinion[s]" and "other information," and BBBY could refuse to issue shares in excessive "amounts . . . specified" by a minority investor. Compl. ex. G §§ 2(n), 3(b). BBBY could do none of those things to Hudson Bay.

The removal of any check on Hudson Bay's stock requests meant that Hudson Bay could command immediate beneficial ownership of any shares underlying the Derivative Securities at will. This peremptory claim to stock on demand gave Hudson Bay a "substantial equivalent" to beneficial ownership, namely, a substantial equivalent to the "right to acquire" stock within 60 days. 17 C.F.R. § 240.13d-3(d)(1)(i). By surreptitiously reserving for Hudson Bay an unchecked power to acquire BBBY stock at its pleasure, the Side Letter opened a back door to the "ownership characteristics and benefits intended to be regulated" — the essence of evasion under *Roth* and *CSX*. The plain terms of Rule 13d-3(b) invalidate this evasive scheme, and the blockers must be disregarded as a matter of law.

## CONCLUSION

The Complaint's allegations raise a plausible claim that the blockers in the Derivative Securities failed to place a binding and effective constraint on Hudson Bay's beneficial ownership of BBBY's equity securities. The motion to dismiss should be denied.

Dated: September 6, 2024

Respectfully submitted,

/s/ James A. Hunter
James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania  19087
Phone: +1 (484) 214-4697
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1,*
*    Inc., f/k/a Bed Bath & Beyond Inc.*