# Exhibit 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 8-K/A

**CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): February 6, 2023

# BED BATH & BEYOND INC.
**(Exact name of registrant as specified in its charter)**

| | | |
|---|---|---|
| **New York** | **0-20214** | **11-2250488** |
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (IRS Employer Identification No.) |

**650 Liberty Avenue, Union, New Jersey 07083**
**(Address of principal executive offices)(Zip Code)**

**(908) 688-0888**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.01 par value | BBBY | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Explanatory Note**

This Amendment No. 1 to Form 8-K of Bed Bath & Beyond Inc. (the "Company") amends the Current Report on Form 8-K filed with the Securities and Exchange Commission on February 7, 2023. The amendment is being filed to include (i) a description of the Company's convertible Series A preferred stock, par value $0.01 per share and stated value of $10,000 per share (the "Series A Convertible Preferred Stock"), warrants (the "Preferred Stock Warrants") to purchase shares of Series A Convertible Preferred Stock and warrants (the "Common Stock Warrants") to purchase shares of the Company's common stock, par value $0.01 per share (the "common stock"), in each case issued on February 7, 2023, and (ii) as Exhibit 10.1 hereto, the Second Amendment (including Amended Credit Facility) dated February 7, 2023 to the Amended and Restated Credit Agreement, dated as of August 9, 2021, among the Company, certain of the Company's US and Canadian subsidiaries party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the lenders party thereto.

**Item 1.01**          **Entry into a Material Definitive Agreement**

On February 7, 2023, the Company issued (i) 23,685 shares of Series A Convertible Preferred Stock, (ii) 84,216 Preferred Stock Warrants and (iii) 95,387,533 Common Stock Warrants pursuant to the the Underwriting Agreement, dated February 7, 2023, between the Company and B. Riley Securities, Inc., as underwriter. If the holder of a Common Stock Warrant also holds Preferred Stock Warrants, then the number of shares of common stock issuable upon the exercise of the Common Stock Warrant held by such investor shall automatically increase on each exercise date of the Preferred Stock Warrant, on a share by share basis, by 50.0% of the aggregate number of share of common stock then issuable upon conversion of the Series A Convertible Preferred Stock issued to the holder in each exercise of the holder's Preferred Stock Warrant at the Alternate Conversion Price (as defined below).

Each Common Stock Warrant is immediately exercisable at any time at the option of the holder for one share of common stock at an exercise price of $6.15 per share and will expire five years from the issuance date. If at the time of exercise of the Common Stock Warrant a registration statement is not effective for the issuance of all of the shares of common stock issuable upon exercise of the Common Stock Warrant, the holder may, in its sole discretion, exercise the Common Stock Warrant on a cashless basis. Whether or not a registration statement is effective, the holder may exercise the Common Stock Warrant on an "alternate cashless exercise" basis, in which case the number of shares of common stock issuable will equal the product of (x) the number of shares of common stock then issuable upon exercise and (y) 0.65. The holder of a Common Stock Warrant will be entitled to participate in dividends and other distributions of assets by the Company to its holders of common stock as though the holder then held common stock. In addition, if the Company grants certain securities or other property to the holders of common stock, then the holder of the Common Stock Warrant will be entitled to acquire the aggregate purchase rights the holder could have acquired if the holder then held common stock.

Each Preferred Stock Warrant is immediately exercisable at any time at the option of the holder for one share of Series A Convertible Preferred Stock (such shares, the "Warrant Preferred Shares") at an exercise price of $9,500 per share, subject to adjustment, and will expire one year from the issuance date. At any time on or after February 27, 2023, so long as (I) no Equity Conditions Failure (as defined in the Preferred Stock Warrants) then exists (unless waived in writing by the holder) and (II) no Forced Exercise (as defined below) (unless waived in writing by the holder) has occurred in the twenty (20) trading day period immediately prior to the applicable date of determination, the Company will have the right to require the holder to exercise the Preferred Stock Warrants into a number of Warrant Preferred Shares equal to the holder's pro rata amount of 10,527 Warrant Preferred Shares, less any shares voluntarily exercised by the holder (a "Forced Exercise"). In the event a Bankruptcy Triggering Event (as defined in the Certificate of Amendment) occurs, the Company will have no right to effect a Forced Exercise unless such Bankruptcy Triggering Event has been waived by the holder.

