UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC., <br><br> Plaintiff, <br><br> – v. – <br><br> HBC INVESTMENTS LLC and HUDSON BAY CAPITAL MANAGEMENT LP, <br><br> Defendants. | ECF CASE <br><br> No. 24-cv-3370 (MKV) (SN) |

**MEMORANDUM OF LAW OF PLAINTIFF
20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC., IN RESPONSE
TO THE BRIEF OF AMICI CURIAE SECURITIES REGULATION PROFESSORS**

Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc. ("BBBY"), respectfully submits this memorandum of law in response to the brief of amici securities regulation professors (collectively, "Amici")[1] in support of Hudson Bay's motion to dismiss.

**PRELIMINARY STATEMENT**

The Complaint alleges an unprecedented "short-swing" trading program that reaped Hudson Bay, in a matter of weeks, a $300 million profit recoverable under Section 16(b) of the Act. This allegation does not rely on a formulaic recital that Hudson Bay beneficially owned more than 10% of BBBY's common stock, or a generic claim that Hudson Bay's blockers were unenforceable. Rather, the Complaint pleads the specific facts, unique to this case, that stripped the blockers of any effective constraint on Hudson Bay's beneficial ownership. These facts include the secret Side Letter that denied BBBY the right to challenge Hudson Bay's conversion

---

[1] Other capitalized terms in this brief are used as defined in BBBY's response to Hudson Bay's motion to dismiss the Complaint. ECF #37.

or exercise requests, the overwhelming number of those requests, Hudson Bay's repeated breach of the 9.99% cap, and the nearly 20 conversions and exercises made in violation of that cap.

With Hudson Bay unable to counter these well-pleaded facts, two fellow hedge funds try to ride to the rescue with an amicus brief financed on behalf of three law professors. Br. of Amici Curiae Securities Regulation Professors ("Br.") at 1 n.1 (ECF #47). The brief offers little in the way of original argument. Its main contribution is market research in the form of an exhibit listing 76 prior transactions that supposedly relied on "[b]lockers such as [Hudson Bay's]." *Id.* at 4. From the faulty premise that these 76 deals are materially indistinguishable from the Hudson Bay financing, Amici predict doomsday consequences to the public markets from any decision denying the motion to dismiss.

Amici's arguments lack merit and provide no basis for dismissing the Complaint. *First*, Amici's market research falls far outside the scope of the material the Court may consider under Rule 12(b)(6). *Second*, the research would not support Hudson Bay's motion even if the Court could properly consider it. *Third*, the per se rule of blocker enforceability advanced by Amici recycles Hudson Bay's own per se argument and has been rejected by the SEC and courts in the Second Circuit.

## ARGUMENT

### I. AMICI'S MARKET RESEARCH IS NOT PROPERLY BEFORE THE COURT ON A MOTION TO DISMISS UNDER RULE 12(b)(6)

Amici list 76 securities transactions that have purportedly used blockers. Decl. of Justin M. Ellis ("Ellis Decl.") ex. A (ECF #48-1). The usefulness of this list depends entirely on Amici's assurance that the cited deals had blockers comparable to Hudson Bay's — i.e., "[b]lockers such as these." Br. at 4. While the Court may take judicial notice of SEC filings on a motion to dismiss, it may not credit Amici's analysis of those filings. *See, e.g.*, *Ong v.*

*Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 223-24 (S.D.N.Y. 2018) (striking an expert declaration). Amici's work is essentially expert evidence, submitted without the safeguards of Rule 702 and *Daubert* scrutiny.[2] The Court has routinely rejected such premature evidence when testing a complaint's sufficiency under Rule 12(b)(6). *See id.* at 224 ("[E]videntiary uncertainty is a primary reason why courts have refused to consider such submissions at the pleadings stage."); *Tung v. Bristol-Myers Squibb Co.*, No. 18-cv-1611 (MKV), 2020 U.S. Dist. LEXIS 182053, at *16 (S.D.N.Y. Sept. 30, 2020) (Vyskocil, J.) ("[T]he Court may not consider any legal conclusions offered by the expert." (citing *Ong*)), *aff'd sub nom. Ark. Pub. Employees Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022); *In re Shanda Games Ltd. Sec. Litig.*, No. 18-CV-2463-ALC, 2022 U.S. Dist. LEXIS 60774, at *12-*13 (S.D.N.Y. Mar. 31, 2022) (refusing to "credit the expert analysis at this stage," and citing *Ong* and *Tung*).

