# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
20230930-DK-BUTTERFLY-1, INC. f/k/a BED
BATH & BEYOND INC.,

                         Plaintiff,

         -against-                                             24 **CIVIL** 3370 (MKV)

                                                               **JUDGMENT**

HBC INVESTMENTS LLC and HUDSON BAY
CAPITAL MANAGEMENT LP,

                         Defendants.
-----------------------------------------------------------------X

         It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion & Order dated September 30, 2025, Defendants' motion to dismiss

is GRANTED. Plaintiff's motion to seal is GRANTED in part, with the caveat that redacted

portions of the Complaint, and the Opposition are unsealed only to the extent that they are

revealed in the Opinion. The Court dismisses this case with prejudice; accordingly, the case is

closed.

**Dated:**  New York, New York

         September 30, 2025

                                                  **TAMMI M. HELLWIG**
                                        _____
                                                  **Clerk of Court**

                              **BY:**       K. Mango
                                        _____
                                                  **Deputy Clerk**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/30/2025__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 20230930-DK-BUTTERFLY-1, INC. f/k/a BED BATH & BEYOND INC., | |
| Plaintiff, | 1:24-cv-03370-MKV |
| -against- | **OPINION & ORDER GRANTING MOTION TO DISMISS** |
| HBC INVESTMENTS LLC and HUDSON BAY CAPITAL MANAGEMENT LP, | |
| Defendants. | |

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff, 20230930-DK-BUTTERFLY-1, INC., f/k/a Bed Bath & Beyond Inc., ("BBBY"), brings this action against HBC Investments LLC ("HBCI") and Hudson Bay Capital Management LP ("Hudson Bay Capital," and together with HBCI, "Defendants"). BBBY brings one cause of action, seeking disgorgement for an alleged violation of the Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)"). Defendants move to dismiss the operative complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons below, the motion to dismiss is GRANTED and the motion to seal is GRANTED in part.

## FACTUAL BACKGROUND[1]

BBBY is the issuer formerly known as Bed Bath & Beyond Inc. Compl. ¶ 6. It sold home goods through a national chain of stores until its bankruptcy in April 2023. Compl. ¶ 30. Until September 29, 2023, BBBY's common stock was registered under Section 12(b) of the Securities Exchange Act of 1934 (the "Securities Exchange Act"), 15 U.S.C. § 78l(b). Compl. ¶ 31.

---

[1] The facts as stated herein are drawn from Plaintiff's Complaint [ECF No. 1 ("Compl.")], the allegations of which are accepted as true for purposes of this motion, s*ee Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as well as documents attached to the Complaint as exhibits. *See Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014).

Defendant HBCI is a limited liability private investment fund that shared voting and investment control over its portfolio securities with its investment adviser and managing member, Defendant Hudson Bay Capital. Compl. ¶ 28. Hudson Bay Capital owned equity interests in HBCI and received fees based on the performance of HBCI's portfolio. Compl. ¶ 29.

BBBY's business began to deteriorate in 2019 and by early 2023 the company was looking for ways to raise additional cash. Compl. ¶¶ 32–34. On February 7, 2023, BBBY and Defendants entered into a financing arrangement that provided BBBY with necessary funds. Compl. ¶ 35–36 (the "Financing Arrangement"). BBBY raised around $225 million at the close of the deal and stood to raise up to $800 million more over the following months. Compl. ¶ 65. Defendants drafted the main deal documents. Compl. ¶ 37.

## I.    <u>The Derivative Securities</u>

In accordance with the Financing Arrangement executed on February 7, 2023, BBBY issued three new classes of derivative securities: (a) Series A Convertible Preferred Stock ("Series A"), (b) Common Stock Warrants ("Common Warrants") and (c) Series A Convertible Preferred Warrants ("Preferred Warrants," and together with "Series A" and "Common Warrants", the "Derivative Securities"). *See* Compl. ¶¶ 36–64.

The Series A was convertible into BBBY common stock at any time at the holder's request at a discount to market price, subject to a floor of $0.7160 per share. Compl. ¶¶ 41–45. Defendants acquired ninety percent of the Series A shares issued and sold by BBBY on February 7, 2023. Compl. ¶ 39.[2]

---

[2] Plaintiff refers to Defendants collectively throughout the Complaint. Exhibits attached to the Complaint suggest that HBCI, the private investment fund, was in fact the derivative security holder and party to several relevant contracts with BBBY, though Hudson Bay Capital often signed these contacts on behalf of HBCI as an "authorized signatory." *See* Compl. Exs. E, G, I ("Conversion Request").

The Common Warrants were issued at no additional cost to buyers of Series A based on the size of their Series A subscriptions.  Compl. ¶ 58.  Common Warrants allowed the owners to purchase shares of BBBY common stock.  Compl. ¶ 55.  Each Common Warrant was exercisable for five years at any time at the holder's request to purchase one share of BBBY's common stock at an exercise price of $6.15.  Compl. ¶ 59.  Holders could also submit a request to use an "alternate cashless exercise," which required the holder to relinquish 35% of the underlying shares to which the holder was entitled in exchange for the remaining 65% of the underlying common stock at no out-of-pocket cost.  Compl. ¶ 60.  Defendants acquired 93.72% of the Common Warrants issued on February 7.  Compl. ¶¶ 58, 64.

The Preferred Warrants were issued pro rata at no additional cost to any investor who purchased at least $75 million of the Series A.  Compl. ¶ 48.  The Preferred Warrants allowed the holder to acquire additional Series A and Common Warrants either at the holder's option or, if several conditions were satisfied, through an exercise "forced" by BBBY.  *See* Compl. ¶¶ 46–54, 64. Owners of Preferred Warrants were also entitled to receive additional Common Warrants upon any exercise of Preferred Warrants.  Compl. ¶ 62.  Defendants acquired all Preferred Warrants issued on February 7.  Compl. ¶ 50.

On the date that a Series A holder requested to convert the derivative shares for common stock, or the "Conversion Date," that holder would "be treated for all purposes as the record holder or holders of such Conversion Shares."  Compl. ¶ 242.  The Common Warrants similarly provided that, "[u]pon delivery of an Exercise Notice . . . , the Holder shall be deemed for all corporate purposes to have become the holder of record" of the requested shares.  Compl. ¶ 243.  As the "holder of record" of shares noticed for conversion or exercise, the Hudson Bay Defendants would

have the power to vote those shares on any matter submitted to BBBY's stockholders of record. Compl. ¶ 244.

The Derivative Securities issued to Defendants gave them the right to buy heavily discounted, tradable BBBY common stock that they could sell to public investors at market price for a profit. Compl. ¶ 66. In the first two weeks after the Financing Arrangement was executed, Defendants sold more than numerous shares into the public market, nearly doubling the number of publicly traded BBBY shares. Compl. ¶ 78–80. Within several months, the number of outstanding shares had expanded to 782 million. Compl. ¶ 81. In the same time period, the value of BBBY common stock plummeted. Compl. ¶¶ 92–100. By March 20, 2023, less than two months after the Financing Agreement was reached, BBBY and the Defendants agreed to terminate the financing. Compl. ¶¶ 103–04. A month later, BBBY filed a Chapter 11 bankruptcy petition, and the business was liquidated. Compl. ¶ 111.

According to Plaintiff, shares *underlying* the Derivative Securities held by Defendants, together with any common stock the Defendants held outright, exceeded 10% of BBBY's shares outstanding from February 7 to April 17, 2023. Compl. ¶ 114–18.