The foregoing description of the Common Stock Warrants and the Preferred Stock Warrants does not purport to be complete and is qualified in its entirety by reference to the full texts of the Form of Warrant to Purchase Common Stock of the Company and the Form of Warrant to Purchase Series A Convertible Preferred Stock of the Company, which are filed as Exhibits 4.1 and 4.2 hereto and incorporated herein by reference.

| Item 5.03 | Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year |
|---|---|

On February 6, 2023, the Company submitted the Certificate of Amendment (the "Certificate of Amendment") establishing the Series A Convertible Preferred Stock with the New York Department of State to establish the voting powers, designations, preferences and relative, participating, optional or other special rights and the qualifications, limitations and restrictions of the Series A Convertible Preferred Stock. The Certificate of Amendment became effective upon filing.

The Series A Convertible Preferred Stock is convertible at any time at the option of the holder into shares of common stock at a fixed conversion price of $6.15 per common share (the "Conversion Price"). However, at any time at the option of the holder, the Series A Convertible Preferred Stock may be converted into shares of common stock at a conversion price at the lower of (i) the applicable Conversion Price in effect on the applicable conversion date and (ii) the greater of (x) $0.7160 and (y) 92.0% of the lowest volume-weight average price ("VWAP") of the common stock on the Nasdaq Global Select Market during the ten consecutive trading day period ending and including the trading day a conversion notice is delivered (the "Alternate Conversion Price"). The Company will provide each holder of Series A Convertible Preferred Stock with notice of certain triggering events as a result of which the holder may choose to convert the Series A Convertible Preferred Stock they hold into shares of common stock at the Alternate Conversion Price for the Triggering Event Conversion Right Period (as defined in the Certificate of Amendment). In the event a Bankruptcy Triggering Event (as defined in the Certificate of Amendment) occurs, the Company will be required to redeem, in cash, the Series A Convertible Preferred Stock at a redemption price based on a required premium, as described in the Certificate of Amendment.

The foregoing description of the Series A Convertible Preferred Stock does not purport to be complete and is qualified in its entirety by reference to the full text of the Certificate of Amendment, which is filed as Exhibit 3.1 hereto and incorporated herein by reference.

The information set forth under Item 1.01 above regarding the Common Stock Warrants and the Preferred Stock Warrants is incorporated herein by reference.

*Forward-Looking Statements*

This Current Report on Form 8-K contains a number of forward-looking statements. Words such as "expect," "will," "working," "plan" and variations of such words and similar future or conditional expressions are intended to identify forward-looking statements. These forward-looking statements are not guarantees of future results and are subject to a number of risks and uncertainties, many of which are difficult to predict and beyond the Company's control. Important factors that may cause actual results to differ materially from those in the forward-looking statements include, but are not limited to, the uncertainties related to market conditions and the receipt of the full amount of gross proceeds from such financing transactions on the anticipated terms or at all,; the Company's ability to use proceeds from such financing transactions to pay down outstanding debt obligations and operate its business; the Company's ability to regain access to its credit agreement; the Company's ability to deliver and execute on its turnaround plan; the Company's potential need to seek additional strategic alternatives, including restructuring or refinancing of its debt, seeking additional debt or equity capital, reducing or delaying its business activities and strategic initiatives, or selling assets, other strategic transactions and/or other measures, including obtaining relief under the U.S. Bankruptcy Code, and the terms, value and timing of any transaction resulting from that process; the Company's ability to finalize or fully execute actions and steps that would be probable of mitigating the existence of "substantial doubt" regarding the Company's ability to continue as a going concern; and the Company's ability to increase cash flow to support the Company's operating activities and fund its obligations and working capital needs, and the other risk factors described in the Company's filings with the SEC, including the factors set forth under the section entitled "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended February 26, 2022 and the Company's Quarterly Report on Form 10-Q for the quarters ended August 27, 2022 and November 26, 2022. The Company disclaims and does not undertake any obligation to update or revise any forward-looking statement in this Current Report on Form 8-K, except as required by applicable law or regulation.