The hazards of overstepping Rule 12(b)(6)'s careful guardrails are apparent from even a cursory review of Amici's work. Of the first five deals Amici cite, three do not involve blockers at all, much less "[b]lockers such as these." Br. at 4. They involve common transfer restrictions. *See* Ellis Decl. ex. A ll. 1-2, 4 (Bright Health, VNET, and James River). For example, the first listed agreement barred investors from transferring their stock "to any (x) Competitors of the Company, (y) Activists or (z) Persons who, after giving effect to such transfer, will Beneficially Own greater than or equal to 10% of the Company's outstanding Common Stock." Bright Health Group, Inc., Investment Agreement § 4.02(a), *linked in* Ellis Decl. ex. A l. 1. The ban on

---

[2] It is noteworthy that Amici will not vouch for what is supposedly their own research. They have filed no declaration in support of it. Their counsel's declaration gives no indication that Amici even had a hand in preparing the table of supposedly comparable deals. *See* Ellis Decl. ¶ 3. Despite having the skill and training to draft a legal brief, Amici left that task to their lawyers too. *See* Br. at 11 (listing Amici's attorneys as sole authors). Nor do Amici have any tangible stake in the issues before the Court; the only tangible interest belongs to the hedge funds financing their brief. *See id.* at 1 n.1. Aside from lending their names and titles to the work of other lawyers, Amici do not appear to have played any role in this case at all.

transfers to "Competitors" and "Activists" indicates that the issuer had a stake in enforcement — something Hudson Bay cannot say about its own blockers. *See, e.g.*, Compl. ¶ 169 (ECF #1) ("This is not the common case where the issuer's management is scrutinizing every stock accumulation to stymie activists and preempt a change in control."); *id.* ¶¶ 11, 170-172. The transfer restriction in the Bright Health deal is not remotely like Hudson Bay's blockers, which restricted the right to *acquire* stock, not dispose of it.

Amici dismiss this as a "distinction without a difference," ECF #43 at 2 n.2, but the difference is quite significant. Rule 13d-3(d)(1)(i) imputes beneficial ownership to an investor only based on his "right to acquire" stock within 60 days. 17 C.F.R. § 240.13d-3(d)(1)(i). It is that "right to acquire" BBBY's common stock which Hudson Bay's blockers are alleged to have ineffectively blocked. No decision on the effectiveness of Hudson Bay's blockers would have any bearing on transfer restrictions like those in the Bright Health, VNET, and James River deals. If *Levy* were overruled tomorrow, those deals would be completely unaffected.

## II. AMICI'S RESEARCH WOULD NOT SUPPORT HUDSON BAY'S MOTION EVEN IF IT WERE PROPERLY BEFORE THE COURT UNDER RULE 12(b)(6)

Amici's flawed research would provide no basis for dismissing the Complaint even if the Court could consider it. Relying on their grab bag of 76 prior deals, Amici prognosticate that the denial of Hudson Bay's motion would "wreak havoc among investors and securities issuers," Br. at 6; and send "*every* Section 16(b) case . . . to costly discovery," *id.* at 7; and "raise the cost of capital and deter investment," hitting "[i]ssuers in financial distress . . . hardest," *id.* at 8; and "prevent the flexibility both issuers and investors need," *id.* at 9; and "clog the courts with meritless litigation," *id.* at 10; and on and on.

Forgotten amid this catastrophizing is that the Court has already rejected a blocker under Rule 12(b)(6) — *twice*. *See Roth v. Solus Alt. Asset Mgmt. LP*, 124 F. Supp. 3d 315 (S.D.N.Y.