## II.   **The Blockers**

Exercise and conversion caps, commonly known as "blockers," were included in the terms of Series A and Common Warrants. Compl. ¶¶ 127, 150. The blockers explicitly barred owners of the Derivative Securities from beneficially owning more than 9.99% of BBBY's outstanding common stock. *See* Compl. ¶ 128; *see also* Compl. ¶¶ 129–130.[3] The blockers were included in the Financing Agreement transactional documents to avoid disclosure and disgorgement

---

[3] These blockers effectively applied to all Derivative Securities issued to Defendants as part of the Financing Agreement because Preferred Warrants could not be converted directly to common stock and instead could only be traded for Series A or Common Warrants. *See id.* ¶ 64.

obligations under Sections 13 and 16 of the Securities Exchange Act that are triggered when an investor beneficially owns more than 10% a company's of stock.  Compl. ¶¶ 3, 126, 150.  The blocker for Series A, which by amendment appears in the BBBY Certificate of Incorporation, reads:

> The Company shall not effect the conversion of any of the Preferred Shares held by a Holder, and such Holder shall not have the right to convert any of the Preferred Shares held by such Holder pursuant to the terms and conditions of this Certificate of Amendment and any *such conversion shall be null and void and treated as if never made, to the extent that after giving effect to such conversion, such Holder* together with the other Attribution Parties collectively *would beneficially own in excess of 9.99%* (the "Maximum Percentage") of the shares of Common Stock outstanding immediately after giving effect to such conversion . . . .  For purposes of clarity, *the shares of Common Stock issuable to a Holder pursuant to the terms of this Certificate of Amendment in excess of the Maximum Percentage shall not be deemed to be beneficially owned by such Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act.*

Compl. ¶ 129, Ex. A ("Certificate of Amendment") § 4(d) (emphasis altered).  The blocker for Common Warrants, which appears in the warrant to purchase common stock itself, reads almost exactly the same:

> The Company shall not effect the exercise of any portion of this Warrant, and the Holder shall not have the right to exercise any portion of this Warrant, pursuant to the terms and conditions of this Warrant and *any such exercise shall be null and void and treated as if never made, to the extent that after giving effect to such exercise, the Holder* together with the other Attribution Parties collectively *would beneficially own in excess of 9.99%* (the "Maximum Percentage") of the shares of Common Stock outstanding immediately after giving effect to such exercise . . . . For purposes of clarity*, the shares of Common Stock issuable pursuant to the terms of this Warrant in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act.*

Compl. ¶ 130, Ex. C ("Common Warrant") § 1(f) (emphasis altered).

Both blockers stated that any shares improperly issued, such that the derivative holder would have beneficial ownership of more than 9.99% of outstanding common stock, shall be "null," "void," and "cancelled ab initio."  Certificate of Amendment § 4(d); Common Warrant § 1(f).  Further, if such common stock shares were improperly issued, Defendants would "not have the power to vote or transfer" them.  Certificate of Amendment § 4(d); Common Warrant § 1(f).

The Certificate of Amendment governing Series A derivative securities provides that:

> If after the Company's receipt of a Conversion Notice from a Holder, the Company or such Holder determines, in good faith, that the issuance of shares of Common Stock to such Holder in accordance therewith would result in the Holder (together with the other Attribution Parties) exceeding the Maximum Percentage (such excess number of shares of Common Stock, the "Blocked Shares"), such party shall notify the other party and any Blocked Shares shall be held in abeyance until such time as the delivery of such Blocked Shares would not result in such Holder and the other Attribution Parties exceeding the Maximum Percentage . . . .

Certificate of Amendment § 4(d).  Common Warrants do not include the same requirement to hold shares exceeding the conversion cap in abeyance.

Both blockers state: "Upon delivery of a written notice to the Company, any Holder may from time to time increase . . . or decrease the Maximum [allowed] Percentage of such Holder to any other percentage not in excess of 9.99% as specified in such notice; provided" certain requirements are met."  Certificate of Amendment § 4(d); Common Warrant § 1(f); *see also* Compl. ¶ 131.

The Common Warrant and the Certificate of Amendment governing Series A allow for amendments but specifically exclude the blocker provisions from permitted amendments.  *See* Certificate of Amendment § 30(b) ("Amendment. *Except for Section 4(d) [the blocker]*, which may not be amended or waived hereunder, this Certificate of Amendment or any provision hereof may be amended by . . . .") (emphasis added); Certificate of Amendment § 4(d) ("[t]he limitation

contained in this paragraph may not be waived and shall apply to a successor holder" of the security); Common Warrant § 11 ("AMENDMENT AND WAIVER. Except as otherwise provided herein, the provisions of this Warrant *(other than Section 1(f) [the blocker])* may be amended . . . .") (emphasis added).

Defendants had no duty to quantify their beneficial ownership when they delivered a conversion or exercise request to BBBY and BBBY never received any "end of the trading day" tally. Compl. ¶¶ 182, 183. Instead, each conversion or exercise request included a representation that the acquisition effected thereby would not make Defendants beneficial owners of more than 9.99% of BBBY's common stock. Compl. ¶ 186. For example: "[T]his Conversion Notice shall constitute a representation by the Holder of the Preferred Shares submitting this Conversion Notice that after giving effect to the conversion provided for in this Conversion Notice, such Holder (together with its affiliates) will not have beneficial ownership (together with the beneficial ownership of such Person's affiliates) of a number of shares of Common Stock which exceeds the Maximum Percentage." Compl. ¶ 186; *see* Ex. I ("Series A Conversion Notice"); Ex. J ("Common Warrant Exercise Notice").

Plaintiff alleges that blockers were "illusory" and Defendants did beneficially own greater than 10% of BBBY's common stock and so, pursuant to the disgorgement provision of Section 16(b), Defendants owe BBBY the $310,061,851.69 profit earned from short swing transactions. Compl. ¶¶ 11, 151–52, 335, 372–79.

## III.    The February 6 Letter

One day before the Financing Agreement was executed, BBBY and HBCI signed a related agreement (the "February 6 Letter"). Compl. ¶ 139. The February 6 Letter stated that the forms of conversion and exercise notices "set forth the totality of the procedures required of the Investor

in order to exercise the Preferred Warrants or the Common Warrants or convert the Preferred Shares." Compl. ¶ 183. The language went on to forbid BBBY from requesting any "other information" from Defendants. Compl. ¶ 183. The February 6 Letter also obligated BBBY to instruct its transfer agent to issue BBBY common shares to Defendants "in such amounts as specified from time to time by the Investor." Compl. ¶ 184. The February 6 Letter also required BBBY and Defendants to "honor" requests for the Derivative Securities "in accordance with" the "conditions" and "terms" of the documents containing the blockers. Compl. Ex. G ("February 6 Letter") § 2(n).

## IV.    Alleged Breaches of the Blockers

Defendants submitted ninety conversion and exercise requests between February 7, 2023 and April 23, 2023, including fifteen on February 7 and 8. Compl. ¶ 215. Plaintiff speculates that the numerous conversion and exercise requests, as well as the revisions of those requests "all but guaranteed that mistakes would be made and that the 9.99% cap would be breached." Compl. ¶ 228. No share issued to Defendants "was ever withdrawn, nullified, or voided" by reason of the blockers. Compl. ¶ 268. Plaintiff alleges that, based on its own *post hoc* calculations, Defendants beneficially owned more than 9.99% of outstanding BBBY stock on February 7, February 8, February 9, and March 21. Compl. ¶¶ 258–61.[4]    However, Defendants' contemporaneous

---

[4] In the Complaint and Plaintiff's opposition to the motion to dismiss ("Pl. Opp." or "Opposition"), Plaintiff makes inconsistent allegations regarding Defendants' purported beneficial ownership and how the percentage Defendants allegedly beneficially owned should be calculated. *Compare* Compl. ¶¶ 198–210, *with* ¶¶ 258–61 *and* Pl. Opp. at 19. Defendants argue that Plaintiff's approach to calculating beneficial ownership is incorrect. *See* Def. Mem. 21–24. As further explained below, Plaintiff concedes that if Defendants are correct regarding the proper approach to calculation, Defendants did not exceed the 9.99% threshold. Compl. ¶¶ 186, 193, 201, 202, 209, 210, 236, Ex. K ("Defendants' Advances Sales Table"); Def. Mem. at 22–24; Def. Reply at 6–8. The Court concludes below that Defendants' approach to calculating beneficial ownership is correct under the law and that the blockers were binding, precluding Defendants from ever acquiring more than 9.99% beneficial ownership. Since the Complaint's detailed allegations regarding Plaintiff's approach to calculating the beneficial ownership of outstanding common stock shares and the shares underlying Defendants' derivative securities are not necessary to the Court's analysis, are at times inconsistent, and are partly under seal, the Court need not and does not restate each of them here.

calculation resulted in a lower beneficial ownership percentage because, they deducted from the numerator any issuable shares they had sold in the open market during the day on February 7. Compl. ¶ 236.