**Item 9.01.**   **Financial Statements and Exhibits**

(d) Exhibits

| Exhibit No. | Description of Exhibit |
|---|---|
| 3.1 | Certificate of Amendment for Series A Convertible Preferred Stock. |
| 4.1 | Form of Warrant to Purchase Common Stock of Bed Bath & Beyond Inc. |
| 4.2 | Form of Warrant to Purchase Series A Convertible Preferred Stock of Bed Bath & Beyond Inc. |
| 10.1 | Second Amendment (including Amended Credit Facility) dated February 8, 2023 to the Amended and Restated Credit Agreement, dated as of August 9, 2021, among Bed Bath & Beyond Inc., certain of Bed Bath & Beyond Inc.'s US and Canadian subsidiaries party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the lenders party thereto. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

*SIGNATURES*

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

|  | **BED BATH & BEYOND INC.** |
|---|---|
|  | (Registrant) |

Date: February 10, 2023

| By: | */s/ David M. Kastin* |
|---|---|
| By: | David M. Kastin |
| Title: | Executive Vice President, Chief Legal Officer & Corporate Secretary |

**Exhibit 10.1**

*Execution Version*

## SECOND AMENDMENT TO AMENDED AND RESTATED
## CREDIT AGREEMENT AND WAIVER

This SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT AND WAIVER (this "Amendment"), dated as of February 7, 2023, among BED BATH & BEYOND INC., a New York corporation (the "Company"), the other U.S. Borrowers party hereto, the Canadian Borrowers party hereto (collectively, the "Borrowers"), the other Loan Parties party hereto, the Lenders party hereto (constituting the requisite Lenders), JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Administrative Agent"), and Sixth Street Specialty Lending, Inc., as FILO Agent for the FILO Term Loan Lenders (in such capacity, the "FILO Agent"). Any and all capitalized terms used herein which are defined in the Credit Agreement and which are not otherwise defined herein shall have the same meaning in this Amendment as set forth in the Credit Agreement.

WHEREAS, reference is hereby made to the Amended and Restated Credit Agreement dated as of August 9, 2021 (as the same may be amended, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"; and the Existing Credit Agreement, as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Company, the other Borrowers party thereto, the other Loan Parties party thereto, the Lenders from time to time party thereto, the Administrative Agent and the FILO Agent;

WHEREAS, certain Defaults and Events of Default have occurred and are continuing under the Credit Agreement, as further described herein;

WHEREAS, the Borrowers have requested the Administrative Agent, the FILO Agent and the Lenders to waive the Existing Events of Default (as defined below) and the Existing Defaults (as defined below);

WHEREAS, the Borrowers have requested, among other things, that (a) the FILO Term Loan Lenders extend a new tranche of "first-in, last-out" term loans in an aggregate original principal amount of $100,000,000 in connection with this Amendment, on the terms and conditions set forth in the Credit Agreement, and (b) the Administrative Agent and the Lenders amend certain other provisions of the Existing Credit Agreement; and

WHEREAS, subject to the satisfaction (or waiver in accordance with the terms hereof) of the conditions set forth herein, (a) the FILO Term Loan Lenders have indicated their willingness to make additional FILO Term Loans available and (b) the Administrative Agent, the FILO Agent and Lenders are willing to so amend the Existing Credit Agreement, in each case, on the terms set forth herein.

**ANNEX A**

(See Attached)

[*Signature Page to Amendment*]

*Execution Version*

# J.P.Morgan

AMENDED AND RESTATED CREDIT AGREEMENT

dated as of

August 9, 2021

among

BED BATH & BEYOND INC.,
as the Company

The Other U.S. Borrowers Party Hereto

The Canadian Borrowers Party Hereto

The Other Loan Parties Party Hereto

The Lenders Party Hereto

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent,

SIXTH STREET SPECIALTY LENDING, INC., as FILO Agent,

PNC BANK, NATIONAL ASSOCIATION,
and
WELLS FARGO BANK, NATIONAL ASSOCIATION
as Syndication Agents

BANK OF MONTREAL, BANK OF AMERICA, N.A., MUFG ~~UNION~~ BANK, ~~N.A~~LTD .,
TD BANK, N.A., CAPITAL ONE, NATIONAL ASSOCIATION, and TRUIST BANK,
as Documentation Agents

JPMORGAN CHASE BANK, N.A., PNC CAPITAL MARKETS LLC,
WELLS FARGO BANK, NATIONAL ASSOCIATION, BMO CAPITAL MARKETS, BANK OF
AMERICA, N.A., MUFG ~~UNION~~ BANK, ~~N~~LTD .~~A.~~ and TD BANK, N.A.,

as Joint Bookrunners and Joint Lead Arrangers

**ASSET BASED LENDING**

# ARTICLE VII

## Events of Default.

SECTION 7.01. ~~SECTION 7.01.~~ Events of Default~~.~~.