2015); *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14cv5226 (DLC), 2015 U.S. Dist. LEXIS 62236 (S.D.N.Y. May 12, 2015). The *Greenberg* case even involved Hudson Bay's firm, though it is the other case, *Roth*, that is especially instructive. The *Roth* Court recognized, as does BBBY, that "[a] conversion cap, or 'blocker,' is one permissible way of avoiding section 16(b) liability." 124 F. Supp. 3d at 323; Compl. ¶ 152. At the same time, however, *Roth* made clear that "the Blocker Provision was not necessarily effective in divesting Solus of beneficial ownership" if its "'limitations . . . [were] discovered to be illusory or a sham.'" *Id.* at 324 (quoting *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 17 n.4 (2d Cir. 2001) (footnotes omitted)). The Court acknowledged the factors laid out in the SEC Amicus Brief relied on by *Levy*, *see id.* at 324 n.8, and went on to apply those factors on cross-motions for summary judgment, *see Roth v. Solus Alt. Asset Mgmt. LP*, 258 F. Supp. 3d 364, 370 (S.D.N.Y. 2017).

So the Court has twice done exactly what Amici dread, by "[a]llowing Section 16(b) claims to move forward despite such blockers." Br. at 6. By Amici's logic, the litigation floodgates should already be open, and the apocalypse upon us. Yet of the 76 deals Amici trawl from the SEC's files, not a single one has been challenged under Section 16(b). In fact, in the ten years since Rule 12(b)(6) motions were denied in *Greenberg* and *Roth*, Amici cannot point to a single blocker — not *one* — that drew a Section 16(b) complaint. Given that this Court has twice "[a]llow[ed] Section 16(b) claims to move forward despite such blockers," *id.*, where is this parade of horribles that should be marching even now through courts and markets across the nation?

It is nowhere to be found, nor will it be if this Court follows precedent and denies Hudson Bay's motion. This case is not and has never been about the enforceability of blockers generally. The Complaint acknowledges that "binding blockers that effectively deny an investor the right to

acquire beneficial ownership of equity securities have been respected as a means of avoiding Section 13 and 16 obligations." Compl. ¶ 152 (citing *Levy*, 263 F.3d at 13-17). Hudson Bay's blockers are alleged to be ineffective not because blockers generally are unenforceable or even because Hudson Bay's blockers omitted the necessary legalese. *But see id.* ¶¶ 186-190 (observing that Hudson Bay's beneficial ownership representations relied on the same language the Court found defective in *Greenberg*, 2015 U.S. Dist. LEXIS 62236, at *6, *18-*19). The Complaint alleges that the blockers were ineffective because the 9.99% cap was "an illusory contrivance that did not bind the Hudson Bay Defendants *in practice*." *Id.* ¶ 155 (emphasis added).

The Complaint backs this allegation with specific, detailed, and abundant facts. It pleads, among many other facts, that the blockers served no purpose but regulatory avoidance, *id.* ¶¶ 150, 161; that the blockers in the Common Warrants were easily waived or amended, *id.* ¶ 162; that BBBY had neither the means nor the will to enforce the blockers, leaving enforcement to self-policing by Hudson Bay, *id.* ¶¶ 11, 185; that Hudson Bay overwhelmed BBBY's personnel with scores of conversion and exercise requests, including 15 conversion or exercise requests submitted just on February 7 and 8, 2023, *id.* ¶¶ 215-220; that Hudson Bay neutralized whatever remaining ability BBBY had to enforce the blockers with a secret Side Letter signed on the eve of the deal, which expressly barred BBBY from requesting information on Hudson Bay's transactions or from issuing shares except in amounts requested by Hudson Bay, *id.* ¶¶ 183-184; that, left to its own devices, Hudson Bay repeatedly blew past the 9.99% cap, beneficially owning as much as 28.24% of BBBY's common stock at 4 p.m. on February 8, 2023, *id.* ¶ 259; that Hudson Bay beneficially owned more than 9.99% of BBBY's common stock from approximately 9:45 a.m. on February 7, 2023 until about 2 p.m. on February 10,

2023, and then again from about 4:25 p.m. on March 20, 2023 until the early afternoon of March 22, 2023, *id.* ¶ 263; and that Hudson Bay submitted nearly 20 violative conversion or exercise requests to BBBY during these excursions above the 9.99% line, none of which was "blocke[d]," *id.* ¶¶ 264, 268.