Plaintiff also asserts that Defendants maintained dispositive power over the common stock underlying their Derivative Securities which made them more than 10% beneficial owners of that underlying, unissued common stock. Compl. ¶¶ 271–315. First, Plaintiff alleges that Defendants' numerous advanced sales of these unissued shares underlying their Derivative Securities often exceeded 10% of BBBY common stock outstanding. Compl. ¶ 276–77. Second, Plaintiff asserts that Defendants' dispositive power over the underlying shares was evident at the time common stock was delivered to Defendants. Compl. ¶ 281. Plaintiff alleges that, at the time of delivery to Defendants' brokerage account on 9:27 a.m. on February 10, 2023, 19.5 million shares that had been requested on February 8, 2023, represented more than 10.1% of BBBY's shares outstanding, including all shares subject to Defendants' pending conversion and exercise requests. Compl. ¶¶ 285–87. Finally, Plaintiff asserts that the terms governing the Derivative Securities gave Defendants dispositive power over the underlying securities in another respect: through the "Required Reserve Amount" required by the Certificate of Amendment and the Common Warrants. *See* Compl. ¶¶ 303, 306–07; Certificate of Amendment §11(a); Common Warrant §1(g)(i). The Required Reserve Amount was a portion of BBBY's authorized but unissued common stock (or treasury stock) that BBBY was required to reserve for issuance to holders of the Derivative Securities to satisfy conversion or exercise requests. Compl. ¶ 304. As holders of Derivative Securities, Defendants had the power to stop BBBY from transferring a certain amount of unissued shares to anyone else. Compl. ¶ 312–15.

V.     **Alleged Short Swing Transactions**

From February 7, 2023 to April 18, 2023, Defendants sold hundreds of millions of shares of BBBY's common stock over the open market in hundreds of thousands of trades.  Compl. ¶ 336.  Plaintiff alleges that if Defendants' transactions in Preferred Warrants, Common Warrants, and call options are construed as purchases and sales of underlying common stock, Defendants made a profit in that time period of $310,061,851.69.  Compl. ¶¶ 369–70.

## PROCEDURAL HISTORY

Plaintiff initiated this case as a miscellaneous action by filing a motion for leave to file a complaint under seal with a redacted version on the public docket, which Judge Koeltl granted. *See 20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, No. 24-mc-206-JGK (S.D.N.Y. Apr. 30, 2024); *see also* [ECF No. 1 ("Complaint" or "Compl.")].  The Complaint asserts one cause of action, a violation of Section 16(b).  Thereafter, the case was reassigned to this Court.

Defendants filed a pre-motion letter seeking leave to move to dismiss the case.  [ECF Nos. 17].  Plaintiff was granted leave by the Court to file an amended complaint in response to the issues raised in the pre-motion letter.  [ECF No. 21].  Plaintiff declined to amend the complaint.  [ECF No. 22].  Thereafter, Defendants moved to dismiss the Complaint, filing a memorandum of law, [ECF Nos. 24, 25 ("Def. Mem.")], and a declaration in support, which attached several exhibits of publicly filed documents.  [ECF No. 26].  In opposition, Plaintiff filed a memorandum of law under seal.  [ECF Nos. 37, 38 ("Pl. Opp.")].  Defendants filed a reply, [ECF No. 44 ("Def. Reply")], and a declaration in further support of its motion, which attached one additional publicly filed exhibit.  [ECF No. 45].  Plaintiff also filed a letter motion to seal its opposition, as well as a declaration in support of the motion.  [ECF Nos. 35 ("Sealing Mot."), 36 ("Hunter Decl")].  Defendants did not oppose the motion to seal.

With leave of the Court, three securities law professors filed a brief of *amicus curiae* in support of the motion to dismiss, [ECF Nos. 46 ("Order Granting Leave to File *Amicus* Brief"), 47 ("*Amicus* Brief")], and a declaration in support, which attached one exhibit. [ECF No. 48]. Plaintiff filed a response to the *amicus* submission. [ECF No. 52 ("Reply to *Amici*")].

## LEGAL STANDARD

### I.   Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. While the Court "must accept as true all of the allegations contained in a complaint," this "tenet . . . is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678.

The "plausibility standard" articulated in *Ashcroft* "is not akin to a 'probability requirement,' " but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 556 U.S. at 678. Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* At bottom, Plaintiff must "nudg[e] [his] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 569. Otherwise, the complaint must be dismissed. *Id.*

On a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference, "matters of which judicial notice may be

taken," and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). "A document is incorporated by reference if the complaint 'makes a clear, definite and substantial reference to [it].' " *Hagan v. City of New York*, 39 F. Supp. 3d 481, 494 (S.D.N.Y. 2014) (quoting *Helprin v. Harcourt, Inc.,* 277 F.Supp.2d 327, 330–31 (S.D.N.Y. 2003)). A court is not required to credit an assertion in a complaint that is directly "contradicted by more specific allegations" in the complaint "or documentary evidence" attached to the complaint. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

## II.  <u>Securities Exchange Act § 16(b)</u>

Section 16(b) requires statutory insiders to disgorge all profits realized from any purchase and sale (or sale and purchase) of the same security made within a six-month period. *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012), *as amended* (July 13, 2012). Section 16(b) seeks to prevent "insiders from taking unfair advantage of confidential company information to realize short-swing profits on trades in the company's stock." *Morales v. Quintel Entm't*, 249 F.3d 115, 122 (2d Cir. 2001). Accordingly, Section 16(b) imposes strict liability regardless of whether the insider traded using inside information or intended to profit on the basis of such information. *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 869 (2d Cir. 2014). Given the section's strict liability regime, Section 16(b) liability is confined within "narrowly drawn limits" and applied mechanically. *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976); *see also Gollust v. Mendell*, 501 U.S. 115, 122 (1991) (courts are "reluctant to exceed a literal, 'mechanical' application of the statutory text in determining . . . liability"). Moreover, the Second Circuit has held that Section 16(b) should be construed as an "exclusion from liability,

not a rule of inclusion." *Rosen v. Brookhaven Cap. Mgmt. Co.*, Ltd., 113 F. Supp. 2d 615, 617–18 (S.D.N.Y. 2000) (quoting *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 310 (2d Cir. 1998).

## DISCUSSION

## I.   Failure to State a Claim

BBBY asserts that Defendants violated Section 16(b) when they made profits from short-swing trading of common stock underlying the Derivative Securities while they were statutory insiders of BBBY. *See* Compl. ¶¶ 372–80. Defendants moved to dismiss arguing that the blocker provisions governing the Derivative Securities prevented them from becoming a statutory insider and thus insulate them from any liability under Section 16(b). *See* Def. Mem. at 1. Plaintiff has failed to plausibly allege that Defendants were statutory insiders of BBBY.

### A.   Absent a Valid Blocker, Defendants Clearly Would Be Statutory Insiders

To establish liability under Section 16(b) Plaintiff must show that there was (1) both a purchase and a sale of a particular security (2) by a statutory insider (3) within a six-month period. *Levy v. Southbrook Int'l Invs.*, *Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001); 15 U.S.C.A. § 78p(b). Disgorgement for these so-called "short-swing profits" only applies when one is a statutory insider at both the time of the purchase and the time of the sale in question. *See* 15 U.S.C. § 78p(b); *Goldman Sachs Grp., Inc.*, 740 F.3d at 875.

A statutory insider includes directors, officers, and "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of the issuer. 15 U.S.C. § 78p(a). Defendants were not officers or directors of BBBY, so Section 16(b) liability can attach here only if Defendants were beneficial owners of more than 10% of outstanding BBBY common stock. Therefore, the dispositive issue on the pending motion is

13

whether Defendants were a more than a 10% beneficial owner of BBBY's common stock at the time of alleged short-swing trades.

Section 16(b) adopts the definition of "beneficial owner" found in Section 13(d) of the Exchange Act and the rules promulgated thereunder. *Levy*, 263 F.3d at 14 (citing 17 C.F.R. 240.16a–1(a)(1). Rule 13d–3 defines a "beneficial owner" as:

> (a) any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3. Moreover, Rule 13d–3 explains that an investor is also "deemed" to be the beneficial owner of a security:

> [I]f that person has the *right to acquire* beneficial ownership of such security, as defined in Rule 13d–3(a) (§ 240.13d–3(a)) *within sixty days*, including but not limited to any right to acquire: (A) through the exercise of any option, warrant or right; (B) through the conversion of a security; (C) pursuant to the power to revoke a trust, discretionary account, or similar arrangement; or (D) pursuant to the automatic termination of a trust, discretionary account or similar arrangement . . . .