If any of the following events ("Events of Default") shall occur:

(a) the Borrowers shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) the Borrowers shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document (including, without limitation, the FILO Applicable Premium), when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c) any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made (or in any respect if such representation or warranty is qualified by materiality or Material Adverse Effect);

(d) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in (i) Section 5.01(f)(ii) or (iii), 5.02(a), 5.03 (with respect to a Borrower's existence), 5.08, 5.14 ~~or~~, 5.16, 5.17(a) or 5.17(f) or in Article VI of this Agreement, (ii) Section 5.01(f)(i) of this Agreement and such failure under this clause (ii) shall continue unremedied for a period of ~~five days (in the case of a monthly Borrowing Base Certificate) or~~ two Business Days ~~(in the case of a weekly Borrowing Base Certificate~~; provided, that with respect to such two Business Days grace period, such grace period shall only be permitted on two occasions within any six-month period, commencing on the date that is sixty (60) days following the Second Amendment Effective Date), (iii) Section 5.17(b), 5.17(c), 5.17(d) or 5.17(e) of this Agreement and such failure under this clause (iii) shall continue unremedied for a period of two Business Days; provided, that with respect to such two Business Days grace period, such grace period shall only be permitted on two occasions within any six-month period, commencing on the date that is sixty (60) days following the Second Amendment Effective Date), or (~~iii~~iv) Section 4.15 or Article VII of the U.S. Security Agreement or Section 4.15 or Article VII of the Canadian Security Agreement;

(e) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another Section of this Article VII) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after notice thereof from the Administrative Agent to the Borrower Representative (which notice will be given at the request of any Lender) if such breach relates to any other provision of any Loan Document;

(f) any Loan Party or Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace periods or notice requirements);

(g) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (after giving effect to any applicable grace periods or notice requirements) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to (x) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness or (y) any Indebtedness that is convertible into Equity Interests, cash or a combination thereof, any redemption, repurchase, conversion or settlement pursuant to its terms unless such redemption, repurchase, conversion or settlement results from a default thereunder;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or Material Subsidiary or its debts, or of a substantial part of its assets, under any federal, state, provincial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, interim receiver monitor, administrator, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or Material Subsidiary or for all or a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) any Loan Party or Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition or proposal seeking liquidation, reorganization or other relief under any Federal, state, provincial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, other than a Canadian Proceeding, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, interim receiver, monitor, administrator, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Material Subsidiary or for all or a substantial part of its assets, other than a Canadian Proceeding, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j) other than with respect to a Canadian Proceeding in respect of the Canadian Entities, any Loan Party or Material Subsidiary shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally to pay its debts as they become due;

(k) one or more judgments for the payment of money in an aggregate amount in excess of $100,000,000 (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage) shall be rendered against any Loan Party, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed or bonded, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any Subsidiary to enforce any such judgment, which judgments are not stayed on appeals or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(l) (i) an ERISA Event shall have occurred that when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect or (ii) any Lien arises (except for contribution amounts not yet due) in connection with any Canadian Pension Plan and any such event could reasonably be expected to have a Material Adverse Effect;

(m) a Change in Control shall occur;

137

(n) the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Loan Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty to which it is a party, or any Loan Guarantor shall deny that it has any further liability under the Loan Guaranty to which it is a party, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Section 10.08;

(o) except as permitted by the terms of any Loan Document (i) any Collateral Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien, securing any Secured Obligation shall cease to be a perfected, first priority Lien subject to Liens permitted under Section 6.02;

(p) any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the validity or enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms); ~~or~~

(q) the subordination provisions of any Intercreditor Agreement shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Indebtedness; or

(r) the occurrence of a Funding Failure;

then, and in every such event (other than an event with respect to the Borrowers described in clause (h) or (i) of this Article VII), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower Representative, take any or all of the following actions, at the same or different times: (i) terminate the Aggregate Revolving Commitments, whereupon the Aggregate Revolving Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any break funding payments) and other obligations of the Borrowers accrued hereunder and under any other Loan Document, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, and (iii) require cash collateral for the LC Exposure in accordance with Section 2.06(j) hereof; and in the case of any event with respect to the Borrowers described in clause (h) or (i) of this Article VII, the Aggregate Revolving Commitments shall automatically terminate and the principal of the Loans then outstanding and the cash collateral for the LC Exposure, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any break funding payments) and other obligations of the Borrowers accrued hereunder and under any other Loan Documents, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders shall, increase the rate of interest applicable to the Loans and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the UCC.