Amici call this "formulaic." Br. at 8. But while Amici speculate that these allegations "could apply to *any* issuer and investor," *id.* at 7, they never back this baseless speculation with any proof. After all, Amici purport to have found 76 comparable financings, every last one of which supposedly included a "[b]locker[]" such as these." *Id.* at 4. If the Complaint's allegations are as "formulaic" as Amici claim, then Amici ought to be able to show how some of their 76 deals would fall prey to the same allegations. Even just *one* match out of 76 candidates would be a good start, yet Amici cannot show that a single one of their 76 supposedly comparable deals even remotely resembles the extreme facts of Hudson Bay's transactions in BBBY's equity securities.

### III. AMICI'S PROPOSED PER SE RULE OF BLOCKER ENFORCEABILITY DEFIES AUTHORITY AND IS AS MERITLESS AS HUDSON BAY'S

So Amici return where Hudson Bay began, demanding that "blockers . . . be enforced according to their terms," Br. at 7, irrespective of any facts exposing the blockers as "illusory" in practice. Hudson Bay pressed the same per se rule of enforceability in its motion, only to walk the argument back in its reply. *Compare* Mem. of Law in Supp. of Mot. to Dismiss (ECF #25) at 14 ("[L]ike any other contractual provision, blockers are enforced as written."), *with* Reply Mem. of Law in Supp. of Mot. to Dismiss (ECF #44) at 4 (calling it a "dramatic and unnecessary overreach" to argue that "blockers are always valid and enforceable," and paring "Hudson Bay's position" to "*these* Blockers were clearly valid and enforceable"). Amici forge on where Hudson Bay retreated, but this "dramatic and unnecessary overreach" is no more persuasive now than it

was before.

Amici go so far as to argue that the Second Circuit did not mean what it said when the *Levy* Court wrote that "'[w]hen the limitations provided by conversion caps are discovered to be illusory or a sham, they should be disregarded and the courts should analyze the case as though no such limitations existed.'" 263 F.3d at 17 n.4. According to Amici, this language did not articulate federal law but "merely explained . . . the ***plaintiff's argument***." Br. at 6. That misreading is belied by the very text it cites. The Second Circuit's footnote did not cite or quote the plaintiff's brief. It quoted the SEC Amicus Brief, and not because the plaintiff cited it. The parties had already fully briefed and argued the case by the time the Second Circuit invited the SEC to participate. *See Levy*, 263 F.3d at 14. Amici fail to show how the Second Circuit could be "explain[ing] . . . plaintiff's argument" with a quote from an SEC brief the plaintiff did not even have when the argument was made.

Amici's argument is also undercut by the Court's decision in *Roth*. The Court there quoted as law the same language Amici try to pass off as lawyering:

> Even if Solus intended to waive its conversion rights, the Blocker Provision was not necessarily effective in divesting Solus of beneficial ownership. "*When the limitations provided by conversion caps are discovered to be illusory or a sham, they should be disregarded and the courts should analyze the case as though no such limitations existed.*" *Levy*, 263 F.3d at 17 n.4 (citing SEC's Amicus Brief, supra, at *25-26). The same is true where an investor uses a contract or other arrangement to divest himself of beneficial ownership as part of a plan or scheme to evade beneficial ownership reporting requirements — the investor is deemed to own the securities he seeks to divest.

124 F. Supp. 3d at 324-25 (emphasis added, footnotes omitted). *Roth* also went on to apply the same factors from the SEC Amicus Brief that Amici urge this Court to ignore.[3] 258 F. Supp. 3d

---

[3] In a footnote, Amici argue that the Court should not give deference to the SEC Amicus Brief at all because the "'general rule' is 'not to give deference to agency interpretations advanced for the first time in legal briefs.'" Br. at 6 n.5 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 579 n.6 (2019)). Even Hudson Bay took a pass on this meritless argument — reason enough to

at 370. Presumably Amici think *Roth* was wrongly decided, but we can't know for sure because they neglect even to cite this contrary authority.