17 C.F.R. 240.13d–3(d)(1)(i) (emphasis added).

Accordingly, "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16" because holding such a derivative security gives the holder the right to acquire the underlying shares. *Levy*, 263 F.3d at 16; *see, e.g., Goldman Sachs Grp., Inc.*, 740 F.3d at 870 (quoting Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 34–28869, 56 Fed. Reg. 7242, 7248 (Feb. 21, 1991)).

Plaintiff alleges that the shares underlying the Derivative Securities held by Defendants, together with any common stock the Defendants held outright exceeded 10% of BBBY's shares outstanding from February 7 to April 17, 2023. Compl. ¶ 114–15, 117–18. As such, accepting that allegation as true, without a valid blocker in place, Plaintiff would state a plausible claim that Defendants were "beneficial owners" of more than 10% outstanding BBBY common stock and thus were statutory insiders subject to the restrictions on short swing transactions in Section 16(b).

### B. Plaintiff Has Not Plausibly Alleged that the Relevant Blocker Provisions are Illusory

A conversion cap, or "blocker," is a permissible way of avoiding Section 16(b) liability. *Levy v. Southbrook Intern. Inv. Ltd.*, 263 F.3d 10, 12 (2d Cir. 2001); *Roth v. Solus Alternative Asset Mgmt. LP*, 124 F. Supp. 3d 315, 321 (S.D.N.Y. 2015) ("*Roth I*"). Indeed, the *Amici* professors correctly point out, "binding Second Circuit precedent has enforced blockers like any other contract." *Amicus* Brief at 2; *see e.g.*, *Roth v. Armistice Cap., LLC*, No. 24-950, 2025 WL 2471028, at *4 (2d Cir. Aug. 28, 2025); *Levy*, 263 F.3d at 12. In *Levy*, the Second Circuit held that, for the purposes of determining whether a defendant is a Section 16(b) statutory insider, "where a binding conversion cap denies an investor the right to acquire more than 10% of the underlying equity securities of an issuer, at any one time, the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities." *See Levy*, 263 F.3d at 12.

The *Amici* professors are not correct, however, that "[t]he question here is whether [Section 16(b)] applies when contractual . . . 'conversion caps' or 'blockers' make it **contractually impossible** for the investor to beneficially own more than 10 percent of a company's securities." *Amicus* Brief at 2 (emphasis in the original). This statement presumes a dispositive issue—disputed here—and fails to address a second inquiry expressly contemplated by Second Circuit

precedent. Specifically, the Second Circuit makes clear in *Levy* that "[w]hen the limitations provided by [the blockers] are discovered to be illusory or a sham, they should be disregarded and the courts should analyze the case as though no such limitations existed." *Levy*, 263 F.3d at 17 n.5 (quoting Brief of the Securities and Exchange Commission, 2001 WL 34120374, at *25 (2d Cir. Mar. 23, 2001)).

Accordingly, the question here is whether Plaintiff plausibly alleges that the relevant blockers were illusory. Under *Levy*, as long as the blockers are valid and binding, Defendants cannot be deemed the beneficial owner of more than 9.99% of BBBY stock because they did not have "the right to acquire" more than 9.99% of BBBY common stock "within sixty days" of any conversion request. *Levy*, 263 F.3d at 16; *see also* 17 C.F.R. 240.13d–3(d)(1)(i) (an investor is a beneficial owner of shares "if that person has the *right to acquire* beneficial ownership of such security, . . . *within sixty days*") (emphasis added).

Plaintiff insists that the blockers here are not binding and should thus be disregarded entirely. *See, e.g.*, Compl. ¶¶ 154–56. In making its argument, Plaintiff relies on a list of non-exclusive factors set out in an *amicus* brief filed by the Securities and Exchange Commission (the "SEC") in *Levy* that are purportedly indicative of whether a conversion cap is binding. *See* Compl. ¶ 157 (citing Brief of the Securities and Exchange Commission, 2001 WL 34120374, at *25 (2d Cir. Mar. 23, 2001) (the "SEC *Amicus*")). The SEC *Amicus* states that factors that "may indicate that a conversion cap is *illusory* include whether the cap":

- is easily waivable by the parties (particularly the holder of the convertible securities);
- lacks an enforcement mechanism;
- has not been adhered to in practice; or
- can be avoided by transferring the securities to an affiliate of the holder.

It goes on to list factors that "may indicate that a cap is *binding*"—whether it:

16

- is provided in the certificate of designation or the issuer's governing instruments;
- reflects limitations established by another regulatory scheme applicable to the issuer; or
- is the product of bona fide negotiations between the parties."

*Id.* Defendants argue that the Court should not rely on such factors because the *Levy* court never expressly applied them. *See* Def. Mem. at 13 (citing an out-of-circuit case, *Klawonn v. YA Global Invs., L.P.*, 2011 WL 3502022, at *4 (D.N.J. Aug. 10, 2011)). Defendants argue that instead this Court should interpret the blocker "as a whole," analyzing the language of the contract, as the Levy court did. *Id.*

However, *Levy* repeatedly relies on the SEC interpretation of Section 16(b) in its *amicus* brief and determines that it is "bound by the SEC's interpretations of its regulations in its *amicus* briefs, unless they are plainly erroneous or inconsistent with the regulation[s]." *Levy*, 263 F.3d at 14, 15–16 (quoting *Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 128 (2d Cir. 2000)). This Court may not necessarily be *bound* by an *amicus* submission filed in a different case. Indeed, the Second Circuit opinions that noted that the Second Circuit is bound by interpretations of regulations in SEC *amicus* briefs, were referring to *amicus* briefs filed in those cases. *See Levy*, 263 F.3d at 14; *Quick & Reilly,* 218 F.3d at 128 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (finding Secretary of Labor's *amicus* brief filed in that case was controlling unless "plainly erroneous")). The SEC has not filed an *amicus* brief in this case.[5] However, considering the dearth of case law in this Circuit on the issue of sham or illusory blockers, in addition of course to textual analysis of the contract, the Court will employ the SEC factors to the extent they are persuasive and applicable, as other courts in this district have done. *See Roth on behalf of YRC Worldwide, Inc. v. Solus*

---

[5] Moreover, the general requirement that courts defer to agency interpretations, which was in place when *Levy* was decided, has since been overruled. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024).

*Alternative Asset, Mgmt. LP*, 258 F. Supp. 3d 364, 370 (S.D.N.Y. 2017) ("*Roth II*"); *Roth I*, 124 F. Supp. 3d at 325; *see also Loper Bright*, 603 U.S. at 386 (holding that the government's longstanding interpretation can be an "interpretive aid").

*Levy* itself remains controlling, and the Court is not convinced that the SEC's "non-exclusive" list of potential factors conflicts with the *Levy* opinion. Rather, *Levy* appears to have applied some of the above factors, assessing: (1) whether the blocker provision was easily waivable by the investor; (2) whether the cap had been adhered to in practice, noting that Plaintiff did not claim that the defendants "ever exceeded the conversion cap"; and (3) whether the parties had a means of enforcing the clause or "ensuring compliance with the cap" by granting the Defendant the ability to revoke a requested conversion to the extent that it would exceed the cap. *Levy*, 263 F.3d at 12, 18.

In any event, employing the SEC factors, as Plaintiff urges the Court to do, Plaintiff fails to plausibly allege that the subject blockers are a sham. Without plausibly alleging that the blockers were illusory, Plaintiff's arguments that Defendants maintained beneficial ownership over the common stock underlying their Derivative Securities fail. *See* Compl. ¶¶ 271–315. Plaintiff's arguments fail because, as explained above, the Second Circuit has clearly held that, "where a *binding* conversion cap denies an investor the right to acquire more than 10% of the underlying equity securities of an issuer, at any one time, the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities." *Levy*, 263 F.3d at 12 (emphasis added).