Unable to confront the holdings of *Levy* and *Roth* head-on, Amici fall back on hoary principles of contract, arguing that "whether blockers are enforceable thus turns on state contract law." Br. at 6. Of course, state law cannot determine whether a blocker is "effective" and "binding" for purposes of the federal securities laws. Rule 13d-3 makes clear that some otherwise valid contracts will not be enforced. *See* 17 C.F.R. § 240.13d-3(b) (disregarding any "contract, arrangement, or device with the purpose of effect of divesting [a] person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act"); *Roth*, 124 F. Supp. 3d at 324-25. Whether a blocker is effective under Rule 13d-3 is a question of federal law, as evidenced by the fact that *Levy* referred that question to the SEC rather than a state supreme court. *See* 263 F.3d at 14.

Amici never engage with this federal law, which is understandable, for the per se rule

---

(continued…)

reject it. *See Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, Nos. 12 Civ. 7935 (ALC) (HBP) etc., 2014 U.S. Dist. LEXIS 11179, at *7 (S.D.N.Y. Jan. 23, 2014) ("'An amicus cannot initiate, create, extend, or enlarge issues.'" (quoting *Waste Mgmt. of Pa., Inc. v. City of York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995))); *New York v. Raimondo*, 594 F. Supp. 3d 588, 605 (S.D.N.Y. 2022) (Vyskocil, J.) ("[T]he Court need not address this issue because it was not raised by either party in its briefs."), *aff'd*, 84 F.4th 102 (2d Cir. 2023).

Amici's argument lacks merit in any case because *Kisor* carved out an exception to the "general rule" where "the agency was not a party to the litigation, and had expressed its views only in response to the Court's request." 588 U.S. at 579 n.6. The exception applies here because the SEC was not a party to *Levy* and submitted the SEC Amicus Brief only at the invitation of the Second Circuit. *See* 263 F.3d at 14. Amici's own authority recognizes that such briefs continue to receive deference. *See Roth v. Armistice Cap., LLC*, No. 20-cv-8872 (JLR), 2024 U.S. Dist. LEXIS 56887, at *33 n.5 (S.D.N.Y. Mar. 27, 2024) (considering an SEC amicus brief because "the concerns motivating *Kisor*'s 'general rule,' . . . are absent" (citations omitted)), *cited in* Br. at 6 n.5.

they press cannot be squared with it. The plain text of Rule 13d-3 rejects a per se rule. *See* § 240.13d-3(b), *quoted supra*. The SEC rejected a per se rule in the SEC Amicus Brief. *See* SEC Amicus Br. at 25-26 ("When the limitations provided by conversion caps are discovered to be illusory or a sham, they should be disregarded and the courts should analyze the case as though no such limitations existed."). The Second Circuit rejected a per se rule in *Levy*. *See* 263 F.3d at 17 n.4 (quoting SEC Amicus Br. at 25-26). This Court rejected a per se rule in *Roth*. 124 F. Supp. 3d at 324 (quoting *Levy*, 263 F.3d at 17 n.4). And the leading treatise (relied on by Hudson Bay) rejected a per se rule in its survey of all these authorities. *See* Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide 163 (6th ed. 2024) ("Clearly, a blocker provision that is a sham would not prevent the holder from being deemed the beneficial owner of all of the underlying securities.").

## CONCLUSION

The motion to dismiss should be denied.

Dated: January 17, 2025

Respectfully submitted,

/s/ James A. Hunter
James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania  19087
Phone: +1 (484) 214-4697
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC.,<br><br>Plaintiff,<br><br>– v. –<br><br>HBC INVESTMENTS LLC and HUDSON BAY CAPITAL MANAGEMENT LP,<br><br>Defendants. | ECF CASE<br><br>No. 24-cv-3370 (MKV) (SN) |

### CERTIFICATE OF COMPLIANCE

To the extent the forgoing document is deemed a reply brief subject to Local Civil Rule 7.1(c), I hereby certify that the document complies with the word limit thereof because, excluding its exempted parts, the document contains 3,331 words as counted by Microsoft Office.

/s/ James A. Hunter
James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road
Suite 650
Radnor, Pennsylvania  19087
Phone: +1 (484) 275-2162
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.*