  **i.**  ***The Text of the Subject Blockers Deny Investors the Right to Acquire More than 10% of the Underlying Equity Securities***

The blockers here expressly limit beneficial ownership of the underlying common stock in excess of 9.99% by (1) prohibiting BBBY from "effect[ing] the conversion" or "effect[ing] the

exercise" of Series A or Common Warrants that would result in the derivative security holder "beneficially owning in excess of 9.99% . . . of the shares of Common Stock outstanding immediately after giving effect to such" conversion or exercise and (2) stating that the holder of the derivative security "shall not have the right" to any such conversion or exercise.  Compl. ¶¶ 129, 130.  The blockers specified that, in the event shares were issued to an investor which made the investor an owner of more than 9.99% outstanding common stock, those shares issued in excess would be deemed "null and void and treated as if never made." Certificate of Amendment § 4(d); Common Warrant § 1(f).  Further, the blockers provided that Hudson Bay "shall not have the power to vote or transfer" shares issued above 9.99%.  *See* Certificate of Amendment § 4(d); Common Warrant § 1(f).  Finally, the blockers state, "[f]or purposes of clarity," that any shares of common stock "issuable" under the Common Warrant or Series A "in excess of [9.99%] shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act."  *See* Certificate of Amendment § 4(d); Common Warrant § 1(f).

Similar to the cases cited by Defendants—in which courts found that blockers were binding and thus defendants were not beneficial owners of over 10% of a company's stock—the blockers in this case are "clear prohibition[s]" on derivative security holders' right to acquire more than 9.99% of BBBY's common stock.  *See Levy*, 263 F.3d at 18; *see Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 448  (S.D.N.Y. 2001) (blocker was "clearly written and enforceable as a matter of law"); *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC,* 115 F. Supp. 2d 440, 443 (S.D.N.Y. 2000) (allegations that defendant was a 10% beneficial owner were "insufficient as a matter of law" due to a binding blocker); *Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99-civ-342 (DLC), 1999 WL 544708, at *16 (S.D.N.Y. July 27, 1999) (holding that a holder of derivative securities was not a beneficial owner of the underlying common

stock when a blocker prevented its purchase of common stock such that it would own more than 4.999% of the outstanding shares of common stock).

As such, if the cap is binding, "the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those [underlying] equity securities." *Levy*, 263 F.3d at 12. The blockers at issue here confirm that the parties have agreed the investors do not beneficially own the common stock underlying the Derivative Securities. Specifically, as Plaintiff's own pleading makes clear, the parties specifically agreed that, "[f]or purposes of clarity, the shares of Common Stock issuable to a Holder pursuant to the terms of this Certificate of Amendment [or Warrant] in excess of the Maximum Percentage shall not be deemed to be beneficially owned by such Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act." Compl. ¶¶ 129, 130.

Cases in this district involving blockers which denied motions to dismiss the Section 16(b) claims are factually distinct from this case in that the "so-called blockers" in those cases did not clearly prohibit defendants from becoming beneficial owners in excess of ten percent. *See Greenberg v. Hudson Bay Master Fund Ltd.,* No. 14c-v-5226 (DLC), 2015 WL 2212215, at *6– *7 (S.D.N.Y. May 12, 2015) (Plaintiff plausibly alleged Defendants were a "shareholder group" sharing a common objective and the court held that the subject blocker did not prohibit beneficial ownership by a shareholder group); *see Roth I*, 124 F. Supp. 3d at 325 (explaining that the purported blocker was "not really a 'blocker' at all," and, instead, was "one-time divestment mechanism," since it was agreed between the parties after the investor had already accrued more than 10% beneficial ownership and since, "rather than preventing [the investor] from attaining insider status . . . purport[ed] to eliminate it.").

Indeed, Plaintiff does not argue that the blockers were do not prohibit ownership greater than 9.99%. Rather, Plaintiff here argues that several other *Levy* SEC factors weigh in favor of a finding that the blockers were illusory, including importantly that blockers were not adhered to in practice. *See* Compl. ¶¶ 157-159; Pl. Opp. at 12–22 (citing Brief of the Securities and Exchange Commission, 2001 WL 34120374, at *25); *see also Roth II*, 258 F. Supp. 3d at 370 (analyzing the *Levy* SEC factors); *Roth I*, 124 F. Supp. 3d at 325 (same). Plaintiff's arguments are unavailing.

### ii.        The Blockers Were Not Easily Waivable by the Parties

Plaintiff emphasizes that the *Levy* SEC *Amicus* states that a blocker may be "illusory" when a conversion cap "is easily waivable by the parties (particularly the holder of the convertible securities)." *See* Pl. Opp. at 14–16; SEC *Amicus*, 2001 WL 34120374, at *25. However, Plaintiff has not plausibly established that the parties could have easily waived the blocker provision.

First, Plaintiff asserts that Defendants could elect to lift the 9.99% cap in both blockers "whenever it wanted." Compl. ¶ 131. This allegation is directly in conflict with a part of the text of the blockers which is omitted from the Complaint but appears in the attached exhibits. *Compare* Compl. ¶ 131 *with* Certificate of Amendment § 4(d); Common Warrant § 1(f). Each blocker states: "Upon delivery of a written notice to the Company, any Holder may from time to time increase . . . or decrease the Maximum Percentage of such Holder to any other percentage *not in excess of 9.99%* as specified in such notice;" provided certain requirements are met. Certificate of Amendment § 4(d); *accord* Common Warrant § 1(f) (emphasis added). In light of the clear text of the blockers, which is set forth in attachments to the complaint, the Court is not required to credit Plaintiff's conclusory allegation that the blockers gave Defendants the "unilateral right" to lift the cap, *see* Compl. ¶ 131 ; *see L-7 Designs, Inc.*, 647 F.3d at 422.

21

Second, Plaintiff argues that the blocker in the Common Warrants could be freely waived because the parties could agree to amend the terms of the Common Warrants which were "purely contractual." Compl. ¶ 162. Plaintiff suggests that the blocker governing the Common Warrant derivatives, which is included in the warrant itself—a contract between parties—is more easily waivable than the Series A blocker, which is "enshrined in BBBY's certificate of incorporation." Compl. ¶ 162. Apparently conceding that the blockers governing the Series A derivative securities were not easily waivable, this argument also fails to establish the Common Warrant blockers were easily waivable.

It is nonsensical to assert that simply because parties could amend a contract, that the contract's provision are "easily waivable" such that they are illusory. *See generally Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684, 49 N.Y.S.3d 65, 71 N.E.3d 556 (N.Y. 2017) (an "illusory contract" is "an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation."). Further, the Second Circuit and courts in this district have found that blockers were binding when included in contracts between the security issuer and the security holder, rather than in the issuer's certificate of incorporation. *See Levy*, 263 F.3d at 11, 18 (binding blocker in a Convertible Preferred Stock Purchase Agreement between the parties); *Roth II*, 258 F. Supp. 3d at 367 (binding conversion waiver in a Stock Purchase Agreement between the parties).

Regardless, Plaintiff's argument that a blocker is easily waivable when it is amendable is irrelevant because both the Common Warrant and the Certificate of Amendment governing Series A expressly prohibit amendment of the blocker provisions. *See* Certificate of Amendment § 30(b) ("Amendment. Except for Section 4(d) [the blocker], which may not be amended or waived hereunder, this Certificate of Amendment or any provision hereof may be amended . . . .");

22

Certificate of Amendment § 4(d) ("[t]he limitation contained in this paragraph may not be waived and shall apply to a successor holder" of the security); Common Warrant § 11 ("AMENDMENT AND WAIVER. Except as otherwise provided herein, the provisions of this Warrant (other than Section 1(f) [the blocker]) may be amended . . . ."). Accordingly, Plaintiff has not plausibly alleged that the Blockers here are easily waivable by the parties.

### iii.    The Blockers Included Enforcement Mechanisms

As indicated above, one of the SEC factors that the *Levy* court considered in determining that a blocker was binding was that it "provid[ed] a means of ensuring compliance." *Levy*, 263 F.3d at 18. The blockers here likewise provided enforcement mechanisms. In particular, both blockers expressly require that "[t]he Company shall not effect the conversion [or exercise]" of any shares that would exceed the conversion cap. Certificate of Amendment § 4(d); Common Warrant § 1(f). Further, both blockers provide that any shares improperly issued over the conversion cap will be deemed "null," "void," and "cancelled ab initio." Certificate of Amendment § 4(d); Common Warrant § 1(f). The blockers further make clear that if shares were issued over the conversion cap, Defendants would "not have the power to vote or transfer" those shares, which would "not be deemed to be beneficially owned" by Defendants. *See* Certificate of Amendment § 4(d); Common Warrant § 1(f). The elimination of any power to vote or transfer shares above the 9.99% threshold, or in effect act with the outsized power of an insider, is fully consistent with the goal of Section 16(b) "to deter insiders from taking unfair advantage of confidential company information to realize short-swing profits on trades in the company's stock." *Greenberg*, 2015 WL 2212215, at *4 (quoting *Morales,* 249 F.3d at 121).

Additionally, the Certificate of Amendment governing Series A derivative securities provides:

> If after the Company's receipt of a Conversion Notice from a
> Holder, the Company or such Holder determines, in good faith, that
> the issuance of shares of Common Stock to such Holder in
> accordance therewith would result in the Holder (together with the
> other Attribution Parties) exceeding the Maximum Percentage (such
> excess number of shares of Common Stock, the 'Blocked Shares'),
> such party shall notify the other party and any Blocked Shares shall
> be held in abeyance until such time as the delivery of such Blocked
> Shares would not result in such Holder and the other Attribution
> Parties exceeding the Maximum Percentage . . . .

Certificate of Amendment § 4(d). *Levy* held that a blocker with a similar enforcement mechanism

was not easily waived by a derivative security holder when it allowed, but did not require, the

derivative holder to revoke its conversion request if such a request would result in the holder

exceeding the conversion cap. *Levy*, 263 F.3d at 17–18. Rather than find the blocker illusory,

*Levy* held that the holder's option to revoke a conversion request in those circumstances was a

"means of ensuring compliance with the cap." *Id.* at 18. Here, for the Series A securities, there

exists an even stronger enforcement mechanism that requires the investor to notify the issuer of

common stock of any stock issued above the 9.99% threshold. Accordingly, the blockers did by

their express terms include enforcement mechanisms.

   In support of its argument that there were no valid enforcement mechanisms for the

blockers, Plaintiff first argues that the above-described enforcement mechanisms were ineffectual

because BBBY lacked the will to enforce the blockers. Compl. ¶¶ 171, 173–78; Pl. Opp. at 16.

Plaintiff speculates that "[i]f someone wanted to acquire more than 9.99% of BBBY's common

stock, management would have been thrilled." Compl. ¶ 171. Plaintiff further asserts that "the

blockers were only there to keep the Hudson Bay Defendants happy," BBBY "did not care whether

[the blockers] were enforced, modified, or terminated," and thus, BBBY lacked any will to enforce

the blockers. Compl. ¶¶ 168, 177–78. Plaintiff cites no authority supporting the assertion that a

lack of interest in enforcement renders a blocker illusory. Further, the proper analysis clearly

focuses on whether enforcement mechanisms were included in the text of the blockers, not whether the issuer was interested in using them. *See See Levy*, 263 F.3d at 17–18; SEC *Amicus* at *25.

Plaintiff next argues that BBBY had no way to determine whether derivative holders' conversion requests would make them over 9.99% beneficial owners, and so, according to Plaintiff, that it lacked the ability to enforce the conversion cap.  Compl. ¶¶ 171, 173–90; Pl. Opp. at 16–17.  Specifically, Plaintiff asserts that, as derivative holders, Defendants had no duty to quantify their beneficial ownership when they delivered a conversion or exercise request to BBBY and BBBY never received any "end of the trading day" tally. Compl. ¶¶ 182, 183. Defendants, however, were required to affirm in each conversion or exercise request that the acquisition effected thereby would not make the Defendants beneficial owners of more than 9.99% of BBBY's common stock. Compl. ¶ 186. [6]

Next, Plaintiff points to the February 6 Letter which stated that the forms of conversion and exercise notices "set forth the totality of the procedures required of the Investor in order to exercise the Preferred Warrants or the Common Warrants or convert the Preferred Shares" and that no "other information . . . shall be required of [Defendants] to exercise their Preferred Warrants or Common Warrants or convert their Preferred Shares." Compl. ¶ 186; February 6 Letter § 2(n). As such, Plaintiff argues BBBY had no means to determine how much common stock Defendants continued to beneficially own and thus whether the pending conversion or exercise request would put them over the conversion cap.

BBBY's inability to assess on its own whether derivative holders' requests could breach the conversion cap may have inhibited BBBY's ability to enforce the cap.  However, the Second

---

[6] *See also* Certificate of Amendment § 4(c)(i) (requiring investor to use form Series A Conversion Notice to convert common stock shares); Common Warrant § 1(a) (requiring investor to use form Common Warrant Exercise Notice to request common stock shares); Series A Conversion Notice (including affirmance of compliance with blocker); Common Warrant Exercise Notice (same).

Circuit's opinion in *Levy* makes clear that an issuer need not have an independent ability to enforce a conversion cap for a blocker to be binding.  The *Levy* Court affirmed an opinion granting a motion to dismiss, finding a blocker was binding where the duty of enforcement rested entirely with the derivative holder.  *See Levy*, 263 F.3d at 17–18 (holding that the holder's option to revoke a conversion request when such a request would result in the holder exceeding the conversion cap was a "means of ensuring compliance with the cap.").[7]  Considering this precedent, Plaintiff's own Complaint, and the documents attached to it make clear that the blockers here included enforcement mechanisms that weigh in favor of concluding that the blockers were binding rather than illusory.

> **iv.   Plaintiff Has Not Plausibly Alleged That the Blockers Were Not Adhered to in Practice**

As noted above, in *Levy*, the Second Circuit reasoned that a blocker was binding in part because there was "no claim" that the defendant had "exceeded the conversion cap."  *Levy*, 263 F.3d at 12.  Here, by contrast, Plaintiff argues that Defendants did not adhere to the blockers in practice.  In particular, Plaintiff asserts that Defendants they beneficially owned more than 9.99% of outstanding BBBY stock on February 7, February 8, February 9, and March 21, 2023, *see* Compl. ¶¶ 258–61, Plaintiff's own allegations contradict that assertion.  However, Plaintiff's own specific allegations contradict Plaintiff's argument.  *See L-7 Designs, Inc.*, 647 F.3d at 422.

Plaintiff argues that Defendants' pending conversion and exercise requests gave them the right to acquire beneficial ownership of more than 9.99% of BBBY's common stock from

---

[7] Here, by Plaintiff's own allegations, the Certificate of Amendment and the Common Warrant clearly place on Defendants, a duty to affirm compliance with the blockers when requesting common stock. Compl. ¶ 186; Certificate of Amendment § 4(c)(i) (requiring investor to use form Series A Conversion Notice to convert common stock shares); Common Warrant § 1(a) (requiring investor to use form Common Warrant Exercise Notice to request common stock shares); Series A Conversion Notice (including affirmance of compliance with blocker); Common Warrant Exercise Notice (same). Moreover, at least for Series A securities, the investor was required to notify the issuer if any common shares were issued in excess of 9.99% and hold such shares in abeyance. *See* Certificate of Amendment § 4(d).

approximately 9:45 a.m. on February 7, 2023 until about 2 p.m., on February 10, 2023, and then again from about 4:25 p.m. on March 20, 2023 until the early afternoon of March 22, 2023.  Compl. ¶ 263.  Central to these allegations is the premise that upon submitting conversion and exercise requests on those days, Defendants had the "right to acquire" any shares requested and thus immediately became the beneficial owner of the common stock shares they requested.  Compl. ¶¶ 254–57.  Indeed, pursuant to Rule 13d–3 any investor is "deemed" to be the beneficial owner of a security "if that person has the *right to acquire* beneficial ownership of such security, . . . within sixty days."  *See* 17 C.F.R. 240.13d–3(d)(1)(i) (emphasis added).

However, the blocker provision terms clearly denied Defendants the right to the issuance of any shares that would make them beneficial owners of more than 9.99%. Compl. ¶¶ 129–30. The blockers specifically instruct that "[t]he Company shall not effect" the conversion or exercise of any derivative security and the "Holder *shall not have the right* to convert [or exercise] any of" the Derivative Securities that would grant Defendants over 9.99% of the common stock outstanding.  Compl. ¶¶ 129–30 (emphasis added).  Accordingly, if the requests Plaintiff made on February 7, February 8, February 9, and March 21, 2023 would have caused Defendants to exceed the conversion cap, as Plaintiff alleges, by operation of the clear terms of the blocker provisions, they did not have had a "right to acquire" the common stock shares requested.

Plaintiff asserts that the February 6 Letter extinguished the 9.99% outstanding common stock limitation because it required BBBY to issue shares "in such amounts as specified by" Defendants and accordingly required BBBY to issue shares that would exceed the blocker cap if Defendants so requested.  *See* Pl. Opp. at 1, 21 n.9 (citing February 6 Letter § 3(b)); Compl. ¶ 184. However, the February 6 Letter does not state that it works to eliminate the conversion caps on the Defendants' Derivative Securities.  In fact, the February 6 Letter explicitly required BBBY and

Defendants to "honor" exercises of the Derivative Securities "in accordance with" the "conditions" and "terms" of the documents containing the blockers. *See* February 6 Letter § 2(n) ("The Company shall honor exercises of the Preferred Warrants and Common Warrants and conversions of the Preferred Shares . . . in accordance with the terms, conditions and time periods set forth in the Certificate of Amendment, Preferred Warrants and Common Warrants, respectively."). The February 6 Letter includes an "Entire Agreement" provision which outlines the agreements that the February 6 Letter is intended to supersede. *Id.* § 4(e). Rather than stating that the February 6 Letter supersedes any part of the Certificate of Amendment or the Common Warrants that include the blockers, the provision states that:

> This Agreement [the February 6 Letter], the other Transaction Documents [defined as the Certificate of Amendment, the Preferred Warrants and the Common Warrants] and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein supersede all other prior oral or written agreements between the Investor [and] the Company, . . . [and] contain the entire understanding of the parties solely with respect to the matters covered herein and therein.

*Id.* (emphasis added). Accordingly, the February 6 Letter was not written to supersede and extinguish the blockers in the Certificate of Amendment and the Common Warrants, but rather to work in conjunction with them.

Consequently, because it is directly contradicted by other allegations, the Court need not accept as true Plaintiff's assertions that on February 7, February 8, February 9, and March 21 Defendants had the "right to acquire" and thus were beneficial owners of the shares they requested on those days, if the requested shares were in fact in excess of 9.99% of the outstanding common stock. Compl. ¶¶ 237, 258–61. *See Levy*, 263 F.3d at 15 (explaining that the SEC *Amicus* counsels that "Rule 13d–3(d)(1)(i) speaks to the 'right,' not the 'ability' to acquire" and thus "the investor's 'right to acquire' stock is at all times subject to the conversion cap."); *L-7 Designs, Inc.*, 647 F.3d

28

at 422.  Plaintiff makes no allegation that on February 7, February 8, February 9, and March 21, Defendants in fact held shares that amounted to more than 10% of outstanding common stock.

Significantly, Defendants assert, and the Complaint concedes, that if the shares Defendants had already sold to third parties are deducted from Plaintiff's calculation of Defendants' beneficial ownership, Defendants would remain under 10% beneficial ownership of outstanding BBBY common stock. Compl. ¶¶ 186, 193, 201, 202, 209, 210 ("This incorrect accounting [of deducting sold shares] . . . served as the basis for the beneficial ownership representation included in each one of the scores of conversion and exercise requests submitted to BBBY by the Hudson Bay Defendants during that period [which represented that Defendants remained below the 10% threshold]"), 236, Ex. K ("Defendants' Advanced Sales Table"); Def. Mem. at 22–24; Def. Reply at 6–8.  According to relevant case law, the moment Defendants sold shares, they lost any dispositive power over those shares. *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 423 (1972) (contemplating that "a statutory insider might sell enough shares to bring his holdings below 10%" thus divesting themselves of beneficial ownership of shares through sale); *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 131 (2d Cir. 2018) (same); *Goldman Sachs Grp., Inc.*, 740 F.3d at 874 (same).

In fact, Defendants' approach of selling common stock before requesting additional shares in order to remain below the conversion cap is specifically condoned by the Second Circuit in *Levy.*  The *Levy* Court states that: "Only when the investor divests itself of sufficient shares of common stock to reduce holdings below the cap does any additional 'right to acquire' come into being . . . . At that point the investor does not have voting power, investment power, or the 'right to acquire' those powers, with respect to the divested shares."  *Levy*, 263 F.3d at 15 (citation omitted).

Plaintiff argues that Defendants retained dispositive power over shares even after they were sold because Defendants retained the "dispositive" power to request those shares in conversion and exercise requests, direct Plaintiff to send those shares to Defendants' brokerage account, and then send those shares to third parties that had previously purchased the shares. *See* Pl. Opp. at 21 ("Once Hudson Bay received those shares [that it had requested], it exercised the power to dispose of them by delivering them to its buyers to close out its sales.").  However, once Defendants sold BBBY common stock to a third-party buyer, that buyer became the owner of the shares, and Defendants were restrained in their actions regardless of the physical location of the shares and Defendants were required to deliver the shares to the buyer. *See Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 651–52 (S.D.N.Y. 2022) ("sale" is completed when "the investors' rights [become] fixed and irrevocable," and "technicalities" like "[s]ettlement of the contracts or delivery of the shares" are "of no import" to determine when a sale occurs "for Section 16(b) purposes") (citation omitted); *see also Connell v. Johnson*, 2020 WL 2748439, at *2 (S.D.N.Y. May 27, 2020) ("the critical moment in the initial 'purchase' or 'sale,' for the purpose of determining when that transaction occurred within the meaning of § 16(b), is that point at which the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to speculative advantage by the investor.").  Accordingly, Defendants could not instead decide to vote the shares already sold or dispose of them differently by selling them for a second time to another buyer.  In sum, those shares already sold should not be counted toward Defendants' beneficial ownership.

Plaintiff has pointed to only one case supporting its assertion that beneficial ownership of securities for purposes of Section 13(d), and thus Section 16(b), does not terminate when the securities are sold. *See* Pl. Opp. at 20 (citing *Chechele v. Standard Gen. L.P.*, No. 20-civ-3177

(KPF), 2021 WL 2853438, at *6–*7 (S.D.N.Y. July 8, 2021)). While this case held that an investor remained a beneficial owner after the sale of shares, it is factually distinguishable because there, the investor retained residual power to vote and did in fact vote its shares at a stockholder meeting. *Id.* at 7. The case did not find that the seller maintained any dispositive power over the sold shares, *see id,* and Plaintiff does not argue that Defendants retained residual voting power here. *See* Pl. Opp. Indeed, under the terms of the blockers, if Defendants beneficially owned more than 9.99% of outstanding common stock, they had no "power to vote or transfer" the stock issued in excess of the cap. *See* Certificate of Amendment § 4(d); Common Warrant § 1(f). Accordingly, it is unclear how Defendants could have asserted more than 9.99% voting power despite the blockers in place. *See* Certificate of Amendment § 4(d); Common Warrant § 1(f) (both blockers provide that derivative holders would "not have the power to vote or transfer" any shares issued that exceeded the 9.99% conversion cap as they would "not be deemed to be beneficially owned" by the holders). Plaintiff also cites a Second Circuit case for the uncontroversial proposition that an investor has beneficial ownership when it has the "power to dispose of a block of securities." Pl. Opp. at 21 (quoting *Wellman v. Dickinson*, 682 F.2d 355, 365 (2d Cir. 1982)). That case merely holds that voting power is not the only measure of beneficial ownership, and it does not support Plaintiff's claim that Defendants retained dispositive power over sold shares. *See Wellman*, 682 F.2d at 365–66.

Beneficial ownership "does not turn on who owns legal title to the stock, or who is the registered owner" but "instead . . . focuses on any relationship that, as a factual matter, confers on a person a significant ability to affect how voting power or investment power will be exercised," *Chechele*, 2021 WL 2853438, at *6 (quoting *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993)). Here, Defendants had no ability to affect voting or investment power

over shares they had already sold. Accordingly, those shares should not be counted toward Defendants' beneficial ownership percentage and Plaintiff has not plausibly alleged that Defendants did not adhere to the relevant 9.99% conversion caps.[8]

In sum, BBBY's allegations do not amount to a plausible claim for relief on the theory that the blocker provisions were illusory or a sham. Thus, Plaintiff does not plausibly allege that Defendants beneficially owned the common stock underlying the Derivative Securities they held such that Defendants were over 10% beneficial owners of outstanding BBBY common stock while executing conversions and sales of the stock within a six-month period. Accordingly, Defendants' motion to dismiss is granted.

## II.  **Motion to Seal**

Plaintiff moves unopposed to file its Opposition to the pending motion to dismiss under seal and file a public version with few redactions. [ECF Nos. 35 ("Mot. to Seal Opp.")]; *see also* [ECF No. 38 ("Pl. Opp." or "Opposition")]. As described above, Plaintiff initiated this case as a miscellaneous action by filing a motion for leave to file a complaint under seal with a redacted version on the public docket. *See* Motion to Seal, *20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, No. 24-mc-206-JGK [ECF No. 1] (S.D.N.Y. Apr. 30, 2024). Plaintiff received the redacted information from Defendants pursuant to a Confidentiality Agreement in a separate lawsuit and, commendably, in this lawsuit Plaintiff has sought to protect this information from disclosure. *See* Mot. to Seal Compl. at 3, *20230930-DK-Butterfly-1*, No. 24-mc-206-JGK [ECF No. 1–2 ("Mot. to Seal Compl.")] (S.D.N.Y. Apr. 29, 2024). Plaintiff states that the purpose of

---

[8] Plaintiff makes no argument regarding the final factor that may suggest a conversion cap is illusory, that it "can be avoided by transferring the securities to an affiliate of the holder." *See* SEC *Amicus*, 2001 WL 34120374, at *25. Plaintiff's arguments regarding the remaining SEC *Amicus* factors are not persuasive because the SEC stated only that they "may indicate that a cap is binding." Pl. Opp. at 12–16. It does not follow, and the SEC never indicated, that the absence of those factors suggests a conversion cap was illusory.

sealing and redacting the Complaint was to protect from public disclosure, information regarding Defendants' terms and timing of their sales of BBBY's securities which Plaintiff alleges would reveal proprietary information about their trading strategies and harm the Defendants if disclosed. *See* Mot. to Seal Compl. at 5; Mot. to Seal Opp.[9]  The judge temporarily presiding over the case in Part One granted the motion to file the Complaint under seal.  *See* Order, *20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, No. 24-mc-206-JGK [ECF No. 4] (S.D.N.Y. Apr. 30, 2024).  Plaintiff argues that since the briefing of the pending motion to dismiss does not seek to redact any information that was not already redacted from the publicly filed version of the Complaint, the same analysis applies, and the Court should grant the motion to seal.  *See* Mot. to Seal Opp.

In assessing whether sealing is appropriate, the Court considers (1) whether the documents at issue are "judicial documents"; (2) if so, the weight of the presumption of public access attaching to any such document; and (3) whether any countervailing factors outweigh the right of public access.  *See e.g.*, *In re IBM Arb. Agreement Litig.*, 76 F.4th 74, 85 (2d Cir. 2023), *cert. denied sub nom. Abelar v. Int'l Bus. Machines Corp.*, 144 S. Ct. 827, 218 L. Ed. 2d 33 (2024); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006).

Plaintiff's Opposition and the Complaint are both judicial documents because they are "relevant to the performance of the judicial function and useful in the judicial process."  *See In re IBM Arb. Agreement Litig.*, 76 F.4th at 85 (quoting *Olson v. Major League Baseball*, 29 F.4th 59, 87 (2d Cir. 2022)). The presumption of public access is strong to the extent that this Court relied on the Complaint and the Opposition to rule on the motion to dismiss.  *See Olson,* 29 F.4th at 89–

---

[9] Defendants have filed no motion seeking protection of their own information and included only a statement in Plaintiff's initial motion to seal that they "do not oppose BBBY's requested relief, as it concerns nonpublic and sensitive information." *See* Mot. to Seal Compl. at 1 n.1.

90 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("*Amodeo II*")) (holding that the "strongest presumption attaches where the documents 'determin[e] litigants' substantive rights.' "); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 142 (2d Cir. 2016) (finding that the presumption is "at its zenith" where documents "directly affect an adjudication, or are used to determine litigants' substantive legal rights" (internal quotation marks and citation omitted)).  However, to the extent those redacted allegations—and the corresponding redacted statements in the Opposition—were irrelevant to the Court's analysis, they are afforded a much weaker presumption of public access.  *See, e.g.*, *Maragh v. Roosevelt Island Operating Corp.*, No. 21-2129, 2022 WL 14199384, at *2 (2d Cir. Oct. 25, 2022) (quoting *Amodeo II*, 71 F.3d at 1050) (holding that the sealed material at issue played only a "negligible role" in the district court's decision and thus the presumption of public access was weak); *see also In re IBM Arb. Agreement Litig.*, 76 F.4th at 85 ("[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.").

This opinion relies on and cites primarily unredacted allegations from the Complaint, exhibits not under seal, and portions of the parties' briefing on the motion to dismiss that are not redacted.  Accordingly, the Court holds in accordance with the prior ruling allowing redactions in the Complaint that, to the extent redacted material is not disclosed in this Opinion, BBBY's privacy interests in its proprietary information outweigh the presumption of public access to the Opposition. *See, e.g.*, *Riseandshine Corp. v. PepsiCo Inc.*, No. 21-civ-6324 (LGS), 2024 WL 3290416, at *2 (S.D.N.Y. July 2, 2024) (granting motion to seal non-public financial information relating to companies' internal strategies); *W.J. Deutsch & Sons Ltd. v. Diego Zamora, S.A.*, No. 1:21-civ-11003-LTS, 2022 WL 890184, at *3 (S.D.N.Y. Mar. 25, 2022) (granting motion to seal

"confidential business information that is not publicly known" where the movant demonstrated that disclosure would "subject them to a competitive disadvantage"); *see also METAx LLC v. Meta Platforms, Inc.*, No. 1:22-civ-06125-LLS, 2025 WL 2753233, at *4 (S.D.N.Y. Sept. 26, 2025) ("[C]ourts have consistently found that confidential commercial information of a business—including confidential research, internal business documents and information about a business's operations[—]are the proper subject of sealing."). Accordingly, Plaintiff's motion is granted in part, and the Opposition may remain under seal with a redacted version filed on the public docket.

However, to the extent this Opinion does reveal redacted allegations in the Complaint or redacted statements from the Opposition, those allegations and statements are necessary to the Court's analysis and thus there is "no justification for sealing those materials that would outweigh the public's right of access to judicial documents necessary to understand the basis for [the Court's] rulings." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 193 n.2 (2d Cir. 2018); *see also Olson*, 29 F.4th at 89–90 (holding that "strongest presumption attaches where the documents 'determin[e] litigants' substantive rights' " and the presumption of public access is "bolstered by the fact that, . . . the public will be able to better understand and assess" the ruling of the Court if unsealed). Accordingly, as the Second Circuit held in *Spinelli* and as is a common practice of courts in this district, redacted portions of the Complaint and Opposition are unsealed only to the extent that they are revealed in this Opinion. *Spinelli*, 903 F.3d at 193 n.2; *see, e.g.*, *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 316 (S.D.N.Y.), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 262 (S.D.N.Y. 2018).

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that the Defendants' motion to dismiss is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion to seal is GRANTED in part, with the caveat that redacted portions of the Complaint, and the Opposition are unsealed only to the extent that they are revealed in this Opinion.

The Court dismisses this case with prejudice.[10]   The Clerk of Court is respectfully requested to terminate docket entries 24 and 35 and close this case.

**SO ORDERED.**

**Date:   September 30, 2025**
        **New York, NY**

                                    **MARY KAY VYSKOCIL**
                                    **United States District Judge**

---

[10] The Court does not *sua sponte* grant Plaintiff leave to amend the Complaint.  First, Plaintiff was granted an opportunity to amend the Complaint in response to issues raised in Defendants' initial pre-motion letter requesting leave to file a motion to dismiss.  [ECF Nos. 17, 21].  Plaintiff declined to amend the complaint.  [ECF No. 22]. Second, Plaintiff did not request leave to amend in its opposition to the pending motion to dismiss and thus did not demonstrate to the Court that the opportunity to amend would not be futile.  *See, e.g.*, *Treiber v. Aspen Dental Mgmt., Inc.*, 635 F. App'x 1, 4 (2d Cir. 2016).